United States District Court
Southern District of Texas
FILED

FEB 18 2000

Michael N. Milby, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSEPH K. CONNOR | § § | |
| Plaintiff | § § | C-00-069 |
| vs. | § § | Civil Action No._____ |
| TEXAS A&M UNIVERSITY - KINGSVILLE; HUMBERTO GARCIA, Individually and in His Official Capacity; and ROBERT BAZAN, Individually and in His Official Capacity | § § § § § § | **JURY TRIAL REQUESTED** |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff, by and through counsel, and in support of his claims against the above-named Defendants respectfully states:

### NATURE OF THE ACTION

In this action, Plaintiff alleges violation of his rights pursuant to 42 U.S.C. §1983 and Title VII and the First Amendment to the United States Constitution. Plaintiff further alleges that Defendants discriminated against him in their disparate and different treatment of him based upon his race. Plaintiff also alleges that Defendants engaged in extensive illegal retaliation in response to his opposition to disparate and different treatment by Defendants. Plaintiff further alleges violation of his right to freedom of speech, violation of his rights to due process and due course of law and violation of his right to petition the government for redress of grievances. Plaintiff also brings this action under the Texas Commission on Human Rights Act.

### PARTIES

1. Plaintiff, Joseph Connor, a Anglo-male, resides at 6034 Sweet Gum, Corpus Christi,

Nueces County, Texas.

2. Defendant, Texas A&M University - Kingsville, is a higher-level state educational institution located in Kleberg County, Texas and service of process will be attempted by waiver pursuant to the Federal Rules of Civil Procedure.

3. Defendant, Humberto Garcia, a Hispanic male, resides in Kleberg Count, Texas and service of process will be attempted by waiver pursuant to the Federal Rules of Civil Procedure.

4. Defendant, Robert Bazan, a Hispanic male, resides in Kleberg County, Texas and service of process will be attempted by waiver pursuant to the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action by reason of 28 U.S.C. 1331 and 1343, in that Plaintiff, pursuant to Title VII, seeks to redress racial discrimination and retaliation for protected activity he experienced at the hands of defendants. The Court also has jurisdiction over Plaintiff's claims of racial discrimination brought pursuant to the Texas Commission on Human Rights Act. This Court has jurisdiction over this action by reason of 42 U.S.C. §1983, in that Plaintiff, pursuant to 28 U.S.C. §1343(3), seek redress for deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States of America. The Court has supplemental jurisdiction over Plaintiff's state law claims brought under the Texas Commission on Human Rights Act. Venue is proper pursuant to 28 U.S.C. §1391 because the acts complained of primarily occurred within the geographical boundaries of the United States District Court for the Southern District of Texas, Corpus Christi, Division.

## FACTS

6. Joseph K. Connor was employed with Texas A&M University - Kingsville in the

university police department. During Mr. Connor's employment, he received raises, was given positive appraisals and was honored as the Officer of the Year during his tenure. Plaintiff was illegally terminated on June 4, 1999.

7. Plaintiff's traffic ticket book was taken away from him after a complaint by a Hispanic student. Other non-Anglo officers' traffic ticket books were not taken away after similar complaints were lodged against them. After Plaintiff spoke to his supervisor about this and cited the Code of Criminal Procedure, his traffic ticket book was returned.

8. In February 1997, it was declared that the policy manual for the university police department was not valid by Humberto Garcia. At the time of Plaintiff's termination, there was still no valid policy manual for the university police department.

9. The official shift for the university police department was from 8:00 a.m. to 4:00 p.m. However, non-Anglo officers were not disciplined for coming in late or leaving early. Anglo officers were disciplined for similar conduct. Plaintiff would call to notify his employer that he was running late coming onto the shift, he was told by Sargent Bazan, a Hispanic male, "If you are late, don't come in."

10. Plaintiff requested leave two months in advance. Sargent Bazan returned the leave request to Plaintiff and told him it was too far in advance to request leave. Plaintiff placed the leave form back in his own box to wait to submit the form again at a later date to Sargent Bazan. Sargent Bazan took the leave form and tore it up. When Plaintiff learned of this, he informed Chief Garcia. This had never happened before to anyone else in the university police department.

11. Plaintiff had jury duty. Plaintiff was informed that he had to work also on that day. Hispanic officers who had jury duty did not have to show up to work on the day of their jury duty.

12. Plaintiff was continually harassed by Sargent Quinones, a Hispanic male. Sargent Quinones was promoted over Plaintiff and Archie Glaspell, both Anglo males. Plaintiff had written up Sargent Quinones for the following: harassment; drinking on the job; drinking in an official vehicle (patrol unit). Plaintiff also had on numerous occasions verbally voiced his concerns about Sargent Quinones drinking and driving to his residence in a university vehicle. Plaintiff voiced these concerns to Chief Garcia.

13. It was common for patrol officers to go off campus in a patrol unit for various reasons. If an Anglo officers, including Plaintiff, went off campus in a patrol car, they were followed. However, if a Hispanic officers went off campus in a patrol car, nothing happened. There was no written policy regarding this issue.

14. Plaintiff was treated disparately in regard to vacation and leave. Sargent Bazan and Sargent Longoria told Plaintiff that he was to use his leave immediately. However, they allowed a Hispanic dispatcher to use his leave as he needed it -- contrary to what Plaintiff was told.

15. Chris Florence, an Anglo officer, notified Sargent Perez that there were problems with Plaintiff's officer's radio. Nothing was done immediately by Defendants to repair Plaintiff's radio. After several verbal complaints by both Plaintiff and Chris Florence, new batteries were installed in the radio. Plaintiff's radio was important and necessary for safety purposes and for the proper execution of his job.

16. Plaintiff voiced his concerns and opinions about safety and university police department lack of procedures. Plaintiff was retaliated against for voicing his concerns and opinions.

17. Sargent Bazan told Plaintiff that "as long he was a supervisor at the university police department, he would never make supervisor." Chief Garcia made this same statement to Sargent

4

Bazan in front of Chris Florence in reference to Plaintiff.

18. Plaintiff requested that he train officers in first aid and CPR. Chief Garcia refused Plaintiff's request.

19. In 1998, Sargent Franco, a Hispanic male, was promoted over Plaintiff. Sargent Franco had less time in employment with Defendant and Sargent Franco had fewer qualifications. Further, Sargent Franco was made the fire arms instructor even though he had never been to school for such training.

20. Plaintiff was told by Chief Garcia that he would be sent to fire arms instructor school. However, a Hispanic male was sent in Plaintiff's place.

21. Sargent Longoria and Sargent Bazan were on the promotion board. However, this board had no policies and procedures. During the course of Plaintiff's employment, he was told on several occasions by both Sargent Longoria and Sargent Bazan that they would, in effect, make his job so difficult and oppressive that Plaintiff would quit. Plaintiff was further told by both Sargent Longoria and Sargent Bazan on numerous occasions, "If he didn't like, there is the door and don't let it hit your ass on the way out."

22. There was no promotion board prior to August 1998. Prior to August 1998, promotion decisions were made by the Chief. No standard or procedures were given for promotions within the department prior to the creation of the promotion board. Even after the creation of the promotion board, nothing changed in regard to failure to enact standards and procedures for promotions. There was no policy manual for the university police department.

23. In March 1999, a memo was circulated that all supervisors would be present at the promotion board. However, the promotion board met without all supervisors present.

5

24. Sargent Perez advised Plaintiff on October 26, 1998 that he felt Plaintiff had been discriminated against during the first meeting of the promotion board because no Anglo held the position of Sargent in over 15 years.

25. At all times during Plaintiff's employment with Defendants, he possessed the required qualifications for promotion as set out by the Texas A&M University System.

26. Plaintiff was injured during the course and scope of his employment with Defendants. Specifically, Plaintiff's hand was punctured during the pursuit of a criminal suspect. Plaintiff was chastised by his supervisors for receiving medical treatment for the wound.

27. Plaintiff was confronted by Chief Garcia about a conversation between Mr. Hartsfield and Plaintiff. Mr. Hartsfield had stopped Plaintiff and asked him several questions about the firing of Sargent Quinones. Plaintiff was accused by Chief Garcia of instigating a conversation with Mr. Hartsfield over the promotion of officers.

28. On several occasions throughout Plaintiff's employment with Defendants, Chief Garcia called Plaintiff a liar.

29. Defendants had placed false reports in other Anglo officers files.

30. Sargent Franco asked Plaintiff to change two criminal reports for content. However, Plaintiff voiced his opinion that this was not correct pursuant to criminal procedures used by the State of Texas in processing such reports. Plaintiff was never given any "write-ups" for this incident during his employment with Defendants. However, in October 1999, he learned that he had been written up for these two reports. At that time, Plaintiff learned that he was written up for alleged grammatical errors in the reports.

31. In August 1998, Plaintiff requested information about the promotion board from

Chief Garcia. However, Plaintiff never received this information.

32. During the first of September 1998, Plaintiff told Lieutenant Jefferson, a black female, that he was going to speak with EEOC about discrimination against him. Lieutenant Jefferson told Plaintiff, "Do you want me to drive you."

33. On October 1, 1998, Plaintiff went to the Corpus Christi Human Relations Office and met with an investigator regarding his claims of discrimination arising from his employment with Defendants. He provided a hand written complaint to the intake officers. Plaintiff's employers learned that Plaintiff had visited the "EEOC" office shortly after the promotion of Sargent Franco, which was September 1, 1998. Defendants also learned that Plaintiff had hired an attorney to assist him with his discrimination claims.

34. Subsequent to Defendants' learning of Plaintiff's actions in protecting his state and federal rights, Defendants stepped up their retaliation toward Plaintiff.

35. In October 1998, Plaintiff was refused "comp" leave which he had earned. However, Hispanic officers were allowed their "comp" leave for the same purposes.

36. Plaintiff's prior supervisory experience was not considered for his potential promotions.

37. In 1999, Plaintiff's traffic tickets were dismissed by Chief Garcia. Hispanic officer's tickets were not similarly dismissed.

38. The two persons promoted by the promotion board were both Hispanic and both had less time and experience than Plaintiff. The promotion board had no Anglos. The board consisted only of Hispanic males and one black female.

39. Plaintiff was pulled twice from a training course to interview before the promotion

7

board. Plaintiff was told that he must interview at those specific time or he would not be allowed to interview. The persons that interviewed for the same position were not similarly treated. The other persons that interviewed for that position were non Anglo. These persons were given proper, prior notice of their interviews and allowed leeway on their scheduling. Plaintiff was not notified until the day of the interview.

40.     Plaintiff was written up and received an official reprimand on April 24, 1999 for illegal search and seizure of property and non-marking of property items. Plaintiff contacted the District Attorney about the report. The District Attorney said the report was fine. Plaintiff alluded to this in his response to the reprimand. Plaintiff was called a "liar" by Chief Garcia when he reviewed Plaintiff's response with him.

41.     On May 5, 1999, Plaintiff was written up for insubordination and was placed on a probationary period. Plaintiff responded by requesting that the first and second reprimands be lowered. Plaintiff's responses were not placed in his personnel file. Plaintiff's first response was dated May 4, 1999 and his second response was dated May 11, 1999. Plaintiff did not receive the letter of insubordination written by his supervisor.

42.     On May 10, 1999 Plaintiff filed a grievance with Jimmy Hartsfield, Director of Human Resources at Texas A&M University-Kingsville regarding discrimination. Plaintiff was advised that he had to file the grievance on a University grievance form. Plaintiff's first letter dated May 10, 1999 was not placed in Plaintiff's personnel file. Plaintiff asked Mr. Hartsfield to keep his grievance confidential. Plaintiff filed his grievance using the University form on May 15, 1999.

43.     Humberto Garcia called Plaintiff a bastard in Spanish about a week prior to Plaintiff's termination.

44. Defendants refused to allow Plaintiff to clean up after he became very dirty while on duty. Eventually, Defendants allowed Plaintiff leave to go to his parent's home to shower and wash his uniform. While Plaintiff was at his parent's home, Defendants called to check to make sure he was there.

45. Sargent Bazan allowed the Hispanic dispatcher to leave even though he came in late. Plaintiff was told not even to come into work if he was late.

46. Plaintiff was terminated on June 4, 1999 for violating his probation and by leaving the front office on May 16, 1999. Plaintiff neither violated his probation nor left the front office. Sargent Bazan left the building, when he was the only person on duty, and was not terminated. The reason given to various state agencies for Plaintiff's termination varied between the persons providing the information on behalf of Defendants which, in effect, contradicted each of the reasons given for his termination.

47. Immediately after learning of his termination, Plaintiff filed a grievance based on retaliation.

48. Plaintiff was denied due process in regard to his grievances. Neither of his grievances were fairly processed.

49. After Plaintiff's termination, Plaintiff discovered in October 1999 that he had been "written up" for numerous alleged violations. However, Plaintiff never had any knowledge of such alleged violations and was never presented with the opportunity to answer said allegations. Further, Plaintiff never received a copy of these "write ups". Plaintiff never received his termination papers.

50. In October 1999, Plaintiff became aware of his termination papers through his attorney. To Plaintiff's alarm, the papers stated that he was "prohibited from access to university

9

property." Texas A&M University-Kingsville is a public university and as such is located on public property. Plaintiff has never been alleged of committing any act which would warrant his denied access to this public property. Defendants, in effect, took Plaintiffs right to attend sporting events at the university which Plaintiff has held season tickets for several years; took Plaintiff's right to attend meetings on campus; and took Plaintiff's right to attend classes on campus.

## CLAIMS

### Violation of 42 U.S.C. §1983

51. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 50.

52. As alleged above in detail, Defendants deprived Plaintiff of the fundamental rights and privileges as guaranteed by 42 U.S.C. §1983 and Title VII and by the First and Fourteenth Amendments to the United States Constitution.

### Discrimination in Violation of Title VII

53. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 50.

54. Through the above alleged actions up to and including Plaintiff's discharge, Defendants violated Plaintiff's federally protected rights by treating him disparately in terms and conditions of employment when compared to non-Anglos. Further, Defendants engaged in extensive retaliation in response to Plaintiff's opposition to disparate and different treatment by all of the Defendants.

55. As a result of the above alleged illegal acts, Plaintiff has suffered the loss of wages and benefits, loss of job opportunity, emotional pain, suffering, inconvenience, mental anguish, loss

of enjoyment of life and other nonpecuniary losses.

### Discrimination in Violation of Texas Commission on Human Rights Act

56. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 50.

57. Through the above alleged actions up to and including Plaintiff's discharge, Defendant violated the Texas Commission on Human Rights Act based upon discrimination based upon race. Because these factors were a motivating factor and made a difference in the discharge of Plaintiff, Defendant violated the Texas Commission on Human Rights Act, with knowledge and/or reckless disregard of that Act's proscriptions.

### Violation of Freedom of Speech Rights

58. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 50.

59. Plaintiff continually spoke out about matters of public concern especially in regard to public safety and protocol and procedures of the university police department.

60. The adverse employment actions taken against Plaintiff by Defendants were responses to Plaintiff's protected speech.

61. By their adverse employment actions against Plaintiff, including Plaintiff's discharge, Defendants arbitrarily and capriciously infringed upon Plaintiff's right to freedom of speech authorized by the First Amendment to the United States Constitution and by Article I, Section 8 of the Texas Constitution.

62. As a result of this violation, Plaintiff has suffered the loss of wages and benefits, loss of job opportunity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of

life and other nonpecuniary losses.

## Violations of Plaintiff's Rights to Due Process of Law, Due Course of Law and to Petition for Redress of Grievances

63. Plaintiff incorporates by reference the allegations contained in paragraphs 1 though 50.

64. As alleged in above in detail, Plaintiff has been deprived of the fundamental rudiments of procedural and substantive due process and due course of law in that his grievances were never meaningfully processed by defendants and he was not given fair notice of allegations against him.

65. As alleged above in detail, Plaintiff was deprived of his right to due process and due course of law as well as his right to petition the government for redress of his grievances, in that his grievances were never meaningfully processed by defendants and he was not given fair notice of allegations against him.

## Jury Trial Requested

66. Plaintiff requests a trial by jury.

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against defendants and award Plaintiff the following:

1. Actual damages plus interest;

2. Compensatory damages arising from the physical and emotional injury, pain, suffering, loss of reputation and humiliation plaintiff suffered as a result of defendant misconduct;

3. Punitive damages as allowed by law;

4. Exemplary damages as allowed by law;

12

5.   Injunctive relief of an affirmative nature, providing make whole economic relief and reinstatement;

6.   Prejudgment interest as allowed by law;

7.   Post-judgment interest as allowed by law;

8.   Attorney's fees;

9.   Court costs; and

10.  Such other legal or equitable relief ultimately justified by the proof of this case.

Respectfully submitted,

Law Office of Gay E. Gilson
4600 Ocean Drive, Suite 104D
Corpus Christi, Texas 78412
Telephone: (512) 814-0573
Facsimile: (512) 814-0674

By: *Gay E Gilson*
GAY E. GILSON
SBN 00784131/Fed.I.D. 16385
ATTORNEY FOR PLAINTIFF

ClibPDF - www.fastio.com