IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

**NOV 0 6 2000**

Michael N. Milby, Clerk

| | | |
|---|---|---|
| JOSEPH K. CONNOR, | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | |
| | § | CIVIL ACTION NO. C-00-069 |
| TEXAS A&M UNIVERSITY–KINGSVILLE, | § | |
| HUMBERTO GARCIA, Individually and in | § | |
| his Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in his Official Capacity, | § | |
| *Defendants.* | § | |

---

## DEFENDANTS` MOTION FOR SUMMARY JUDGMENT
## WITH BRIEF IN SUPPORT

---

TO THE HONORABLE B. JANICE ELLINGTON:

TEXAS A & M UNIVERSITY–KINGSVILLE, HUMBERTO GARCIA, and ROBERT

BAZAN, Defendants, move for summary judgment pursuant to Rule 56(b), Fed.R.Civ.P., and for

cause, would show this Court as follows:

## I.
## STATEMENT OF THE CASE

Plaintiff, Joseph K. Connor, brought this suit on February 18, 2000 against his former

1



employer, Texas A & M University–Kingsville[1] and its then[2] Chief of the University Police

Department[3], HUMBERTO GARCIA, and one of his sergeants, ROBERT BAZAN, claiming

that his termination from TAMUK violated his rights under 42 U.S.C. §1983, Title VII (disparate

treatment and retaliation) , his First Amendment rights to free speech, and Substantive and

Procedural Due Process under the 14th Amendment, and various State law claims[4] including

claims of racial discrimination under the Texas Commission on Human Rights Act, violations of

freedom of speech under Article I. Section 8 of the Texas Constitution, and due course of law

under the Texas Constitution.

Defendants have, concurrently with the filing of this Motion for Summary Judgment,

filed their Unopposed Motion For Leave to File First Supplement to Defendants` Original

Answer asserting sovereign immunity, qualified and official immunity as defenses to all claims

of Plaintiff in this litigation.  By this Motion for Summary Judgment, Defendants seek the

dismissal of this lawsuit.

## II.
## SUMMARY JUDGMENT STANDARD

---

[1]Hereinafter referred to as "TAMUK".

[2]Humberto Garcia, Defendant, retired from TAMUK on August 31, 1999, see Exhibit 1, Affidavit of Humberto Garcia.  As a result, he cannot be sued in his "Official" capacity.

[3] Hereinafter referred to as "UPD". Also, §51.203 of the Texas Education Code allows governing boards of each college to commission campus security personnel as police officers.

[4] The State law claims include claims under the Texas Commission on Human Rights Act, due course of law, and free speech claims under the Texas Constitution.  These claims are subject to the Eleventh Amendment immunity of the Defendants.

CIbPDF - www.fineha.com

A motion for summary judgment is properly granted "if the pleadings, answers, to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party " on that issue. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505 (1986). Conclusory allegations or general denials are insufficient to preclude summary judgment, *Anderson, id.*

"The burden on the moving party may be discharged by "showing"–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2554 (1986).

A defendant who moves for summary judgment may rely on the absence of evidence to support an essential element of the Plaintiff's case. *International Association of Machinists Aerospace Workers Lodge No. 2504 v. Intercontinental Mfg. Co.* 812 F.2d 219, 222 (5th Cir. 1987). The nonmoving party "must (then) set forth specific facts showing that there is a genuine issue for trial." *Anderson, id* at 2510.

The Texas causes of action are governed by Tex.R.Civ.P. 166a(c) and 166a(i), "no evidence" motion for summary judgment.

### III.

### ARGUMENT AND AUTHORITIES

**A.    PLAINTIFF'S CLAIMS UNDER §1983, TITLE VII (DISPARATE TREATMENT AND RETALIATION), FOURTEENTH AMENDMENT DUE PROCESS, FIRST**

AMENDMENT FREE SPEECH RETALIATION, AND ALL STATE LAW
CLAIMS ARE BARRED BY THE DEFENDANTS` ELEVENTH AMENDMENT
SOVEREIGN IMMUNITY AND QUALIFIED IMMUNITY.

### 1. Defendant TAMUK and individual Defendants in their "official capacity":

Plaintiff`s Original Complaint raises issues concerning Plaintiff`s two reprimands, and his
ultimate termination being the result of TAMUK`S [5] and the individual Defendant GARCIA`s
and Defendant BAZAN `s violation of §1983, Title VII, Fourteenth Amendment Due Process,
First Amendment Free Speech, and various State law claims[6].

The Eleventh Amendment to the U.S. Constitution bars a damages action in federal court
against a State, or in this case, an agency of the State. *Kentucky v. Graham* 473 U.S. 159, 169,
105 S.Ct. 3099, (1985). The bar remains in effect when State officials are sued for damages in
their "official capacity". *Graham, id; Edelman v. Jordan,* 415 U.S. 651,663, 94 S.Ct. 1347,
(1974). (The Eleventh Amendment bars actions seeking retroactive monetary relief from states
and state officials acting in their "official capacity".). That is true because "a judgment against a
public servant 'in his official capacity' imposes liability on the entity that he represents."
*Graham, id* at 169.

Indeed, the "Constitution does not embrace authority to entertain a suit brought by private
parties against a state without consent given; not one brought by a citizen of another state...and

---

[5] TAMUK and the individual defendants are not distinguished in any causes of action of
Plaintiff`s Original Complaint.

[6] The State law claims include alleged violations of the Texas Commission On Human
Rights Act for discrimination, free speech under Article I, Section 8 of the Texas Constitution,
and due course of law under the Texas Constitution.

not even one brought by its own citizens." *Pennhurst State School and Hospital v. Halderman,*
465 U.S. 89, 99, 104 S.Ct. 900, 907 (1984). At footnote 8, the Supreme Court states that this
Eleventh Amendment immunity is of "such compelling force" that courts will consider the issue
even if raised for the first time on appeal. *Pennhurst id* at 99, n.8. See also *Loya v. Texas
Department of Corrections,* 878 F.2d 860 (5th Cir. 1989), which applied this Eleventh
Amendment immunity to discrimination claims brought against a State agency such as TAMUK,
pursuant to §1983.

Plaintiff sued Defendant GARCIA and Defendant BAZAN in their "Official" capacity[7],
and therefore those claims are barred by the Eleventh Amendment and should be dismissed by
this Court. *Will v. Michigan Dept. of Police, 91 U.S. 58, 70-71, 109 S.Ct. 2304, (1989)*[8].

As to Plaintiff's cause of action under the Texas Commission on Human Rights Act,
Chapter 21 of the Texas Labor Code waives immunity from suit and from damages in its own
courts, but this waiver does not extend to federal courts. A state can only waive Eleventh
Amendment immunity by expressly specifying its intent to be sued in federal courts, *Atascadero
State hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146 (1985). Thus, since the Texas
Commission on Human Rights Act contains no specific waiver of Eleventh Amendment
immunity to be sued in *federal* court, the Eleventh Amendment bars any State-law claims made

---

[7]The style of this case indicates "official capacity" of the individual Defendants.

[8]Although injunctive relief would not be barred by the Eleventh Amendment–in the
instant case, Plaintiff failed to name any individual Defendants who could be enjoined to
reinstate Plaintiff. See Exhibits 1,2, and 3 Affidavits, which show that Defendant Garcia is no
longer employed by TAMUK, and Defendant Bazan does not have the authority to hire, or even
recommend the hiring or reinstatement of Plaintiff.

5

against Defendants in this case, and Defendants' Motion for Summary Judgment should be granted..

### 2. Defendant GARCIA and Defendant BAZAN in their individual capacity:

Plaintiff's Original Complaint names Defendant HUMBERTO GARCIA and Defendant ROBERT BAZAN "Individually" and fails to distinguish which of the claims in Paragraphs 51–65 of the Complaint would apply to these Defendants. These Defendants have, concurrently with the filing of this Motion For Summary Judgment filed their Unopposed Motion For Leave to File First Supplement To The Original Answer by which they will assert their qualified immunity defense to all of Plaintiff's constitutional claims.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727 (1982) the Supreme Court found that the individual Defendants, as in our case, could be entitled to qualified immunity if they were acting "(1) in the course and scope of their governmental duties; (2) pursuant to clearly established law; and (3) in good faith." In order for Plaintiff in this case to defeat Defendant GARCIA's and Defendant BAZAN's qualified immunity defense, the rights violated must have been "clearly established in a 'particularized' manner, and ...the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 334 (1987). Thus, if the right is "murky", there can be no individual liability, *Koch v. City of Hutchinson,* 847 F.2d 1436 (10th Cir. 1988).

More recently, the Fifth Circuit analyzed the qualified immunity defense and found that the (Plaintiff's) "...allegations must portray an objectively unreasonable violation of a clearly established right". *Shipp v. McMahon,* 199 F.3rd 256 (5th Cir. 2000). Here, Plaintiff must show

6

that "...a right is clearly established by being based on pre-existing law, the unlawfulness of the conduct in question is apparent" and that "...the defendant's violation of the clearly established right was objectively unreasonable." *Shipp, id* at 262. Indeed, "(w)hether an official's conduct is objectively reasonable depends upon the circumstances confronting the official as well as 'clearly established law' in effect at the time of the official's actions...The subjective intent of the public official is irrelevant, and the official's knowledge of the relevant law need not rise to the level of a 'constitutional scholar'". *Sanchez v. Swyden,* 139 F.3rd 464 (5th Cir. 1998).

In the instant case, the gravamen of Plaintiff's Complaint is that Plaintiff was treated differently than Hispanic officers in the conditions of his employment, which resulted in at least two reprimands, and ultimately his termination from TAMUK.  The two reprimands include (1) the April 24, 1999 reprimand for his "illegal search and seizure of property" described in Paragraph 40 of the Complaint; and (2) the reprimand for his actions on failing to move from the back office to the front desk to receive "911" emergency calls, described in Paragraph 46 of his Complaint.  Under the *Shipp* standards above, to defeat Defendant GARCIA's and Defendant BAZAN's qualified immunity, Plaintiff will now have to come forward with evidence that being reprimanded for making an illegal seizure of property and being reprimanded for not being at his duty station to answer "911" calls–would somehow violate "established law".  Similarly, Plaintiff in this case is faced with the additional burdens of Defendant BAZAN having no authority to terminate, and having no part of the reprimands described above[9]; as well as the fact that Defendant GARCIA had no authority to terminate (or hire or reinstate) employees, since that

---

[9]See Exhibit 2, Affidavit of Robert Bazan,§3 and §11.

7

authority rests solely with the Vice President of Finance and Administration at TAMUK[10]

As to each of those reprimands, Plaintiff has testified that at the time of the April incident involving illegal seizure, it is true that he did not know whether or not the property was stolen[11]. Likewise, Plaintiff has admitted to the may incident of not manning the front desk to answer "911" calls[12]. As a result, Plaintiff cannot show a violation by these Defendants of "established law", and all claims against Defendant GARCIA and Defendant BAZAN in their individual capacity should be dismissed and summary judgment granted for Defendants.

**B.    PLAINTIFF'S CLAIMS FOR TITLE VII[13] RACIAL DISCRIMINATION BASED ON DISPARATE TREATMENT FAIL BECAUSE:**

    **(i).    PLAINTIFF CANNOT ESTABLISH DISPARATE TREATMENT AS THE BASIS FOR HIS *PRIMA FACIE* CASE OF RACIAL DISCRIMINATION; AND**

---

[10]See Exhibits 2 and 3, Affidavits of ROBERT BAZAN, §3, and JIMMY HARTSFIELD,§3..

[11]See Exhibit 4, Deposition of Plaintiff at pages 115-117.

[12]See Exhibit 4, Deposition of Plaintiff at page 150.

[13]42 U.S.C.§2000e *et seq.*. It should be noted that since Plaintiff is "Anglo", other circuits have altered the *McDonnell Douglas* test to require a heightened standardto require the Plaintiff to prove "background circumstances (that) support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker v. Baltimore & Ohio R.R.* 652 F.2d 1012, 1017 (D.C. Cir. 1981); *Notari v. Denver Water Department,* 971 F.2d 585, 588-589, (10th Cir,. 1992). One Texas District Court has expressed another test, *Switzer v. Texas Commerce Bank,* 850 F. Supp. 544, 547 (N.D. Tex.) Aff'd without opinion, 42 F.3d 642 (5th Cir. 1994). Since there is no clear undertaking by the 5th Circuit to adopt a different standard, this Motion For Summary Judgment will proceed under the standard *McDonnell Douglas* test.

**(ii).    ALTERNATIVELY, PLAINTIFF CANNOT SHOW RACE WAS THE DETERMINATIVE FACTOR IN HIS REPRIMANDS AND TERMINATION.**

**1.    PLAINTIFF'S FAILURE TO SHOW *PRIMA FACIE* CASE.**

In Paragraphs 54 and 55 of the Complaint, Plaintiff alleges that certain "actions" taken by Defendants constituted disparate treatment and racial discrimination, in violation of Title VII, and that those actions led to his termination, and caused him monetary damages. These actions may be summarized as follows (with Paragraph references to the Complaint):

(7.) Plaintiff's traffic ticket book was taken away and later returned; (9., 45.) Plaintiff was treated differently if he wanted to leave early or arrive late; (10.)Plaintiff's leave request made two months in advance was denied (and "torn up" by someone); (11.) Plaintiff was required to report in to the station on days he had jury duty; (13.) "Anglo" officers were followed if they left the campus while in their patrol cars; (14.) Plaintiff was not allowed to accrue his leave indefinitely; (19.) Plaintiff was denied a promotion to Sergeant; (20.) a Hispanic was sent to firearms school, instead of Plaintiff; (24.) No "Anglo" had been sergeant for fifteen years; (37.) Some of Plaintiff's traffic tickets were dismissed; (38.) There was no "Anglo" on either Selection Boards for sergeant promotion; (39.) Plaintiff was "pulled" from a training course (he was not required to attend) in order to be interviewed by the Selection Board for promotion to Sergeant; and (46.) Plaintiff was terminated for not manning the front desk to receive "911" calls.

9

Notwithstanding those allegations, plaintiff himself admits that he is not aware of any policy, custom, or procedure of TAMUK that would permit any discrimination under Title VII[14]. In order for Plaintiff to prevail, he must meet the requirements of proving disparate treatment and reverse racial discrimination under Title VII of the Civil Rights Act of 1964.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), the Supreme Court established an evidentiary framework for analyzing claims under Title VII. Here, Plaintiff is required to establish a *prima facie* case of discrimination, at which point the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged actions. The establishment of a *prima facie* case creates a presumption that the employer discriminated against the employee, which is rebutted and drops from the case if the employer carries its burden of production. At that point, Plaintiff must show (in the absence of direct evidence of intentional discrimination) that the proffered reason for the challenged decision was not the real reason and that unlawful discrimination was. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-508, 113 S.Ct. 2742 (1993). This framework for judicial analysis of Title VII claims has been followed for analyzing employment discrimination claims made under 42 U.S.C. §1983.*Wallace v. Texas Tech University*, 80 F.3rd 1042, 1047 (5th Cir. 1996).[15]

In the instant case, Plaintiff's challenge of his reprimands and termination on racial or

---

[14]See Exhibit 4, Deposition of Plaintiff, pages 158-160.

[15]Although Plaintiff's Complaint lists "Violation of 42 U.S.C. §1983" in Paragraph 52, that Paragraph indicates that no separate claims are made under §1983, than are pled for Title VII , First, and Fourteenth Amendments claims. Therefore, this Motion assumes that such §1983 claims are subsumed within those remaining claims of Plaintiff, and will not address them separately..

10

disparate treatment grounds is unsupported by any evidence. That is, as shown in the affidavits of HUMBERTO GARCIA and ROBERT BAZAN, Exhibits 1 and 2 respectively, there are legitimate business reasons for each of the actions taken by them and by TAMUK with respect to Plaintiff. Specifically, they show that Plaintiff received the same pay raises and benefits as did other officers, including the Hispanic officers[16]; and that as to the first reprimand regarding illegal seizure of personal property on April 1, 1999, Plaintiff admitted taking it, without knowing that in fact it was reported stolen[17]; and with respect to the May 16,1999 incident regarding failure to answer the "911" calls at the front desk, Plaintiff again admitted to this action[18].

Moreover, Plaintiff cannot identify any Hispanic officer who was treated differently than Plaintiff where such officer violated the rules of UPD. In particular, Sergeant Quinones, a Hispanic officer, was treated exactly the same as Plaintiff, in that he was terminated for violating the rules and procedures of the Department. Sergeant Quinones was terminated by the same actors who terminated Plaintiff[19], i.e. the Vice President of Finance and Administration made the final decision, and Defendant GARCIA as Chief of the UPD made the recommendation to terminate this Hispanic officer. Likewise, Plaintiff cannot show that a Hispanic officer illegally

---

[16]See Exhibit 1, Affidavit of HUMBERTO GARCIA, §5; Exhibit 2, Affidavit of ROBERT BAZAN, §5.

[17]See Exhibit 1, Affidavit of HUMBERTO GARCIA, §10, and letter of reprimand, Exhibit "G" to Exhibit 1.

[18]See Exhibit 1, Affidavit of HUMBERTO GARCIA, §10, and Exhibits "I", "J", and "K" to Exhibit 1.

[19]See Exhibit 4, Deposition of Plaintiff, at page 73.

11

seized property, or abandoned a 911 duty station and was not similarly disciplined. Consequently, Plaintiff cannot make his *prima facie* case under the *McDonnell Douglass* analysis of Title VII claims, since TAMUK has proffered a business reason for each of the decisions it made concerning plaintiff, including his reprimands and ultimate termination.

### 2. Plaintiff lacks evidence to show race as determining factor.

Since TAMUK has legitimate business reasons for the reprimands and termination of plaintiff as shown above, Plaintiff can only survive this Motion for Summary Judgment by coming forward and producing evidence that "(1) creates a fact issue as to whether each of the employer's stated reasons for the challenged action was not what motivated the employer, and (2) creates a reasonable inference that the prohibited characteristic (e.g. race) was a determinative factor in the action of which the Plaintiff complains. *Grimes v. Texas Department of Mental Health,* 102 F.3d 137, 141 (5th Cir. 1996). That is, Plaintiff must present sufficient evidence to create a reasonable inference of discriminatory intent in order to avoid a summary judgment. *LaPierre v. Benson Nissan, Inc.* 86 F.3d 444,450 (5th Cir. 1996). Sufficient evidence is considered to exist where there is a conflict in "substantial" evidence, which is that which is of such a nature and quality as to "allow a rational fact finder to make a reasonable inference that (race) was a determinative reason for the employment decision." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989,993-994 (5th Cir. 1996) *(en banc).* Here, unless Plaintiff can prove that the proffered reasons for his reprimands and termination were "pretextual", this Court should grant the Summary Judgment for the Defendants. *Faruki v. Parsons, S.I.P., Inc.* 123 F.3d 315,320 (5th Cir. 1997).

A review of the summary judgment evidence shows that Plaintiff did not dispute that he

committed the acts described in Paragraphs 40[20] (illegal seizure of property) and 46[21] (failure to staff the "911" when assigned). Therefore, Plaintiff cannot complain regarding his termination, which was based on those violations[22].

As a result, this Court should find that Plaintiff failed to meet his burdens under the *McDonnell Douglass* burden-shifting analysis of Title VII claims, and grant Defendants' Motion for Summary Judgment.

## C.   PLAINTIFF'S CLAIMS FOR TITLE VII RETALIATION SHOULD BE DENIED BECAUSE HE CANNOT SHOW A CAUSAL CONNECTION BETWEEN HIS TERMINATION AND THE FILING OF HIS EEOC CHARGES.

In Paragraph 54 of the Complaint, Plaintiff alleges that "Defendants engaged in extensive retaliation in response to Plaintiff's opposition to disparate and different treatment by Defendants."   To support those claims, Plaintiff's Complaint contains the following allegations: (17., 49.) Plaintiff was told he would never make Sergeant; (21.) Defendant BAZAN allegedly said he would make Plaintiff's job "difficult"; (26.) Plaintiff was "chastised" by his supervisors for seeking medical treatment; (27., 28., 43.) Defendant GARCIA allegedly "confronted" Plaintiff, and called Plaintiff a "liar" and a "bastard"; (32.) Plaintiff told Lieutenant Jefferson of UPD that he intended to file a complaint with the EEOC and she responded with "Do you want me to drive you?"; (40.) Plaintiff received a

---

[20]See Exhibit 4, Deposition of Plaintiff at pages 116-118.

[21]See Exhibit 4, Deposition of Plaintiff at page 150.

[22]See Exhibit 1, Affidavit of HUMBERTO GARCIA, §10.

13

CRMPDF - www.lexisx.com

reprimand for illegal seizure of someone`s property; (41.) Plaintiff "written up" for

insubordination; (46.) Plaintiff reprimanded for not being at front desk for "911" calls,

and terminated for violating his probation.  In his deposition, Plaintiff also asserted that

after filing his first EEOC charge, he was given worse work[23]  and car[24] assignments.


To make a retaliation claim, Plaintiff must show: "(1) he engaged in an activity protected

under Title VII, (2) an adverse employment action occurred, and (3) there was a causal

connection between the protected activity and the adverse employment decision.  *Herrod v.*

*American Airlines, Inc.,* 132 F.3d 1112 n.8 (5th Cir. 1998).  Of all the allegations above, the only

"protected activities" would be filing the EEOC charges, which Plaintiff notified Defendants of

in September/October 1998[25].  Yet the reprimands Plaintiff complains about occurred in April

and May of 1999[26], and therefore Plaintiff cannot establish any causal connection[27] between

events separated by the passage of time.

Moreover, the acts described in the Complaint as retaliation, with the exceptions

---

[23]See Exhibit 4, Plaintiff`s Deposition, pages 141-143.

[24]See Exhibit 4, Plaintiff`s Deposition, page 142.

[25]See Paragraphs 32 and 33 of the Complaint.

[26]See Paragraphs 40 and 46 of the Complaint.

[27]Plaintiff may argue that his grievance (Paragraph 42 of the Complaint) was causally related–however, his grievance was not made until May 10, 1999, well after the April 24, 1999 reprimand for the illegal seizure of property, Paragraph 40 of the Complaint. Further, the events of May 16, 1999 (Paragraph 46 of the Complaint) were not shown to be related to the May 10, 1999 grievance filed with Mr. Hartsfield, since there is no allegation of his communication to Mr. Crandall, Vice president of Finance and Administration–especially where Plaintiff has "asked Mr. Hartsfield to keep his grievance confidential.", Paragraph 42 of the Complaint.

discussed above, do not rise to the level of an "adverse employment action", unless they are "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Beaux v. City of Garland, 205 F.3d* 150, 157-158 (5th Cir,. 2000).

As a result, summary judgment should be granted since Plaintiff failed to establish a causal connection between his termination, and his filing an EEOC charge several months before.

**D.   PLAINTIFF'S CLAIMS FOR FIRST AMENDMENT SPEECH RETALIATION SHOULD BE DENIED BECAUSE PLAINTIFF CANNOT SHOW THAT HIS SPEECH:**

**(ii)   INVOLVED MATTERS OF PUBLIC CONCERN; AND**

**(ii)   MOTIVATED HIS REPRIMANDS AND TERMINATION.**

In Paragraphs 59–62 of the Complaint, Plaintiff alleges that his speaking "on matters of public concern especially in regard to public safety and protocol and procedures of the university police department" resulted in his termination. The Complaint describes the matters he spoke on to be as follows:

(12.) concerns about Sergeant Quinones "drinking on the job"; (15.) complaints about Plaintiff's radio needing new batteries; and (16) general concerns about safety and lack of procedures[28].

---

[28]Plaintiff's deposition testimony failed to elaborate on these "matters of public concern", see pages 143–146, Exhibit 4.

In order to prevail on a retaliation claim, Plaintiff must show that "(1) he suffered an adverse employment decision; (2) his speech addressed a matter of public concern; (3) his interest in commenting upon matters of public concern outweighed the employer's interest in promoting efficiency; and (4) his speech motivated the employer's actions." *Harris v. Victoria Independent School District,* 168 F.3d 216, 220 (5th Cir. 1999).

In the instant case, Plaintiff's speech does not rise to the level of "public concern" because his Complaint shows that his speech occurred not as a private citizen, but rather as a police officer employed by TAMUK. *Harris, id.* In fact, the Court should look to the "content, form, and context of the speech, as revealed by the whole record, in determining whether a plaintiff's speech addresses a matter of public concern." *Harris, id* at 222. Hence, matters relating to his personal radio and the alleged "lack of procedures" within the Department are matters relating to Plaintiff's employment, and would not rise to the level of a "public concern". *Urofsky v. Gilmore,* 167 F.3d 191, 195-196 (4th Cir. 1999) (employee's computer access restrictions); *Tang v. Rhode Island,* 163 F.3d 7, 10-13 (1st Cir. 1998) (employee's allegations of workplace harassment). Likewise, even Plaintiff's speech concerning Sergeant Quinones is not a "*matter of public concern". Havekost v. United States Department of Navy, 925 F.2d 316 (9th Cir. 1991).*

Also problematic to Plaintiff's free speech claims is his inability to prove that his protected speech was the "substantial or motivating factor " behind his termination. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, (1976). There are no allegations that any adverse employment action described in the Complaint were "motivated" by any of Plaintiff's speech. Likewise, Defendants have asserted their affirmative

16

defense that they would have reached the same result regarding the reprimands and termination even in the absence of any protected conduct. *Mt. Healthy, id* at 287. Thus, even if Defendants had bad motives, which they expressly deny[29], Plaintiff must prove that the adverse actions of reprimands and termination would not have occurred anyway, based on Plaintiff's own conduct. Since Plaintiff cannot show that the reprimands and termination were due to any alleged speech by him, he cannot establish this *Mt. Healthy* causation, and summary judgment should be granted to Defendants.

**E.   PLAINTIFF HAS NO PROPERTY INTEREST IN HIS EMPLOYMENT AND THEREFORE HIS FOURTEENTH AMENDMENT DUE PROCESS CLAIMS SHOULD BE DISMISSED.**

In Paragraphs 64 and 65 of the Complaint, Plaintiff raises both procedural and substantive due process claims under the Fourteenth Amendment to the United States Constitution. He alleges that "his grievances were never meaningfully processed by defendants and he was not given fair notice of allegations against him."[30]   Yet, Plaintiff does not allege that he had any contract of employment with TAMUK.   As a result, Plaintiff cannot establish that he has a property interest in his employment with TAMUK.   His claims under the Fourteenth Amendment will fail because the Fourteenth Amendment does not create a property interest in employment–rather, that interest must stem from independent sources. *Board of Regents v. Roth,*

---

[29]See Exhibits 1 (§4), and 2 (§4), Affidavits of Defendants GARCIA and BAZAN.

[30]Paragraph 64, Original Complaint.

17

408 U.S. 564, 577 92 S.Ct. 2701 (1972).  The State law of Texas will therefore determine whether a public employee has a property interest in his job.  *Bishop v. Wood,* 426 U.S. 341, 346-347 (1976).  An employee can claim a property interest in his employment only when a legitimate right to continued employment exists.  *Perry v. Sinderman,* 408 U.S. 593, 601-602, 92 S.Ct. 2694 (1972).  Thus, Plaintiff must identify some state or local law, contract, or understanding to support a claim that he has a property interest in his employment with the State.  *Carroll v. Town of Youngsville,* 106 F.3d 101, 105 (5th Cir. 1997).

In Texas, employment is "at will" if the term of service is left to the discretion of either the employer or the employee.  *Federal Express v. Dutschmann,* 846 S.W.2d 282, 283 (Tex. 1993).In the instant case, the Complaint is silent as to any modification of the "at will" status, and therefore Plaintiff has no property interest that would sustain due process violations.  As a result, Defendants' Motion for Summary Judgment should be granted.

**F.    PLAINTIFF'S REMAINING CAUSES OF ACTION FOR TEXAS CONSTITUTIONAL FREE SPEECH AND DUE COURSE OF LAW CLAIMS SHOULD BE DISMISSED SINCE   PLAINTIFF CANNOT RECOVER MONETARY DAMAGES ON THESE CLAIMS.**

Plaintiff's Complaint contains Texas Constitutional claims for alleged violations of free speech under Article I, Section 8 of the Texas Constitution[31] and for due course of law[32], for

---

[31]See Plaintiff's Complaint, Paragraph 61.

[32]See Plaintiff's Complaint Paragraph64 and 65.

18

which Plaintiff seeks to recover monetary damages.[33]  Defendants are entitled to summary judgment on these claims, however, since the Bill of Rights to the Texas Constitution does not create a separate implied cause of action, nor a private cause of action  for damages, since Texas does not have the equivalent of a 42 U.S.C. §1983 statute.  *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149-150 (Tex. 1995).  This holding has been extended to claims under Article I, Section 19 of the Constitution, *O`Bryant v. City of Midland,* 949 S.W. 2d 406, 413 (Tex.App.–Austin 1997), (aff`d in part).

The Supreme Court in *Bouillon* recognized that equitable remedies for violation of constitutional rights may be enforced, *Bouillon, id* at 149.  However, as shown in the Affidavits of Defendant HUMBERTO GARCIA[34] and Defendant ROBERT BAZAN[35], Plaintiff will not be able to obtain injunctive relief against TAMUK since Plaintiff has failed to name as a Defendant any person with authority to hire or reinstate a former employee[36].  As a result, any Texas Constitutional claims should be dismissed and this Court should grant Defendants` Motion for Summary Judgment.


## CONCLUSION

For the foregoing reasons, Defendants request that this Court grant their Motion For Summary Judgment.

---

[33]See Plaintiff`s Complaint, paragraphs 62, and damage requests in prayer.

[34]See Exhibit 1, Affidavit of HUMBERTO GARCIA, §§ 2 and5.

[35]See Exhibit 2, Affidavit of ROBERT BAZAN, §3.

[36]See Plaintiff`s Complaint.

19

Respectfully submitted,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

JEFFREY S. BOYD
Deputy Attorney General for Litigation

TONI HUNTER, Chief
General Litigation Division


WILLIAM T. DEANE
Assistant Attorney General
Texas Bar No. 05692500
Fed. Id No. 3775
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4264
(512) 320-0667 FAX

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument has been sent by U.S. Certified Mail, on November 6, 2000 to:

Ms.Gay E. Gilson
LAW OFFICE OF GAY E. GILSON
4600 Ocean Drive, Suite 104D
Corpus Christi, Texas 78412

_____
WILLIAM T. DEANE
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOSEPH K. CONNOR,          §
    *Plaintiff*,          §
                    §
V.          §
                    §          CIVIL ACTION NO. C-00-69
TEXAS A&M UNIVERSITY-KINGSVILLE,   §
HUMBERTO GARCIA, Individually and in   §
his Official Capacity; and ROBERT BAZAN,   §
Individually and in his Official Capacity,   §
    *Defendants*.          §

---

### MOTION FOR SUMMARY JUDGMENT
### EXHIBIT INDEX

---

**Exhibit**               **Description**

1          Affidavit of Humberto Garcia

2          Affidavit of Robert Bazan

3          Affidavit of James Hartsfield

4          Excerpts from the Deposition of Joseph Connor

1

## AFFIDAVIT OF HUMBERTO GARCIA

STATE OF TEXAS         §
                                     §
COUNTY OF KLEBERG     §

BEFORE ME, the undersigned authority, on this day personally appeared HUMBERTO GARCIA, who, being duly sworn, deposed and said as follows:

"1.     My name is HUMBERTO GARCIA, and I am over the age of eighteen years and competent to make this Affidavit, and have personal knowledge of the facts stated herein, which are true and correct.

2.     I was employed by department at a time when it was Texas A. & I. University. My original position was patrol officer, and I was hired on February 1, 1980. Texas A & I University eventually was changed to the current name, as Texas A & M University–Kingsville[1]. Over the years, I worked my way to the position of Chief of the University Police Department. I was promoted to Chief on September 1, 1994 and retired from that position on August 31, 1999. On the date this lawsuit was filed on February 18, 2000, I was no longer employed by TAMUK. As a result, any relief requested by Plaintiff against me would only be in my "individual capacity", since I am no longer employed by Defendant TAMUK.

3.     At all times material to Mr. Joseph Connor's[2] Complaint, during 1998 and 1999, I acted as Chief, and had management responsibility for the University Police Department. I was familiar with the rules and regulations of both the University Police Department and

---

[1] Hereinafter referred to as "TAMUK".

[2] Hereinafter referred to as "Plaintiff".

of the University, as they applied to employment matters.[3]

4.      I am personally acquainted with Plaintiff. He worked as a patrolman while I was Chief of the University Police Department[4]. I found Plaintiff to be an average police officer, who sometimes had difficulty accepting responsibility for his mistakes.

5.      During the time I served as Chief of the UPD, Plaintiff received the same percentage raises as all other patrol officers, and also received the same vacation, sick leave, and other benefits as all other officers employed by TAMUK. Plaintiff's claims that any actions taken by me were based on discrimination and/or retaliation are completely without merit. As will be shown below, there are legitimate business reasons for each decision I made. Moreover, I personally DO NOT HAVE AUTHORITY TO TERMINATE ANY EMPLOYEE, rather, I make a recommendation to the Vice-President of the University. In this case, the decision to terminate was made by STEVEN CRANDALL, Vice-President of Finance and Administration. Mr. Crandall is an "Anglo", Caucasion male.

6.      I am aware of some of Plaintiff's Complaints relating to the "number" of "Anglo" officers hired and promoted by the UPD. However, since the department is located in Kleberg County, and this County is predominately Hispanic, it follows that most of the applicants for jobs, and therefore most of the persons hired by UPD are Hispanic. There is no policy, practice, custom, or procedure to hire Hispanic officers, over any other race. Quite the contrary, there is official policies prohibiting discrimination.[5] In fact, the only

---

[3] See Appendix A excerpts from "University Police Department Rules And Regulations".

[4] Hereinafter referred to as "UPD".

[5]See Footnote 3, *supra*.

2

CVISION - www.cvisiontech.com

other officer I recommended for termination while I was Chief at UPD was Sergeant Quinones, a Hispanic male.

7.      With respect to the 1998 Sergeant's position at UPD, on August 13, 1998 I posted a Memorandum listing Plaintiff along with four other potential candidates as being "qualified" for this position.   The sergeant's position has a fixed "Position Description"[6] which sets out the qualifications for Sergeant. The qualifications require three to five years experience as a commissioned police officer, two years of education (60 semester hours) or "equivalent combination of experience and training"[7].   According to my records, all of the applicants to both the 1998 and 1999 sergeant promotions were qualified.   Prior to making a decision, I required a Selection Board, composed of at least three of my senior officer staff (currently sergeants or lieutenant in rank) to interview the applicants and ask them each the same questions.   The questions for the 1998 promotion are attached as Appendix "C", and for the 1999 sergeant promotion as Appendix "D", respectively.   A review of those questions would demonstrate that they are not racially biased, nor contain any indicia of a discriminatory intent on the part of the Selection Board, or myself in participating in this process.   As shown in Appendix "E-1" the scores for candidate Salvador Franco were considerably higher than the scores of Plaintiff, represented in Appendix "E-2". Significantly, my co-Defendant, Sergeant. Robert Bazan, actually rated Plaintiff higher on overall score than did Sergeant. Longoria, another member of the panel.[8]

---

[6]See "Sergeant University Police", attached as Appendix B.

[7]See Footnote 6, *supra.*

[8] See "Qualification Appraisal Guide", Appendix E-2, pages 2 and 3.

3

8.      Likewise, the Selection Board also met on the 1999 sergeant's promotion and again rated the applicants.  As shown in Appendix "F-1", Pedro Cavazos had an overall score much higher than did Plaintiff, as shown in Appendix "F-2".  Even more interesting is the fact that Robert Bazan, co-Defendant, rated Plaintiff higher than did either of the other two members of the Selection Board.

9.      On August 26, 1998, I announced in writing the selection of Salvador Franco as the new sergeant; and on March 12, 1999, I announced in writing the selection of Pedro Cavazos as the new sergeant.  In both instances, the best qualified applicant was selected without regard to his race, nor to any complaints filed by Plaintiff with respect to the first promotion decision in 1998.  In both the 1998 and 1999 promotions, Plaintiff was the lowest scorer of all the applicants.

10.     The events leading up to Plaintiff's termination by TAMUK began with an incident on April 1, 1999, when it was reported to me by Plaintiff's supervisors that he had confiscated property belonging to a student at the University without any warrant or other probable cause.  I held a personal conference with plaintiff on April 15, 1999 concerning this matter.  At that conference Plaintiff admitted that he was in the room of the student because some drug paraphernalia was discovered by the dorm director while in plain view.  However, the items confiscated by plaintiff included other personal property belonging to the students, e.g. a stereo, which did not then appear on any stolen property list.  To my knowledge, this stereo was never on a stolen property list, and was therefore eventually returned to the student.  Plaintiff's response was to not deny taking it, but to try to "share" the blame with

4

other officers.  As a result, I issued a letter of reprimand,[9] on April 24, 1999.  This letter concluded with the statement that "...any further infraction will result in disciplinary action up to and including termination."[10]  Only a few days later, it was necessary to again issue a second "Official Reprimand" concerning an act of insubordination by Plaintiff.[11]  This second reprimand also imposed a six months probation on Plaintiff with the added requirement that "...any infraction thereof during this period will result in termination."[12]  Again, within days of that second reprimand, plaintiff again violated the rules on May 16, 1999 by leaving the front desk unattended at a time that he was supposed to answer the "911" calls.  According to the reports of the incident by officer Everett.[13]  Plaintiff had left the front desk unattended and the front door locked–so that if any student had an emergency, there would be no "911" response.[14]  According to both the report of Lieutenant Jefferson[15] who interviewed Plaintiff about this May 16, 1999 incident, and Plaintiff's own response in his June 16, 1999 Grievance.[16]  Plaintiff never denied that he left the front desk unattended during his shift.  Instead, he again attempted to shift the blame.[17]  As a result, I made a

---

[9]Appendix "G", letter to Plaintiff dated 4-24-99.

[10]See Footnote 9, *supra*.

[11]Appendix "H" letter of May 5, 1999 to Plaintiff.

[12]See Footnote 11, *supra*.

[13] See "Officer's Report" Appendix "I".

[14]See Footnote 13, *supra*.

[15]See "Officer's Report" Appendix "J".

[16] See "Employee Complaint and Appeal Form" Appendix "K".

[17] See Footnote 16 *supra*.

recommendation to Mr. Steven Crandall, Vice-President of Finance and Administration, to terminate Plaintiff, and after receiving Mr. Crandall`s final decision to terminate Plaintiff, on June 4, 1999, I called Plaintiff to my office and orally terminated him effective June 18, 1999.

11.     All of my actions in issuing the reprimands and in making a *recommendation* to terminate Plaintiff were made based on my understanding of my duties and obligations under the rules and regulations of TAMUK, as explained to me by the Director of Human Resources Jimmy Hartsfield, and by the system`s general counsel`s office. At no time did I act outside the scope and course of my employment with TAMUK.

12.     At the time Plaintiff was employed by TAMUK, he did not have an employment contract with TAMUK and he served as an employee-at-will as I understand Texas law. I never entered into any contract with Plaintiff in my personal and individual capacity concerning his employment by TAMUK."

FURTHER AFFIANT SAYETH NOT.



HUMBERTO GARCIA

SUBSCRIBED AND SWORN TO by the said HUMBERTO GARCIA this 3rd day of November, 2000.

DEBBIE WILSON
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-18-2003

NOTARY PUBLIC in and for the State of Texas

6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSEPH K. CONNOR, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | CIVIL ACTION NO. C-00-69 |
| TEXAS A&M UNIVERSITY-KINGSVILLE, | § | |
| HUMBERTO GARCIA, Individually and in | § | |
| his Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in his Official Capacity, | § | |
| Defendants. | § | |

## APPENDIX TO AFFIDAVIT OF HUMBERTO GARCIA

| **Appendix** | **Description** |
|---|---|
| A | Excerpts from University Police Department Rules and Regulations |
| B | Sergeant University Police |
| C | Questions for 1998 Sergeant Promotion |
| D | Questions for 1999 Sergeant Promotion |
| E-1 | 1998 Qualification Appraisal Guide of Salvador Franco |
| E-2 | 1998 Qualification Appraisal Guide of Joseph K. Connor |
| F-1 | 1999 Qualification Appraisal Guide of Pete Cavazos |
| F-2 | 1999 Qualification Appraisal Guide of Joseph Connor |
| G | Letter to Plaintiff dated 4-24-99 |
| H | Letter to Plaintiff dated 5-5-99 |
| I | Officer's Report dated 5-24-99 |
| J | Officer's Report dated 5-16-99 |
| K | Employee Complaint and Appeal Form |

A

# UNIVERSITY  POLICE  DEPARTMENT

# RULES  AND  REGULATIONS

# TEXAS A&M UNIVERSITY-KINGSVILLE

# APRIL  1998

revised   4-01-98

000062

# PREFACE

This manual is made available to you so that all employees share the same Information, Standard Procedures, Policies and other related materials.

It will be the responsibility of each employee to keep abreast of all information contained herein.

There will be four ( 4 ) copies of this manual within the department, the original being in the Director's Office.  The other three ( 3 ) will be in each division as follows:

1. Communications  -  Front Office
2. Patrol Division  -  Squad Room
3. Special Services Division  -  Investigators

The Communications Office will distribute the copies of the information to each division and all manuals should contain the same information or copies thereof.

000063

# General Information

## Equal Opportunity Policy

In compliance with *Title VI of the Civil Rights Act of 1964* and *Executive Order 11246*, Texas A&I University is open to all persons regardless of race, color, religion, sex, national origin or qualified handicap who are otherwise eligible for admission as students. Furthermore, Texas A&I University is an Equal Opportunity/Affirmative Action Employer and no applicant or employee will be discriminated against because of race, color, age, religion, sex, national origin or non-job related physical or mental handicap in any personnel action. This University will not enter knowingly into contractual agreements for services or supplies with any firm failing to follow fair employment practices.

Texas A&I University does not discriminate on the basis of handicap in admission or access to its programs.

## Statement of Mission

Texas A&I University, a state-assisted university, is the most comprehensive institution of higher education in South Texas. Its mission is to provide educational opportunities of the highest quality to the citizens of the State, particularly to those of the bilingual/bicultural area of South Texas. The mission encompasses the following chief purposes:

1. to provide excellence in teaching;
2. to contribute to the store of human knowledge; and
3. to serve the specific continuing education and other education-related needs of the region.

In its instructional programs, the University seeks:

1. to establish an atmosphere suitable for the learning which students need in order to increase their understanding of problems and to increase their ability to analyze problems critically;
2. to provide students with a broad, general education as a foundation for specialized learning;
3. to offer technological and professional education to enable students to improve their capacity for productive careers;
4. to help students to understand themselves and the nature of mankind;
5. to provide opportunities for students to participate in cultural and social activities;
6. to recognize and to provide for individual differences in background, and in interests, needs and attitudes of students so that each may achieve the highest level of personal development; and,
7. to develop citizens who have a greater understanding of the society in which they live and who are prepared to exercise responsible, human leadership in their areas of endeavor.

In the areas of research, the University seeks:

1. to establish an environment that encourages systematic inquiry into both practical and purely intellectual problems;
2. to actively encourage faculty and students to engage in research in their fields of interest and expertise; and
3. to share the results of its research efforts with other researchers/scholars/artists and the general public as a means of contributing to the store of human knowledge.

In its public service efforts, Texas A&I University seeks:

1. to provide non-credit, continuing education opportunities to the general public and to particular agencies/organizations upon request;
2. to make its expertise available to individuals/groups through consulting and applied research; and
3. to work with state and local governments, community and civil organizations, and the private sector on projects of mutual concern.

## Grounds

Texas A&I University property consists of over 1,600 acres of land located at 12 different sites from near Bishop, Texas, to just north of Brownsville. The main campus consists of approximately 250 acres of land located in the northwest quadrant of the City of Kingsville. On the main campus, there are over 80 buildings comprising 1.7 million square feet of floor space, numerous streets, sidewalks, and parking lots and over 30 acres of beautiful lawns and uniquely landscaped areas of native and imported trees and shrubs.

The *Texas A&I University Farm* consists of 545 acres of land located about one-half mile north of the main campus. The south entrance to the Farm leads to a horsemanship training area that includes a horse pavilion, classroom building, and associated facilities. The middle entrance leads to a Wildlife Research facility with a building, numerous cages, a small lake, and associated facilities for wildlife research and studies. The north entrance to the Farm leads into the major portion of the farmland. In this area are pastures, experimental plots, buildings, and equipment needed to demonstrate the various phases of agriculture for teaching, research, and public service programs offered by the College of Agriculture. A recent addition to this area is the South Texas Plant Materials Center.

Texas A&I University operates a *Citrus Research Center* headquartered in Weslaco, Texas. Properties include a number of tracts used for the development and evaluation of citrus crops: a 9 acre tract located at Bayview and 12 acres located northwest of Edinburg, 67 acres located 8 miles north of the Center's headquarters, and 183 acres located around the headquarters. There are a total of nine buildings in the headquarters area. These include research and teaching facilities, greenhouses, storage buildings, and shops.

In 1968, a total of 141.5 acres of land was donated by the Federal Government to Texas A&I University. This site is located 26 miles southeast of the main campus and borders on Baffin Bay. Two temporary buildings have been placed on this site, and a new pier was built in 1980. This land, facilities, and the adjoining Bay are utilized for academic training and research in biology and marine science.

Also included as University property are three different farms used primarily for soil conservation studies and wildlife research.

## Administrative Buildings

*College Hall*, erected in 1951, is a two-story, air-conditioned building built of brick and tile. In it are located the administrative offices, including those of the President, the Vice-President for Academic Affairs, the Vice-President for University Affairs, the Comptroller, the Vice-President for Institutional Advancement, the Director of Admissions, the Registrar, the Director of Financial Aid, and the John R. Guinn Computation Center.

*Edward W. Seale Hall*, originally built in 1935 as a student dormitory, is a two-story building located on the corner of Armstrong and Santa Gertrudis Boulevard. This building houses the Campus Security Office, Student Placement Office, Texas A&I University Federal Credit Union, and other rented office space.

# TEXAS A&I UNIVERSITY



Police Department                    Campus Box 126, Kingsville, Texas 78363     (512)595-2611

INFORMATION DATA FOR UNIVERSITY POLICE DEPARTMENT EMPLOYEES

    YOU ARE NOW, OR, ARE ABOUT TO BECOME AN EMPLOYEE OF THE
TEXAS A & I UNIVERSITY POLICE DEPARTMENT.  IN AS MUCH AS THE
MANAGEMENT AND THE EMPLOYEES OF AN ORGANIZATION ARE A TEAM FORMED
FOR THE WELFARE AND PROMOTION OF THE BUSINESS OF THE ORGANIZATION,
THERE SHOULD BE, AS FAR AS POSSIBLE, A THOROUGH AND CLEAR UNDER-
STANDING OF WHAT IS TO BE EXPECTED OF EACH OF THE PARTIES
CONCERNED.

    AS YOU KNOW, TEXAS A & I UNIVERSITY IS IN THE BUSINESS OF
EDUCATING YOUNG MEN AND WOMEN.  THESE PEOPLE COME FROM NEAR AND
FAR AND SPEND SOME OF THE MOST FORMATIVE YEARS OF THEIR LIVES
HERE.  THIS BEING TRUE, THE PEOPLE WHO ARE ON THE STAFF MUST BE
OF THE HIGHEST MORAL CHARACTER.  WE TRY TO MAINTAIN A STAFF THAT
IS MORALLY CLEAN, HONEST, SOBER, COURTEOUS, AGREEABLE AND ALSO
INTERESTED IN THE WELFARE OF THE UNIVERSITY AND STUDENTS.  WE
ARE HERE SOLELY BECAUSE THERE ARE STUDENTS ATTENDING THE UNIVERSITY
AND TO MAKE OUR JOBS SECURE, WE MUST KEEP THE UNIVERSITY DESIRABLE
SO THAT STUDENTS WILL CONTINUE TO ATTEND.

    AS AN EMPLOYEE OF THE UNIVERSITY POLICE STAFF OF TEXAS A & I
UNIVERSITY, YOU WILL BE WORKING UNDER DIFFERENT CONDITIONS AS THE
OTHER EMPLOYEES OF THE UNIVERSITY, AND THE FOLLOWING ITEMS ARE
ENUMERATED FOR YOUR INFORMATION AND GUIDANCE:

    FULL TIME UNIVERSITY POLICE PERSONNEL:

1. YOU ARE TO WORK A MINIMUN OF FORTY ( 40 ) HOURS PER WEEK AS
    ASSIGNED.  ORDINARILY, THE ASSIGNMENT WILL BE FOR EIGHT ( 8 )
    HOURS PER DAY ( THIS MAY BE VARIED BY THE DIRECTOR ).
    ASSIGNMENTS WILL BE MADE FOR SATURDAYS, SUNDAYS AND SPECIAL
    EVENTS.  THE SUNDAY ASSIGNMENTS WILL BE KEPT TO A MINIMUM BY
    THE DAY TIME FRONT OFFICE STAFF.  THE FOLLOWING ITEMS WILL

DIRECTOR OF UNIVERSITY POLICE TO GIVE YOU COMPENSATORY TIME OFF.

2. AS AN EMPLOYEE OF THE UNIVERSITY, DEDUCTIONS WILL BE MADE IN ACCORDANCE WITH THE PROPER LAWS FOR THE FOLLOWING:

   A.) TEACHER RETIREMENT

   B.) SOCIAL SECURITY

   C.) FEDERAL INCOME TAX

3. YOU WILL BE EXPECTED TO COMPLETE AND SIGN THE FOLLOWING PAPERS AS A CONDITION OF YOUR EMPLOYMENT:

   A.) EMPLOYEE'S AFFIDAVIT

   B.) WITHHOLDING TAX FORM

   C.) TEACHER RETIREMENT DATA SHEET

   D.) PERSONAL INFORMATION SHEET

4. IT IS UNDERSTOOD THAT YOU ARE EMPLOYED ON A PROBATIONARY BASIS FOR THE FIRST SIX ( 6 ) MONTHS, AND THEREAFTER YOUR EMPLOY-MENT WILL BE EVALUATED EVERY YEAR.  YOUR EMPLOYMENT WILL BE CONTINUED SO LONG AS YOUR WORKMANSHIP ( BOTH AS TO QUALITY AND QUANTITY ) AND CONDUCT MEETS THE EXPECTATIONS OF THE DEPARTMENT, SUPERVISOR AND DIRECTOR.

000067

# G E N E R A L   R U L E S

THE FOLLOWING RULES SHALL BE KNOWN AS THE GENERAL RULES FOR THE TEXAS A & I UNIVERSITY POLICE DEPARTMENT.

SAID RULES ARE ESTABLISHED IN ACCORDANCE WITH SENATE BILL NO. 162, ACTS OF THE 60TH LEGISLATURE, REGULAR SESSION, 1967, AUTHORIZED TO PROMULGATE RULES AND REGULATIONS TO CARRY OUT THE PROVISIONS OF THE ACT WHILE ON THE PROPERTY UNDER THE CONTROL AND JURISDICTION OF TEXAS A & I UNIVERSITY.  VIOLATIONS OF ANY OF THE FOLLOWING SAID RULES AND REGULATIONS BY ANY MEMBER OF THE TEXAS A & I UNIVERSITY POLICE DEPARTMENT SHALL PROVIDE GROUNDS FOR REPRIMAND, SUSPENSION OR REMOVAL OF SAID MEMBER.

**\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \***

RULE 162-01: INCOMPETENCY TO PERFORM THE REQUIRED DUTIES. INCOMPETENCY SHALL BE DEFINED AS FAILURE TO PERFORM HIS/HER DUTIES IN SUCH A MANNER AS WILL TEND TO ESTABLISH AND MAINTAIN THE HIGHEST STANDARDS OF EFFICIENCY IN CARRYING OUT THE FUNCTIONS AND OBJECTIVES OF THE DEPARTMENT.

RULE 162-02: COWARDICE OR LACK OF ENERGY OF SUCH DEGREE AS TO AMOUNT TO EITHER INCOMPETENCY OR TO NEGLECT OF DUTY.

RULE 162-03: MAKING AND SUBMITTING FALSE REPORTS, OR GIVING FALSE INFORMATION TO A SUPERIOR OR THE DEPARTMENT.

RULE 162-04: BEING INTOXICATED WHILE ON DUTY, OR WHILE IN UNIFORM. NO MEMBER SHALL DRINK ANY KIND OF INTOXICATING LIQUOR WHILE ON DUTY OR IN UNIFORM.

RULE 162-05: MEMBERS SHALL NOT ASSOCIATE, OR CONSORT WITH KNOWN CRIMINALS OR ANY PERSON OF QUESTIONABLE CHARACTER.

RULE 162-06: MEMBERS SHALL SHOW THE PROPER RESPECT TO ALL SUPERIOR OFFICERS OF THE DEPARTMENT.

RULE 162-07: MEMBERS SHALL BE REQUIRED TO GIVE IMMEDIATE
ATTENTION TO, AND SHALL NOT WILLFULLY DISOBEY A
LAWFUL ORDER ISSUED BY A SUPERIOR OFFICER.

RULE 162-08: MEMBERS SHALL NOT USE ANY UNNECESSARY OR UNWARRANTED
FORCE TOWARDS A PRISONER OR OTHER PERSON.

RULE 162-09: MEMBERS SHALL NOT WITHHOLD FROM THEIR IMMEDIATE
SUPERIOR OFFICERS, INFORMATION PERTAINING TO ANY
SECURITY OR POLICE MATTERS.

RULE 162-10: MEMBERS SHALL ECERCISE CARE AND PROPER JUDGEMENT
WHILE OPERATING ANY UNIVERSITY OWNED VEHICLE OR
WHILE USING ANY UNIVERSITY OWNED PROPERTY.

RULE 162-11: MEMBERS WHEN INVOLVED IN ANY ACCIDENT WHILE ON DUTY
SHALL IMMEDIATELY NOTIFY A SUPERIOR OFFICER SO THAT
NECESSARY INVESTIGATION CAN BE MADE.

RULE 162-12: MEMBERS SHALL NOT USE INDECENT, PROFANE, OR HARSH
LANGUAGE, WHILE ON DUTY OR IN UNIFORM WHILE IN
PUBLIC.

RULE 162-13: MEMBERS SHALL NOT INDULGE IN ANY CONDUCT WHICH
WOULD TEND TO BRING THE DEPARTMENT INTO DISREPUTE
OR REFLECTS DISCREDIT UPON THE MEMBER AS A MEMBER
OF THE DEPARTMENT, OR WHICH IMPAIRS THE OPERATION
OF THE UNIVERSITY POLICE DEPARTMENT.

RULE 162-14: MEMBERS SHALL NOT VIOLATE ANY OF THE LAWS OF THE
UNITED STATES, STATE OF TEXAS, AND/OR ORDINANCES OF
THE CITY OF KINGSVILLE.

RULE 162-15: MEMBERS SHALL NOT VIOLATE ANY OF THE GENERAL AND
FISCAL REGULATIONS AND PROCEDURES OF TEXAS A & I
UNIVERSITY.

RULE 162-16: MEMBERS SHALL NOT PUBLICLY CRITICIZE OR RIDICULE
THE DEPARTMENT, ITS POLICIES, OR OTHER MEMBERS.

RULE 162-17: MEMBERS SHALL NOT ATTEMPT TO INFLUENCE THE ACTION
OF THE DIRECTOR OF UNIVERSITY POLICE, VICE-PRESIDENT,

MEMBERS OF THE ADMINISTRATIVE COUNSEL OR THE
PRESIDENT OF THE UNIVERSITY, IN ANY MATTER
AFFECTING THE DISCIPLINE OF THE DEPARTMENT, OR THE
PUNISHMENT OF ITS MEMBERS FOR BREACH OF RULES,
EXCEPT BY GIVING TRUTHFUL EVIDENCE IN REFERENCE TO
THE MATTER.

RULE 162-18: MEMBERS SHALL NOT, DIRECTLY OR INDIRECTLY, ATTEMPT
TO SOLICIT OR INFLUENCE ANY PERSON TO EFFECT THEIR
OWN TRANSFER OR PROMOTION, OR THE STATUS OF OTHERS,
WITHIN OR WITHOUT THE DEPARTMENT.

RULE 162-19: MEMBERS SHALL USE THE CHAIN OF COMMAND OF THE
UNIVERSITY POLICE DEPARTMENT BEFORE CONTACTING THE
DIRECTOR OF PERSONNEL, VICE-PRESIDENT, MEMBERS OF
THE ADMINISTRATIVE COUNSEL OR THE PRESIDENT OF THE
UNIVERSITY, ON BEHALF OF THEMSELVES OR OTHERS.

RULE 162-20: ANY MEMBER FEELING AGGRIEVED BECAUSE OF TREATMENT
OR ORDERS OF HIS/HER SUPERIOR OFFICER, SHALL MAKE
HIS/HER COMPLAINT KNOWN IN WRITING WITHIN FIVE
WORK DAYS FROM THE DATE OF CAUSE AND FORWARD IT TO
THE DIRECTOR OF UNIVERSITY POLICE THROUGH HIS/HER
DIVISION SUPERVISOR.  NO SUPERVISOR SHALL IMPEDE
THE FORWARDING OF THE COMPLAINT TO THE DIRECTOR.

RULE 162-21: MEMBERS SHALL MAKE AN EFFORT TO AVOID RELIGIOUS OR
POLITICAL DISCUSSION WHILE ON DUTY OR WHEN IN
UNIFORM.

RULE 162-22: MEMBERS SHALL NOT ACTIVELY PARTICIPATE IN ANY
POLITICAL CAMPAIGN ON DUTY OR IN UNIFORM, NOR
SHALL THERE BE ANY POLITICAL ASSOCIATION WITHIN
THE DEPARTMENT.  THEY SHALL NOT BECOME A MEMBER
OF ANY NON-RECOGNIZED UNIVERSITY ORGANIZATION,
ASSOCIATION OR SOCIETY WHICH IN ANY WAY DIVIDES
THEIR LOYALTY TO TEXAS A & I UNIVERSITY, THE STATE
OF TEXAS, OR THE UNITED STATES OF AMERICA.

RULE 162-23: MEMBERS SHALL NOT JOIN, OR BE A MEMBER OF ANY
NON-RECOGNIZED UNIVERSITY ORGANIZATION OR SOCIETY,
THE OBJECT OR PURPOSE OFWHICH SHALL, EITHER DIRECTLY
OR lNDIRECTLY, SEEK TO INTERFERE WITH THE DISCIPLINE
OR CONDUCT OF THE MEMBERS OF THE DEPARTMENT.

RULE 162-24: MEMBERS SHALL NOT PERMIT ANY PERSON, FOR WHOM IT IS
NOT INTENDED IN ACCORDANCE WITH ESTABLISHED
PROCEDURES, TO SEE OR EXAMINE ANY DEPARTMENTAL
DOCUMENT, RECORD OR REPORT.

RULE 162-25: MEMBERS SHALL NOT MAKE KNOWN ANY PROPOSED POLICE
MOVEMENT OF THE DEPARTMENT TO ANY PERSON NOT HAVING
AUTHORITY IN ACCORDANCE WITH ESTABLISHED DEPARTMENTAL
PROCEDURES.

RULE 162-26: MEMBERS SHALL NOT CONTRACT DEBTS THEY ARE UNABLE OR
UNWILLING TO PAY.

RULE 162-27: MEMBERS SHALL NOT BE ABSENT WITHOUT LEAVE WITHOUT
PRIOR DEPARTMENTAL APPROVAL.

RULE 162-28: MEMBERS SHALL NOT BE ABSENT FROM DUTY, UNLESS IN
CASE OF DEATH IN THE FAMILY, SICKNESS, SICKNESS IN
THE FAMILY, OR DISABILITY, WITHOUT THE PERMISSION
OF THE DIRECTOR OF UNIVERSITY POLICE OR IN HIS/HER
ABSENCE, NEXT SUPERVISOR IN COMMAND.

RULE 162-29: ANY MEMBER WHO, BECAUSE OF DEATH IN THE FAMILY,
SICKNESS, SICKNESS IN THE FAMILY, OR WHO WILL BE
ABSENT FROM DUTY, SHALL NOTIFY HIS/HER SUPERVISOR
AT LEAST TWO HOURS BEFORE THEIR SCHEDULED TOUR OF
DUTY, OR AS SOON AS PRACTICABLE.

RULE 162-30: MEMBERS SHALL NOT SLEEP ON DUTY.

RULE 162-31: MEMBERS SHALL DEVOTE THEIR ENTIRE TIME AND ATTENTION
TO THE BUSINESS OF THE DEPARTMENT WHILE ON ACTIVE
DUTY.  MEMBERS ARE SUBJECT TO CALL WHEN NOT ON
ACTIVE DUTY DURING DEPARTMENTAL EMERGENCIES.

PROVIDED BY LAW.

RULE 162-40: MEMBERS SHALL SIGN ALL POLICE RECORDS AND REPORTS WITH THEIR RANK, INITIALS, SURNAME, AND ASSIGNMENT.

RULE 162-41: MEMBERS WHILE ON DUTY IN UNIFORM SHALL WEAR THE BADGE ON THE OUTSIDE OF THE OUTERMOST GARMENT OVER THE LEFT BREAST.

RULE 162-42: MEMBERS WHILE ON DUTY, EITHER IN UNIFORM OR CIVILIAN CLOTHING, ARE REQUIRED, UNLESS OTHERWISE ORDERED, TO HAVE THEIR PERSON, UNIFORM, CIVILIAN CLOTHING, AND EQUIPMENT IN A NEAT CONDITION AND GOOD ORDER.

RULE 162-43: MEMBERS, DURING THEIR TOUR OF DUTY, SHALL CARRY ONLY SUCH WEAPONS AS HAVE BEEN OFFICIALLY APPROVED.

RULE 162-44: MEMBERS SHALL NOT LEAVE THEIR ASSIGNED DISTRICT WHILE ON DUTY, EXCEPT BY PERMISSION OF THEIR COMMANDING OFFICER OR POLICE DISPATCHER.

RULE 162-45: MEMBERS ASSIGNED OR DETAILED TO VEHICULAR DUTY SHALL BE RESPONSIBLE FOR THE CLEANLINESS OF THE POLICE VEHICLE, AND PRIOR TO EACH TOUR OF DUTY, SHALL EXAMINE SUCH VEHICLE THOROUGHLY FOR NECESSARY SUPPLIES, DAMAGES AND/OR DEFECTS, SUCH DEFECTS ARE TO BE REPORTED TO THE COMMANDING OFFICER.

RULE 162-46: MEMBERS SHALL NOT CHARGE, ADD TO OR REMOVE ANY EQUIPMENT IN ANY POLICE VEHICLE.

RULE 162-47: NO MEMBER SHALL PLACE AN UNCONSCIOUS OR OBVIOUSLY SICK PERSON IN JAIL.  WHEN OFFENDERS ARE ENCOUNTERED IN SUCH CONDITION, THEY ARE TO BE TAKEN TO THE UNIVERSITY INFIRMARY OR HOSPITAL FOR EXAMINATION AND DIAGNOSIS.

RULE 162-48: MEMBERS SHALL NOT, AFTER THE AFFIDAVIT IS FILED ON ANY CASE, REDUCE, ALTER OR CHANGE THE ORIGINAL CHARGE, NOR RECOMMEND OR AGREE TO ANY SUCH ARRANGEMENT WITHOUT THE APPROVAL OF THEIR COMMANDING

RULE 162-32: MEMBERS SHALL NOT SELL TICKETS OR SOLICIT ANY FORM
OF DONATIONS OR CONTRIBUTIONS WHILE ON DUTY OR IN
UNIFORM OR WHILE REPRESENTING THEMSELVES AS POLICE
OFFICERS, WITHOUT THE WRITTEN PERMISSION OF THE
DIRECTOR OF UNIVERSITY POLICE.

RULE 162-33: MEMBERS SHALL NOT ACCEPT ANY GIFT FROM, PURCHASE
ANY ARTICLE FROM, OR BARTER WITH ANY PERSON WHO IS
IN CUSTODY.

RULE 162-34: NO MEMBER SHALL ACCEPT ANY GRATUITY FROM A MEMBER OF
THE PUBLIC IN CONNECTION WITH THE PERFORMANCE OF
HIS/HER DUTIES WITHOUT THE WRITTEN PERMISSION OF THE
DIRECTOR OF UNIVERSITY POLICE.

RULE 162-35: MEMBERS SHALL NOT MAKE ANY EXPENDITURES OF MONEY OR
INCUR A FINANCIAL OBLIGATION IN THE NAME OF THE
DEPARTMENT, WITHOUT WRITTEN PERMISSION OF THE
DIRECTOR OF UNIVERSITY POLICE.

RULE 162-36: MEMBERS SHALL NOT INDULGE IN JOKING, KIDDING OR
TRANSACT PRIVATE BUSINESS, OVER ANY POLICE
COMMUNICATIONS SYSTEM AS SUCH SYSTEMS ARE STRICTLY
FOR BUSINESS PURPOSES.

RULE 162-37: MEMBERS SHALL NOT RECOMMEND TO A PRISONER OR OTHER
PERSON, THE EMPLOYMENT OF ANY PERSON OR ATTORNEY,
AND SHALL NOT SUGGEST OR NAME ANY LAWYER, BAIL
BONDSMAN, OR OTHER PERSON, TO A PRISONER WITH THE
VIEW TO HIS/HER DEFENSE OR RELEASE.

RULE 162-38: MEMBERS SHALL TAKE NO OFFICIAL ACTION IN CIVIL
CASES, EXCEPT TO PREVENT AN IMMEDIATE BREACH OF
THE PEACE.

RULE 162-39: MEMBERS SHALL NOT, DIRECTLY OR INDIRECTLY, BE
CONCERNED IN MAKING ANY COMPROMISE OR ARRANGEMENT
BETWEEN THIEVES, OR OTHER CRIMINALS, AND PERSONS
WHO HAVE SUFFERED BY THEIR ACTS WITH A VIEW OF
PERMITTING THE CRIMINAL TO ESCAPE THE PENALTIES

OFFICER OR THE PROSECUTING ATTORNEY.

RULE 162-49: MEMBERS SHALL NOT, AFTER THE AFFIDAVIT IS FILED, DISCUSS THE CIRCUMSTANCES WITH THE DEFENDANT'S ATTORNEY, OR ANY UNAUTHORIZED PERSON, BUT SHALL POLITELY REFER THEM TO THE PROSECUTING ATTORNEY FOR ANY INFORMATION DESIRED, AS THE CASE IS THEN UNDER THE JURISDICTION OF THE COURT.

RULE 162-50: MEMBERS, WHEN FINDING IT NECESSARY TO USE FORCE IN ARRESTING OR ATTEMPTING TO ARREST, ANY PERSON, SHALL AS SOON AS POSSIBLE, ADVISE HIS COMMANDING OFFICER OF SUCH FACT, WHO SHALL MAKE OR CAUSE TO BE MADE, AN IMMEDIATE INVESTIGATION, AND CAUSE A COMPLETE REPORT TO BE SUBMITTED.

RULE 162-51: MEMBERS, WHEN TRANSPORTING OR GUARDING PRISONERS, SHALL BE HELD STRICTLY RESPONSIBLE FOR THEIR SAFE-KEEPING.  HANDCUFFS SHALL BE USED WHEN AN ARREST IS MADE, OR WHILE TRANSPORTING PRISONERS, EXCEPT WHEN THE PRISONER IS CRIPPLED OR INCAPACITATED, UNLESS CONDITIONS WARRANT OTHERWISE.  WHENEVER THE USE OF HANDCUFFS IS NECESSARY, IT SHOULD BE DONE IN AS HUMANE MANNER AS POSSIBLE.  HANDCUFFS ARE A MEANS OF RESTRAINT AND NOT A FORM OF PUNISHMENT.  TO DELIBERATELY TIGHTEN THE HANDCUFFS ON A PRISONER IN ORDER TO " PUNISH " HIM/HER MAY BE CONSTRUED, AFTER INVESTIGATION, AS AN ASSAULT ON THE PRISONER BY THE OFFICER.

( TEXAS PENAL CODE - SECTION 22.01 )

000074



**POLICE DEPARTMENT**

CAMPUS BOX 126 • KINGSVILLE, TEXAS 78363

512/595-2611

**STANDARD   PROCEDURES**

TO                    :   ALL UNIVERSITY POLICE PERSONNEL

SUBJECT          :   TRAINING SCHOOLS AND SEMINARS, COMPENSATORY TIME
                         OFF AND TRAVEL TIME

PURPOSE         :   To provide for a simple and efficient system and to
                         insure uniform standards of practice by all
                         University Police Department Personnel

REFERENCE      :   The Texas A/M University System Administrative policy
                         and Reporting Manual, Texas A/M University General
                         and Fiscal Regulation, Fair Labor Standards Act, Texas
                         Commission on Law Enforcement Officer Standards and
                         Education, and prior departmental directives.

PROCEDURE     :   The primary function of the University Police Department
                         is to serve the students, faculty, staff and to protect
                         them and their property from criminal acts. The University
                         Police is also charged to protect university property and
                         to preserve the peace and maintain civil order on campus,
                         while enforcing all Federal, State and local laws as well
                         as University Rules and Regulations. Occasionally, it may
                         be required for employees to work beyond their normal
                         tour of duty and/or attend a specialized training session
                         or workshop. Advanced certification and current knowledge
                         of police related topics enable the university police
                         department to provide the highest professional service to
                         our academic community.

                         The University provides Compensatory Time Off for employees
                         that may incur any overtime balance during an official
                         administrative work week. The overtime may be a result of
                         an additional service to the department/university and/or
                         additional In-Service Police Training.

                         The COMPENSATORY TIME OFF STANDARD PROCEDURE IS AS FOLLOWS:

                         Overtime to be documented on the time card by any police
                         employee must be approved in advance by a supervisor, Lt
                         and Director of University Police.

000086



**POLICE DEPARTMENT**

CAMPUS BOX 126 • KINGSVILLE, TEXAS 78363

512/595-2611

Compensatory Time Off will be provided for any full time employee who
works more than eight hours on any schedule tour of duty. Prior to
compensatory time off being granted at the rate of time and a half, the
employee must have exceeded the 40-hour work week. For the purpose of
assessing the overtime, vacation, holiday, sick leave and other official
leaves are not counted as hours worked. Should the emplyee exceed 8 hours
during any particular day and not exceed the 40 hour workweek, compensatory
time off will be granted on an hour per hour basis.

University employees are encouraged to attend Police In-Service Training
Schools or seminars that are required for advanced certification or seminar
topics revelant to the performance of Police duties on our campus. An
employee will be compensated for his/her travel time (departure and return)
based on the millage from the University Police Department Headquarters in
Kingsville Texas. Attendance of any Police Ir-Service Training School or
Seminar must be requested in writing by the employee, and approval by the
Shift Supervisor, Lieutenant and Director of University Police.

The " Compensatory Time Off" to be granted for the classified staff employee
shall be awarded no sooner than eight(8) days _after_ the overtime is worked
and prior to thirty(30) days of the date the overtime was worked. Any
other arrangements for compensatory time off must be approved in advance
by the Directors Office.

September 9, 1994

Humberto M Garcia
Director, University Police

B

Create PDF www.freepdf.com

EXHIBIT

Position Description


SERGEANT

UNIVERSITY POLICE

RESPONSIBILITY:

The Sergeant has a supervisory role involving the
direction of the Patrol Officers and Guards engaged in the
protection and safeguarding of human lives and property.  The
exercise of independent judgement is expected within the
limits of provisions of traffic, civil and criminal laws, and
Police policies.  This employee maintains control and
provides assistance to subordinates through close and
constant acquaintance and familiarization of field
conditions.  He/she shall report to and be accountable to the
Investigator and/or the Director.

EXAMPLES OF WORK:

These examples are intended as illustrations of the
various types of duties performed in positions allocated to
this class.

    1.  Directs all activities of uniformed personnel during
an assigned shift.
    2.  Makes special assignments or dispatches officers as
necessary.
    3.  Assign personnel to assemble information for
reports, and reviews all reports prepared by officers.
    4.  Responsible for building checks and investigates and
unusual events.
    5.  Provide training to officers as appropriated.
    6.  Monitors use of all vehicles during a shift and
maintains records.
    7.  May interview witnesses and gather information.
    8.  Maintains contact with other law enforcement
agencies.
    9.  Performs other duties as required.

QUALIFICATIONS:

Three to five years experience as a commissioned police
officer, two years of education ( 60 semester units ) at an
accredited college or university or equivalent combination of
experience and training or experience.  And should have an
Intermediate certificate from the Texas Commission on Law
Enforcement.

000156

C

ClickPDF - www.fastio.com

**EXHIBIT B1**
Interview Questions 1998

1. As a police supervisor you have received numerous complaints about your patrol vehicle, vary from poor maintenance to uncomfortable surroundings.

What steps would you take to rectify this situation?

2. As a supervisor you are informed that one of your subordinates is n alcoholic. He does not drink on the job, but has the smell of alcohol on his or her breath. What action will you take and when?

3. As a supervisor you have noticed that one of your officers is having difficulty in following your orders or instructions. What is your course of action, if any?

4. As a supervisor you have notice that one of your subordinates is having problems with his or her personal hygiene. What actions would you take to correct this situation?

5. As a police supervisor you were called by the outgoing shift crew member, approximately 30 minutes into the mid-shift that your crew was not coming into work. Your dispatcher was out on holiday leave, one officer called in side earlier, one officer was on days off, and the other officer called in sick at the last minute. What would you do to cover the shift?

6. In your own words, tell us why you should be the one selected for the position of sergeant.

D

Case 2:00-cv-00069    Document 25    Filed in TXSD on 11/06/2000    Page 52 of 103

1. As a supervisor your duty officers advise you that two patrol vehicles are out of service. It is reported that the vehicles have flat tires. This has occurred at six p.m.  What would you do to resolve the issue?

2. As a supervisor you are informed that two of your officers were involved in a dispute with each other. The incident is reported to have occurred in public. The two officers and a dispatcher cover the shift. What would you do to resolve the matter and when?

3. In your own words tell us that characteristics are essential in order to be a police supervisor.

4. As a supervisor you receive information that one of your subordinates is involved in conduct which may discredit the department and the university. The information is in reference to harassment of members of the opposite sex and is reported to have the smell of alcohol on his breath. What action would you take and when?

5. As a supervisor you have noticed that your officers continue having difficulty following your orders or instructions. What is your course of action if any?

6. One of your officers is involved in a vehicle accident and is driving a police vehicle. The officer is slightly injured. The operator of the second vehicle is seriously injured. The accident occurred at University Blvd., and B Ave. What action will you take and when?

7. In your own words tell us why you should be the one selected for the position of sergeant.

8. In your opinion is it necessary to issue traffic citations for all motor vehicle accidents?

E

Created by eDocPrinter PDF Pro, www.Tinstry.com

Case 2:00-cv-00069   Document 25   Filed in TXSD on 11/06/2000   Page 54 of 103

# QUALIFICATION APPRAISAL GUIDE

CANDIDATE _Salvador Trevino_   TITLE OF EXAMINATION _Sergeant_   DATE _8-18-98_

OVERALL PERCENTAGE RATE _92_
( 70% is qualifying )

| | BELOW PASSING NOT ACCEPTABLE DEFICIENT 46-69 | PASSING AVE 70-84 | PASSING ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |
|---|---|---|---|---|
| APPEARANCE, MANNER AND BEARING | | | 92 | |
| ABILITY TO PRESENT IDEAS | | | | 98 |
| ALERTNESS | | | | 97 |
| BACKGROUND AND EXPERIENCE | | | | 96 |
| | | | | 98 |
| | | | | 100 |
| | | | | 98 |

RATERS SIGNATURE _Sgt. R. Rios #105_

00164

... UNIVERSITY POLICE DEPARTMENT

QUALIFICATION APPRAISAL GUIDE

CANDIDATE _FRANCO_          TITLE OF EXAMINATION _____          DATE _8-18-98_

OVERALL PERCENTAGE RATE
( 70% is qualifying )

| | BELOW PASSING NOT ACCEPTABLE DEFICIENT 40-69 | PASSING AVE 70-84 | ABOVE AVERAGE 85-92 | PASSING OUTSTANDING 93-100 |
|---|---|---|---|---|
| APPEARANCE, MANNER AND BEARING | | | 92 | |
| ABILITY TO PRESENT IDEAS | | | | 97 |
| | | | | 95 |
| ALERTNESS | | | | 95 |
| | | | | 97 |
| | | | | 100 |
| | | | | 97 |

RATERS SIGNATURE _Sgt. [signature]_

00000165

# QUALIFICATION APPRAISAL GUIDE

CANDIDATE: _St. Thomas_     TITLE OF EXAMINATION: _Sergeant_     DATE: _2/18-98_

OVERALL PERCENTAGE RATE
( 70% is qualifying )

| | BELOW PASSING | | PASSING | | |
|---|---|---|---|---|---|
| | NOT ACCEPTABLE 0-69 | DEFICIENT | AVE 70-84 | ABOVE AVERAGES 85-92 | OUTSTANDING 93-100 |
| | | | | 92 | |
| | | | | | 98 |
| | | | | | 95 |
| | | | | | 93 |
| | | | | | 95 |
| | | | | | 98 |
| | | | | | 100 |

RATERS SIGNATURE _[signature]_

000166

ClickPDF · www.fawia.com

## QUALIFICATION APPRAISAL GUIDE

CANDIDATE: _Connell_

OVERALL PERCENTAGE RATE
( 70% is qualifying)

TITLE OF EXAMINATION _____

DATE _8-18-98_

| | BELOW PASSING NOT ACCEPTABLE DEFICIENT 40-69 | AVE 70-84 | PASSING ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |
|---|---|---|---|---|
| APPEARANCE, MANNER, AND BEARING: Will he appear, dress, and present himself in a neat and businesslike manner? | | | 92 | |
| ADAPTABILITY: Is he willing to take and adapt to a variety of assignments? | | | 88 | |
| ABILITY TO PRESENT IDEAS: Will his ability to present his ideas get the message across? | | | | 93 |
| ALERTNESS: Does he quickly and accurately size up a situation and does he have the quickness to react? | | | 85 | |
| FRANKNESS: Does he make a candid and honest appraisal or is he evasive? Does he try to avoid problems or does he face them? | | | 85 | |
| RESPONSIVENESS AND BACKGROUND: When backed into a problem or issue, how did he respond and react? How did he use his background and training? | | | 92 | |
| EVALUATION AND CONCLUSIONS: After an overall evaluation of the candidate, what are your conclusions? | | | 90 | |

RATERS SIGNATURE _Sgt. _____

000176

QUALIFICATION APPRAISAL GUIDE

CANDIDATE: Joseph Connor

TITLE OF EXAMINATION: SERGEANT

DATE: 8-18-98

OVERALL PERCENTAGE RATE
( 70% is qualifying ) _____

| | BELOW PASSING NOT ACCEPTABLE 40-69 DEFICIENT | | AVE 70-84 | PASSING ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |
|---|---|---|---|---|---|
| | | | | 92 | |
| | | | | 89 | |
| | | | | 90 | |
| | | | | 89 | |
| | | | | 88 | |
| | | | | 90 | |
| | | | | 90 | |

RATERS SIGNATURE

# QUALIFICATION APPRAISAL GUIDE

CANDIDATE: _(signature)_

TITLE OF EXAMINATION: _Dept_

DATE: _8-18-98_

OVERALL PERCENTAGE RATE
( 70% is qualifying )

| Criteria | BELOW PASSING NOT ACCEPTABLE DEFICIENT 40-69 | AVE 70-84 | PASSING ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |
|---|---|---|---|---|
| APPEARANCE, MANNER AND BEARING: Will his appearance, manner, bearing and voice detract from or add to his presence? Does he create a favorable presence? Drive? Stamina? | | | 92 | |
| BILL TO PRESENT IDEAS: Will his ability to present ideas assist or detract in his work? Does he express himself clearly? Could he submit his views in an orderly and convincing manner? | | | 85 | |
| SPECIAL ADAPTABILITY: Is he a good organizer? Would he work congenially and get along with others? Would he have a friendly adaptable personality to fit into the organization? | | | 90 | |
| ALERTNESS: Does he accept ideas quickly or does he need to have the costs explained to him? Will problems in his job or in obvious points would he understand they present a problem before they become acute? | | | 85 | |
| POLICY AND BACKGROUND: Will his background experience and training lend itself to the exemplary job assignment? | | 85 | | |
| OVERALL EVALUATION: After considering the above, what overall combined head and qualifications... | | 84 | | |
| | | 84 | | |

RATERS SIGNATURE _(signature)_

000178

F

CutePDF — www.festo.com

# TEXAS A & M UNIVERSITY POLICE DEPARTMENT
## QUALIFICATION APPRAISAL GUIDE

CANDIDATE _Pete Cavazos_   TITLE OF EXAMINATION _Sergeant_   DATE _3-26-99_

OVERALL PERCENTAGE RATE ___94___
(70% is qualifying)

**APPEARANCE, MANNER & BEARING:** Will his/hers appearance, manner or bearing help or hinder him/her in their job? Will he/she be impressive when speaking to the officers? Other Law Enforcement Officers? Civic Groups? Does he/she appear to have the necessary command presence? Drive? Stamina?

**ABILITY TO PRESENT IDEAS:** Will his/her ability to express himself/herself be adequate for the job? Is he/she logical, convincing, persuasive? Or does he/she ramble or get confused or talk vaguely or get verbose?

**SOCIAL ADAPTABILITY:** Is he/she at ease, friendly and confident? Will he/she have the adaptability necessary to deal with public officials, co-workers, etc. Under trying conditions? Or would he/she tend to be submissive, overbearing or impatient?

**ALERTNESS:** Does he/she grasps ideas quickly or does he/she appear to be slow to understand? Do his/hers responsive indicate that he/she would be quick to understand the problem in his/her job or would he/she understand only the more obvious points?

**JUDGEMENT:** Will he/she consider all the facts before reaching a decision? Will he/she know when to act and when to get more information before acting? Will he/she .now when a situation justifies departure from policy and when it doesn't? Would you trust his/her judgement?

**ADEQUACY OF BACKGROUND:** Will his/her background fit him/her for the duties of this position? Is his/hers experience sufficiently broad and extensive that he/she will have an adequate background upon which to draw?

**OVERALL EVALUATION:** After comparing the candidate with the above factors and any other personal qualifications, would you select him/her for employment in this job? To what extend does he/she meet what you consider to be the ideal qualifications for this job?

| | BELOW PASSING NOT ACCEPTABLE 0-39 | DEFICIENT 40-69 | AVERAGE 70-84 | PASSING ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |
|---|---|---|---|---|---|
| | | | | | 95 |
| | | | | | 94 |
| | | | | | 93 |
| | | | | | 95 |
| | | | | | 95 |
| | | | | 91 | |
| | | | | | 95 |

RATER'S SIGNATURE _Sgt. R. Bigler #105_

# TEXAS A & M UNIVERSITY POLICE DEPARTMENT
## QUALIFICATION APPRAISAL GUIDE

CANDIDATE **Pedro Cavazos**   TITLE OF EXAMINATION **Sergeant's**   DATE **3-26-99**

OVERALL PERCENTAGE RATE **94**
(70% is qualifying)

| | BELOW PASSING | | PASSING | | |
|---|---|---|---|---|---|
| | NOT ACCEPTABLE 0-39 | DEFICIENT 40-69 | AVERAGE 70-84 | ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |
| **APPEARANCE, MANNER & BEARING:** Will his/hers appearance, manner or bearing help or hinder him/her in their job? Will he/she be impressive when speaking to the officers? Other Law Enforcement Officers? Civic Groups? Does he/she appear to have the necessary command presence? Drive? Stamina? | | | | | 95 |
| **ABILITY TO PRESENT IDEAS:** Will his/her ability to express himself/herself be adequate for the job? Is he/she logical, convincing, persuasive? Or does he/she ramble or get confused or talk vaguely or get verbose? | | | | | 95 |
| **SOCIAL ADAPTABILITY:** Is he/she at ease, friendly and confident? Will he/she have the adaptability necessary to deal with public officials, co-workers, etc. Under trying conditions? Or would he/she tend to be submissive, overbearing or impatient? | | | | 92 | |
| **ALERTNESS:** Does he/she grasps ideas quickly or does he/she appear to be slow to understand? Do his/hers responsive indicate that he/she would be quick to understand the problem in his/her job or would he/she understand only the more obvious points? | | | | | 93 |
| **JUDGEMENT:** Will he/she consider all the facts before reaching a decision? Will he/she know when to act and when to get more information before acting? Will he/s 'now when a situation justifies departure from policy and when it doesn't? Would you trust his/her judgement? | | | | | 95 |
| **ADEQUACY OF BACKGROUND:** Will his/her background fit him/her for the duties of this position? Is his/hers experience sufficiently broad and extensive that he/she will have an adequate background upon which to draw? | | | | | 95 |
| **OVERALL EVALUATION:** After comparing the candidate with the above factors and any other personal qualifications, would you select him/her for employment in this job? To what extend does he/she meet what you consider to be the ideal qualifications for this job? | | | | | 95 |

RATER'S SIGNATURE _[signature]_

# TEXAS A & M UNIVERSITY POLICE DEPARTMENT
## QUALIFICATION APPRAISAL GUIDE

CANDIDATE **Pedro Cavazos**   TITLE OF EXAMINATION **Sergeant**   DATE **3/24/99**

OVERALL PERCENTAGE RATE **91**
(70% is qualifying)

| | BELOW PASSING | | PASSING | |
|---|---|---|---|---|
| | NOT ACCEPTABLE 0-39 | DEFICIENT 40-69 | AVERAGE 70-84 | ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |

**APPEARANCE, MANNER & BEARING:** Will his/hers appearance, manner or bearing help or hinder him/her in their job? Will he/she be impressive when speaking to the officers? Other Law Enforcement Officers? Civic Groups? Does he/she appear to have the necessary command presence? Drive? Stamina?

**ABILITY TO PRESENT IDEAS:** Will his/her ability to express himself/herself be adequate for the job? Is he/she logical, convincing, persuasive? Or does he/she ramble or get confused or talk vaguely or get verbose? — 92, 95

**ALERTNESS:** Does he/she grasps ideas quickly or does he/she appear to be slow to understand? Do his/hers responsive indicate that he/she would be quick to understand the problem in his/her job or would he/she understand only the more obvious points? — 92

**SOCIAL ADAPTABILITY:** Is he/she at ease, friendly and confident? Will he/she have the adaptability necessary to deal with public officials, co-workers, etc. Under trying conditions? Or would he/she tend to be submissive, overbearing or impatient? — 84

**JUDGEMENT:** Will he/she consider all the facts before reaching a decision? Will he/she know when to act and when to get more information before acting? Will he/s know when a situation justifies departure from policy and when it doesn't? Would you trust his/her judgement? — 90

**ADEQUACY OF BACKGROUND:** Will his/her background fit him/her for the duties of this position? Is his/hers experience sufficiently broad and extensive that he/she will have an adequate background upon which to draw? — 92

**OVERALL EVALUATION:** After comparing the candidate with the above factors and any other personal qualifications, would you select him/her for employment in this job? To what extend does he/she meet what you consider to be the ideal qualifications for this job? — 93

RATER'S SIGNATURE

000187

Case 2:00-cv-00062  Document    Filed in TXSD on 11/06/2006  Page 64 of 101
CutePDF - www.texts.com

# TEXAS A & M UNIVERSITY POLICE DEPARTMENT
## QUALIFICATION APPRAISAL GUIDE

CANDIDATE _Joseph Cowne_   TITLE OF EXAMINATION _Seegehot_   DATE _3-26-99_

OVERALL PERCENTAGE RATE _89_
(70% is qualifying)

| | BELOW PASSING | | PASSING | |
|---|---|---|---|---|
| | NOT ACCEPTABLE 0-39 | DEFICIENT 40-69 | AVERAGE 70-84 | ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |

**APPEARANCE, MANNER & BEARING:** Will his/hers appearance, manner or bearing help or hinder him/her in their job? Will he/she be impressive when speaking to the officers? Other Law Enforcement Officers? Civic Groups? Does he/she appear to have the necessary command presence? Drive? Stamina?    89

**ABILITY TO PRESENT IDEAS:** Will his/her ability to express himself/herself be adequate for the job? Is he/she logical, convincing, persuasive? Or does he/she ramble or get confused or talk vaguely or get verbose?    90

**SOCIAL ADAPTABILITY:** Is he/she at ease, friendly and confident? Will he/she have the adaptability necessary to deal with public officials, co-workers, etc. Under trying conditions? Or would he/she tend to be submissive, overbearing or impatient?    88

**ALERTNESS:** Does he/she grasps ideas quickly or does he/she appear to be slow to understand? Do his/hers responsive indicate that he/she would be quick to understand the problem in his/her job or would he/she understand only the more obvious points?    89

**JUDGEMENT:** Will he/she consider all the facts before reaching a decision? Will he/she know when to act and when to get more information before acting? Will he/she ..now when a situation justifies departure from policy and when it doesn't? Would you trust his/her judgement?    87

**ADEQUACY OF BACKGROUND:** Will his/her background fit him/her for the duties of this position? Is his/hers experience sufficiently broad and extensive that he/she will have an adequate background upon which to draw?    90

**OVERALL EVALUATION:** After comparing the candidate with the above factors and any other personal qualifications, would you select him/her for employment in this job? To what extend does he/she meet what you consider to be the ideal qualifications for this job?    89

RATER'S SIGNATURE _[signature] #25_

000182

# TEXAS A M UNIVERSITY POLICE DEPARTMENT
## QUALIFICATION APPRAISAL GUIDE

CANDIDATE  *Joseph Connor*

TITLE OF EXAMINATION  *Sergeant*   DATE  *3/26/99*

OVERALL PERCENTAGE RATE  _66_
(70% is qualifying)

**APPEARANCE, MANNER & BEARING:** Will his/her appearance, manner or bearing help or hinder him/her in their job? Will he/she be impressive when speaking to the officers? Other Law Enforcement Officers? Civic Groups? Does he/she appear to have the necessary command presence? Drive? Stamina?

**ABILITY TO PRESENT IDEAS:** Will his/her ability to express himself/herself be adequate for the job? Is he/she logical, convincing, persuasive? Or does he/she ramble or get confused or talk vaguely or get verbose?

**SOCIAL ADAPTABILITY:** Is he/she at ease, friendly and confident? Will he/she have the adaptability necessary to deal with public officials, co-workers, etc. Under trying conditions? Or would he/she tend to be submissive, overbearing or impatient?

**ALERTNESS:** Does he/she grasps ideas quickly or does he/she appear to be slow to understand? Do his/here responsive indicate that he/she would be quick to understand the problem in his/her job or would he/she understand only the more obvious points?

**JUDGEMENT:** Will he/she consider all the facts before reaching a decision? Will he/she know when to act and when to get more information before acting? Will he/she know when a situation justifies departure from policy and when it doesn't? Would you trust his/her judgement?

**ADEQUACY OF BACKGROUND:** Will his/her background fit him/her for the duties of this position? Is his/hers experience sufficiently broad and extensive that he/she will have an adequate background upon which to draw?

**OVERALL EVALUATION:** After comparing the candidate with the above factors and any other personal qualifications, would you select him/her for employment in this job? To what extent does he/she meet what you consider to be the ideal qualifications for this job?

| | BELOW PASSING NOT ACCEPTABLE 0-39 | BELOW PASSING DEFICIENT 40-69 | PASSING AVERAGE 70-84 | PASSING ABOVE AVERAGE 85-92 | PASSING OUTSTANDING 93-100 |
|---|---|---|---|---|---|
| APPEARANCE, MANNER & BEARING | | | 70 | | |
| ABILITY TO PRESENT IDEAS | | 65 | | | |
| SOCIAL ADAPTABILITY | | 69 | | | |
| ALERTNESS | | 60 | | | |
| JUDGEMENT | | 69 | 70 | | |
| ADEQUACY OF BACKGROUND | | 60 | | | |
| OVERALL EVALUATION | | | | | |

RATER'S SIGNATURE  _[signature]_ *#/04*

# TEXAS A & M UNIVERSITY POLICE DEPARTMENT
# QUALIFICATION APPRAISAL GUIDE

CANDIDATE  Joseph Connor   TITLE OF EXAMINATION  Sergeant's   DATE  3-26-99

OVERALL PERCENTAGE RATE  86
(70% is qualifying)

| | BELOW PASSING | | PASSING | |
|---|---|---|---|---|---|
| | NOT ACCEPTABLE 0-39 | DEFICIENT 40-69 | AVERAGE 70-84 | ABOVE AVERAGE 85-92 | OUTSTANDING 93-100 |
| **APPEARANCE, MANNER & BEARING:**  Will his/hers appearance, manner or bearing help or hinder him/her in their job? Will he/she be impressive when speaking to the officers? Other Law Enforcement Officers? Civic Groups? Does he/she appear to have the necessary command presence? Drive? Stamina? | | | | | |
| **ABILITY TO PRESENT IDEAS:**  Will his/her ability to express himself/herself be adequate for the job? Is he/she logical, convincing, persuasive? Or does he/she ramble or get confused or talk vaguely or get verbose? | | | | 85 | |
| **ALERTNESS:**  Does he/she grasps ideas quickly or does he/she appear to be slow to understand?  Do his/hers responsive indicate that he/she would be quick to understand the problem in his/her job or would he/she understand only the more obvious points? | | | | 85 | |
| **SOCIAL ADAPTABILITY:**  Is he/she at ease, friendly and confident?  Will he/she have the adaptability necessary to deal with public officials, co-workers, etc.  Under trying conditions?  Or would he/she tend to be submissive, overbearing or impatient? | | | 75 | | |
| **JUDGEMENT:**  Will he/she consider all the facts before reaching a decision?  Will he/she know when to act and when to get more information before acting?  Will he/s  :now when a situation justifies departure from policy and when it does'nt?  Would you trust his/her judgement? | | | | 85 | |
| **ADEQUACY OF BACKGROUND:**  Will his/her background fit him/her for the duties of this position?  Is his/hers experience sufficiently broad and extensive that he/she will have an adequate background upon which to draw? | | | | | 93 |
| **OVERALL EVALUATION:**  After comparing the candidate with the above factors and any other personnel qualifications, would you select him/her for employment in this job?  To what extend does he/she meet what you consider to be the ideal qualifications for this job? | | | | 85 | 95 |

RATER'S SIGNATURE  H. Sandra Henson

G



POLICE DEPARTMENT

MSC 126 • KINGSVILLE, TEXAS 78363

PHONE 361/593-2611 • FAX 361/593-2583

April 24, 1999

To:       Joseph Connor
          Patrolman, UPD

From:     Bert Garcia
          Chief, UPD

re:       Personal Conference

     On April 15, 1999 at 4:00 p.m., a personal conference
was held between yourself, Sgt. Franco and myself to
discuss a report you filed regarding a call from Martin
Hall received on April 1, 1999.  My concern was that you
and Officer Everett had confiscated some personal property
from room 122B-Martin Hall without the consent of the
student assigned to that room or without a search warrant.
This is in violation of all laws in this and every state.

The call from Martin Hall by the dorm director was for drug
paraphernalia that was discovered in plain view by the
director while conducting a security check of the dorm
rooms during the Easter break.  The confiscation of the
drug paraphernalia was legal since it was in plain view,
however, the search of the room and the seizure of personal
property was unacceptable.

In addition, according to your report, you stated that all
property seized was properly tagged and marked.  This
statement was incorrect in that none of the property was
marked and tagged.  You also failed to properly secure the
property in the evidence storage and you had stored it in
your personal locker.  Your excuse was that no supervisor
was available and this statement was also incorrect since
Sgt. Perez was on duty at the time.

Due to the seriousness of these infractions, this letter
will serve as an "OFFICIAL REPRIMAND" and any further
infraction will result in disciplinary action up to and
including termination.

*I do not agree*   4/28/99

000441

H



POLICE DEPARTMENT

MSC 126 • KINGSVILLE, TEXAS 78363

PHONE 361/593-2611 • FAX 361/593-2583

May 5, 1999

Mr. Joseph Connor
Patrol Officer
Texas A&M University-Kingsville
Police Department

Dear Mr. Connor;

On April 15, 1999, a personal conference was held between you, Sgt. Franco and myself regarding a report you had filed that included illegal searches and confiscations of personal property without consent or search warrants. At the conclusion of the letter presented to you, it stated that any further infraction would result in disciplinary action up to and including termination.

Apparently the letter presented to you had no meaning since you were called upon again on April 28, 1999 for another personal conference regarding your refusal of an order from your supervisor to initiate a theft report from Turner Hall. This constitutes "INSUBORDINATION". In addition, a report was also obtained from the resident advisor at Turner Hall where you requested the resident advisor to enter a private room without authority. A written report was also received from the dorm director, Mr. Rodriguez, advising that you had called him to obtain information on the report that had been filed by the resident advisor on this matter.

This letter is to serve as your second "OFFICIAL REPRIMAND" on your actions concerning the improprieties. Furthermore, a "PROBATION PERIOD" to be imposed for a period of six (6) months to commence on May 5, 1999 and stipulate that any infraction thereof during this period will result in termination. You will be notified in writing upon termination of this restriction.

000437

I



## TEXAS A&M
### UNIVERSITY
### KINGSVILLE
POLICE DEPARTMENT

# OFFICER'S REPORT

Case No. _____

| Place of Occurrence | Dist Occurrence | Offense Classification (Crime) |
|---|---|---|
| University Police Department | 1 | Information |

| Last Name of Complainant—First—Middle Name (or Firm Name) | Address of Complainant | Phone |
|---|---|---|
| | | RES |
| | | BUS |

| Day of Occurrence | Date of Occurrence | Time of Occurrence | Date Reported | Time Reported | How Reported |
|---|---|---|---|---|---|
| | | | | | ☐ Police Officer ☐ Person ☐ Phone ☐ Other |

Routing of Report—(Original to Records  Specify Other/s)

Attention  Records

Details (List Persons Involved/Injured/Arrested, Etc )—

On May 17, 1999, I was advised that the day shift for Sunday May 16, 1999 did not have a dispatcher. Officer Luis Everett and Officer Joseph Connor agreed to share the dispatcher's duties by alternating dispatching every two hours. Officer Everett advised that when he went out to patrol the campus, he realized that he had forgotten to get a set of keys. Officer Everett went back to the office to get some keys and he tried to go into the office and the door was locked. Officer Everett advised that he went to the front counter to advised Officer Connor to get him a set of keys and Officer Connor was not there. Officer Everett stated that he called for Officer Connor several times, but Officer Connor did not answer. Officer Everett advised that finally he got Officer Connor's attention and he asked him why he was not at the front desk. Officer Connor advised him that he was typing some paperwork. Officer Everett said that when he tried to see what Officer Connor was typing, Officer covered the paperwork up.

On Monday, May 17, 1999, I called the shift supervisor, Sgt. Hiram Perez and Officer Connor into my office. I asked Officer Connor why he was not at the dispatcher's desk when it was his turn to dispatch and he advised that he was in the back doing some paperwork. This officer advised him of the fact that Officer Everett came to the office and no one was at the dispatcher's desk and when Officer Everett tried to call and get his attention, he still did not respond. Officer Connor then tried to bring up the fact that Officer Everett had been late for work several times, and I advised Officer Connor that we were not talking about Officer Everett's tardiness, at this time, but the fact that he left the dispatcher's desk unmanned and that it might have been someone else other than Officer Everett at the front counter trying to get some help. Officer Connor advised that he was doing some paperwork. I advised Officer Connor that there were several typewriters in the front office and that he could have used either one of them and that he was never to leave the dispatcher's desk unmanned. Officer Connor did not say anything more and this officer advised him that he could leave the office and he did.

Witness:

Sgt Hiram Perez #108

000434

| Officer Making Report/Badge No. | Time & Date Prepared | Approving Authority |
|---|---|---|
| #104 Lt. Sandra Jefferson | 8:20 AM 5-24-99 | |

UPS Form 85-09-02

CSXPDF — www.fosta.com.cn

J

CWWPUB ™www.oki-e.com

Case 2 ... Document 25    Filed in TXSD on 11/06/2000    Page 74 of 103



# TEXAS A&M
## UNIVERSITY
### KINGSVILLE
POLICE DEPARTMENT

# OFFICER'S REPORT

Case No. _____

| Place of Occurrence | Dist Occurrence | Offense Classification (Crime) |
|---|---|---|
| Seale Hall | I | Incident |

| Last Name of Complainant—First—Middle Name (or Firm Name) | Address of Complainant | Phone |
|---|---|---|
| Everett , L.  Officer #110 | Seale Hall | RES<br>BUS 593-2611 |

| Day of Occurrence | Date of Occurrence | Time of Occurrence | Date Reported | Time Reported | How Reported |
|---|---|---|---|---|---|
| Sunday | 05-16-99 | 12:20p.m. | 05-16-99 | | ☐ Police Officer<br>☐ Person  ☐ Phone  ☐ Other |

Routing of Report—(Original to Records. Specify Other/s)

Attention: Records

Details  (List Persons Involved/Injured/Arrested, Etc )—

On 5-16-99 at approximately 8:05a.m. Officer Connor and myself Everett #110 were the only two individuals working on the day shift. At the start of our shift Connor and myself agreed  that we would split the shift into two hour rotations which makes the eight hour shift go by faster . Connor agreed to take the first two hours (8 - 10 )  and  I would relieve him at 10:00a.m. until 12 noon . At 11:30a.m. , Connor came into the station and was typing some paperwork in the squadroom. At 12:05p.m. after Connor hadn't come up front I went over to the squadroom and asked Connor for the keys to the unit so I could go on patrol. Connor got up and handed me the keys and I walked out the glass door to the unit out front. Connor at no time advise me that he was in need of more time to continue doing paperwork, but stated he'd be up front in a minute. After about twenty minutes I realized Connor had kept the keyring and went back to the station to pick up him. Upon arrival I found the interior door locked and went up to the front counter to ask Connor for a keyring or to open the door for me. As I entered I heard the phone ring twice and then it stopped, I did not see Connor in the front office. I called out his name thinking he was in the mens room but after a few minutes there was still no sign of him. I then went outside and entered through the glass door and found Connor still typing paperwork.I asked him if he had gone up front since I had left and he replied no. I then asked him if he was aware that I had left on patrol and he said he was but was finishing some paperwork and quickly covered up the papers he had near and in the typewritter. I informed him I was going up front until he finished and left it at that.

This Officer isnot complaining about having to sit and dispatch for whatever amount of time or about patroling. It is my concern that the front office was left unattended for an extended amount of time, and Officer Connor was aware of this. There are two typewriters up front in the front office and a third just off to the side in the copy room. If Officer Connor was not ready to go up front all he had to do was inform me of it. The previous weekend we both worked together without incident.

000433

| Officer Making Report—Badge No | Time & Date Prepared | Approving Authority |
|---|---|---|
| L. Everett #110 | 1:30p.m.  5-16-99 | |

UPS Form 86-08-02

CNIPDF • www.texia.com

K

Created by PaperSnatch.com

*November*
*6/25/58*

**Texas A&M University-Kingsville**
**Employee Complaint and Appeal Form**
Please route in order

Human Resources Officer (Please print): _I. L. HARTSFIELD_

Signature: _I. L. Hartsfield_          Date Received _6/16/99_

Dean, Director or Department Head (Please print): _____

Signature: _____          Date Received _____

Vice President (Please print): _____

Signature: _____          Date Received _____

**Statement of Complaint:**
       Please state the details of your complaint, including the dates of occurrence.
Include how you wish the complaint resolved. Attach pages if needed.

_____

_____

_____

_I WAS TERMINATED ON 6-4-99 FOR_
_AN ALLEGED VIOLATION OF A RULE, however,_
_ANOTHER HISPANIC employee who HAS_
_VIOLATED THIS RULE WAS NEVER DISCIPLINED_
_OR TERMINATED. I BELIEVE I have_
_BEEN DISCRIMINATED AGANST BECAUSE OF_
_my RACE, Anglo._

_____

Joseph K. Connor          _Joseph K. Connor_          _6/11/99_
Employee (Please Print)          Signature          Date

000430

2

CVisPDF – www.fineite.com

## AFFIDAVIT OF ROBERT BAZAN

STATE OF TEXAS       §
                        §
COUNTY OF KLEBERG    §

BEFORE ME, the undersigned authority, on this day personally appeared ROBERT BAZAN, who being by me duly sworn, deposed and said as follows:

"1.      My name is ROBERT BAZAN, and I am over the age of eighteen years and competent to make this Affidavit, and have personal knowledge of the facts stated herein, which are true and correct.

2.      I am currently employed by Texas A. & M. University–Kingsville.[1] And have been there since July 10, 1986, the date I was first employed. I started as a Patrolman, and eventually worked my way up to Sergeant. My promotion to Sergeant occurred on February 1992.

3.      As a Sergeant in the University Police Department.[2] I do not have the ability to hire, fire, promote, or demote employees of the UPD, including Mr. Joseph Connor.[3] Instead, my supervision duties are limited to such things as providing training, scheduling shifts of work for the officers[4] or serving on Selection Boards for promotions to Sergeant, when called on by the Chief. I do not have any authority to make decisions to terminate, place on probation, or otherwise suspend, demote, or affect any patrolman's employment–other than in scheduling and training, as set

---

[1]Hereinafter "TAMUK".

[2]Hereinafter "UPD".

[3]Hereinafter referred to as "Plaintiff".

[4]see Appendix "B" to the Affidavit of Humberto Garcia, the position description of "Sergeant University Police".

forth above.  My understanding is that those decisions are made by the Vice-President of Finance and Administration, based on the recommendations of the current Chief of the UPD.  Likewise, I have no authority to hire or "re-instate" a former employee to a position with the UPD–those decisions rest with the Vice-President.  In short, I should not have been named as a Defendant in this case since I cannot be compelled by injunctive or other remedies to take any of the requested actions that Plaintiff seeks in this lawsuit.

4.      At all times material to Plaintiff's Complaint in 1998 and 1999, I held my current position as Sergeant.  I am familiar with the rules and regulations of both the UPD and the requirements for being a peace officer licensed in Texas.  I am currently licensed as a peace officer and meet all requirements to retain my certification.  At different times during this period, I knew Plaintiff and had occasion to supervise him.  I found Plaintiff to be an average police officer, who often had difficulty accepting responsibility for his mistakes.  His evaluations for the years of 1997–1999 were unremarkable.

5.      During Plaintiff's tenure with the UPD, he received the same raises (in the same percentages) as all other employees of UPD, without regard to his race or any claims of retaliation.

6.      I am aware that Plaintiff is asserting a "First Amendment" free speech claim in this lawsuit.  This seems strange–since I am not aware of Plaintiff speaking out on any "public" issues, outside the course and scope of his employment.  Instead,  his remarks concerned everyday business of the UPD.  He would complain, as would almost all other officers, if his radio was not working properly, or if a patrol car

2

needed servicing.  He was not alone in those complaints, however, as many other officers likewise voiced the same or similar workday complaints concerning their jobs.  I am not personally aware of Plaintiff ever engaging in any public discussions of any issues, even UPD workday issues.  I am aware that Plaintiff, and other officers, made reports and complaints on a Sergeant Quinones.  Sgt. Quinones, a Hispanic male, was ultimately terminated by UPD  for drinking on the job.  Like Plaintiff's termination, I am not aware of any other causes therefor, other than the ones advanced by TAMUK.

7.      As to the 1998 and 1999 Sergeant promotions, I was appointed to serve on both Selection Boards appointed by Chief Garcia.  Before the 1998 position opening, promotion to Sergeant (under Chief Gonzalez, the former chief prior to Chief Garcia) had simply been made on the Chief's recommendation to the Vice-President of Finance and Administration, without any objective standards, and without any input from his other Sergeants or other supervisors.  Under Chief Garcia, a new system was implemented wherein standard questions[5] for all of the applicants.  After the Selection Board met, it would interview each of the candidates.  It was decided by the Board that we would interview all of the candidates within the same day (or two) if at all possible, so as to be fair, and prevent any information about the questions from becoming public.  In Plaintiff's case, on the 1999 promotion, he was attending a school on "terrorism" which was not related to his job at UPD and therefore was

---

[5]See "Interview Questions, Appendix "C" to the Affidavit of Humberto Garcia) for 1998 promotions, and Appendix "D" to the Affidavit of Humberto Garcia for 1999 promotion questions.

3

not a requirement of the UPD. Nonetheless, in an effort to accommodate him, I checked with his instructor and was told that Plaintiff could leave the class for the short period of time that the selection Board needed to interview him. I personally interrupted him in his class to give him this information, and to schedule his appearance at noon the day of the interviews with all of the other candidates. Some of the candidates were coming off their eight-hour shifts, and like Plaintiff, requested that the interviews be postponed, but we treated everyone equally, and refused everyone's request for postponement of the interviews. In that regard, some of the requests for postponements were made by Hispanic officers.

8.   On the August 18, 1998 interview of Plaintiff by the Selection Board, Plaintiff did not convince me (nor anyone else judging by their scores of Plaintiff) that he could act decisively and independently–which is something required of a sergeant. For example, when asked how Plaintiff would respond to various hypothetical questions, unlike the other candidates, he consistently responded that he would "contact my supervisor". Of course, when a sergeant and other officers are in the field, "contacting my supervisor" is *not* an option. In a small police department such as UPD, the only supervisors a sergeant would have is the acting lieutenant (if one is appointed) and the Chief. Thus, Plaintiff's solution is unworkable, since he would be frozen in inaction pending the availability of only two potential "supervisors".

   Also, another problem that Plaintiff had during the interview was his hesitation to answer the questions posed by the Selection Board. While most applicants responded to the questions without much hesitation or prompting from the Board, Plaintiff required more prompting from the Board than anyone else. In addition,

4

Plaintiff's record was reviewed by the Board, including notices of deficient performance from 1992 which resulted in an Official Reprimand (for "showing undue affection towards a female employee", who had complained), and 1995 from improper performance of his duties as a police escort on a "bank run". On the other hand, the person selected, Officer Franco, demonstrated both from his oral responses and from his performance with the UPD (without any complaints) that he could act decisively and had the requisite supervisory skills needed for the position of sergeant.

9.    The 1999 promotion for sergeant by the Selection Board was similar to the 1998 procedure.  Again, plaintiff appeared and failed to respond decisively to the various questions posed to him by the Selection Board.  His problem with hesitation also returned in the 1999 interview.  In fact, in the 1999 interview, Plaintiff seemed to have an unusual difficulty understanding the questions from the panel, even though he had a hard printed copy in front of him.  None of the other applicants expressed this difficulty.  As a result, Plaintiff's interview took approximately thirty minutes longer than the other applicants.  In addition, when Lieutenant Jefferson asked Plaintiff why he should be promoted to sergeant, instead of describing his credentials and prior supervisory experience as he argues in this lawsuit[6] he spoke about how he would *personally* make changes to the UPD.  As in the 1998 promotion, the Selection Board also looked at his prior record with the UPD and found that he had the complaints described above.  As a result of Plaintiff again receiving the lowest

---

[6]I personally heard these claims when I attended plaintiff's deposition.  He did not make similar claims at the time of the interviews before the Selection Board.

5

score, the Selection Board recommended Pedro Cavazos for the sergeant promotion.
Unlike Plaintiff, Officer Cavazos had no complaints nor reprimands in his file, and
he demonstrated in his oral responses a decisiveness that was sorely lacking in
Plaintiff. Like Officer Franco in the 1998 promotion, Officer Cavazos had excellent
supervisory skills.

10.     It should be noted that at the time of both promotions, I did not bear Plaintiff any ill
will, nor have any feelings about discrimination or retaliation. This can be proven
by the ratings and scores I gave Plaintiff while I served on both Selection Boards.[7]
I have never discriminated against Plaintiff on the basis of race, nor retaliated against
Plaintiff for filing any EEOC complaints. In fact, I had limited knowledge of his
EEOC complaints, and certainly did not consider them in the Selection Board
decisions I made. It should be remembered that I am only one vote of the three
members of the Board—yet Plaintiff does not say in his Complaint that the other two
members acted inappropriately nor discriminated against him.

11.     The events leading up to Plaintiff's termination were, for the most part, done without
my participation. Since the Vice-President for Finance and Administration is the
only one with "final" authority to terminate Plaintiff, even with Chief Garcia's
recommendation to do so, never-the-less, I neither recommended nor voted nor made
any decisions affecting the termination of Plaintiff. However, based on my
knowledge as a police officer, and as a Sergeant at UPD, I believe that Plaintiff's
termination was correct, based on the seriousness of the charges made against him.

---

[7]See Appendix E-2 and Appendix "F-2" to the Affidavit of Humberto Garcia, the
evaluations.

I am aware that in his Complaint, Plaintiff makes various allegations about my day-to-day supervision of him regarding leave and other policy matters that I am charged to uphold. Yet, since I had no decision-making role in his termination, and since many of his allegations are simply untrue[8] it is difficult to imagine how they would relate to his deficient performance that ultimately led to his termination. When dealing with Plaintiff, he always takes the position that he can do no wrong–and this makes it difficult to try to change his behavior to conform to UPD and State law requirements for police officers. When, after repeated reprimands, his actions did not appear to change, the Defendant had no choice but to terminate him.

12.    All of my actions taken in regard to Plaintiff including my service on the Selection Boards for 1998 and 1999, were taken in the course and scope of my employment, and were based on my understanding of my duties both as a police officer trained by the State, and as a Sergeant-supervisor at TAMUK. My actions on the Selection Boards and my actions as a supervisor are all taken within the discretion allowed to me in my position. My acts were therefore based on my training and experience. I have been a police officer for 22 years. I never entered into an employment contract with Plaintiff in my personal capacity."

FURTHER AFFIANT SAYETH NOT.

ROBERT BAZAN

---

[8]See e.g. paragraph 44 of the Complaint, where Plaintiff alleges *contradictory* positions that he was "refused" and that he was "eventually...allowed" to go clean up after he "became very dirty while on duty".

SUBSCRIBED AND SWORN TO by the said ROBERT BAZAN  this 3rd day of

November, 2000.



NOTARY PUBLIC in and for the State of
Texas

8

3

# AFFIDAVIT OF JIMMY HARTSFIELD

STATE OF TEXAS        §
                              §
COUNTY OF KLEBERG    §

BEFORE ME, the undersigned authority, on this day personally appeared Jimmy Hartsfield, who, being by me duly sworn, deposed and said as follows:

"1.      My name is JIMMY HARTSFIELD, and I am over the age of eighteen years and competent to make this Affidavit, and have personal knowledge of the facts stated herein, which are true and correct.

2.      I am currently employed by Texas A. & M. University –Kingsville.[1] As the Director of Human Resources,  and have been since November 1996.  My education and training consists of the following:

University of Florida/ March 1971/B.A. Business Management.

I have specific knowledge concerning personnel procedures of TAMUK and the requirements of applicable federal and state law as they relate to grievances, salary, vacation, sick leave, and other employment issues routinely encountered at TAMUK. I have, through education and experience in prior Human Resources positions, acquired knowledge and expertise in the personnel policies and the systems employed by TAMUK for routine matters such as employee promotions, demotions, grievances and their appeal, and EEOC complaints and the proper ways to process these claims.

3.      I am familiar with Joseph Connor[2]. and of the claims he has made in this lawsuit by

---

[1]Hereinafter "TAMUK"

[2]Hereinafter "Plaintiff".

virtue of attending his deposition. In May and June 1999, I was serving as Director of Human Resources and was consulted by Chief Garcia concerning the reprimands, the probation, and the ultimate recommendation to terminate Plaintiff for violating the terms of his probation. After having reviewed the facts involved, I concurred with Chief Garcia's decision to recommend the termination of Plaintiff. From my review of the records, it appears that the April 1999 incident involving not covering the front desk where the "911" calls were received, and the act of locking the front door to the police department, thereby rendering impossible the ability of any student at TAMUK from reaching the University Police Department[3]. with any emergency calls or contacts, were sufficiently serious to merit the recommendation of termination that was made by Chief Garcia. At the time of this termination of Plaintiff, the Chief of UPD makes a *recommendation*, but the final decision to terminate Plaintiff was made by the Vice President of Finance and Administration, Mr. Steven Crandell. Plaintiff always had the right to aggrieve that termination and/or institute proceedings with the EEOC to investigate and determine his appeal. In the instant case he elected both routes–which had the effect under our policy of abating the internal grievance through TAMUK, until the EEOC could complete their investigation. It should be noted that Plaintiff had no trouble coming to my office to discuss his rights of appeal and grievance in the past. The only problems of communication with Plaintiff with respect to the events in May and June 1999 resulted from Plaintiff's own decision to hire an attorney and to notify TAMUK that

---

[3]Hereinafter "UPD".

2

"all" communications should be made through his attorney.  This was made evident in Plaintiff's refusal to attend regularly scheduled meetings unless I or the staff at TAMUK agreed to set it up with his attorney.  Of course, I followed Plaintiff's directions, and therefore all future communications, including the information concerning his termination was forwarded, at Plaintiff's own request, through his attorney.  Neither his attorney, nor Plaintiff, during this June 1999 time period ever expressed any dissatisfaction with their decision to force us to communicate with Plaintiff through his attorney.  To suggest in the lawsuit that I or TAMUK did not communicate with Plaintiff about his procedural rights is, therefore, false.

4.      I am aware that Plaintiff in this lawsuit makes a claim for racial discrimination based on the number of "Anglo" officers who were promoted in the past ten years.  That could not be indirect evidence of racial discrimination, however, due to the fact that the population density of Kleberg County and the areas surrounding it are primarily composed of Hispanics.[4]  As a result of this statistically significant percentage of Hispanics in the labor pool, naturally their proportions within the UPD would mirror that dominance.

5.      I am personally aware that TAMUK has policies that prohibit racial discrimination, retaliation, and discrimination of any kind in the operation of the UPD.[5]  I am not aware of any policy, rule, custom, or practice that would suggest otherwise.  After attending Plaintiff's deposition, I did not learn any statements from him to suggest

---

[4]The Chamber of Commerce estimates 64% Hispanic, 32.9% Caucasian, and 3.1% African-American for Kleberg County.

[5]See Appendix "A" to Affidavit of HUMBERTO GARCIA, "Rules and Regulations".

3

that Defendants in this case have instituted any policy, rule, custom, or regulation that would encourage, or even permit discrimination and/or retaliation.

6.     Defendant HUMBERTO GARCIA consulted with me concerning the methods of selecting the best applicants for the sergeants position in 1998. After discussions with him, I am aware that he instituted a Selection Board that asked all of the applicants the same questions[6] and used a uniform system to evaluate each applicant for the sergeant position depending on his or her responses.[7] This system of evaluation had not, according to our records, been used for UPD promotions in the past. Since nobody claimed the questions used by the Selection Board were racially biased, the reason(s) for Plaintiff's poor performance in the interview were not related to race.

7.     During the time period of 1998 and 1999, I was not aware of any "public issues" that Plaintiff claims to have expressed under his First Amendment[8] rights. In fact, although I was Director of Human Resources at the relevant time-periods, I was not aware that Plaintiff was speaking on any issues whatsoever in any "public" forum. The items he discussed in his deposition on this issue related solely to everyday work matters–i.e. condition of vehicles, radios, and to another officer (a Hispanic officer) being intoxicated while on duty[9]

---

[6]See Affidavit of HUMBERTO GARCIA, Appendix "C" for 1998 questions and Appendix "D" for the 1999 questions.

[7]See Affidavit of HUMBERTO GARCIA Appendix E-1, Appendix "F-1".

[8]First Amendment to the U.S. Constitution.

[9]Sergeant Quinones was terminated for being intoxicated while on duty.

4

8.      During the time that I have been employed by TAMUK, Plaintiff has been treated

no differently than any other TAMUK employee in terms of receiving raises,

vacation time, leave time and sick leave.   He received every benefit that any

Hispanic officer received.

9.      All of my actions in regard to any matters relating to Plaintiff were taken within the

course and scope of my employment.   The decisions I made involving discretion

were based on my training, education, and experience."

FURTHER AFFIANT SAYETH NOT.



JIMMY HARTSFIELD

SUBSCRIBED AND SWORN TO by the said Jimmy HARTSFIELD this 3rd day of

November, 2000.

NOTARY PUBLIC in and for the
State of Texas

DEBBIE WILSON
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-18-2003

5

4

CibPDF – www.fastio.com

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    CORPUS CHRISTI DIVISION
 3   JOSEPH K. CONNOR,            )
            Plaintiff,            )
 4                               )
                                 )
 5                               )
                                 )
 6                               )
     VS.                         )   CIVIL ACTION NO. C-00-69
 7                               )
     TEXAS A&M UNIVERSITY-        )
 8   KINGSVILLE, HUMBERTO         )
     GARCIA, INDIVIDUALLY AND     )
 9   IN HIS OFFICIAL CAPACITY;    )
     AND ROBERT BAZAN,            )
10   INDIVIDUALLY AND IN HIS      )
     OFFICIAL CAPACITY,           )
11        Defendants.             )
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
12                  ORAL DEPOSITION OF
                    JOSEPH K. CONNOR
13
                    AUGUST 23, 2000
14   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
15              ORAL DEPOSITION OF JOSEPH K. CONNOR,
16   produced as a witness at the instance of the
17   DEFENDANTS, and duly sworn, was taken in the
18   above-styled and numbered cause on the 23RD of AUGUST,
19   2000, from 9:00 a.m. to 3:45 p.m., before Brenda J.
20   Wright, RPR, CSR in and for the State of Texas,
21   reported by machine shorthand, at the Law Offices of
22   Gay E. Gilson, 4600 Ocean Drive, Suite 104D, Corpus
23   Christi, Texas, pursuant to the Texas Rules of Federal
24   Procedure and the provisions stated on the record or
25   attached herein.
```

EXHIBIT

4

COPY

Page 2

1    APPEARANCES
2
   For the Plaintiff:
3       Ms. Gay E. Gilson
        LAW OFFICE OF GAY E GILSON
4       4600 Ocean Drive
        Suite 104D
5       Corpus Christi, Texas 78412
        (361) 814-0573
6
7    For the Defendants
        Mr. William T. Deane
8       Assistant Attorney General
        OFFICE OF THE ATTORNEY GENERAL
9       General Litigation Division
        300 West 15th Street
10      Suite 1200
        Austin, Texas 78701
11      Post Office Box 12548, Capitol Station
        Austin, Texas 78711-2548
12      (512) 463-2120
           -and-
13      Ms. Cherry Kay Wolf
        Assistant General Counsel
14      THE TEXAS A&M UNIVERSITY SYSTEM
        Office of General Counsel
15      John B. Connally Building
        301 Tarrow
16      Sixth Floor
        College Station, Texas 77840-7896
17      (979) 458-6142
18
     Also Appearing:
19      Mr. Jim Hartsfield, SPHR
        Director, Human Resources Department
20      TEXAS A&M UNIVERSITY-KINGSVILLE
        700 University Boulevard
21      MSC 107
        Kingsville, Texas 78363-8203
22      (361) 593-2258
23      Mr. Humberto M. Garcia
24      Mr. Robert P. Bazan
25

Page 3

1              INDEX
2
3    Appearances...................................... 2
4    JOSEPH K. CONNOR
5       Examination by Mr. Deane.................. 5
6    Signature and Changes............................ 168
     Reporter's Certificate........................... 170
7
              EXHIBITS
8
                          PAGE
9    NO.  DESCRIPTION                    MARKED
10   1    Notice                          5
11   2    May 5, 1999 letter                  5
12   3    Charge of Discrimination              5
13   4    Affidavit                      5
14   5    May 4, 1999 letter                5
15   6    Performance appraisal              5
16   7    Employee evaluation                5
17   8    Report Supplement                5
18   9    August 27, 1998 letter              5
19   10   March 12, 1999 memorandum            5
20   11   May 10, 1999 letter              5
21   12   May 11, 1999 letter              5
22   13   Page 2 of affidavit              5
23   14   Charge of Discrimination            5
24   15   Employee Complaint and Appeal Form    5
25   16   May 24, 1999 letter              5

Page 4

1        EXHIBITS - CONTINUED
2    JOSEPH K. CONNOR
                          PAGE
3    NO.  DESCRIPTION                    MARKED
4    17   October 23, 1999 letter            5
5    18   November 10, 1999 Findings and Decision    5
6    19   January 25, 2000 letter            5
7    20   Dismissal and Notice of Rights        5
8    21   August 2, 1999 letter              5
9    22   October 1, 1999 letter and appeal      5
10   23   Plaintiff's Original Complaint        5
11   24   Response to EEOC Complaint            5
12   25   Traffic citation and handwritten note    164
13   26   Texas A&M-Kingsville Student Handbook -
           1994 - 1995                  166
14
15   27   Certification                  166
16
17   28   Truck loan Register Report          166
18
19   29   Receipt from Smith's Guns          166
20
21   30   Employment applications            166
22
23   31   Various documents, calendars, and
           certifications                166
24
25

Page 5

1        (Defendant's Exhibit Nos. 1-24
2        (marked for identification.
3           JOSEPH K. CONNOR,
4    having been first duly sworn, testified as follows:
5              EXAMINATION
6    QUESTIONS BY MR. DEANE:
7       Q.  Would you state your name for the record,    09:15
8    sir.                                   09:15
9       A.  My name is Joseph Kevin Connor.          09:15
10      Q.  Okay.  And where do you currently reside?    09:15
11      A.  I live at 6034 Sweetgum, Corpus Christi,    09:15
12   Texas.                                 09:15
13      Q.  Mr. Connor, my name is Bill Deane.  I'm an    09:15
14   attorney representing the defendants in the lawsuit  09:15
15   that you've filed against Texas A&M University,     09:15
16   Officer Humberto Garcia, and Officer Robert Bazan.   09:15
17   You understand that you're here today to give      09:15
18   deposition testimony, which is the same in the -- as  09:15
19   being in the courtroom, meaning that you're under    09:15
20   oath?                                  09:15
21      A.  Yes, sir.                           09:15
22      Q.  Okay.  I will be asking you questions this   09:15
23   morning.  And I will try to not talk when you're    09:15
24   making an answer, and by the same token, it would help  09:15
25   me if you could wait until I finished all of my long,  09:15



Page 114

1    A.  I was -- went to a call and picking up drug    13:52
2    paraphernalia and saw areas within -- the other    13:52
3    officer observed other evidence which he, in turn,    13:52
4    turned over to me.  The other officer also observed    13:52
5    a -- a stereo car receiver, which, in his opinion,    13:52
6    believed to be of possibly stolen.  So that evidence    13:53
7    was also turned over to me.    13:53
8    Q.  At the time that you were in that room, did    13:53
9    you have a warrant for a search?    13:53
10    A.  On the conditions that we entered the room,    13:53
11    the dorm director has the authority to enter the --    13:53
12    the room for safe -- safety conditions.  He observed    13:53
13    drug paraphernalia within there.  And the subject, who    13:53
14    initially was in that room, was not registered in that    13:53
15    room.  He had been there for a good period of time, so    13:53
16    he was not the official registered owner of the room.    13:53
17    Q.  Is it your contention that the dorm director    13:53
18    then allowed you access to the room?    13:53
19    A.  Yes, sir.    13:53
20    Q.  Was the dorm director present when you were    13:53
21    in the room?    13:53
22    A.  Yes, he was.    13:53
23    Q.  And was the student present who had the    13:54
24    lease of that room?    13:54
25    A.  No, sir.    13:54

Page 115

1    Q.  The property that was confiscated consisted    13:54
2    of a stereo and what else?    13:54
3    A.  A drug paraphernalia, which was a pipe,    13:54
4    ammunition, which is also against the student    13:54
5    handbook, and a car stereo.    13:54
6    Q.  And how did you know that that stuff was    13:54
7    stolen?    13:54
8    A.  The car stereo?    13:54
9    Q.  Yes, sir.    13:54
10    A.  The other officer advised me -- Officer    13:54
11    Everett advised me that he believed that the car    13:54
12    stereo had been in -- one of the stereos taken from    13:54
13    the university property, in one of the vehicles.    13:54
14    Q.  Was it marked with the university's name?    13:54
15    A.  No, sir.    13:54
16    Q.  Did it have a serial number that matched a    13:54
17    list of stolen property that you had?    13:55
18    A.  At that time, we -- it was taken back to the    13:55
19    university police department where it was soon to be    13:55
20    found that no information was found on that.    13:55
21    Q.  Why didn't Everett take those items to the    13:55
22    police department?    13:55
23    A.  He turned the information over -- turned the    13:55
24    evidence over to me.  Why, I'm not sure, sir.    13:55
25    Q.  So when you left the room with those items,    13:55

Page 116

1    could you confirm that they were stolen at that    13:55
2    moment?    13:55
3    A.  The car stereo, sir?    13:55
4    Q.  Yes.    13:55
5    A.  No, sir, not at that time period.  There is    13:55
6    an extensive look having to go through the reports of    13:55
7    having to relook -- see if it happened to be stolen or    13:55
8    not.    13:55
9    Q.  But I'm --    13:55
10    A.  We had a rash of car stereos and things like    13:56
11    that, so the assumption of Officer Everett that it was    13:56
12    possible stolen.    13:56
13    Q.  Okay.  I can concede that Officer Everett    13:56
14    may have had an opinion on that, but he didn't take    13:56
15    the item back to the station, did he?    13:56
16    A.  He did not, no, sir.    13:56
17    Q.  And so when you took the item back to the    13:56
18    station, what did you have that would confirm that the    13:56
19    item was stolen?    13:56
20    A.  I had to take his knowledge that it was, you    13:56
21    know, because he is an officer.  I have to trust an    13:56
22    officer's opinion.    13:56
23    Q.  But the officer who voiced that opinion    13:56
24    didn't know for certain, did he?    13:56
25    A.  No, sir.    13:56

Page 117

1    Q.  And, in fact, did the information that you    13:56
2    developed at the station prove that the item was    13:56
3    stolen?    13:56
4    A.  As far as I know, no, sir.    13:56
5    Q.  What happened to the stereo?    13:56
6    A.  The stereo and all the information was    13:56
7    tagged and put in my locker, as including the drug    13:57
8    paraphernalia.    13:57
9    Q.  And what eventually happened to the stereo?    13:57
10    A.  It eventually was turned over to my    13:57
11    supervisor, which turned it over to Lieutenant    13:57
12    Jefferson.    13:57
13    Q.  And then after it went to Lieutenant    13:57
14    Jefferson, was it returned to the student?    13:57
15    A.  That I do not know, sir.    13:57
16    Q.  Was it also stolen?    13:57
17    A.  The stereo?    13:57
18    Q.  Yes, sir.    13:57
19    A.  As far as I know, I do not know, as far as    13:57
20    that, sir.    13:57
21    Q.  So are you disagreeing that it was incorrect    13:57
22    to remove that property from the room without consent    13:57
23    of the student and without a warrant?    13:57
24    A.  I had to go on the assumption that Officer    13:57
25    Everett's decision was correct, that, you know, this    13:57

Case 2:00-cv-00069   Document 25   Filed in TXSD on 11/06/2000   Page 96 of 103

**Page 142**

1  Hispanic officers were not.                           14:35
2  Q.  Okay.  Can you give me some examples of    14:35
3  those details?                                        14:35
4  A.  Going back into the May Hall.  Other things, 14:35
5  I can't as far as remember at this time.              14:36
6  Q.  Okay.  Any other facts that would support   14:36
7  your retaliation claims under racial discrimination,  14:36
8  not First Amendment?                                  14:36
9  A.  As far as that there -- there were like     14:36
10  patrol vehicles that they had at the university     14:36
11  police -- or they have a newer vehicle or they have  14:36
12  a -- the old Chevy S-10 trucks.  Informed by the     14:36
13  supervisors that I had to use that particular vehicle 14:36
14  while other Hispanic officers were allowed to use the 14:36
15  better vehicles.                                     14:36
16  Q.  So none of the Hispanic officers ever drove 14:37
17  the S-10 trucks?                                     14:37
18  A.  Well, they did drive S-10 trucks if they    14:37
19  preferred.  But in -- normally, they would be asked -- 14:37
20  or given the better running vehicles.               14:37
21  Q.  Well, I'm not understanding.  Are you saying 14:37
22  that -- well, what were the other vehicles?  Let's   14:37
23  define those first.                                 14:37
24  A.  The Chevy Caprice.  And I think there is a   14:37
25  Lumina.  At one of the S-10 trucks, several persons  14:37

**Page 143**

1  had signed a letter that this one particular vehicle 14:37
2  had a carbon monoxide leak.  Two letters were actually 14:37
3  sent out, one to the chief.  The first time it was not 14:37
4  acknowledged.  The second one -- in fact, to the chief 14:37
5  and also to the president, that this vehicle had a    14:38
6  safety problem, had carbon monoxide.                 14:38
7  Q.  How did you know it had a carbon monoxide   14:38
8  problem?                                             14:38
9  A.  Because you could smell it.                 14:38
10  Q.  You could smell carbon monoxide?           14:38
11  A.  In other words, the smell coming from the -- 14:38
12  from the leak of the manifold.                      14:38
13  Q.  Okay.  Any other facts that would relate to 14:38
14  retaliation?                                        14:38
15  A.  No, sir, not at this time, I cannot think of 14:38
16  any.                                                14:38
17  Q.  Okay.  Let me move over to First Amendment  14:38
18  free speech retaliation.  And first, tell me what free 14:38
19  speech that you exercised.                          14:38
20  A.  I would inform my supervisors of these      14:38
21  safety conditions.  One safety condition was Sergeant 14:38
22  Quinones, who would drink on the job.  He would also 14:39
23  drive a patrol vehicle while intoxicated.  It's not  14:39
24  only safety towards me, but also safety towards all  14:39
25  who would come and confront with Sergeant Quinones.  14:39

**Page 144**

1  The harassment of Sergeant Quinones towards me.  The 14:39
2  radios situation, to have both the main console.  When 14:39
3  I left, still having troubles with that main console  14:39
4  on campus.  And also, the condition of radios that I  14:39
5  carried.                                             14:39
6  There were policies as far as the --      14:39
7  they were not up to date.  As far as training        14:39
8  personnel, there was no personnel that were fully    14:39
9  qualified trained in first aid and CPR.  As I left,  14:39
10  there were very few of the officers trained in first 14:40
11  aid and CPR, which I informed Spanish supervisor     14:40
12  Humberto Garcia.  That's three points.  He advised   14:40
13  that he could train them cheaper and with no cost,   14:40
14  which I was fully trained as a -- as a CPR and first 14:40
15  aid instructor.                                     14:40
16  There were other parts as far as safety 14:40
17  and personnel.  There were high turnaround as far as 14:40
18  personnel in '97, '99, and even -- and as far as I   14:40
19  know, even as of this date, there is still a high    14:40
20  turnaround of personnel --                          14:40
21  Q.  Excuse me.  I'm not understanding.  What    14:40
22  does high turnaround have to do --                  14:40
23  A.  In other words, there was a large amount of 14:40
24  personnel for this size department.  I mean, from two 14:41
25  to four persons leaving within a short period of time. 14:41

**Page 145**

1  Q.  Okay.  Why is that your free speech?  What  14:41
2  is it you're saying about them?                     14:41
3  A.  Well, I'm saying that if an officer is out  14:41
4  on patrol and he needs a backup personnel, there is a 14:41
5  good chance that he could not receive this backup    14:41
6  within -- excuse me -- a short period of time.  The -- 14:41
7  some of the supervisors have made the local agencies 14:41
8  unhappy, so they will have a tendency of not         14:41
9  responding as fast as they should be.  So it is always 14:41
10  good to have the personnel there and favorable to back 14:41
11  them up.                                            14:41
12  Q.  Okay.  Which local agencies are going to say 14:41
13  that they're slow response?                         14:41
14  A.  Kingsville Police Department, which would be 14:42
15  the closest agency.                                 14:42
16  Q.  Has anyone from KPD told you that?          14:42
17  A.  Several persons -- I'm not sure if they are 14:42
18  still present at this time -- did advise that if they 14:42
19  did -- you know, they would take their time as far as 14:42
20  responding.                                         14:42
21  Q.  What are their names?                        ·14:42
22  A.  All I know -- I remember is one is a Joe,   14:42
23  and I can't remember the other two.                 14:42
24  Q.  Okay.  Any other -- and I'm not talking     14:42
25  about the retaliation part, but just the free speech 14:42

CONNOR VS.
TEXAS A&M UNIVERSITY, ET AL.

JOSEPH K. CONNOR
AUGUST 23, 2000

Page 146

1   part. Any other exercise of free speech that you can  14:42
2   think of?                                          14:42
3       A   Basically, I talked about the safety, the   14:42
4   training, the equipment, personnel, and some of the  14 42
5   older policies as far as what -- that I could see.   14:43
6   And that I even had the chance of turning in several  14 43
7   grants at least -- I turned in 18 grants that could   14:43
8   assist the university police department, and I know  14:43
9   all 18 were thrown in the trash.                    14:43
10      Q   Any other free speech examples?             14:43
11      A   No, sir.                                     14:43
12      Q   Now let's move to the retaliation part of    14:43
13  the free speech. Can you give me any facts that would 14:43
14  say, because I spoke up on these things, here is how I 14:43
15  was retaliated against?                             14:43
16      A   I have the information of -- of when         14:43
17  Sergeant Quinones was dismissed, I've had this look   14:43
18  of -- from several of the supervisors that I did     14:44
19  something wrong. In other words, if a person is      14:44
20  drinking, then something should be done about it. And 14:44
21  I -- just a minute.                                 14:44
22      MS. GILSON: Can we go off the record            14:45
23  for a second?                                       14:45
24      MR. DEANE: Sure. Do you need to take            14:45
25  a break for a second?                              14:45

Page 147

1       THE WITNESS: Yes.                               14:45
2       (RECESS.)                                       14:54
3       Q   (By Mr. Deane) Mr. Connor, when we broke,    14:54
4   we were talking about retaliation -- acts of         14:55
5   retaliation in regards to free speech First Amendment. 14.55
6   And you had told me about Quinones, the information   14:55
7   about the supervisors criticizing you for your       14:55
8   participation in that. Are there any other examples   14:55
9   of retaliation?                                     14:55
10      A   Yes, sir. I turned in a leave form and it    14:55
11  was two months in advance prior to that leave. I've   14:55
12  always turned in leave with extensive time. That way, 14:55
13  my supervisor knows exactly what is going on. And     14:55
14  this leave form was turned in to Robert Bazan. He     14:55
15  advised that it was too long in advance. I put it     14:55
16  back into my -- like a pigeonhole, which is my box,   14:55
17  and -- to be turned in at another time closer to the  14:55
18  time. At that, he had taken out of the box and tore   14:56
19  it up, where no other Hispanic officer or officer had 14:56
20  had their leave form torn up. I informed chief        14:56
21  Humberto Garcia that this had happened, and I had to  14:56
22  resubmit a leave form.                              14:56
23      On another case, where I had jury duty,          14:56
24  I had to work plus go to jury service, where other    14:56
25  Hispanic officers did not have that occasion. A leave 14:56

Page 148

1   form was turned in to my supervisor -- to my attorney 14:56
2   for this case.                                      14.56
3       Q   Okay  Any others?                            14:56
4       A   Not that I can think of, sir.                14:56
5       Q   Okay  Let's talk about procedural due        14:56
6   process and due -- due course of law under the State 14:56
7   constitution. Can you think of any examples or       14:57
8   illustrations of your contentions for procedural due  14:57
9   process?                                           14:57
10      A   In your mention of -- which one is that,      14:57
11  sir? Due process?                                   14:57
12      Q   64 in your complaint. Well, 65, I guess,     14:57
13  may answer the due process, due course of law         14:57
14  allegation.                                         14:57
15      A   With that, as far as the -- as of October,   14:58
16  1999, I was never fully given details of my write-ups 14:58
17  or even informed of any allegations that I had done   14:58
18  prior to May or April of 1999 and never received --  14:58
19  able to submit a rebuttal against such said          14:58
20  allegations of -- that were against me. And to the   14:58
21  grievances that I had filed, I was unable to get a    14:59
22  true -- true and factual hearing of such said response 14:59
23  when employed at the university.                     14:59
24      Q   Any others?                                  14:59
25      A   No, not -- not at this time.                 14:59

Page 149

1       Q   Okay  Before we leave these, your first     14 59
2   complaint here about not getting the details of the   14:59
3   write-ups, were those write-ups done at about the time 14:59
4   that you had filed the complaint and sent the notice  14:59
5   to the university that you were not to be contacted   14.59
6   directly on those issues?                           14:59
7       A   No, sir  This was prior to -- from 1992 to,  15:00
8   say, somewhere in '99                              15 00
9       Q   So from 1992 to 1999, you were not given     15.00
10  notice of the write-ups against you?                15 00
11      A   Yes, sir. I had no knowledge of anything     15:00
12  written. I had not received and I had not signed and  15 00
13  not the knowledge or able to give written information  15:00
14  about any particular item that was within my file.    15:00
15      Q   Now, when you were put on probation, you     15:00
16  were given that in writing, were you not?            15:00
17      A   I have only received two letters. With       15:00
18  that, I was able to submit two letters of rebuttals.  15:00
19  And even with that, these letters were not placed in  15.01
20  my file until, to my knowledge, during the Texas      15 01
21  Workforce Commission hearing, which was several months 15.01
22  after I had been terminated.                        15:01
23      Q   After you wrote the rebuttals, did you not   15:01
24  receive notice that your appeals were denied?        15:01
25      A   I had not received a letter that they were   15:01

38 (Pages 146 to 149)

Page 150

1  denied.                                    15:01
2     Q.  What was your assumption, if you had not    15:01
3  received a letter that they were denied?  That they  15:01
4  were granted?                              15:01
5     A.  I had no -- no knowledge.  I had not even   15:01
6  received my letter of termination from the university  15:01
7  from Hispanic police chief Humberto Garcia.       15:01
8     Q.  How did you get your notice of termination?  15:01
9     A.  I had received it on October, 1999 at my    15:01
10  attorney's office -- on my original attorney's office.  15:02
11     Q.  But you're not disputing the date of that   15:02
12  notice of termination, are you?            15:02
13     A.  I am disputing the information that is on   15:02
14  the termination, sir.                      15:02
15     Q.  What information are you disputing?    15:02
16     A.  The -- there are two bases as far as the   15:02
17  information, whereas Officer Everett's statement and  15:02
18  Humberto Garcia's statement are different.  Where the  15:02
19  statement that Officer Everett gave that I failed to  15:02
20  relieve him at the front office, whereas Humberto's  15:02
21  Garcia's statement is that I left the front office,  15:02
22  which contradicts each other.  I never was at the  15:02
23  front office.  And Officer Everett, in fact, left the  15:02
24  front office without being properly relieved.  Any  15:03
25  department, or even the military, that would be either  15:03

Page 151

1  a court-martial or a severe write-up of that     15:03
2  particular instance.                       15:03
3         The second complaint would be, I was    15:03
4  noticed that I could not show up onto a public    15:03
5  university or a public area.  This information was not  15:03
6  known until -- of October.  And, of course, it was  15:03
7  after the football season had already started, so I  15:03
8  had already had tickets to allow to go -- I attended  15:03
9  functions on the campus.  So really, I did not know  15:03
10  this information prior to October of 1999.    15:03
11     Q.  Is it your testimony today that after you   15:04
12  obtained that information, you ceased attending   15:04
13  sporting events at the college?            15:04
14     A.  No, sir.  I -- at the last portion of the   15:04
15  game, I had not attended any function on to the   15:04
16  campus after that.                         15:04
17     Q.  When was that that you stopped attending   15:04
18  functions?                                 15:04
19     A.  I think it was the last football game, I   15:04
20  think, there.                              15:04
21     Q.  In the fall of 1999?                 15:04
22     A.  Yes, sir.                           15:04
23     Q.  And you've not been back on the campus since  15:04
24  then?                                      15:04
25     A.  As far as I know, no, sir.           15:04

Page 152

1     Q.  Now, you've been advised, have you not, by  15:04
2  the -- by us, by the State, that that contention is  15:04
3  not correct?                               15:04
4     A.  Yes, sir.  I understand my attorney has   15:04
5  written a letter to you to the fact of.    15:04
6     Q.  Okay.  And you understand today that you're  15:04
7  only barred from being in the police offices in areas  15:04
8  that the public is not allowed to access?   15:05
9     A.  Yes, sir.                           15:05
10     Q.  Okay.  And the information on your    15:05
11  probation, you're not contending that you didn't know  15:05
12  why you were placed on probation, are you?   15:05
13     A.  I did not receive the letter of -- the   15:05
14  official letter from my supervisor for        15:05
15  insubordination, so I have no knowledge of what his  15:05
16  actual writing, no way of -- I did not receive or sign  15:05
17  or given the -- the right of giving a written    15:05
18  statement against it.                      15:05
19     Q.  But you were aware when you were placed on  15:05
20  probation, were you not?                   15:05
21     A.  I was aware of a letter of probation, but I  15:05
22  was not aware -- officially aware of his official  15:05
23  letter by the supervisor for insubordination.  15:05
24     Q.  And so when you were aware of the probation,  15:06
25  did you appeal that decision to place you on    15:06

Page 153

1  probation?                                 15:06
2     A.  Yes, sir, I did.                     15:06
3     Q.  And what was the basis of your appeal?   15:06
4     A.  I had not received a written -- written   15:06
5  response.                                  15:06
6     Q.  That you had not received in writing the   15:06
7  basis for your probation?                  15:06
8     A.  I hadn't -- the answer to my written     15:06
9  response to lower the letter of probation or the...  15:06
10     Q.  So you didn't appeal the probation itself,  15:06
11  you appealed the penalty set out in the probation?  15:06
12     A.  I -- I believe I had appealed both the   15:06
13  probation and the penalties of it.  I would have to  15:06
14  look at the letter, but I believe.         15:06
15     Q.  And who did you appeal those to?     15:06
16     A.  I had appealed it to the chief with my    15:07
17  letter.                                    15:07
18     Q.  And what was his decision on those issues?  15:07
19     A.  I had not received the information --    15:07
20  written information of it.                 15:07
21     Q.  So clearly, you -- clearly, you were on   15:07
22  probation when you made the appeal.  Is that correct?  15:07
23     A.  Yes, sir.                           15:07
24     Q.  And you've not received anything changing   15:07
25  that original probation.  Is that correct?   15:07

Page 158

1  know?                                    15:13
2     A.  That I'm not sure of, sir, at this time.    15:13
3     Q.  Okay.                             15:13
4        MS. GILSON:  If you don't understand,    15:13
5  just let him know.                       15:13
6        THE WITNESS:  Okay.                 15:13
7     A.  I do not understand at this time, sir.    15:13
8     Q.  (By Mr. Deane)  Okay.  But you understand    15:13
9  what I'm asking you.  I'm just asking you if you know    15:13
10  of any facts that would support what is said in    15:13
11  paragraph 64.                            15:13
12     A.  Offhand, I cannot think of so.     15:13
13     Q.  Okay.                            15:13
14     A.  I'm sorry.                        15:13
15     Q.  No.  That's fine.                  15:13
16        Now, the thing about leaving your post    15:13
17  we were talking about a minute ago, you had been    15:13
18  warned back in April of '99, had you not, about    15:13
19  leaving the post?                        15:13
20        Strike that.                       15:14
21        Okay.  Let's talk about -- well, let me    15:14
22  go back to the racial claims that you've made in this    15:14
23  lawsuit.  Are you aware of any official policy of    15:14
24  Texas A&M University-Kingsville that would employ    15:14
25  racial discrimination against Anglos?    15:14

Page 159

1     A.  No, sir, I do not.                  15:14
2     Q.  Are you aware of any custom or practice of    15:14
3  racial discrimination against Anglos at Texas A&M    15:14
4  University-Kingsville?                    15:14
5     A.  I am aware that there has been past suits    15:14
6  filed against Texas A&M University-Kingsville --    15:15
7     Q.  But as we --                       15:15
8     A.  -- for discrimination.              15:15
9     Q.  As we sit here today, can you tell me if    15:15
10  there is a custom or practice adopted by Texas A&M    15:15
11  University-Kingsville that would infer or support a    15:15
12  claim of reverse racial discrimination?    15:15
13        MS. GILSON:  Can I ask you to clarify?    15:15
14  Are we talking about the university system or the    15:15
15  department?                              15:15
16        MR. DEANE:  I'm talking about both,    15:15
17  actually.  What I'm suggesting -- he has told me very    15:15
18  specific things that happened with these defendants,    15:15
19  and I'm just trying to find out if there is any    15:15
20  policies or procedures.  And then the last question is    15:15
21  going to be, rules or regulations.  I mean, maybe    15:15
22  there is an official standard somewhere that says, we    15:15
23  can discriminate against Anglos.  That -- I'm sure    15:15
24  there is not, but I'm just going to make sure.  That's    15:15
25  why I'm asking.                          15:15

Page 160

1     Q.  (By Mr. Deane)  So are you aware of any    15:15
2  custom, practice, rule, or regulation of the    15:16
3  university that would condone or permit racial    15:16
4  discrimination?                          15:16
5     A.  I do note that in the front of the policy    15:16
6  manual, it says, the university will not discriminate    15:16
7  against.                                 15:16
8     Q.  You didn't finish the sentence, but not    15:16
9  discriminate against anyone on race?      15:16
10     A.  Anyone of race, creed, or color.    15:16
11     Q.  Okay.  So if there is any custom or policy,    15:16
12  it's actually against committing discrimination.  Is    15:16
13  that correct?                            15:16
14     A.  Yes, sir.                         15:16
15     Q.  How about on First Amendment retaliation    15:16
16  claims?  Are there any official policies of the    15:16
17  university that would permit First Amendment free    15:16
18  speech retaliation by university employees?    15:16
19     A.  Not to my knowledge.               15:16
20     Q.  Okay.  Are there any custom, practice, rule,    15:16
21  or regulation of the university that would permit    15:16
22  First Amendment retaliation by its employees?    15:17
23     A.  Not to my knowledge, sir.           15:17
24     Q.  Okay.  On the procedural due process    15:17
25  complaints, are you aware of any official policy of    15:17

Page 161

1  the university that would condone procedural due    15:17
2  process violations?                      15:17
3     A.  I just was informed by my first attorney who    15:17
4  talked to Mr. Hartsfield, and Mr. Condit advised me    15:17
5  that I would not get a fair -- fair grievance upon --    15:17
6  on -- upon filing any such statement against the    15:17
7  university.                              15:17
8     Q.  Okay.  I understand that contention, but is    15:17
9  that an official policy of the university?  Is that a    15:17
10  published --                             15:17
11     A.  No.  I -- no, sir.  I do not feel...    15:17
12     Q.  Okay.  Is there a custom, practice, rule, or    15:18
13  regulation of the university that condones procedural    15:18
14  violation -- procedural due process violations?    15:18
15     A.  No.                              15:18
16     Q.  Okay.  And substantive due process, you    15:18
17  don't have any facts to support that, but do you have    15:18
18  any official policy of the university that would    15:18
19  condone a substantive due process violation?    15:18
20     A.  No.                              15:18
21     Q.  Are you aware any custom, practice, rule, or    15:18
22  regulation that would condone a substantive due    15:18
23  process violation by the university?      15:18
24     A.  No, sir.                          15:18
25     Q.  Can you tell me, sir, what your damages are    15:18

41 (Pages 158 to 161)

CONNOR VS.
TEXAS A&M UNIVERSIT⁓ ET AL.

JOSEPH K. CONNOR
AUGUST 23, 2000

Page 166

1    Q.   Sure.                    15:35
2    A.   I believe to the effect, it is complete --   15:36
3    Q.   Okay.                    15:36
4    A.   -- with the exception of the copy of the    15:36
5    ticket book and the accident report, which is    15:36
6    submitted.                   15:36
7    Q.   Okay. And just for the record, Exhibit 25   15:36
8    is going to be what was just produced to us a moment   15:36
9    ago, which is the traffic citation that was dismissed.   15:36
10   Is that correct?              15:36
11   A.   That is correct, sir.        15:36
12   Q.   And then I guess we're going to mark as   15:36
13   Exhibit 26 the student handbook for 1994.   15:36
14        MR. DEANE:  Do you want to do these   15:36
15   first?                        15:36
16        MS. GILSON:  Are we going to -- will he   15:36
17   get his originals back?          15:36
18        MR. DEANE:  Yes.            15:36
19        MS. GILSON:  Okay. Can I just --   15:36
20        MR. DEANE:  Let's go off the record   15:36
21   just a second.                15:36
22        (Defendant's Exhibit Nos. 26-31   15:39
23        (marked for identification.      15:39
24        MS. GILSON:  Just for the purposes of   15:40
25   the record, Exhibit Number 25 consists of a   15:40

Page 167

1    handwritten note by Chief Garcia on Pioneer Mortgage   15:41
2    Company stationery. And it includes a traffic   15:41
3    citation and a police report regarding location number   15:41
4    99-0096. That's it. Thank you.     15:41
5    Q.   (By Mr. Deane) Mr. Connor, have I been   15:41
6    courteous to you today?          15:41
7    A.   Yes, you have, sir.          15:41
8        MR. DEANE:  Okay. With that, I'll pass   15:41
9    the witness.                  15:41
10        MS. GILSON:  We'll reserve our   15:41
11   questions until time of trial.     15:41
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1    CHANGES AND SIGNATURE
2    Page/Line    Correction    Reason for Correction
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24        I, JOSEPH K. CONNOR, have read the
25   foregoing deposition and hereby affix my signature

Page 169

1    that same is true and correct, except as noted above.
2
3
4        _____
4        JOSEPH K. CONNOR
5
6
7    THE STATE OF _____  )
8    COUNTY OF _____  )
9
10        Before me, _____, on
11   this day personally appeared, JOSEPH K. CONNOR, known
12   to me to be the person whose name is subscribed in the
13   foregoing instrument and acknowledged to me that they
14   executed the same for the purposes and consideration
15   therein expressed.
16
17        Given under my hand and seal of office
18   this _____ day of _____,
19   _____.
20
21
22
23        _____
23        NOTARY PUBLIC IN AND FOR
24        THE STATE OF _____
25   JOB NO. 000823BJW

43 (Pages 166 to 169)

Page 170

```
1          IN THE UNITED STATES DISTRICT
                COURT
2      FOR THE SOUTHERN DISTRICT OF TEXAS
                CORPUS CHRISTI DIVISION
3   JOSEPH K. CONNOR,       )
          Plaintiff,        )
4                           )
    VS.                     ) CIVIL ACTION NO. C-00-69
5                           )
    TEXAS A&M UNIVERSITY-    )
6   KINGSVILLE, HUMBERTO     )
    GARCIA, INDIVIDUALLY AND )
7   IN HIS OFFICIAL CAPACITY; )
    AND ROBERT BAZAN,        )
8   INDIVIDUALLY AND IN HIS  )
    OFFICIAL CAPACITY,       )
9         Defendants.       )
10  * * * * * * * * * * * * * * * * * *
11          REPORTER'S CERTIFICATION
         ORAL DEPOSITION OF JOSEPH K. CONNOR
12                AUGUST 23, 2000
13  * * * * * * * * * * * * * * * * * *
14       I, BRENDA J. WRIGHT, Certified Shorthand
15  Reporter in and for the State of Texas, hereby certify
16  to the following:
17       That the witness, JOSEPH K. CONNOR, was duly
18  sworn by the officer and that the transcript of the
19  oral deposition is a true record of the testimony
20  given by the witness;
21       That the deposition transcript was submitted on
22  SEPTEMBER 11, 2000 to the witness or to the attorney
23  for the witness for examination, signature and return
24  to MR. WILLIAM T. DEANE;
25       That $_____ is the deposition
```

Page 171

```
1   officer's charges for preparing the original
2   deposition transcript and any copies of exhibits,
3   charged to DEFENDANTS;
4        That pursuant to information given to the
5   deposition officer at the time said testimony as
6   taken, the following includes all parties of record:
7   For the Plaintiff:
         Ms. Gay E. Gilson
8        LAW OFFICE OF GAY E. GILSON
         4600 Ocean Drive
9        Suite 104D
         Corpus Christi, Texas 78412
10       (361) 814-0573
11  For the Defendants:
         Mr. William T. Deane
12       Assistant Attorney General
         OFFICE OF THE ATTORNEY GENERAL
13       General Litigation Division
         300 West 15th Street
14       Suite 1200
         Austin, Texas 78701
15       Post Office Box 12548, Capitol Station
         Austin, Texas 78711-2548
16       (512) 463-2120
                  -and-
17       Ms. Cherry Kay Wolf
         Assistant General Counsel
18       THE TEXAS A&M UNIVERSITY SYSTEM
         Office of General Counsel
19       John B. Connally Building
         301 Tarrow
20       Sixth Floor
         College Station, Texas 77840-7896
21       (979) 458-6142
22       I further certify that I am neither counsel
23  for, related to, nor employed by any of the parties or
24  attorneys in the action in which this proceeding was
25  taken, and further that I am not financially or
```

Page 172

```
1   otherwise interested in the outcome of the action.
2        Certified to by me this 11TH day of SEPTEMBER,
3   2000.
4
5
6        BRENDA J. WRIGHT, Texas CSR No. 1780
         Expiration Date: 12-31-00
7        1609 Shoal Creek Boulevard, Suite 202
         Austin, Texas 78701
8        (512) 474-4363

    JOB NO. 000823BJW
9
```

# Deposition Order For

**DEPOSITION (S) OF** Joseph K. Connor

**JOB NO.** 000823BJW

**TAKEN ON** 8·23·00   **BY** Bill Deane

By signing below, I hereby request that I be provided with the goods and/or services I have checked below. I agree that all invoices are due and payable by me or my firm upon receipt and that if the invoices are not paid accordingly, that interest on all past due amounts shall be calculated at eighteen percent (18%) per annum beginning thirty (30) days from the date of the first invoice.

|  |  | Yes | No |
|---|---|---|---|
| **By:** PLAINTIFF - GAY GIKSON | Copy | | |
| **Print Name** Gay G Ali | Exhibits | | |
| | ASCII Diskette | | |
| | Condensed Transcript | | |
| | Videotape | | |
| **E-Mail Address** | E-Transcript | | |

*none at this time*

|  |  | Yes | No |
|---|---|---|---|
| **By:** DEFENDANT 1 | Copy | ✓ | |
| **Print Name** WILLIAM T. DEANE | Exhibits | | |
| | ASCII Diskette | ✓ | |
| | Condensed Transcript | ✓ | |
| | Videotape | | |
| **E-Mail Address** | E-Transcript | ✓ | |

|  |  | Yes | No |
|---|---|---|---|
| **By:** | Copy | | |
| **Print Name** | Exhibits | | |
| | ASCII Diskette | | |
| | Condensed Transcript | | |
| | Videotape | | |
| **E-Mail Address** | E-Transcript | | |

|  |  | Yes | No |
|---|---|---|---|
| **By:** | Copy | | |
| **Print Name** | Exhibits | | |
| | ASCII Diskette | | |
| | Condensed Transcript | | |
| | Videotape | | |
| **E-Mail Address** | E-Transcript | | |

|  |  | Yes | No |
|---|---|---|---|
| **By:** | Copy | | |
| **Print Name** | Exhibits | | |
| | ASCII Diskette | | |
| | Condensed Transcript | | |
| | Exhibits | | |
| **E-Mail Address** | E-Transcript | | |



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSEPH K. CONNOR, | § | |
|     *Plaintiff*, | § | |
| | § | |
| V. | § | |
| | § | CIVIL ACTION NO. C-00-069 |
| TEXAS A&M UNIVERSITY-KINGSVILLE, | § | |
| HUMBERTO GARCIA, Individually and in | § | |
| his Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in his Official Capacity, | § | |
|     *Defendants*. | § | |

---

**ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION FOR LEAVE TO FILE
FIRST SUPPLEMENT TO DEFENDANTS' ORIGINAL ANSWER**

---

Came on this day for consideration Defendants' Unopposed Motion for Leave to File their

First Supplement to Defendants' Original Answer and the Court having reviewed the motion and

the pleadings on file in this matter is of the opinion that Defendants' Motion is meritorious and

should be granted.

It is therefore, ORDERED, that Defendants' Motion for Leave to File the First Supplement

to Defendants' Original Answer is hereby GRANTED.

SIGNED this the _____ day of November, 2000.


                                _____

                                B. JANICE ELLINGTON
                                UNITED STATES MAGISTRATE JUDGE