Case 2:00-cv-00069   Document 29   Filed in TXSD on 11/27/2000   Page 1 of 42

# United States District Court

_____ DISTRICT OF _____

Noe Ortiz

V.

Kenneth Apfel
Commissioner of Social
Security Administration

**APPLICATION TO PROCEED IN
FORMA PAUPERIS, SUPPORTING
DOCUMENTATION AND ORDER**

CASE NUMBER: _00 mc 7.1_

I, _NOE ORTIZ_, declare that I am the (check appropriate box)

[X] petitioner/plaintiff          [ ] movant (filing 28 U.S.C. 2255 motion)

[ ] respondent/defendant          [ ] _____
                                                _other_

in the above-entitled proceeding; that, in support of my request to proceed without being required to prepay fees, cost or give security therefor, I state that because of my poverty, I am unable to pay the costs of said proceeding or give security therefor; that I believe I am entitled to relief. The nature of my action, defense, or other proceeding or the issues I intend to present on appeal are briefly stated as follows:

In further support of this application, I answer the following questions.

1. Are you presently employed?                          Yes [ ]   No [X]
    a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (list both gross and net salary)

    b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.
       _UNCERTAIN - NOT EMPLOYED FOR OVER FIVE YEARS_

2. Have you received within the past twelve months any money from any of the following sources?
    a. Business, profession or other form of self-employment   Yes [ ]   No [X]
    b. Rent payments, interest or dividends?                     Yes [ ]   No [X]
    c. Pensions, annuities or life insurance payments?           Yes [ ]   No [X]
    d. Gifts or inheritances?                                     Yes [ ]   No [X]
    e. Any other sources?                                         Yes [ ]   No [X]

CNXPDF - www.fsstio.com

brings this action under the Texas Commission on Human Rights Act.

## II. FACTUAL SUMMARY

2.      **Plaintiff is an Anglo male**.  Joseph K. Connor, Plaintiff in the present case, is an Anglo male. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).

3.      **Defendant Garcia and Defendant Bazan are Hispanic males**.  Humberto Garcia is a Hispanic male.  (Exhibit 3 - Deposition of Humberto Garcia).  Defendant Robert Bazan is a Hispanic male.  (Exhibit 4 - Deposition of Robert Bazan).

4.      **Humberto Garcia was Police Chief of Texas A&M University - Kingsville Police Department during Plaintiff's tenure**.   While Plaintiff Joseph Connor was employed with Defendants, Humberto Garcia was the Police Chief of Texas A&M University - Kingsville Police Department. (Exhibit 3 - Deposition of Humberto Garcia).

5.      **Robert Bazan was a Sergeant with the Texas A&M University - Kingsville Police Department during Plaintiff's tenure**.  While Plaintiff Joseph Connor was employed with Defendants, Robert Bazan was a Sergeant with the Texas A&M University - Kingsville Police Department. (Exhibit 4 - Deposition of Robert Bazan).

6.      **Plaintiff's was employed with Texas A&M University - Kingsville Police Department as an officer for over six years**.  Joseph K. Connor was employed with Texas A&M University - Kingsville in the university police department as an officer for over six years.  During Mr. Connor's employment, he received raises, was given positive appraisals and was honored as the Officer of the Year during his tenure. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).  Plaintiff was illegally terminated by Chief Humberto Garcia on

2

If the answer to any of the above is "yes," describe each source of money and state the amount received from each during the past twelve months.

3. Do you own any cash, or do you have money in checking or savings accounts?
   Yes ☐    No ☒    (Include any funds in prison accounts.)
   If the answer is "yes," state the total value of the items owned.

4. Do you own or have any interest in any real estate, stocks, bonds, notes, automobiles or other valuable property (excluding ordinary household furnishings and clothing)?
   Yes ☐    No ☒
   If the answer is "yes," describe the property and state its approximate value.

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.
   *NO*

6. I authorize the official in charge of Prisoner Accounts to release records pertaining to my Inmate Trust Account, as requested by the United Sates District Court for the Southern District of Texas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __11/20/00__                                    x _Nee Ortz_
                    (Date)                                    Signature of Applicant

---

## CERTIFICATE
### (Prisoner Accounts Only)

I certify that the applicant named herein has the sum of $ _____ on account to his credit at the _____ institution where he is confined. I further certify that the applicant likewise has the following securities to his credit according to the records of said institution: _____

_____

I further certify that during the last six months the applicant's average balance was $ _____

_____                    _____
Date                                Authorized Officer of Institution

---

## ORDER OF COURT

The application is hereby denied

The application is hereby granted. Let the applicant proceed without prepayment of cost or fees or the necessity of giving security therefor.

United States

the Police Department, Tony Gonzales. (Exhibit 7 - Deposition of Robert Nash, pages 33, 34, lines 23-3). Robert Nash also testified that there a white binder that came out about a year and a half ago which discussed conduct. (Exhibit 7 - Deposition of Robert Nash, page 34, lines 4-13). However, Mr. Nash could not testify as to whether or not the binder was published before or after Plaintiff Joseph Connor had been terminated. (Exhibit 7 - Deposition of Robert Nash, page 34, lines 14-17.)

9.     **Police Department Employees were not informed of alleged Policies or Procedures**. Molly Sanchez, a Hispanic female who has been employed with the University Police Department for nine years, testified that she was not aware of the university police department's policies and procedures. (Exhibit 6 - Deposition of Molly Sanchez, p. 8, lines 2-8). Molly Sanchez further testified that she was never told by a supervisor where the university police department's policies and procedures were kept. (Exhibit 6 - Deposition of Molly Sanchez, p. 8, lines 11-14). Plaintiff Joseph Connor was never informed of the University Police Department's policies and procedures and where they were located. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).

10.     **Defendant Humberto Garcia testifies that the University Police Department did not have a policy regarding discrimination or equal employment opportunities**. Defendant Humberto Garcia testified that the University Police Department did not have a policy regarding discrimination or equal employment opportunities. (Exhibit 3 - Deposition of Humberto Garcia, p. 52, lines 13-16.)

12.     **Defendant Humberto Garcia testified that he was a supervisor with authority to: hire, fire, promote, demote**. Defendant Humberto Garcia testified that he was a supervisor with the authority to hire, fire, promote and demote. (Exhibit 3 - Deposition of Humberto Garcia, p. 40,

4

lines 17-24; Exhibit 15 - Memorandum "I have approved the Promotion").

**13.** **Defendant Humberto Garcia never read University's Equal Employment**
**Opportunities.** Despite being responsible for hiring, firing, promoting and demoting, Defendant Humberto Garcia did not read the Texas A&M University's policy regarding Equal Employment Opportunities. (Exhibit 3 - Deposition of Humberto Garcia, p. 40, lines 2-5, p. 41, lines 8-15).

**14.** **Plaintiff treated differently from non-Anglo officers - in regard to coming in**
**late or leaving early.** The official shift for the university police department was from 8:00 a.m. to 4:00 p.m. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). Plaintiff Joseph Connor would call to notify his employer that he was running late coming onto the shift, he was told by Sargent Bazan, a Hispanic male, "If you are late, don't come in." (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). Hispanic and Black employees of the University Police Department were not disciplined in any manner when they came in late or left early. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).

**15.** **Plaintiff treated differently from non-Anglo officers - Defendant Chief**
**Humberto Garcia did not discipline Hispanics and Blacks for coming in late or leaving early**.
Defendant Chief Humberto Garcia testified that he never disciplined a Hispanic employee or Black employee for leaving work early or coming in late. (Exhibit 3 - Deposition of Humberto Garcia, p. 103, lines 1-12). Sergeant Longoria's schedule was from 8:00 a.m. to 5:00p.m. (Exhibit 1 - Affidavit of Joseph K. Connor). Sergeant Longoria would consistently leave before 5:00 p.m. (Exhibit 1 - Affidavit of Joseph K. Connor). Lieutenant Jefferson was scheduled to work from 8:00 a.m. to 5:00 p.m. (Exhibit 1 - Affidavit of Joseph K. Connor). Lieutenant Jefferson would consistently come

5

CitiPDF - www.fenila.com

Friday-Saturday off. (Exhibit 1 - Affidavit of Joseph K. Connor). Plaintiff Joseph Connor was only given nine months of Friday-Saturday off. (Exhibit 1 - Affidavit of Joseph K. Connor).

18. **Plaintiff treated differently than non-Anglo officers - Plaintiff not allowed to take off for jury duty**. Plaintiff had jury duty. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 5 - Plaintiff's Deposition Exhibits, Plaintiff's Exhibit 10). Plaintiff was informed that he had to work also on that day. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). Hispanic officers who had jury duty did not have to show up to work on the day of their jury duty. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). Defendant Humberto Garcia testified that everybody that goes to jury duty is automatically exempt from work. (Exhibit 3 - Deposition of Humberto Garcia, p. 44, lines 2-7). Defendant Humberto Garcia also testified that he was not aware of any written policies regarding leave for jury duty. (Exhibit 3 - Deposition of Humberto Garcia, p. 44, lines 17-19). Texas A&M University - Kingsville, does in fact have a policy regarding Jury Duty Leave and it states: "Texas A&M University - Kingsville recognizes that employees are legally required to serve jury duty. A leave of absence, with pay, for jury duty is intended to give an employee protection against a reduction in earnings caused by absence due to requirements of jury duty service." (Exhibit 8 - TAMUK Employee Handbook, Jury Duty Leave).

19. **Plaintiff was continually harassed by Sergeant Quinones, despite Plaintiff reporting to Defendant Chief Humberto Garcia on numerous occasions that Sergeant Quinones was drinking on duty and operating a University vehicle while drinking.** Plaintiff was continually harassed by Sargent Quinones, a Hispanic male. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 13 - Report of 8-4-96 including

7

Quinones Harassment of Connor). Sargent Quinones was promoted over Plaintiff and Archie Glaspell, both Anglo males. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). Plaintiff had written up Sargent Quinones for the following: harassment; drinking on the job; drinking in an official vehicle (patrol unit). (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 14 - 7/17/98 Write up of Quinones for drinking). Plaintiff also had on numerous occasions verbally voiced his concerns about Sargent Quinones drinking and driving to his residence in a university vehicle while drinking. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 7 - Deposition of Robert Nash, p. 44, lines 9-25). Plaintiff voiced these concerns to Chief Garcia. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 3 - Deposition of Humberto Garcia, p. 104, lines 10-13). Despite drinking while on duty being against TAMUK policies, Defendant Chief Humberto Garcia did nothing in response to Plaintiff's voiced concerns. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor) After remaining with the University Police Department for several years and after Plaintiff Joseph Connor consistently made complaints to Defendant Humberto Garcia about Quinones' drinking, Sergeant Quinones was eventually terminated for having alcohol on his breath. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 3 - Deposition of Humberto Garcia, p. 104, lines 1-13). Sergeant Quinones would tell Plaintiff Joseph Connor that, "He did not give a shit about his white ass" or "He didn't care about my stupid gringo way". (Exhibit 1 - Affidavit of Joseph K. Connor). Plaintiff Joseph Connor told Defendant Chief Humberto Garcia of this harassment. (Exhibit 1 - Affidavit of Joseph K. Connor).

**20. Plaintiff treated differently than non-Anglo officers - followed while in patrol**

8

**car off campus**. It was common for patrol officers to go off campus in a patrol unit for various reasons. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). If an Anglo officers, including Plaintiff, went off campus in a patrol car, they were followed. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). However, if a Hispanic officers went off campus in a patrol car, nothing happened. There was no written policy regarding this issue. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).

21.    **Plaintiff treated differently than non-Anglo officers - in regard to taking leave and vacation**. Plaintiff was treated disparately in regard to vacation and leave. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). Sargent Bazan and Sargent Longoria told Plaintiff that he was to use his leave immediately. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor). However, they allowed a Hispanic dispatcher to use his leave as he needed it – contrary to what Plaintiff was told. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).

22.    **Plaintiff treated differently than non-Anglo officers - in regard to safety and officer radios.** Chris Florence, an Anglo officer, notified Sargent Perez that there were problems with Plaintiff's officer's radio. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 7 - Deposition of Robert Nash, Jr., pages 42-43, lines 5- 10; Exhibit 4 - Deposition of Robert Bazan, pages 49-50, lines 18-6; Exhibit 5 - Plaintiff's Deposition Exhibits, Plaintiff's Exhibit 8, Memorandum regarding portable radios). Patrolman Chris Florence, even wrote a memorandum to Sgt. Hiram Perez about the situation siting that "safety is compromised". (Exhibit 5 - Plaintiff's Deposition Exhibits, Plaintiff's Exhibit 8, Memorandum regarding portable

9

radios).   Nothing was done immediately by Defendants to repair Plaintiff's radio. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).  After several verbal complaints by both Plaintiff and Chris Florence, new batteries were installed in the radio. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).  Plaintiff's radio was important and necessary for safety purposes and for the proper execution of his job. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor).  Further, whether or not portable radios were working was a matter of public concern because if the portable radios were not working, the officer could not respond to calls. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 7 - Deposition of Robert Nash, Jr., pages 42-43, lines 5- 8; Exhibit 5 - Plaintiff's Deposition Exhibits, Plaintiff's Exhibit 8, Memorandum regarding portable radios).

23.     **Plaintiff voiced his concerns about matters of public concern and faced retaliation.** Plaintiff voiced his concerns and opinions about safety and university police department lack of procedures. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 7 - Deposition of Robert Nash, Jr.;  Exhibit 4 - Deposition of Robert Bazan, Exhibit 3 - Deposition of Humberto Garcia; Exhibit 9 - Deposition of Molly Sanchez). Plaintiff was retaliated against for voicing his concerns and opinions.     (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 7 - Deposition of Robert Nash, Jr.; Exhibit 4 - Deposition of Robert Bazan, Exhibit 3 - Deposition of Humberto Garcia; Exhibit 9 - Deposition of Molly Sanchez).

24.     **Defendant Chief Humberto Garcia called Plaintiff Joseph Connor a bastard before he was terminated.**  Molly Sanchez, a Hispanic female who has been employed with the

10

TAMUK University Police Department for nine years as a dispatcher testified that Defendant Chief Humberto Garcia called Plaintiff Joseph Connor a bastard in Spanish before he got **terminated**. (Exhibit 9 - Deposition of Molly Sanchez, p. 6, lines 2-24).

      25.    **Plaintiff's request to train officers in CPR ignored by Defendant Chief Humberto Garcia – despite Defendant Garcia not verifying which employees had CPR training**. Plaintiff requested that he train officers in first aid and CPR. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph K. Connor; Exhibit 3 - Deposition of Humberto Garcia, Pages 105 - 107, lines 20- 1). Chief Garcia ignored Plaintiff's request because "because I didn't feel that just because – my opinion, that because he just went and took a – many hours, a few hours of first aid and he got a card, that he was competent to give everybody within the police department the proper training." (Exhibit 3 - Deposition of Humberto Garcia, Pages 105 - 107, lines 20- 1).

      26.    **Prior to 1998, the University Police Department did not have a promotion board, Defendant Chief Humberto Garcia made the sole decisions regarding promotion**. Prior to 1998, the University Police Department did not have a promotion board, Defendant Chief Humberto Garcia made the sole decisions regarding promotion. (Exhibit 3 - Deposition of Humberto Garcia, p. 91, lines 6-15; Exhibit 4 - Deposition of Robert Bazan).

      27.    **After 1998, a promotion board, appointed by Defendant Humberto Garcia, made decisions regarding promotions**. After 1998, a promotion board, appointed by Defendant Humberto Garcia, made decisions regarding promotions. (Exhibit 3 - Deposition of Humberto Garcia, p. 92, lines 2-4; Exhibit 4 - Deposition of Robert Bazan).

      28.    **The promotion boards for 1998 and 1999 were made of all non-Anglos**. The

11

promotion boards for 1998 and 1999 were made up of all non-Anglos. (Exhibit 3 - Deposition of Humberto Garcia, pages 92-93, lines 8-11; Exhibit 4 - Deposition of Robert Bazan).

29. **No Anglo has held any supervisory position with the TAMUK Police Department for at least the last ten years**. No Anglo has held any supervisory position with the TAMUK Police Department for at least the last ten years. (Exhibit 3 - Deposition of Humberto Garcia, p. 95, lines 21-23; Exhibit 4 - Deposition of Robert Bazan; Exhibit 7 - Deposition of Robert Nash, Jr.).

30. **University didn't follow its own policies regarding hiring, promoting - Defendant Chief Humberto Garcia was not qualified to be Chief because he did not possess a bachelor's degree**. Defendant Chief Humberto Garcia did not possess a bachelor's degree. (Exhibit 3 - Deposition of Humberto Garcia, pages 95-96, lines 24-6). Defendant Chief Humberto Garcia is unaware of the requirement that the Chief hold a bachelor's degree. (Exhibit 3 - Deposition of Humberto Garcia, p. 96, lines 1-6). A bachelor's degree is a "necessary qualification" for the position of Director/Chief of Police. (Exhibit 5 - Plaintiff's Deposition Exhibits, Plaintiff's Exhibit 7, Job description for Director/Chief of Police). Defendant Humberto Garcia signed the job description in 1997, along with Steven Crandall, VPFA, despite Defendant Garcia not possessing a "necessary" qualification for the position. (Exhibit 5 - Plaintiff's Deposition Exhibits, Plaintiff's Exhibit 7, Job description for Director/Chief of Police).

31. **Defendant Chief Humberto Garcia refused to consider education as a qualification in hiring and promotions, despite University Policies**. Defendant Chief Humberto Garcia refused to consider education as a qualification in hiring and promotions. (Exhibit 3 - Deposition of Humberto Garcia, p.90, lines 16-19). The Texas A&M University System Regulations

12

state in 33.99.01, Section 5: "Employment decisions will be based on job-related factors such as education...license/certification requirement....Race, sex, religious affiliation, or other protected status or classification shall not be the basis for a hiring decision. (Exhibit 10 - TAMU System Regulations - Employment Practices).

32.     **Defendant Chief Humberto Garcia, despite responsibility to hire, fire, promote and demote, not provided any training regarding employment discrimination**. Defendant Chief Humberto Garcia testified that he didn't recall if he ever received any training as far as discrimination in the workplace while he was employed with the A&M system. (Exhibit 3 - Deposition of Humberto Garcia, p. 40, lines 2-5; Exhibit 5 - Plaintiff's Deposition Exhibits, Plaintiff's Exhibit 1, Humberto Garcia's personnel file).  All other employees testified that they did not receive any training from Defendants regarding discrimination in the work place until the year 2000. (Exhibit 7 - Deposition of Robert Nash, Jr., pages 29-30, lines 21-8).

33.     **Hispanic male with less time with the University and less qualifications was promoted over Plaintiff in 1998.**  In 1998, Sargent Franco, a Hispanic male, was promoted over Plaintiff. (Exhibit 5 - Plaintiff's Deposition Exhibits). Sargent Franco had less time in employment with Defendant and Sargent Franco had fewer qualifications. (Exhibit 5 - Plaintiff's Deposition Exhibits).

34.     **Hispanic male made fire arms safety officer even though he did not have training.**  Sargent Franco was made the fire arms safety officer even though he had never been to school for such training. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Humberto Garcia, p. 2-15).

13

35.     **Plaintiff was told he would be sent to fire arms instructing school, a Hispanic male was sent in his place.**   Plaintiff was told by Chief Garcia that he would be sent to fire arms instructor school. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Humberto Garcia, p. 2-15).   However, a Hispanic male was sent in Plaintiff's place. (Exhibit 1 - Affidavit of Joseph K. Connor).

36.     **Promotion Board had no policies and procedures**.   The Promotion Board had no policies and procedures. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 5 - Plaintiff's Deposition Exhibits; Exhibit 7 - Deposition of Robert Nash, Jr.)

37.     **Plaintiff is told by Hispanic supervisors that they would make his job so oppressive that he would quit**.   During the course of Plaintiff's employment, he was told on several occasions by both Sargent Longoria and Sargent Bazan that they would, in effect, make his job so difficult and oppressive that Plaintiff would quit.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor.)   Plaintiff was further told by both Sargent Longoria and Sargent Bazan on numerous occasions, "If he didn't like, there is the door and don't let it hit your ass on the way out."   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

38.     **Memorandum said Promotion Board was to meet with all supervisors, however that did not occur**.   In March 1999, a memo was circulated that all supervisors would be present at the promotion board.   (Exhibit 1 - Affidavit of Joseph K. Connor, Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 5 - Plaintiff's Deposition Exhibits; Exhibit 7 - Deposition of Robert Nash, Jr.).   However,

14

the promotion board met without all supervisors present. (Exhibit 1 - Affidavit of Joseph K. Connor;

Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 -

Deposition of Robert Bazan; Exhibit 5 - Plaintiff's Deposition Exhibits; Exhibit 7 - Deposition of

Robert Nash, Jr.).

   **39.    Plaintiff is told by Sargent Perez that he is being discriminated against**.  Sargent

Perez advised Plaintiff on October 26, 1998 that he felt Plaintiff had been discriminated against

during the first meeting of the promotion board because no Anglo held the position of Sargent in

over 15 years. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

   **40.    Plaintiff possessed required qualifications for promotion**.  At all times during

Plaintiff's employment with Defendants, he possessed the required qualifications for promotion as

set out by the Texas A&M University System. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit

2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits).

   **41.    Plaintiff was treated different from non-Anglos - chastised for receiving medical**

**treatment for injury**. Plaintiff was injured during the course and scope of his employment with

Defendants.  Specifically, Plaintiff's hand was punctured during the pursuit of a criminal suspect.

(Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).  Plaintiff was

chastised by his supervisors for receiving medical treatment for the wound.  (Exhibit 1 - Affidavit

of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).  None Anglos were not similarly

chastised by the supervisors.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition

of Joseph Connor).

   **42.    Plaintiff is accused by Defendant Chief Humberto Garcia of instigating a**

**conversation with Mr. Hartsfield about promotions**.  Plaintiff was confronted by Chief Garcia

about a conversation between Mr. Hartsfield and Plaintiff. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Mr. Hartsfield had stopped Plaintiff and asked him several questions about the firing of Sargent Quinones.  (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff was accused by Chief Garcia of instigating a conversation with Mr. Hartsfield over the promotion of officers. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

     **43.**     **Defendant Chief Humberto Garcia would call Plaintiff a liar**. On several occasions throughout Plaintiff's employment with Defendants, Chief Garcia called Plaintiff a liar. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia, p. 110, lines 13-8).

     **44.**     **Defendant Humberto Garcia placed false reports in other Anglo officer's files**. Defendants had placed false reports in other Anglo officers files. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

     **45.**     **Written disciplinary action was placed in Plaintiff's file without his every being aware of its existence**. Sargent Franco asked Plaintiff to change two criminal reports for content. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits). However, Plaintiff voiced his opinion that this was not correct pursuant to criminal procedures used by the State of Texas in processing such reports. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits). Plaintiff was never given any "write-ups" for this incident during his employment with Defendants. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits).  However, in October 1999, he

learned that he had been written up for these two reports. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits). At that time, Plaintiff learned that he was written up for alleged grammatical errors in the reports. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits).

46.    **Plaintiff never received information about Promotion Board after request.** In August 1998, Plaintiff requested information about the promotion board from Chief Garcia. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 16 - Connor's request to Defendant Garcia for Promotion Board Information).   However, Plaintiff never received this information. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

47.    **After stating that he was going to file a charge with the EEOC, Plaintiff was told in sarcastic manner by Lt. Jefferson "do you want me to drive you".** During the first of September 1998, Plaintiff told Lieutenant Jefferson, a black female, that he was going to speak with EEOC about discrimination against him. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).  Lieutenant Jefferson told Plaintiff, "Do you want me to drive you." (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

48.    **Defendants are aware that Plaintiff went to file a charge of discrimination in 1998.**  On October 1, 1998, Plaintiff went to the Corpus Christi Human Relations Office and met with an investigator regarding his claims of discrimination arising from his employment with Defendants. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). He provided a hand written complaint to the intake officers. (Exhibit 1 - Affidavit of Joseph K.

17

Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff's employers learned that Plaintiff had visited the "EEOC" office shortly after the promotion of Sargent Franco, which was September 1, 1998. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Defendants also learned that Plaintiff had hired an attorney to assist him with his discrimination claims. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

49. **Defendants stepped retaliation after Plaintiff goes to 'EEOC'.** Subsequent to Defendants' learning of Plaintiff's actions in protecting his state and federal rights, Defendants stepped up their retaliation toward Plaintiff. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

50. **In October 1998, Plaintiff is refused leave - Hispanics are not refused similar leave.** In October 1998, Plaintiff was refused "comp" leave which he had earned. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). However, Hispanic officers were allowed their "comp" leave for the same purposes. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

51. **Plaintiff's experience not considered in promotions.** Plaintiff's prior supervisory experience was not considered for his potential promotions. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 5 - Plaintiff's Deposition Exhibits).

52. **During 1999, Defendant Chief Humberto Garcia dismissed tickets Plaintiff had written.** In 1999, Plaintiff's traffic tickets were dismissed by Chief Garcia. Hispanic officer's tickets were not similarly dismissed. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

18

53.    **The person promoted in 1999 had less experience and qualifications than Plaintiff, but was Hispanic.**  Pete Cavazos was promoted in 1999 and had less experience and qualifications than Plaintiff, but was Hispanic. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 5 - Plaintiff's Deposition Exhibits; Exhibit 7 - Deposition of Robert Nash, Jr.).  Pete Cavazos had a criminal history which Defendant Chief Humberto Garcia was aware of. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 7- Deposition of Robert Nash, Jr.).

54.    **Supervisors frequently spoken Spanish and excluded non-Spanish speaking persons.**  Supervisors frequently spoke Spanish. (Exhibit 7 - Deposition of Robert Nash, Jr., pages 17, 18, 19, 20, lines 20 - 10; Exhibit 4 - Deposition of Robert Bazan, pages 60, 61, 62, 63, lines 25-25; Exhibit 9 - Deposition of Molly Sanchez, p. 10, lines 10-13).

55.    **When the Sergeants were together, it was easier to communicate in Spanish.**  When the Sergeants were together it was easier for them to communicate in Spanish. (Exhibit 4 - Deposition of Robert Bazan, p. 63, lines 8-19).  When the Sergeants would speak in Spanish, that would include talking about the job.   (Exhibit 4 - Deposition of Robert Bazan, p. 63, lines 23-25).

56.    **Participation was important for promotions and participation meant speaking in Spanish.**  Participation was important for promotions and participation meant speaking in Spanish. (Exhibit 7 - Deposition of Robert Nash, Jr., p. 20, lines 1-10).

57.    **At the time of Plaintiff's termination, he was the only Anglo employee of the University Police Department.**  At the time of Plaintiff's termination, he was the only Anglo employee of the University Police Department. (Exhibit 7 - Deposition of Robert Nash, Jr., p. 17, lines 8-13).

19

58.     **At the time of Plaintiff's termination, there were approximately 21 employees at the University Police Department**. At the time of Plaintiff's termination there were about 15 patrolmen and five or six other employees such as dispatchers and office help. (Exhibit 7 - Deposition of Robert Nash, p. 17, lines 14-19).

59.     **Plaintiff was pulled from training course to interview for promotions**. Plaintiff was pulled twice from a training course to interview before the promotion board. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).   Plaintiff was told that he must interview at those specific time or he would not be allowed to interview.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).   The persons that interviewed for the same position were not similarly treated.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).   The other persons that interviewed for that position were non Anglo.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).   These persons were given proper, prior notice of their interviews and allowed leeway on their scheduling.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).   Plaintiff was not notified until the day of the interview.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

60.     **Plaintiff written up wrongfully.**   Plaintiff was written up and received an official reprimand on April 24, 1999 for illegal search and seizure of property and non-marking of property items. (Exhibit 1 - Affidavit of Joseph K. Connor, Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits).   Plaintiff contacted the District Attorney about the report.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). The District Attorney said the report was fine.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 -

20

Deposition of Joseph Connor). Plaintiff alluded to this in his response to the reprimand. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff was called a "liar" by Chief Garcia when he reviewed Plaintiff's response with him. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

**61.    Write-ups are not given to Plaintiff/Plaintiff's responses are not placed in file.** On May 5, 1999, Plaintiff was written up for insubordination and was placed on a probationary period. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits). Plaintiff responded by requesting that the first and second reprimands be lowered. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff's responses were not placed in his personnel file. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff's first response was dated May 4, 1999 and his second response was dated May 11, 1999. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff did not receive the letter of insubordination written by his supervisor. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

**62.    Plaintiff files grievance on May 10, 1999 alleging racial discrimination.** On May 10, 1999 Plaintiff filed a grievance with Jimmy Hartsfield, Director of Human Resources at Texas A&M University-Kingsville regarding discrimination. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff's grievance was rejected and he was told to file the grievance on a University grievance form. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff's first letter dated May 10, 1999 was not placed in Plaintiff's personnel file. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of

21

CM-PDF - www.fesoa.com

Joseph Connor).   Plaintiff asked Mr. Hartsfield to keep his grievance confidential.   (Exhibit 1 -

Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff filed his

grievance using the University form on May 15, 1999. (Exhibit 1 - Affidavit of Joseph K. Connor;

Exhibit 2 - Deposition of Joseph Connor).

    63.    **Defendant Chief Humberto Garcia called Plaintiff a bastard about a week**

**before he was terminated**.   Humberto Garcia called Plaintiff a bastard in Spanish about a week

prior to Plaintiff's termination. (Exhibit 1 - Affidavit of Joseph K. Connor, Exhibit 2 - Deposition

of Joseph Connor; Exhibit 9 - Deposition of Molly Sanchez).

    64.    **Plaintiff treated differently than non- Anglos - not allowed to clean up;**

**"followed"**. Defendants refused to allow Plaintiff to clean up after he became very dirty while on

duty.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

Eventually, Defendants allowed Plaintiff leave to go to his parent's home to shower and wash his

uniform.   (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

While Plaintiff was at his parent's home, Defendants called to check to make sure he was there.

(Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

    65.    **Reasons given to Plaintiff for termination were false and contradicting**.  Plaintiff

was terminated on June 4, 1999 for violating his probation and by leaving the front office on May

16, 1999.  (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

Plaintiff neither violated his probation nor left the front office.  (Exhibit 1 - Affidavit of Joseph K.

Connor; Exhibit 2 - Deposition of Joseph Connor).  Sargent Bazan left the building, when he was

the only person on duty, and was not terminated.   (Exhibit 1 - Affidavit of Joseph K. Connor;

Exhibit 2 - Deposition of Joseph Connor; Exhibit 4 - Deposition of Robert Bazan; Exhibit 5 -

Plaintiff's Deposition Exhibits; Exhibit 7 - Deposition of Robert Nash, Jr.; Exhibit 9 - Deposition

of Molly Sanchez). The reason given to various state agencies for Plaintiff's termination varied

between the persons providing the information on behalf of Defendants which, in effect, contradicted

each of the reasons given for his termination. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit

2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits).

   **66.    Plaintiff files grievance for retaliation**. Immediately after learning of his

termination, Plaintiff filed a grievance based on retaliation. (Exhibit 1 - Affidavit of Joseph K.

Connor; Exhibit 2 - Deposition of Joseph Connor).

   **67.    Plaintiff was denied due process in processing of grievances**. Plaintiff was denied

due process in regard to his grievances. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 -

Deposition of Joseph Connor). Neither of his grievances were fairly processed. (Exhibit 1 -

Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff's attorney, Brad

Condit, was told by the University representatives that Jimmy Hartsfield was very good friends with

Humberto Garcia and that it would not be worth grieving. (Exhibit 1 - Affidavit of Joseph K.

Connor; Exhibit 2 - Deposition of Joseph Connor).

   **68.    Write-ups found in Plaintiff's file which were never given to Plaintiff**. After

Plaintiff's termination, Plaintiff discovered in October 1999 that he had been "written up" for

numerous alleged violations. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition

of Joseph Connor). However, Plaintiff never had any knowledge of such alleged violations and was

never presented with the opportunity to answer said allegations. (Exhibit 1 - Affidavit of Joseph

K. Connor; Exhibit 2 - Deposition of Joseph Connor). Further, Plaintiff never received a copy of

these "write ups". (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph

23

Connor). Plaintiff never received his termination papers. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

69. **Plaintiff denied access to the University – which is public property**. In October 1999, Plaintiff became aware of his termination papers through his attorney. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). To Plaintiff's alarm, the papers stated that he was "prohibited from access to university property." (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 5 - Plaintiff's Deposition Exhibits). Texas A&M University-Kingsville is a public university and as such is located on public property. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff has never been alleged of committing any act which would warrant his denied access to this public property. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Defendants, in effect, took Plaintiffs right to attend sporting events at the university which Plaintiff has held season tickets for several years; took Plaintiff's right to attend meetings on campus; and took Plaintiff's right to attend classes on campus. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

70. **Defendant Chief Humberto Garcia doesn't know if Plaintiff received a copy of any write-ups he received in April, May or June 1999**. Defendant Chief Humberto Garcia doesn't know if Plaintiff received a copy of any write-ups he received in April, May or June 1999. (Exhibit 3 - Deposition of Humberto Garcia, p. 60, lines 18-20).

71. **Defendant Chief Humberto Garcia doesn't know if Plaintiff received any information regarding his termination**. Defendant Chief Humberto Garcia doesn't know if Plaintiff received any information regarding his termination. (Exhibit 3 - Deposition of Humberto

24

Garcia, p. 61, lines 2-4). Plaintiff never received his F-5 form as required by TCLOSE. (Exhibit 1 - Affidavit of Joseph K. Connor). Further, in discovery Defendants indicated that this form was not sent to TCLOSE. (Exhibit 5 - Plaintiff's Deposition Exhibits).

72. **Defendants Chief Humberto Garcia cannot cite laws, regulations or other standard which Plaintiff violated which led to his termination.** Defendant Chief Humberto Garcia could not cite laws, regulations or other standards which Plaintiff violated which led to his termination. (Exhibit 3 - Deposition of Humberto Garcia, p. 77, lines 12-15, p. 81, lines 18-25, p. 82, lines 1-5).

73. **Defendants aren't sure who replaced Plaintiff.** Defendants are not sure who replaced Plaintiff. (Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 7 - Deposition of Robert Nash, Jr.).

74. **Defendants basis for termination.** In response to Interrogatory Number 13, Defendants state that "Plaintiff was terminated because on April 1, 1999 and April 21, 1999 Plaintiff was reprimanded for confiscation items without a warrant. He was told that a probation period would be imposed for a period of six months to commence on May 5, 1999 and that any infraction during this period will result in termination. On May 16, Plaintiff left the dispatcher's post unattended to complete some personal paperwork in the back room. He was aware that department policy requires the dispatcher's post be manned to receive 911 calls. He was immediately relieved of his duties and terminated effective June 18, 1999." (Exhibit 5 - Plaintiff's Deposition Exhibits, Exhibit 7).

75. **April 1, 1999 "confiscation" approved by Sargent Hiram Perez.** In a report signed by Sargent Hiram Perez, it states, "On 04-1-99 at about 5:48 PM #111 Connor was

25

dispatched to Martin Hall in reference to some drug paraphernalia in one of the rooms. This was called in by Billy Knapp, Dorm Director. #110 Everett also responded to said call. At about 6:00 PM #110 Everett called this officer #108 Sgt. Perez and advised that they had found a pipe, a car stereo, and some ammunition in room 122B and #110 wanted to know if they should bring in the car stereo because it was a possibility that the stereo could have been one that was stolen in a rash of car burglaries that had happened on campus. This officer told #110 to ask Mr. Knapp if it was okay with him (Knapp) to bring in the stereo to check against the cases U.P.D. had. The items were removed after permission was given by Mr. Knapp and brought to U.P.D....." (Exhibit 5 - Plaintiff's Deposition Exhibits - Plaintiff's Exhibit 3). Prior to Plaintiff being written up, Defendant Chief Humberto Garcia did not speak to Sergeant Hiram Perez about this incident. (Exhibit 1 - Affidavit of Joseph K. Connor). At the time, Sergeant Perez was Plaintiff's supervisor and he should have been there at the time of the write-up. However, Defendant Chief Humberto Garcia had Sergeant Franco there instead – who was not Plaintiff's supervisor. (Exhibit 1 - Affidavit of Joseph K. Connor).

76. **Plaintiff wrote response to allegation arising from April 1, 1999 incident to Defendant Chief Humberto Garcia, but document not in Plaintiff's personnel file.** Plaintiff wrote a response to the action taken against him as a result of the April 1, 1999 "confiscation". (Exhibit 12 - Connor Response to "Confiscation" dated May 4, 1999). However, this response was not placed in Plaintiff's personnel file. (Exhibit 5 - Plaintiff's Deposition Exhibits).

77. **Plaintiff wrote written response to April 21, 1999 write up, but document not in Plaintiff's personnel file.** Plaintiff wrote a response to the April 21, 1999 write up, but that

document was not placed in Plaintiff's personnel file. (Exhibit 18 - 05/11/99 Memorandum from Connor to Garcia).

78. **Non-Anglo employees/supervisors violated policies and were not disciplined.** **Other non-Anglo employees/supervisors violated policies and were not disciplined. Lieutenant Jefferson, a black female, used the copy machine for personal use; Sergeant Longoria** and Defendant Sergeant Robert Bazan took University property for their personal use. (Exhibit 7 - Deposition of Robert Nash, Jr., pages 51-52, lines 3-19). Defendant Chief Humberto Garcia was aware of these activities. (Exhibit 7 - Deposition of Robert Nash, Jr., page 52, lines 9-19).

79. **It is common for the front office to be unattended and those persons are not written-up.** Molly Sanchez, a Hispanic female who has employed with the University Police Department for nine years was asked, "Since you've been employed in the last nine years with the university police department, are you aware of any officers that have left the front office of the university police department unmanned?" (Exhibit 9 - Deposition of Molly Sanchez, p. 10, lines 14-17). Ms. Sanchez responded, "We all do...." (Exhibit 9 - Deposition of Molly Sanchez, p. 10, line 18). Robert Nash testified that Louie Everett, Pete Chapa and Defendant Sergeant Robert Bazan had all left the front of the office unmanned. (Exhibit 7 - Deposition of Robert Nash, Jr., pages 28- 29, lines 22-20). None of these persons were disciplined. (Exhibit 7 - Deposition of Robert Nash, Jr.; Exhibit 9 - Deposition of Molly Sanchez; Exhibit 5 - Plaintiff's Deposition Exhibits; Affidavit of Joseph K. Connor).

80. **Plaintiff not aware that he was alone in the building on May 16, 1999.** Plaintiff

27

Joseph Connor was not aware that he was alone in the building on May 16, 1999.  (Exhibit 1 -

Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).  Therefore, he was not

aware of the need for him to go to the front of the office. (Exhibit 1 - Affidavit of Joseph K. Connor;

Exhibit 2 - Deposition of Joseph Connor).

     **81.**    **No procedures for tagging and storing evidence**.  The University Police

Department does not have procedures for tagging and storing evidence. (Exhibit 1 - Affidavit of

Joseph Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto

Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 7 - Deposition of Robert Nash, Jr.).  Robert

Nash testified to the following:

> Q     Has any supervisor instructed you where to go to find the procedures
>       for tagging and storing evidence?
> A     No.
> Q     Today, do you know where to go to find that information?
> A     Not really.  I have to ask my supervisor what they want me to do with it.

(Exhibit 7 - Deposition of Robert Nash, Jr., p. 34, lines 18-25).

     **82.**    **Defendant Chief Humberto Garcia says that Plaintiff would never make**

**sergeant as long as he was there**.  Defendant Chief Humberto Garcia stated that Plaintiff Joseph

Connor would never make sergeant as long as he was there. (Exhibit 7 - Deposition of Robert Nash,

Jr., p. 14, lines 7-22).

### III. SUMMARY JUDGMENT

     83.    The purpose of a summary judgment is to pierce the pleadings and to assess the proof

to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. V. Zenith Radio*

*Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *Perkins v. Brigham & Women's Hosp.*, 78

F.3d 747, 749 (1st Cir.1996).

84.     Summary judgment is proper if the pleadings, discovery products on file and affidavits show there are no genuine issues about any material facts and that the movant is entitled to judgment as a matter of law. FRCP 56(c).

85.     In reviewing a motion for summary judgment, the Court views the facts and inferences to be drawn from those facts in the light most favorable to the non-movant, in this case the Plaintiff Joseph Connor. *Dickey v. Baptist Memorial Hospital-North MS,* 146 F.3d 262, 264 (5th Cir.1988), *citing Celotex Corp. v. Catrett,* 106 S.Ct 2548, 2552 (1996).

## IV. ARGUMENTS & AUTHORITIES

### A. Individual Defendant's Qualified Immunity & §1983

86.     In order to overcome qualified immunity, Plaintiff Joseph Connor must show that Defendant Humberto Garcia and Defendant Robert Bazan's conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S. Ct. 2727, 2738 (1982) ; *Davis v. Scherer,* 468 U.S. 183, 104 S. Ct. 3012, 3018, 82 L. Ed. 2d 139 (1984); *Baddour, Inc. v. United States,* 802 F.2d 801, 807(5th Cir. 1985); *Thorne v. Jones,* 765 F.2d 1270, 1277 (5th Cir. 1985), cert. denied, 475 U.S. 1016, 106 S. Ct. 1198, 89 L. Ed. 2d 313 (1986). A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq. *Pederson v. Louisiana State University,* 201 F.3d 388, 2000.C05.0042051<http://www.versuslaw.com>, 141 Ed. Law Rep. 126.

87.     The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative. In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees. . . . It is this recognition that has required the denial of absolute immunity to most public officers. *Harlow v. Fitzgerald,* 102

29

S. Ct. at 2736, (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.), cert. denied, 339 U.S. 949, 70 S. Ct. 803, 94 L. Ed. 1363 (1950)).

88.     Plaintiff Joseph Connor alleges clearly and specifically in his Complaint that Defendants Garcia and Bazan violated clearly established statutory and constitutional rights of which a reasonable person would have known in that they discriminated against him based upon his race, Anglo, and retaliated against him for opposing racial discrimination. Further, Defendants Garcia and Bazan retaliated against Plaintiff Joseph Connor in violation of his First Amendment rights in that Plaintiff spoke out about matters of public concern and he was subsequently retaliated against for this protected speech. The evidence set out above in paragraphs 2 through 82 and attached hereto and incorporated by reference show that the individual defendants clearly violated Plaintiff Joseph Connor's established statutory and constitutional rights in that they treated him disparately because of his race, Anglo; retaliated against him because he opposed discrimination; and retaliated against him because he spoke out about matters of public concern.

89.     Any reasonable official would understand that it is in violation of federal laws to discriminate against an employee based upon race.

90.     Any reasonable official would understand that it is in violation of federal laws to retaliate against an employee because the employee opposed discrimination.

91.     Any reasonable official would understand that is in violation of the United States Constitution to retaliate against an employee for speaking out about matters of public concern - exercising their rights under the First Amendment.

92.     Defendants assert in their motion that Plaintiff "will have to come forward with evidence that being reprimanded for making an illegal seizure of property and being reprimanded

30

for not being at his duty stations to answer "911" calls would somehow violate "established law".

This is incorrect. First, Plaintiff was reprimanded for seizure of property which Sergeant Hiram

Perez instructed him to seize. (Exhibit 5 - Plaintiff's Deposition Exhibits - Plaintiff's Exhibit 3).

Sergeant Hiram Perez, a Hispanic male, was not reprimanded for instructing Plaintiff Joseph Connor

to seize the evidence. (Exhibit 5 - Plaintiff's Deposition Exhibits - Plaintiff's Exhibit 3; Exhibit 1 -

Affidavit of Joseph K. Connor). Second, Plaintiff told Defendant Chief Humberto Garcia that he

was not aware that Officer Everett had left the front office. Therefore, Plaintiff Joseph Connor was

not aware that he was to move to the front office. In any event, it was common practice that the front

office would be left unmanned and no one else had been reprimanded or disciplined in any other

manner – besides the Plaintiff, Joseph Connor. (Exhibit 9 - Deposition of Molly Sanchez, p. 10, lines

14-17; Exhibit 9 - Deposition of Molly Sanchez, p. 10, line 18; Exhibit 7 - Deposition of Robert

Nash, Jr., pages 28- 29, lines 22-20; Exhibit 7 - Deposition of Robert Nash, Jr.; Exhibit 9 -

Deposition of Molly Sanchez; Exhibit 5 - Plaintiff's Deposition Exhibits; Affidavit of Joseph K.

Connor). These facts establish that Plaintiff Joseph Connor, an Anglo, was treated disparately which

led to his unlawful termination.

      93.     Defendants also argue in their motion that Defendants Chief Humberto Garcia did

not have authority to terminate (or hire or reinstate) employees. This is entirely contrary to

Defendant Chief Humberto Garcia's own testimony and the documentary evidence. (Exhibit 3 -

Deposition of Humberto Garcia, p. 40, lines 17-24; Exhibit 15 - Memorandum "I have approved the

Promotion"). The affidavits of Jimmy Hartsfield and Robert Bazan that Defendants rely upon to

support their contention that Defendant Chief Humberto Garcia did not have authority to terminate

employees are not credible, not free of contradiction and self-serving. Plaintiff Joseph Connor

objects to these affidavits on these grounds.

94.     In regard to Plaintiff's §1983 claims, at all times, the conduct complained of the individual defendants were (1) acting under color state law, and (2) their conduct deprived Plaintiff Joseph K. Connor of rights, privileges, or immunities secured by the Constitution or laws of the United States.

## B. TITLE VII RACIAL DISCRIMINATION

95.     In *Byers v. Dallas Morning News, Inc.*, a recent Fifth Circuit opinion, the Fifth Circuit addressed the issue of reverse discrimination. *Byers v. Dallas Morning News, Inc.*, 2000.C05.0042221<http://www.versuslaw.com>. The Court stated:

> Under Title VII, "[i]t shall be an unlawful employment practice for an employer (1)...to discharge any individual...because of such individual's race..." 42 U.S.C. §2000e-2(a). An employer's decision to terminate an individual's employment violates Title VII when that decision was based on race, whether that race be white or back. See McDonald v. Santa Fe Transpo. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed. 2d 493. This Court will apply, absent direct evidence of discrimination based on race, the basic framework that the Supreme Court articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed. 2d 668 (1973). Under that framework, the plaintiff must establish a prima facie case of discrimination. See id at 802. If the plaintiff succeeds in showing a prima facie case, the defendant must then provide some legitimate, non-discriminatory reason for the employer's rejection. See id. Lastly, if the employer gives a legitimate, non-discriminatory reason for the employment action, the plaintiff must then prove, by a preponderance of the evidence, that the proffered reason was mere pretext for discrimination. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 253, 101 S.Ct. At 1093, 67 L.Ed.2d at 215(1981).

Id.

96.     To establish a prima facie case, Plaintiff Joseph Connors must establish: (1) that he is a member of a protected group; (2) that he was qualified for the position held; (3) that he was discharged from the position; and (4) that he was replaced by someone outside of the protected group. Id.

97.     **Plaintiff is a member of a protected group.** Plaintiff Joseph Connor was the only

CIMPDF - www.fasoo.com

Anglo working in the University Police Department at the time of his termination. (Exhibit 7 - Deposition of Robert Nash, Jr., p. 17, lines 8-13). At the time of Plaintiff's termination there were about 15 patrolmen and five or six other employees such as dispatchers and office help. (Exhibit 7 - Deposition of Robert Nash, p. 17, lines 14-19). There had been no Anglo supervisors in the University Police Department in at least ten years. (Exhibit 3 - Deposition of Humberto Garcia, p. 95, lines 21-23; Exhibit 4 - Deposition of Robert Bazan; Exhibit 7 - Deposition of Robert Nash, Jr.). Therefore, he is a member of a protected group.

98.     **Plaintiff was qualified for the position of officer.** Plaintiff Joseph Connor was qualified to perform his job duties as a patrol officer with the University Police Department and had been performing those duties for at least six years. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor). Plaintiff Joseph Connor had over sixty hours of college credit and was certified as a Master Peace Officer through TCLEOSE, as well as being a certified instructor. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor) Further, Plaintiff Joseph Connor had the recommendation of several of the current supervisors within the University Police Department. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor).

99.     **Plaintiff was discharged from his position.** Plaintiff Joseph Connor was terminated from his position as a patrol officer with the University Police Department. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 5 - Plaintiff's Deposition Exhibits).

100.    **That he was replaced by someone outside the group.** Defendants cannot state who replaced Plaintiff. (Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of

Robert Bazan; Exhibit 7 - Deposition of Robert Nash, Jr.). Regardless of who replaced Plaintiff, the Fifth Circuit cited in footnote 7 of ***Nieto v. L&H Packing Co.***, stated, "While the fact that one's replacement is of another national origin 'may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition." ***Byers citing Nieto***. Clearly, taking the evidence as a totality and the fact that the Defendants themselves cannot say who replaced Plaintiff, Plaintiff meets this prong of his case.

101.    As set out in paragraphs 97-100, Plaintiff Joseph Connor makes his prima facie case of reverse racial discrimination.

102.    Turning to the next step, even assuming that Defendants' reasons for termination of Plaintiff are a legitimate, non-discriminatory reason for the employer's rejection, Plaintiff has provided enough evidence, in paragraphs 2-82 and the attached documents incorporated by reference hereto, for a jury to find, by a preponderance of the evidence, that the proffered reason given by the Defendants was mere pretext for discrimination. Therefore, Plaintiff has met his Summary Judgment burden on this issue.

103.    In response to Defendants' assertion that Plaintiff cannot identify any Hispanic officer who was treated differently than Plaintiff where such officer violated the rules of the UPD, that is not true. As set out in the facts portion of this response, Plaintiff points out that Lt. Jefferson, a black female, Sargeant Bazan, a Hispanic male, Sargeant Longoria, a Hispanic male, and Pete Chapa, a Hispanic male, all violated UPD rules and were not disciplined in any manner. (Exhibit 7 - Deposition of Robert Nash, Jr., pages 51-52, lines 3-19; Exhibit 7 - Deposition of Robert Nash, Jr., page 52, lines 9-19:   (Exhibit 9 - Deposition of Molly Sanchez, p. 10, lines 14-17; Exhibit 9 - Deposition of Molly Sanchez, p. 10, line 18; Exhibit 7 - Deposition of Robert Nash, Jr., pages 28-29, lines 22-20; Exhibit 7 - Deposition of Robert Nash, Jr.; Exhibit 9 - Deposition of Molly Sanchez;

Exhibit 5 - Plaintiff's Deposition Exhibits; Affidavit of Joseph K. Connor).

104.    In response to Defendants' motion wherein they assert that "Plaintiff lacks evidence to show race as a determining factor." Plaintiff Joseph Connor has specifically set out competent summary judgment evidence as outlined in paragraphs 2-82 of this response which raises a genuine issue of material fact as to whether race was a determining factor. Specifically, such facts as Plaintiff was the only Anglo employee of the University Police Department at the time of his termination; Sargeant Hiram Perez, a Hispanic male told Plaintiff to confiscate evidence without a warrant, but he was not reprimanded like Plaintiff; Defendant Chief Humberto Garcia called Plaintiff a bastard in Spanish prior to his termination; There had been no Anglo supervisors in the University Police Department for over ten years; Defendant Chief Humberto Garcia never read the EEO policy of the University; Defendant Chief Humberto Garcia never received any training from the University regarding discrimination in the workplace; Other non-Anglo officers and employees left the front-office unmanned and were not disciplined in any manner; when asked under oath to point to the laws, rules or regulations that Plaintiff Joseph Connor violated which led to his termination, neither Defendant Garcia nor Defendant Bazan could; and Plaintiff's responses to reprimands were excluded from his personnel file – including his explanation that he was not notified that he was only person in the office on May 16, 1999.

## C. TITLE VII - RETALIATION

105.    Defendants were very much aware that Plaintiff opposed the discrimination he was suffering at their hands. Not only had Plaintiff notified Lt. Jefferson that he was going to the Equal Employment Opportunity Commission in early September of 1998, Plaintiff had even written a letter to Steven Crandall, Vice President of Finance and Administration, complaining about disparate treatment in early September of 1998. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 -

Deposition of Joseph Connor; Exhibit 17 - 11/2/98 Crandall Memorandum Regarding Leave).

Plaintiff had not been written up from December 8, 1995 through September 5, 1998 - after he

notified his employer that he was going to contact EEOC. (Exhibit 5 - Plaintiff's Deposition

Exhibits, Exhibit 7, last page). Two more write-ups followed in September of 1998 - one on

September 7, 1998 and one on September 29, 1998; two more write-ups followed in April 1999 and

one in May 1999. (Exhibit 5 - Plaintiff's Deposition Exhibits, Exhibit 7, last page). Plaintiff went

for almost three years without any write–ups and good evaluations.    (Exhibit 5 - Plaintiff's

Deposition Exhibits, Exhibit 7, last page). After he openly opposes discrimination, he is written up

six times. Of further importance is the fact that Plaintiff had not been written up from October 1,

1992 through December 8, 1995.  (Exhibit 5 - Plaintiff's Deposition Exhibits, Exhibit 7, last page).

106.    With the evidence attached hereto and incorporated by reference, Plaintiff Joseph

Connor has raised a fact issue for a jury to determine about whether or not there is a connection

between the protected activity and the adverse employment actions taken against him.

### D. First Amendment Speech Retaliation

107.    During Plaintiff Joseph Connor's employment with the University, he spoke on

several matters of public concern including, but not limited to the following: Sergeant Quinones'

drinking on the job and in an official patrol unit; reporting problems with the University Police

Department radios (which were not working); Campus safety issues; the University Police

Department's lack of procedures; and a request made of Mr. Connor to change an official report.

(Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 -

Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 7 - Deposition of

Robert Nash, Jr.; Exhibit 5 - Plaintiff's Deposition Exhibits; Exhibit 14 - Write up of Quinones for

drinking). Not only did Plaintiff Joseph Connor speak about these matters, but he submitted written documentation of such concerns which have been exchanged during discovery in this case. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 3 - Deposition of Humberto Garcia; Exhibit 4 - Deposition of Robert Bazan; Exhibit 7 - Deposition of Robert Nash, Jr.; Exhibit 5 - Plaintiff's Deposition Exhibits; Exhibit 14 - Write up of Quinones for drinking) . Some of these complaints culminated in his seeking advice and information from the local District Attorney. (Exhibit 1 - Affidavit of Joseph K. Connor; Exhibit 2 - Deposition of Joseph Connor; Exhibit 18 - 05/11/99 Memorandum from Connor to Garcia; Exhibit 12 - Connor Response to "Confiscation" dated May 4, 1999). Clearly, Mr. Connor's speech is protected under the First Amendment to the United States Constitution because he was speaking as a citizen upon matters of public concern.

108.    Plaintiff Joseph Connor did not surrender his First Amendment freedom of speech rights by accepting public employment. *Connick v. Myers*, 461 U.S. 138 (1983), *Keyishian v. Board of Regents of University of State of New York*, 385 U.S. 589, 605-606 (1967) (a public employer cannot compel a public employee to relinquish his or her First Amendment right as a condition of public employment.)

109.    To pursue a First Amendment claim of actual or constructive discharge for the exercise of free speech, Plaintiff Joseph Connor will need to prove (1) that his speech was one motivating factor in the separation from employment and (2) that his speech was constitutionally protected. Once Mr. Connor establishes these two elements, the burden of proof will shift to the Defendants to show by a preponderance of the evidence that Plaintiff Joseph Connor would have been terminated in the absence of his protected speech. *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410 (1979); *Mt. Healthy School Distr.. Bd. Of Education v. Doyle*, 429 U.S. 274

(1997).

110.    Protected free speech must involve a "matter of public concern". Certainly the matters on which Plaintiff Joseph Connor spoke were "matters of public concern": Sergeant Quinones' drinking on the job and in an official patrol unit while driving; reporting problems with the University Police Department radios (which were not working - these radios were used to respond to incidents on campus); Campus safety issues; the University Police Department's lack of procedures; and a request made of Mr. Connor to change an official report (Williams v. Board of Rents of the University System of Georgia, et al., 1980.C05.41501<http://www.versuslaw.com>; 629 F.2d 993, held that speech about falsification of an official document is a matter of public concern).

111.    The evidence presented in paragraphs 2-82 of this response and the documents attached hereto and incorporated by reference present a genuine issue of material for a jury to determine on the issue of First Amendment retaliation.

## V. INCORPORATION OF EVIDENCE BY REFERENCE

112.    Plaintiff attaches summary judgment evidence hereto and incorporates it by reference into this Response. The affidavit of Gay E. Gilson is attached to authenticate the documents attached.

## VI. CONCLUSION

113.    For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,
Law Office of Gay E. Gilson
4600 Ocean Drive, Suite 104D
Corpus Christi, Texas 78412
Telephone: (361) 814-0573
Facsimile: (361) 814-0674

By: _____

GAY E. GILSON
SBN 00784131/Fed.I.D. 16385

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded on November 27, 2000 by certified mail, return receipt requested to:

William T. Deane                                          Via CMRRR
Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

_____
Gay E. Gilson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSEPH K. CONNOR | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. C-00-069 |
| | § | |
| TEXAS A&M UNIVERSITY - KINGSVILLE; | § | **JURY TRIAL REQUESTED** |
| HUMBERTO GARCIA, Individually and in | § | |
| His Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in His Official Capacity | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S EXHIBIT LIST TO PLAINTIFF'S RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Attached hereto and incorporated by reference are Plaintiff's exhibits to Plaintiff's Response

to Defendant's Motion for Summary Judgment:

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Affidavit of Joseph K. Connor

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Joseph K. Connor

Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Humberto Garcia

Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Robert Bazan

Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Deposition Exhibits

Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Molly Sanchez

Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Robert Nash, Jr.

Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAMUK Employee Handbook

Exhibit 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Molly Sanchez

Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . . . . TAMU System Regulations - Employment Practices

Exhibit 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Affidavit of Gay E. Gilson

Exhibit 12 . . . . . . . . . . . . . . . . . . . . . . . .  Connor Response to "Confiscation" dated May 4, 1999

Exhibit 13 . . . . . . . . . . . . . . . . . . . .  Report of 8-4-96 including Quinones Harassment of Connor

Exhibit 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Write up of Quinones for Drinking

Exhibit 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Memorandum "I have approved the promotion"

Exhibit 16 . . . . . . . . . . . Connor's request to Defendant Garcia for Promotion Board Information

Exhibit 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11/2/98 Crandall Memorandum Regarding Leave

Exhibit 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 05/11/99 Memorandum from Connor to Garcia

CSXPDF - www.fastio.com

EXHIBITS

NOT

IMAGED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOSEPH K. CONNOR                         §
                                         §
        Plaintiff                        §
                                         §
vs.                                      §        Civil Action No. C-00-69
                                         §
TEXAS A&M UNIVERSITY - KINGSVILLE; §        **JURY TRIAL REQUESTED**
HUMBERTO GARCIA, Individually and in    §
His Official Capacity; and ROBERT BAZAN, §
Individually and in His Official Capacity §
                                         §
        Defendants.                      §

## ORDER DENYING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

On the _____ day of _____, 2000, the Court considered Defendants'

Motion for Summary Judgment. After considering the Motion, Pleadings and the argument of the

Parties, the Court DENIES Defendants' Motion for Summary Judgment.

It is therefore Ordered, Adjudged and Decreed that Defendants' Motion for Summary

Judgment is DENIED.

SIGNED this _____ day _____, 2000.


                              _____
                              PRESIDING JUDGE