UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

**JAN 2 4 2001**

Michael N. Milby, Clerk

| | | |
|---|---|---|
| JOSEPH K. CONNOR | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. C-00-069 |
| | § | |
| TEXAS A&M UNIVERSITY - KINGSVILLE; | § | **JURY TRIAL REQUESTED** |
| HUMBERTO GARCIA, Individually and in | § | |
| His Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in His Official Capacity | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this Plaintiff's Supplemental Response to Defendant's Motion for Summary Judgment seeking the denial of Defendant's Motion for Summary Judgment and would show the Court as follows:

1.     The Fifth Circuit Court of Appeals has very recently released two opinions, *Russell v. McKinney Hospital Venture, et al.,* 2000.C05.0042577 http://www.versuslaw.com and *Evans v. City of Bishop,* 2000.C05.0042606 http://www.versuslaw.com, that support Plaintiff's argument that Defendant's Motion for Summary Judgment should be denied in the present case.  A copy of these cases are attached hereto.

2.     Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

Law Office of Gay E. Gilson
4600 Ocean Drive, Suite 104D
Corpus Christi, Texas 78412
Telephone: (361) 814-0573
Facsimile: (361) 814-0674

By: _____
GAY E. GILSON
SBN 00784131/Fed.I.D. 16385

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded on January 24, 2001 by certified mail, return receipt requested to:

William T. Deane                                          Via CMRRR
Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

_____
Gay E. Gilson

2

Russell v. *McKinney Hospital* Venture, No. 99-41390 (5th Cir. 12/06/2000)

[1]    IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[2]    No. 99-41390

[3]    2000.C05.0042577   http://www.versuslaw.com~

[4]    December 6, 2000

[5]    **SANDRA RUSSELL**
       **PLAINTIFF - APPELLANT**
       **V.**
       ***MCKINNEY HOSPITAL* VENTURE, A JOINT VENTURE**
       **OF PARKWAY HOSPITAL, INC. AND NTMC VENTURE,**
       **INC., D/B/A COLUMBIA MEDICAL CENTER OF MCKINNEY,**
       **D/B/A COLUMBIA HOMECARE OF MCKINNEY; NTMC**
       **VENTURE, INC., D/B/A COLUMBIA MEDICAL CENTER OF**
       **MCKINNEY; COLUMBIA HOMECARE OF MCKINNEY**
       **DEFENDANTS - APPELLEES**

[6]    Before King, Chief Judge, Wiener, Circuit Judge, and LYNN,[fn1] District Judge.

[7]    The opinion of the court was delivered by: King, Chief Judge

[8]    Appeal from the United States District Court for the Eastern District of Texas

[9]    Plaintiff-Appellant Sandra Russell appeals from the district court's order granting
       Defendants-Appellees judgment as a matter of law in this case brought under the Age
       Discrimination in Employment Act. For the following reasons, we AFFIRM in part and
       REVERSE in part.

[10]   I. BACKGROUND

[11]   On October 9, 1995, fifty-four year old Sandra Russell began employment for Columbia
       Homecare of McKinney ("Homecare") as the Director of Clinical Services. Carol Jacobsen,
       age fifty-three and Russell's immediate supervisor, also began working at Homecare on the
       same day. In January 1996, Steve Ciulla, age twenty-eight, was hired as the Director of

Operations, a position that was to be at the same level as Russell's position and one that reported to Jacobsen as well. Ciulla was the son of the Chief Executive Officer of Columbia Medical Center of McKinney ("Medical Center"), the parent company of Homecare.

[12]     On January 27, 1997, Russell was terminated from her employment. Subsequently, on April 23, 1998, Russell filed suit in federal district court*fn2 charging defendants with violating the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) (1999).*fn3 A jury trial commenced on July 12, 1999. At the close of Russell's case in full, defendants moved for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court responded that it would take the motion under advisement and would render a ruling after the jury returned its verdict. On July 15, 1999, the jury returned a verdict in favor of Russell, granting her $25,000 in back pay. The jury further found that defendants had willfully violated the ADEA, but did not assess any liquidated damages. Defendants renewed their motion for judgment as a matter of law, which the district court granted on November 1, 1999. Russell timely appeals.

[13]     II. STANDARD OF REVIEW

[14]     We review de novo a district court's grant of a motion for judgment as a matter of law, applying the same standard as the district court. See Price v. Marathon Cheese Corp., 119 F.3d 330, 333 (5th Cir. 1997). Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). Reviewing all of the evidence in the record, we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2110 (2000); see also Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc) (stating that it is the function of the jury to weigh conflicting evidence and inferences and determine the credibility to be accorded to the witnesses). In so doing, we "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 120 S. Ct. at 2110.

[15]     III. SUFFICIENCY OF THE EVIDENCE TO SUSTAIN THE JURY VERDICT

[16]     To determine whether judgment as a matter of law against Russell was appropriate, we must ascertain if sufficient evidence existed for a reasonable jury to find age discrimination. This inquiry is driven by the Supreme Court's most recent statement on the standard for granting judgment as a matter of law, Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097 (2000). We thus set out this analytical framework, and then analyze whether the evidence was sufficient to sustain the jury verdict in this case.

[17]     A. Analytical Framework

CMXPDF - www.fasiso.com

[18]     A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence. Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).*fn4 "First, the plaintiff must establish a prima facie case of discrimination." Reeves, 120 S. Ct. at 2106. Second, the employer must respond with a legitimate, nondiscriminatory reason for its decision. See McDonnell Douglas, 411 U.S. at 802. This burden on the employer is only one of production, not persuasion, involving no credibility assessments. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981). Third, if the employer carries its burden, the "mandatory inference of discrimination" created by the plaintiff's prima facie case, Burdine, 450 U.S. at 256 n.10, "drops out of the picture" and the fact finder must "decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination]," St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511-12 (1993).

[19]     In making this showing, the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 804. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Reeves, 120 S. Ct. at 2106 (quoting Burdine, 450 U.S. at 255 n.10). However, as the Court stated in Hicks, a showing of pretext does not automatically entitle an employee to a judgment as a matter of law. See 509 U.S. at 524. It is "not enough . . . to disbelieve the employer; the [fact finder] must believe the plaintiff's explanation of intentional discrimination." Id. at 519 (emphasis in original). This statement in Hicks caused confusion as to whether intentional discrimination could be inferred from a showing of pretext. See Reeves, 120 S. Ct. at 2104-05 (describing the circuit conflict resulting from the confusion).

[20]     The Supreme Court resolved the circuit split by repudiating the "pretext-plus" approach, thus overruling our decision below, Reeves v. Sanderson Plumbing Products, Inc., 197 F.3d 688 (5th Cir. 1999). See id. at 2108. A unanimous Court held that this circuit had "misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence." Id. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employee unlawfully discriminated." Id. at 2109.

[21]     The Court further stated that, more likely than not, a showing of pretext will lead to an inference of discrimination: "Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Id. at 2108-09.

[22]     The Court also cautioned that there may be instances, although rare, where a showing of pretext would not be sufficient to infer discrimination. Such a situation would occur "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's

reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." Id. at 2109.*fn5

[23]  With this framework in mind, we proceed to analyze Russell's evidence supporting her ADEA claim.

[24]  B. Application of the Analytical Framework

[25]  Under the McDonnell Douglas circumstantial evidence framework, to make out a prima facie case of age discrimination under the ADEA, a plaintiff must establish:

[26]  (1) [she] was discharged; (2) [she] was qualified for [her] position; (3) [she] was within the protected class; and (4) [she] was replaced by someone outside the protected class, someone younger, or was otherwise discharged because of age. Brown v. CSC Logic, Inc., 82 F.3d 651, 654 (5th Cir. 1996) (citations omitted).

[27]  It is undisputed that Russell satisfied her burden to establish a prima facie case of discrimination.*fn6 In response, defendants put forth the need for a new management style as their legitimate reason for terminating Russell. Russell disputed this proffered justification, contending that the real reason for her termination was Ciulla's age-based animus.

[28]  While evidence beyond that of the prima facie case and pretext clearly is not required, see supra Part III.A, Russell provided additional evidence of discrimination. Because we review the entire record when considering a motion for a judgment as a matter of law, see Reeves, 120 S. Ct. at 2110, we first examine Russell's evidence of pretext and then her additional evidence of discrimination.

[29]  1. Evidence of Pretext

[30]  Defendants' proffered reason for Russell's termination was that "a change in management style" was needed. We find that Russell provided sufficient evidence to create a jury issue that this justification was pretextual.

[31]  At trial, Russell demonstrated that she had received a very favorable evaluation from her supervisor Jacobsen only two months prior to her termination. On that evaluation, Russell was noted as "exceptional" or "exceeding expectations" in all the relevant categories but one, in which she received a "meets standards" rating.*fn7 Jacobsen conceded that Russell was not given a formal oral warning, a written warning, or a "corrective action plan," all of which are required by Homecare's own internal procedures.

[32]     In addition, Dayna Westmoreland, Jacobsen's administrative assistant, testified that
         Jacobsen received (what Jacobsen herself termed) an "ultimatum" from Ciulla that he would
         quit if Russell were not fired. During the four days between Ciulla's ultimatum and Russell's
         termination, Jacobsen called a special meeting of nurses under Russell's supervision, during
         which some indicated that they were unhappy with Russell. Thus, the jury had before it
         evidence that the meeting was hastily assembled immediately after Ciulla's ultimatum and
         that Russell was fired only a few days after the ultimatum.

[33]     Russell also elicited information from two nurses, who were defendants' witnesses, that
         Russell did an "excellent" job of keeping the facility in federal compliance. As for feeling
         belittled from Russell's "nitpicking," the nurses conceded that the reprimands occurred
         when they committed errors that were violations of professional and federal rules regarding
         accuracy of data and dispensing medication to patients.*fn8 In addition, Russell produced
         evidence at trial that Homecare dominated the healthcare market, thus casting doubt upon
         defendants' contention that the nurses were "disinterested" witnesses.*fn9

[34]     Although defendants contested Russell's case, their evidence is not of such magnitude that a
         reasonable jury could only find in their favor (i.e., that their justification for terminating
         Russell was not pretextual). All defendants have demonstrated is that they disputed
         Russell's characterization of the events and put forth evidence to support their position. The
         record reveals that Russell countered defendants' arguments and created conflicts in
         substantial evidence. See Boeing, 411 F.2d at 375.

[35]     The jury had both conflicting versions before it and apparently did not find credible
         defendants' explanation that the ratings reflected serious management style issues, that
         tensions with other staff stemmed from Russell's inability to work with people (v. Russell's
         ensuring that Homecare was in federal compliance), and that the special meeting with the
         nurses was entirely aboveboard. See Reeves, 120 S. Ct. at 2110 (stating that courts are not
         required to give credence to evidence supporting defendants that is not uncontradicted and
         unimpeached); see also United States v. Ramos-Garcia, 184 F.3d 463, 466 (5th Cir. 1999)
         (stating that the jury evidently did not believe the alternative explanation of the events and
         that the court would "not second guess the jury in its choice'"); Woodhouse v. Magnolia
         Hosp., 92 F.3d 248, 254 (5th Cir. 1996) ("The jury was presented conflicting evidence . . .
         [and] apparently chose to believe that [age was a criterion in the decision]."); United States
         v. Kaufman, 858 F.2d 994, 1004 (5th Cir. 1988) (finding that it was a "serious mistake . . .
         to second-guess judgments that . . . [were made] firsthand"); Fowler v. Carrollton Pub.
         Library, 799 F.2d 976, 984 (5th Cir. 1986) ("Motivation presents a classic jury issue.").

[36]     The jury, with its ability to listen to live testimony, was in a better position to judge the
         credibility of the witnesses and the accounts of the events; as such, we will not second
         guess their rejection of defendants' proffered justification. See Reeves, 120 S. Ct. at 2110
         (stating that the court "may not make credibility determinations or weigh the evidence");
         Vance v. Union Planters Corp., 209 F.3d 438, 443 (5th Cir. 2000) (stating that the court

"[lacked] the jury's opportunity to observe [the witness's] demeanor and hear his voice" and this fact contributed to the court's confidence in the jury's verdict).

[37]   2. Additional Evidence of Discrimination

[38]   In addition to establishing a prima facie case of discrimination and creating a jury issue as to the veracity of defendants' explanation, Russell introduced evidence of oral statements that supported her case of age discrimination.*fn10 The value of such remarks is dependent upon the content of the remarks and the speaker. See Reeves, 120 S. Ct. at 2111 (finding that the age-related comments further supported the jury's verdict of liability because the content of the remarks indicated "age-based animus" and the speaker was "principally responsible for [the plaintiff's] firing.").

[39]   The four-part test of Brown v. CSC Logic, Inc., 82 F.3d 651 (5th Cir. 1996),*fn11 was originally devised in order to address a situation in which one of the elements of the plaintiff's prima facie case is missing and the plaintiff attempts to remedy the deficiency by adducing evidence of discrimination in the form of remarks evidencing animus or bias. That said, the four-part test has been widely used in this circuit, notably by the panel that decided Reeves. See Reeves, 197 F. 3d at 692-93. The Court in Reeves made clear that viewing remarks that a jury could find to evidence animus through the harsh lens employed by the Reeves panel (which, in turn, relied upon Brown) was unacceptable:

[40]   The [Fifth Circuit] also failed to draw all reasonable inferences in favor of petitioner. For instance, while acknowledging "the potentially damning nature" of [the] age-related comments, the court discounted them on the ground that they "were not made in the direct context of [the plaintiff's] termination." 120 S. Ct. at 2111 (citation omitted).

[41]   The remarks at issue in this case are certainly appropriate additional circumstantial evidence of age discrimination because their content indicates age animus and the speaker (Ciulla) was primarily responsible for Russell's termination. See Reeves, 120 S. Ct. at 2111. Russell revealed at trial that Ciulla frequently referred to her as "old bitch."*fn12 She testified that the constant drumbeat of "old bitch" forced her to get earplugs so she would be able to work in the office. Russell also testified that Ciulla laughed at her when she confronted him about his dealings with her. We determine that the jury could find the repeated use of "old bitch" indicates that Ciulla had discriminatory motivations.*fn13 That Ciulla did not explicitly remark to Russell, "I do not like you because you are old," does not render Russell's evidence infirm. See, e.g., Normand, 927 F.2d at 864 n.4 ("[I]ndirect references to an employee's age . . . can support an inference of age discrimination."). Thus, the content of Ciulla's remarks could be found by a jury to manifest age animus.

[42]   Next, a jury could find that these remarks were made by one "principally responsible" for Russell's termination. See Reeves, 120 S. Ct. at 2110. Typically, the person with authority over the employment decision is the one who executes the action against the employee.

However, that is not necessarily the case. See Long v. Eastfield Coll., 88 F.3d 300, 306 (5th Cir. 1996) ("[O]rdinary employees . . . normally [cannot affect the employment of their co-employees.]" (emphasis added)). If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary co-workers, it is proper to impute their discriminatory attitudes to the formal decisionmaker. See, e.g., id. at 307 (stating that if official decisionmaker "merely 'rubber stamped'" the wishes of others, that decisionmaker would inherit the discriminatory taint); Haas v. Advo Sys., Inc., 168 F.3d 732, 734 n.1 (5th Cir. 1999) (rejecting defendant's argument that subordinate exerted no influence over ultimate decisionmaker and thus determining that sufficient evidence existed to demonstrate a causal nexus between the discriminatory remarks and the employment decision (citing Long, 88 F.3d at 307)).

[43]    Our sister circuits also support this approach. *fn14 For instance, in Shager v. Upjohn Co., Judge Posner, writing for a panel of the Court of Appeals for the Seventh Circuit, reversed a summary judgment for the employer in an ADEA case, finding that the influence of the person with the discriminatory attitude may well have been decisive in the employment decision. See 913 F.3d 398, 405 (7th Cir. 1990). "If the [formal decisionmakers] acted as the conduit of [the employee's] prejudice -- his cat's paw --the innocence of the [decisionmakers] would not spare the company from liability." Id.

[44]    Many circuit cases have also echoed the idea underlying Judge Posner's "cat's paw" analysis that courts will not blindly accept the titular decisionmaker as the true decisionmaker: "[A] defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000) (citing, inter alia, Long, 88 F.3d at 307); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) ("discriminatory comments . . . made by the key decisionmaker or those in a position to influence the decisionmaker" can be used by the plaintiff to establish pretext); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354-55 (6th Cir. 1998) ("[Decisionmaker] rule was never intended to apply formalistically, and [thus] remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant."); Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998) ("In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."); Long, 88 F.3d at 307 (citing Shager); Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1060 (8th Cir. 1993) ("A reasonable jury could have found that [the employee] used [the decisionmakers] as the conduit of his prejudice -- 'his cat's paw.'").

[45]    We therefore look to who actually made the decision or caused the decision to be made, not simply to who officially made the decision. Consequently, it is appropriate to tag the employer with an employee's age-based animus if the evidence indicates that the worker possessed leverage, or exerted influence, over the titular decisionmaker.

[46]     As in Reeves, Russell fortified her evidence of age-related remarks by "[introducing] evidence that [the speaker of the discriminatory remarks] was the actual decisionmaker behind [her] firing." Reeves, 120 S. Ct. at 2111 (emphasis added). Defendants repeatedly emphasize that Russell and Ciulla were both managers at the same level and that Russell was officially terminated by Jacobsen, her supervisor, not by Ciulla. However, Russell presented adequate evidence at trial for a jury to find that Ciulla wielded sufficiently great "informal" power within Homecare such that he effectively became the decisionmaker with respect to Russell's termination. See id. (finding that the source of the age-related remarks was the actual decisionmaker because of his influence over the company president, his wife, who officially terminated the employee); see also Griffin, 142 F.3d at 1312 (collecting cases from various circuits, including the Fifth Circuit).

[47]     To demonstrate that Ciulla was the de facto decisionmaker, Russell points to the following evidence: Ciulla gave Jacobsen an ultimatum that he would quit if she did not fire Russell*fn15; Jacobsen's budget was controlled by Ciulla's father; Jacobsen went crying to her assistant Dayna Westmoreland immediately after Ciulla's ultimatum; before the ultimatum, Jacobsen had told Russell that she was not going to lose her job over the friction between Russell and Ciulla; Ciulla unilaterally transferred an employee under Russell's supervision without her knowledge or consent; and Ciulla received "perks" that his colleagues did not, such as arriving late at work with impunity, setting up a ping-pong table outside his office, and playing in charity golf tournaments on company time.

[48]     A jury could find that Ciulla possessed power greater than that of the ordinary worker at his level due to his father's position as CEO of the parent corporation and that Ciulla took advantage of that power. Furthermore, the evidence also established that Jacobsen was afraid of losing her job. The jury could find that Jacobsen believed her options were limited by the fact that Ciulla was the son of the CEO, who controlled her job and her budget.*fn16 Thus, it would not be unreasonable for the jury to conclude that Jacobsen essentially regarded her decision to terminate Russell as ordained by other forces. Whatever the formal hierarchy of Homecare might be, the jury could reasonably find that Ciulla contributed significantly to the termination decision officially made by Jacobsen.*fn17 In the language of Reeves, a jury could find that Ciulla "was motivated by age-based animus and was principally responsible for [the plaintiff's] firing." Reeves, 120 S. Ct. at 2110.*fn18 His remarks contribute to the evidence demonstrating that the jury's finding of age discrimination was not unreasonable.

[49]     In light of the Supreme Court's admonition in Reeves, our pre-Reeves jurisprudence regarding so-called "stray remarks" must be viewed cautiously.*fn19 See Reeves, 120 S. Ct. at 2111. Before Reeves was decided by the Supreme Court, we warned that "the 'stray remark' jurisprudence is itself inconsistent with the deference appellate courts traditionally allow juries regarding their view of the evidence presented and so should be narrowly cabined." Vance v. Union Planters Corp., 209 F.3d 438, 442 n.4 (5th Cir. 2000). Just so. Age-related remarks are appropriately taken into account when analyzing the evidence supporting the jury's verdict (even if not in the direct context of the decision*fn20 and even

if uttered by one other than the formal decisionmaker, provided that the individual is in a position to influence the decision).

[50]   Judge Posner recently explained the distinction between cases in which "stray remarks" were not taken into account in examining the plaintiff's case and cases in which such remarks are appropriately considered:

[51]   All that these ["stray remarks"] cases hold -- and all they could hold and still make any sense -- is that the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the decision had a discriminatory motivation. That is simple common sense. It is different when . . . it may be possible to infer that the decision makers were influenced by [the discriminatory] feelings in making their decision. . . . Emanating from a source that influenced the personnel action (or non-action) of which these plaintiffs complain, the derogatory comments became evidence of discrimination. Hunt v. City of Markham, Ill., 219 F.3d 649, 652-53 (7th Cir. 2000) (emphasis in original) (internal citations omitted).

[52]   We determine that there was sufficient evidence for the jury to find that defendants discriminated against Russell on the basis of age. Russell established a prima facie case, introduced sufficient evidence for the jury to reject the defendants' reason for her termination, and produced additional evidence of age-based animus. See Reeves, 120 S. Ct. at 2112. This case was "based upon the accumulation of circumstantial evidence and the credibility determinations that were required. We conclude that 'reasonable men could differ' about the presence of age discrimination, Boeing, 411 F.2d at 374, and we must thus reverse the district court's judgment [as a matter of law] and reinstate the jury's verdict." Normand, 927 F.2d at 864-65.

[53]   3. Willful Violation of the ADEA

[54]   The ADEA is willfully violated if the employer "acts in 'reckless disregard' of the requirements of the ADEA." Normand, 927 F.2d at 865 (citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128-29 (1985)). This test applies not only to cases in which there is formal discrimination, but also to cases in which the age factor is used on an informal, ad hoc basis. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 616-17 (1993). An employer who willfully violates the ADEA is subject to liquidated damages. See 29 U.S.C. § 626(b) (1999). "The Supreme Court has held that liquidated damages are a punitive sanction and should be reserved for the most egregious violations of the ADEA." Hansard v. Pepsi-Cola Metro. Bottling Co., 865 F.2d 1461, 1470 (5th Cir.), cert. denied, 493 U.S. 842 (1989) (citing Trans World Airlines, 469 U.S. at 125).

[55]   As we have discussed in Part III.B, supra, both sides presented evidence supporting their respective versions of the events. While the jury could quite reasonably find defendants violated the ADEA, we conclude that the same cannot be said for a willful violation. We do

not find evidence in the record to support the jury's determination that defendants' conduct was such that it amounted to "reckless disregard." See Trans World Airlines, 469 U.S. at 127-28 (stating that simply knowing of the potential applicability of the ADEA does not meet the "reckless disregard" standard because it would be contrary to legislative intent by making every violation a willful violation); see also Smith v. Berry Co., 165 F.3d 390, 395 (5th Cir. 1999) (stating that there was sufficient evidence for the jury to conclude employer's actions were willful when plaintiff presented evidence of company memorandum that categorized employees by age); Burns v. Tex. City Refining, Inc., 890 F.2d 747, 751-52 (5th Cir. 1989) (finding a willful violation when plaintiff presented evidence that employer acted to terminate him because of his age and before his pension benefits vested); Powell v. Rockwell Int'l Corp., 788 F.2d 279, 287-88 (5th Cir. 1986) (affirming jury finding of willfulness in a case in which jury found that plaintiff was fired in retaliation for exercising his ADEA rights). As such, the jury finding of willfulness is not supported by sufficient evidence. Because the jury awarded Russell only back pay, and no liquidated damages, we do not disturb the jury's damage award.

[56]     V. CONCLUSION

[57]     For the above-stated reasons, the judgment of the district court is REVERSED in part and the case is REMANDED with instructions to reinstate the jury verdict as to a violation of the ADEA and damages. We AFFIRM the judgment of the district court as to a willful violation of the ADEA. Costs shall be borne by defendants.

Opinion Footnotes

[58]     *fn1 . District Judge of the Northern District of Texas, sitting by designation.

[59]     *fn2 . Russell had originally filed her suit in Texas state court, which defendants subsequently removed to federal district court. Russell moved to remand, but the district court denied her motion.

[60]     *fn3 . Under the ADEA, it is unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (1999).

[61]     *fn4 . Russell is asserting her claim of disparate treatment under the ADEA. "Although McDonnell Douglas is a Title VII case, we have previously held that its framework is applicable to ADEA cases." Woodhouse v. Magnolia Hosp., 92 F.3d 248, 252 n.3 (5th Cir. 1996); see also Bauer v. Albemarle Corp., 169 F.3d 962, 966 (5th Cir. 1999) ("The same

CISPDF - www.fesisi.com

evidentiary procedure for allocating burdens of production and proof applies to discrimination claims under both [Title VII and the ADEA]."). Thus, we will examine Russell's ADEA claim under the well-established Title VII rubric of analysis.

[62]     *fn5 . By its ruling in Reeves, the Supreme Court repudiated part of our en banc decision in Rhodes v. Guiberson Oil Tools, 75 F.3d 989 (1996). The Court noted that Rhodes stood for the proposition that the "plaintiff must introduce sufficient evidence for [the] jury to find both that [the] employer's reason was false and that [the] real reason was discrimination." Reeves, 120 S. Ct. at 2105 (emphasis added) (statement in parenthetical). This pretext-plus requirement is contrary to the Court's holding that the employer's prevarication may be sufficient in many cases to demonstrate discriminatory animus. See id. at 2108-09. While portions of our Rhodes opinion do not fully comport with Reeves, we have previously recognized that there are central features of Rhodes that endure. See Vadie v. Miss. State Univ., 218 F.3d 365, 373 n.23 (5th Cir. 2000) ("Rhodes is consistent with Reeves and continues to be the governing standard in this circuit."). We do not see much to be gained from dissecting Rhodes to divine those features. Rather, we simply comply with the Supreme Court's mandate in Reeves not to substitute our judgment for that of the jury and not to unduly restrict a plaintiff's circumstantial case of discrimination. We therefore underscore that Reeves is the authoritative statement regarding the standard for judgment as a matter of law in discrimination cases. Reeves guides our decisions, and insofar as Rhodes is inconsistent with Reeves, we follow Reeves.

[63]     *fn6 . Defendants stipulated to the prima facie case because Russell established that she was terminated, that she was qualified for her position, that she was in her mid-fifties, and that she was replaced by a woman in her early-thirties. Defendants contended in their supplemental brief that because they stipulated to the prima facie case, it is somehow infirm. This argument is wholly without merit. First, stipulations do not weaken the evidence. Second, the Supreme Court has stated that for a case that is "fully tried on the merits," the sufficiency of the prima facie case as such is "no longer relevant." See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714, 715 (1983).

[64]     *fn7 . The rating guide was as follows: 4 - "exceptional performance"; 3 - "exceeds standards"; 2 - "meets standards"; 1 -"almost meets standards"; and 0 - "does not meet standards." Russell received her "2" rating in a cost-control category ("manages the utilization of supplies and equipment").

[65]     *fn8 . For example, one of the nurses was reprimanded for giving a patient insulin without a doctor's authorization.

[66]     *fn9 . Defendants had argued that because the nurses no longer worked for Homecare during the time of the trial, they were "disinterested" witnesses.

[67]     *fn10 . We note that such remarks could also be utilized by a plaintiff to demonstrate

pretext.

[68]     *fn11 . "[R]emarks may serve as sufficient evidence of age discrimination if the offered comments are: 1) age related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." Id. at 655 (emphasis added).

[69]     *fn12 . Russell also testified that Ciulla "viciously" referred to her as "Miss Daisy." In addition, the evidence revealed that one of Ciulla's employees created a cover to a book of work discrepancies kept by Homecare; the cover read "Miss Daisy's Discrepancy Book." It is uncontested that the "Miss Daisy" remarks had an innocuous beginning. In the summer of 1996, Gwen Morris, Homecare's Quality Assurance Director, began referring to Russell in jest as "Miss Daisy." In the course of managing nurses from regional offices and reviewing their paperwork for regulatory compliance, Russell and Morris regularly traveled together to outlying locations. On these occasions, Russell drove because Morris preferred not to drive. Morris, who is African American, found the situation amusing in light of the film Driving Miss Daisy, in which an African-American man chauffeurs a Caucasian woman. Viewing references to Russell as Miss Daisy as evidence of age-based animus is considerably more difficult than so viewing the "old bitch" comments. Russell also recounted a conversation between herself and Jacobsen that occurred when she spoke with Jacobsen about her problems with Ciulla: Russell asked whether she should be seeking other employment, and Jacobsen replied, "You and I really don't have to work but Steve Ciulla has a young family." We agree with defendants that a reasonable jury could not find that this comment evidences age-based discrimination.

[70]     *fn13 . Ciulla disputes that he repeatedly called Russell "old bitch," but in reviewing judgment as a matter of law, we make all reasonable inferences in favor of the nonmoving party and do not make credibility determinations. See Reeves, 120 S. Ct. at 2110. Further, defendants on appeal also concede that we must take as true that Ciulla made those comments.

[71]     *fn14 . If this were not so and we adhered to a rigid formalistic application, employers could easily insulate themselves from liability by ensuring that the one who performed the employment action was isolated from the employee, thus eviscerating the spirit of the "actual decisionmaker" guideline.

[72]     *fn15 . Again, Ciulla denies giving Jacobsen the ultimatum, but we take as true that he did. See supra note 12.

[73]     *fn16 . While the "perks" received by Ciulla are insufficient, per se, to support the inference that he had power over the decision to terminate Russell, they do provide evidence of his "informal" power within the organization -- a power which played a role in Jacobsen's decision. Similarly, in Reeves, the Supreme Court took into account that a "letter authored

CMPDF - www.tesnu.com

by [the individual with the discriminatory animus] indicated that he berated other company directors, who were supposedly his co-equals, about how to do their jobs." 120 S. Ct. at 2111. Thus, as in this case, the evidence demonstrated that an employee possessed greater power than other employees at his level, strengthening the link between the age-related remarks and the employment decision and providing further support for the reasonableness of the jury's verdict. See id.

[74]   *fn17 . Defendants also argue that the "same actor" inference applies. The "same actor" inference arises when the individual who allegedly discriminated against the plaintiff was the same individual who hired the plaintiff and gives rise to an inference that discrimination was not the motive behind plaintiff's termination. See Brown, 82 F.3d at 658. In this case, defendants assert that the same person who hired Russell, Jacobsen, was also the same person who fired her. However, it was not uncontested that Jacobsen hired Russell, and thus, the inference is not automatic. Russell presented evidence that she was hired and then did a courtesy interview with Jacobsen, who had also recently been hired. Again, the jury had both versions before it and had the opportunity to take the information into account in whatever fashion it found credible. We will not substitute our interpretation for that of the jury. Further, we also note that the "same actor" inference does "not rule out the possibility that an individual could prove a case of discrimination." Id.

[75]   *fn18 . We also note that the fact that Jacobsen herself was similar in age to Russell, although relevant and appropriate for the jury to consider, "is certainly not dispositive." Reeves, 120 S. Ct. at 2111 (stating that evidence of defendant employing other employees over the age of fifty does not negate discriminatory motivation regarding the plaintiff).

[76]   *fn19 . See, e.g., Boyd v. State Farm Ins. Co., 158 F.3d 326 (5th Cir. 1998).

[77]   *fn20 . In our post-Reeves case, Rubinstein v. Administrators of the Tulane Educational Fund, we affirmed summary judgment for the employer on several claims (and affirmed the jury verdict for the employee on the remaining claim). See 218 F.3d 392 (5th Cir. 2000). The Rubinstein plaintiff's case fell into the narrow exceptions crafted by Reeves that "the record conclusively revealed some other, nondiscriminatory reason . . ., or [that] the plaintiff created only a weak issue of fact as to . . . [pretext] and there was abundant and uncontroverted independent evidence that no discrimination had occurred." 120 S. Ct. at 2109. In marked contrast to the instant case, the Rubinstein record was "replete with evidence of [the employee's] poor . . . evaluations," Rubinstein, 218 F. 3d at 400, evidence that was so overwhelming as to make summary judgment for the employer appropriate in spite of evidence of discriminatory animus in the form of remarks that the plaintiff wholly failed to tie to any potentially relevant time frame. In our remarks jurisprudence, Rubinstein stands only for the proposition that an overwhelming case that the adverse employment actions at issue were attributable to a legitimate, nondiscriminatory reason will not be defeated by remarks that have no link whatsoever to any potentially relevant time frame. Were we to read more into Rubenstein in this regard, it would be in direct conflict with Reeves.

20001206

© 2000 VersusLaw Inc.

Evans v. City of Bishop, No. 99-41444 (5th Cir. 12/11/2000)

[1]    IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[2]    No. 99-41444

[3]    2000.C05.0042606 <http://www.versuslaw.com>

[4]    December 11, 2000

[5]    **LEROY EVANS, JR PLAINTIFF - APPELLANT**
v.
**CITY OF BISHOP DEFENDANT - APPELLEE**

[6]    King, Chief Judge, and CUDAHY*fn1 and Wiener, Circuit Judges.

[7]    The opinion of the court was delivered by: Per Curiam.

[8]    Appeal from the United States District Court for the Southern District of Texas

[9]    Plaintiff-Appellant Leroy Evans, Jr. appeals from the district court's order granting Defendant-Appellee City of Bishop summary judgment on Evans's discrimination claims. For the following reasons, we REVERSE.

[10]    I. FACTUAL AND PROCEDURAL BACKGROUND

[11]    On June 17, 1998, Defendant-Appellee City of Bishop ("Bishop") advertised in the Kingsville Record the newly created position of administrative assistant. Shortly thereafter, Plaintiff-Appellant Leroy Evans, Jr., a former council member,*fn2 applied for the opening by handing his application directly to Charles Wesley Rogers, the mayor of Bishop.

[12]    Three days before the city council meeting, Cindy Villarreal, a Bishop municipal court clerk,*fn3 turned in her application for the advertised position. In total, Rogers received between five and ten applications. He reviewed only Evans's and Villarreal's applications*fn4 and chose Villarreal for a position that now combined the responsibilities of the posted administrative assistant position and the existing municipal judge position. Rogers did not interview Villarreal or inform her of his actions until the date of the city council meeting. Rogers then went before the city council and received approval of his decisions.*fn5

[13]    Evans filed suit against Bishop on December 18, 1998, asserting claims under Title VII of

the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). He alleged employment discrimination on the basis of race, color, age, and sex. On June 23, 1999, Bishop filed a motion for summary judgment.

[14]    The district court referred the case to a United States magistrate judge who, on August 26, 1999, filed her Memorandum and Recommendation. The magistrate judge recommended that Bishop's motion for summary judgment be granted and judgment rendered in Bishop's favor. In a decision dated November 29, 1999, the district court adopted the magistrate judge's conclusions*fn6 and granted Bishop's motion for summary judgment.

[15]    Evans timely appealed the decision to this court. On May 22, 2000, a panel of this court affirmed the district court in an unpublished opinion. See Evans v. City of Bishop, No. 99-41444 (5th Cir. May 22, 2000) (per curiam). However, on July 27, 2000, in light of the recent Supreme Court decision in Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097 (2000), we withdrew our May 22 opinion.

[16]    II. STANDARD OF REVIEW

[17]    We review de novo a district court's grant of summary judgment, applying the same standard as the district court. See Walker v. Thompson, 214 F.3d 615, 624 (5th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000) (internal quotations and citation omitted). Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party. See Burch v. City of Nacogdoches, 174 F.3d 615, 619 (5th Cir. 1999).

[18]    III. SOVEREIGN IMMUNITY DOES NOT BAR ADEA CLAIM

[19]    Bishop asserts that Evans's ADEA claim is barred because the ADEA has recently been held to be an invalid abrogation of a state's sovereign immunity. Bishop argues further that the law at the time of appellate review determines the existence of a live controversy.*fn7

[20]    The Supreme Court in Kimel v. Florida Board of Regents, 120 S. Ct. 631 (2000), held that Congress exceeded its powers under § 5 of the Fourteenth Amendment by enacting the ADEA. As such, the states and their political subdivisions are protected by the sovereign immunity principle embodied in the Eleventh Amendment. In this case, however, Bishop is not a state; it is a city. Bishop argues that the Kimel Court noted that Congress did not have sufficient grounds to believe that state and local governments were engaging in age discrimination, see id. at 645; thus, Bishop concludes that it, as a city, is immune from ADEA suits.

[21]     However, the Kimel Court's comment about congressional findings has no relevance regarding whether a city has sovereign immunity from suit. That determination arises from the well-settled law under Eleventh Amendment jurisprudence regarding "political subdivisions." Not all political subdivisions are automatically immunized when the state is immunized. See Earles v. State Bd. of Certified Pub. Accountants, 139 F.3d 1033, 1036 (5th Cir. 1998) (citing Edelman v. Jordan, 415 U.S. 651, 677-78 n.12 (1974)). "We must look to see whether the entity in effect[] stands in the shoes of the state itself." Id. (internal quotations and citation omitted).

[22]     In the overwhelming number of cases, Eleventh Amendment protection "does not extend to counties and similar municipal corporations." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) (emphasis added). Thus, "independent local political subdivisions are not entitled to . . . [sovereign] immunity even though they exercise a 'slice of state power.'" Jacintoport Corp. v. Greater Baton Rouge Port Comm'n, 762 F.2d 435, 438 (5th Cir. 1985); see also City of Lafayette, La. v. La. Power & Light Co., 532 F.2d 431, 434 n.6 (5th Cir. 1976) ("[C]ities, counties, and other state political subdivisions are not considered 'the state' for purposes of Eleventh Amendment immunity.").

[23]     Bishop is a city, and there is no evidence that it is controlled by the State of Texas to such an extent that it stands in the shoes of the state. Thus, Bishop is not immune from ADEA suits.

[24]     IV. PLAINTIFF SURVIVES SUMMARY JUDGMENT

[25]     Evans argues that because he made out a prima facie case of discrimination and illustrated that Bishop's proffered reasons were pretextual, he has presented a genuine issue as to Bishop's discriminatory motives. He asserts further that Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097 (2000), explicitly did not require evidence beyond a prima facie case and pretext as a prerequisite for a plaintiff to survive summary judgment. Bishop responds that although Evans put forth a prima facie case, Reeves does not alter the result of the previous panel decision because no rational trier of fact could conclude that its actions were motivated by discriminatory animus. We do not agree. We find that Evans fulfilled his duty under Reeves to demonstrate genuine issues of material fact as to his discrimination claims, and thus, the case should proceed to trial.*fn8

[26]     In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court specified a burden-shifting approach to establishing proof of intentional discrimination via circumstantial evidence.*fn9 First, Evans made out his prima facie case by showing that (1) he is an African-American male over sixty years old; (2) he was qualified for the job; (3) he was not hired; and (4) a Hispanic woman under forty years was subsequently hired for that position. See id. at 802. The burden then shifted to Bishop to articulate a legitimate, non-discriminatory reason for its decision. See id. at 802-03; see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981) (stating that defendant's burden is only one of production and not persuasion). Bishop claimed that economic factors and qualifications motivated its choice of Villarreal. Rogers stated that he had previously considered combining the municipal court judge and administrative assistant positions because neither position required full-time attention and because such a consolidation would cut costs. Rogers further maintained that he believed Villarreal was the best-qualified applicant.

[27]   Because Bishop produced non-discriminatory reasons, the "presumption of discrimination [created by Evans's prima facie case] drops out of the picture." Reeves, 120 S. Ct. at 2106 (internal quotations and citation omitted). However, the fact finder "may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Id. (quoting Burdine, 450 U.S. at 255 n.10).

[28]   The district court found that a trier of fact could conclude that both of Bishop's proffered reasons were pretextual.*fn10 The court noted that the fact that combining the two positions would save money did not address why Villarreal was chosen over Evans. Furthermore, Evans contests the timing of this consolidation decision, pointing out that it was not made until after Villarreal submitted her application (as the original posting was for a different position, and Villarreal herself did not know of the modification until the city council meeting). We thus find that Evans has, at the very least, created a jury issue as to pretext on this proffered justification. See *Russell* v. *McKinney* Hosp. Venture, --- F.3d ----, 2000 WL 1785541, at *4 (5th Cir. 2000) (reiterating that it is the province of the jury to choose among conflicting versions and make credibility determinations).

[29]   Evans also adduced evidence to support a finding of pretext regarding the qualification justification. He points to a contrary statement by Rogers in his deposition that qualification was not his main priority. Evans also questions how Villarreal could be deemed the most qualified when Rogers did not interview any other candidates and when he stated that he did not compare Evans's and Villarreal's qualifications.*fn11 We agree with the district court that sufficient evidence exists for a jury to find that this justification is also pretextual.

[30]   Thus, Evans has established a prima facie case of discrimination and put forth sufficient evidence for a fact finder to find Bishop's proffered reasons to be pretextual. Reeves instructs that this showing is usually sufficient for a plaintiff's case to survive summary judgment:

[31]   [O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

[32]   Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employee unlawfully discriminated. Reeves, 120 S. Ct. at 2108-09.

[33]   In this case, Evans has also put forth evidence beyond that of the prima facie case and pretext. Evans stated that one*fn12 city council member made racially derogatory comments directed against African Americans. Reeves emphatically states that requiring evidence of discriminatory animus to be "in the direct context" of the employment decision is incorrect. See id. at 2111; see also *Russell*, --- F.3d ----, 2000 WL 1785541, at *7-*8 (5th Cir. 2000) (emphasizing that our "stray remarks" jurisprudence must be viewed with caution in light of Reeves). Thus, it would be proper for a jury to take this evidence into account. In addition, Evans claimed that this same council member worked to defeat him in his re-election. The district court stated that this was outside the realm of the dispute at hand. However, again, the same Reeves principle applies: any evidence that could shed

light on an employer's true motive must be considered.

[34]     The district court applied a now-disallowed legal standard to analyze Bishop's summary judgment motion. The Supreme Court in Reeves emphasized the importance of jury fact finding and reiterated that evidence of the prima facie case plus pretext may, and usually does, establish sufficient evidence for a jury to find discrimination. See Reeves, 120 S. Ct. at 2109. Thus, considering all of the evidence and taking all reasonable inferences in favor of the non-movant Evans, a genuine issue exists as to whether Bishop intentionally discriminated against Evans.

[35]     V. CONCLUSION

[36]     For the above-stated reasons, the judgment of the district court is REVERSED. We REMAND for further proceedings in light of this opinion. Costs shall be borne by Bishop.

---

Opinion Footnotes

---

[37]     *fn1 Circuit Judge of the Court of Appeals for the Seventh Circuit, sitting by designation.

[38]     *fn2 Evans left the city council on May 2, 1998 because he lost a bid for re-election.

[39]     *fn3 Villarreal was the municipal court clerk at the time she submitted her application for the administrative assistant position. Although the record is not entirely clear on this point, it appears that she became the municipal court judge sometime after she submitted the application.

[40]     *fn4 Rogers stated that he reviewed Evans's application because Evans handed the application directly to him and that he reviewed Villarreal's application because he heard that she had applied.

[41]     *fn5 Rogers did not make the applications available to the city council for review. He did tell the city council members that he had only examined Evans's and Villarreal's applications.

[42]     *fn6 As such, the magistrate judge's findings and conclusions will be referred to, hereinafter, as those of the district court.

[43]     *fn7 Bishop did not raise this issue in the district court and thus did so for the first time on appeal. However, Bishop did not waive appellate review because Eleventh Amendment "claims are jurisdictional in nature and may be raised and considered at any time." Laje v.

R.E. Thomason Gen. Hosp., 665 F.2d 724, 726 n.2 (5th Cir. 1982) (citing Edelman v. Jordan, 415 U.S. 651, 677-78 (1974)).

[44]     *fn8 Bishop repeatedly asserts on appeal that "a subjective belief of discrimination, however genuine, . . . [may not] be the basis of judicial relief." Elliott v. Group Med. & Surgical Serv., 714 F.2d 556, 567 (5th Cir. 1983). However, as we have explained in Portis v. First National Bank, in "the Elliott line of cases, the plaintiffs' testimony failed because it alone stood against unimpeached and uncontradicted opposing testimony." 34 F.3d 325, 330 n.10 (5th Cir. 1994). Thus, when the plaintiff challenges the defendant's assertions and testimony, the "fact that [the plaintiff's] case-in-chief consists solely of [his] own testimony does not prevent [him] from establishing intentional discrimination." Id. (emphasis added); see also Vance v. Union Planters Corp., 209 F.3d 438, 442 & n.3 (5th Cir. 2000) (citing Portis with approval). In this case, Evans has challenged Bishop's claims and has put forth other evidence (in addition to his subjective belief).

[45]     *fn9 This circuit has acknowledged that the McDonnell Douglas framework applies to both Title VII and ADEA claims. See *Russell* v. *McKinney* Hosp. Venture, --- F.3d ----, 2000 WL 1785541, at *9 n.3 (5th Cir. 2000).

[46]     *fn10 Although the district court found that Evans had established a prima facie case and pretext, the court stated that Evans failed to create a fact question about Bishop's discriminatory animus. As we discuss infra in the text, this analysis was in error.

[47]     *fn11 Bishop argues that Evans does not make a showing that Rogers's statement of Villarreal's superior qualifications was untrue. Even assuming without deciding that Evans's case is lacking in this regard, Bishop's argument is without merit. Pretext can be illustrated via circumstantial evidence, as has been done here, and does not require direct evidence. See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 n.3 (1983) (stating that the district court erred in requiring the plaintiff to submit direct evidence).

[48]     *fn12 The Reeves facts are analogous here -- derogatory remarks also could not be attributed to all of the individuals responsible for making the employment decision in Reeves. However, the Supreme Court stated that "although [that was] relevant, [it was] certainly not dispositive" and went on to find the remarks of one decisionmaker to further support plaintiff's case of discrimination. See 120 S. Ct. at 2111.

*20001211*

© 2001 VersusLaw Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSEPH K. CONNOR | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. C-00-69 |
| | § | |
| TEXAS A&M UNIVERSITY - KINGSVILLE; | § | **JURY TRIAL REQUESTED** |
| HUMBERTO GARCIA, Individually and in | § | |
| His Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in His Official Capacity | § | |
| | § | |
| Defendants. | § | |

## ORDER DENYING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

On the _____ day of _____, 2000, the Court considered Defendants'

Motion for Summary Judgment. After considering the Motion,  Pleadings and the argument of the

Parties, the Court DENIES Defendants' Motion for Summary Judgment.

It is therefore Ordered, Adjudged and Decreed that Defendants' Motion for Summary

Judgment is DENIED.

SIGNED this _____ day _____, 2000.


_____
PRESIDING JUDGE

3