UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

MAR 9 - 2001

MICHAEL N. MILBY, CLERK

| | |
|---|---|
| JOSEPH K. CONNOR § | |
| § | |
| Plaintiff § | |
| § | |
| vs. § | Civil Action No. C-00-69 |
| § | |
| TEXAS A&M UNIVERSITY - KINGSVILLE; § | JURY TRIAL REQUESTED |
| HUMBERTO GARCIA, Individually and in § | |
| His Official Capacity; and ROBERT BAZAN, § | |
| Individually and in His Official Capacity § | |
| § | |
| Defendants. § | |

## PLAINTIFF'S PROPOSED JURY INSTRUCTION

The Plaintiff requests that the Title VII jury instructions include the following:

To establish a prima facie case of retaliation based upon his opposition to an employment practice made by unlawful by Title VII, the Plaintiff Joseph Connor need not prove that the employer's practices were actually unlawful, only that he reasonably believed the employer was engaged in unlawful employment practices.

Byers v. Dallas Morning News, Inc. _ F.3d _ (5th Cir. April 24, 2000). Copy Attached.

Respectfully submitted,

Law Office of Gay E. Gilson
4600 Ocean Drive, Suite 104D
Corpus Christi, Texas 78412
Telephone: (361) 814-0573
Facsimile: (361) 814-0674

By: /s/ Gay Gil
GAY E. GILSON
SBN 00784131/Fed.I.D. 16385
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded on March 9, 2001 by hand delivery to:

Jose Rangel
Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

_____
Gay E. Gilson

Byers v. Dallas Morning News, Inc., No. 99-10554 (5th Cir. 04/24/2000)

[1] UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[2] No. 99-10554

[3] 2000.C05.0042221 http://www.versuslaw.com

[4] April 24, 2000

[5] ROBERT C. *BYERS*, JR.,
PLAINTIFF-APPELLANT,
V.
THE DALLAS MORNING NEWS, INC.,
DEFENDANT-APPELLEE.

[6] Before Reynaldo G. Garza, Higginbotham, and Benavides, Circuit Judges.

[7] The opinion of the court was delivered by: Reynaldo G. Garza, Circuit Judge

[8] Appeal from the United States District Court for the Northern District of Texas

[9] BACKGROUND

[10] A. Procedural History

[11] On May 14, 1997, Plaintiff Robert C. *Byers*, Jr. ("*Byers*") filed suit against Defendant The Dallas Morning News, Inc. ("TDMN"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, et seq. On January 16, 1998, *Byers* filed his First Amended Complaint and Jury Demand, adding claims of race discrimination and retaliation based on 42 U.S.C. § 1981.*fn1 After TDMN filed a Motion for Summary Judgment, the district court issued its Memorandum Opinion and Order, granting summary judgment in favor of TDMN on all claims. On January 7, 1999, the district court entered a Final Judgment. *Byers* perfected his appeal to this Court by timely filing his Notice of Appeal on February 4, 1999. Based on the district court's subsequent Request for Leave to Consider rule 60(b) Motion, filed on March 19, 1999, this Court remanded the case to the district court without retaining jurisdiction on April 18, 1999. On April 22, 1999, the district court

entered its Order Modifying Judgment under Rule 60. On May 7, 1999, *Byers* perfected his appeal to this Court by timely filing his Notice of Appeal.

[12]    B. Facts

[13]    On February 13, 1985, TDMN hired *Byers*, a white man, as a financial analyst. In February of 1988, TDMN promoted *Byers* to General Accounting Manager. After receiving his promotion, *Byers* reported to Scott Messer, who is white. On March 1, 1993, Reginald Brown, who had been the Assistant Controller at A.H. Belo Corporation, the parent corporation of TDMN, replaced Messer and became President of Finance at TDMN. Brown, a black man, served as *Byers*'s direct supervisor at TDMN from March 1, 1993 until *Byers*'s termination on February 27, 1996.

[14]    On March 23, 1993, *Byers* and one of his supervisors recommended that Loira Baker, who is black, be discharged from the Accounts Payable Department because she had exhibited performance problems similar to those of a white employee, Ann Self, who had been terminated from the Department previously. Brown decided not to discharge Baker, instead conducting a review of the entire Accounts Payable Department to discern the reasons for the performance problems in the department. *Byers* alleges that he subsequently complained to Mark Rapier, in Human Resources, about Brown's hiring and firing practices.

[15]    On or about August 30, 1993, Brown gave *Byers* a three-month performance evaluation. Although *Byers* received relatively high marks in certain categories, *Byers* was dissatisfied with the scores he received in the areas of Initiative and Resourcefulness, Judgment, Communications and Working Relationships. The evidence shows that prior to this August 1993 appraisal, *Byers* had failed to perform a high priority task assigned to him by Brown. On September 7, 1993, *Byers* sent a response to his evaluation to Ellen Wilson, in which he claimed that he was the "victim of [Brown's] personal biases" and that Brown had to "relinquish his personal vendetta" against him.

[16]    On May 9, 1994, *Byers* left work after lunch claiming that he was ill. When *Byers* returned to work, he observed that Brown had recorded "sick leave" on *Byers*'s timecard for the half-day of work he missed. *Byers* confronted Brown, informing him that exempt employees must receive credit for working a full day even though they only work a half day. Brown responded that he did not agree with this policy. Later that day, Brown sent *Byers* an e-mail stating that he had spoken with Human Resources and that he had been mistaken about the sick leave policy. On May 16, 1994, at a Department Supervisors Meeting attended by many of the Department's managers and supervisors, *Byers* challenged Brown about the timecard notation. Four days later, Brown issued *Byers* a Written Warning for his conduct during the Supervisors Meeting. *Byers* alleges that his sick leave incident is another example of Brown's racial discrimination against him because black supervisors were treated differently. Specifically, Madeline Norris was allowed to work from home, and Elaine Kidd took two days off without reporting it.

However, Norris had received prior authorization from Brown and her immediate supervisor to work from home due to back problems. In addition, *Byers* later admitted that Kidd reported directly to him and that he was unaware of how her leave issue was resolved.

[17]     *Byers*, as General Accounting Manger, supervised employees in the Accounts Payable department at TDMN. In December of 1995, *Byers* held a meeting with the Accounts Payable clerks to discuss problems with unrecorded checks. While there is some disagreement in the record as to the exact occurrences at the meeting, it is undisputed that *Byers* placed two stacks of paper on the table, one containing correct invoices and the other containing incorrect invoices. It is further undisputed that *Byers* asked the two poor performers who had created the incorrect invoices to stay after the meeting with him. Lastly, it is undisputed that *Byers* was not the direct supervisor of either of these clerks and that he had circumvented the authority of two intermediary managers. After the meeting, the two clerks went to Brown to request immediate transfers from *Byers*'s supervision. Brown later told *Byers* that his approach to the meeting was inappropriate and that he should have let the more immediate supervisor handle the issue.

[18]     Subsequent to the December 1995 meeting, Brown determined that he no longer wanted *Byers* working in a management position in his department and contacted both TDMN's Production Department and Belo Corporation's Broadcast Division to inquire about employment opportunities for *Byers*. Neither Department felt that *Byers* was the right candidate for their openings. Brown then met with managers Bill Cox, Ellen Wilson and Joe Daume to discuss terminating Byers's employment. All three managers agreed with Brown that *Byers* should be terminated.

[19]     After Brown made the recommendation for termination, but before *Byers* was notified of his termination, Brown attended meetings at which Brown praised the work of Elaine Kidd, who is black, and Julie Bimmerman and Yvonne Morgan, who are both white. *Byers* was not at the meeting but heard about the praise for Kidd. *Byers* then sent an e-mail to Brown, which he copied to Kidd, Bimmerman, Morgan, and another employee, in which he informed Brown that there were other employees besides Kidd who deserved recognition. Brown responded that he had also praised Bimmerman and Morgan and reprimanded *Byers* for questioning his judgment in front of other employees.

[20]     On February 27, 1996, Brown and Daume called a meeting with *Byers* to inform him that his employment was terminated. Yvonne Morgan, who is white, assumed most of *Byers*'s job responsibilities after the termination. On or about December 16, 1996, Gary J. Wierzbicki, who is white, filled the position of General Accounting Manager. On or about May 23, 1996, *Byers* filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming he was the victim of discrimination based on his race and retaliation based on his prior complaints of race discrimination, in violation of Title VII. On May 14, 1997, after receiving his right to sue letter from the EEOC, *Byers* filed suit in federal district court. *Byers*'s First Amended Complaint was filed with this Court on January 16, 1998. Defendant's Motion for Summary Judgment,

which the district court granted, was filed with this Court on October 16, 1998.

[21]  STANDARD OF REVIEW

[22]  Courts of Appeals review summary judgments de novo, applying the same standard as the district courts. Fed.R.Civ.P. 56. The moving party is entitled to judgment as a matter of law when the pleadings, answers to interrogatories, admissions and affidavits on file indicate no genuine issue as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). If the burden at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case. See id.

[23]  This Court will consider the evidence in the light most favorable to the non-movant, yet the non-movant may not rely on mere allegations in the pleadings; rather, the non-movant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. See Celotex Corp., 477 U.S. at 322, 106 S.Ct. 2548; Fed.R.Civ.P. 56(c).

[24]  ANALYSIS

[25]  A. Procedural Claims

[26]  1. Statute of Limitations for Title VII and § 1981

[27]  Under 42 U.S.C. § 2000e-5(e)(1), for causes of action in which the aggrieved party has "initially instituted proceedings with a State or local agency with authority to grant or seek relief," an EEOC Charge must be filed "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1) For Title VII claims based on an employee's termination, the 300-day statute of limitations period for filing a discrimination charge with the EEOC begins to run at the time of termination, which is viewed as a discrete act of discrimination. See Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). *Byers* was terminated from his position with TDMN on February 27, 1996. He filed his EEOC charge on May 23, 1996, safely within the 300-day period allowed by law. Accordingly, *Byers*'s claims of discrimination and retaliatory discharge in violation of VII are not barred under that law's statue of limitations.

[28]　　Under Texas law, § 1981 claims are subject to a two-year statute of limitations period. See National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex., 40 F3d 698, 713 n. 22. As discussed above, *Byers*'s claims of discrimination and retaliation are based on his termination from TDMN on February 27, 1996. This lawsuit was filed on May 14, 1997, safely within the two-year period provided by law.

[29]　　2. Exhaustion of Administrative Remedies

[30]　　In his EEOC Charge, *Byers* expressly states that his "Personal Harm" was that he "was discharged from [his] position as General Accounting Manager on February 27, 1996." In Plaintiff's Response to Defendant's Motion for Summary Judgment, *Byers* clearly limits his Title VII claims to discrimination and retaliation based on his allegedly wrongful discharge from TDMN. Thus, there is no conflict between the matters alleged in Plaintiff's EEOC Charge and those alleged in his First Amended Complaint, filed with the district court on January 16, 1998. Accordingly, *Byers* has exhausted his administrative remedies, and this Court need not dismiss certain of *Byers*'s Title VII claims because they were not included in the EEOC charge.

[31]　　3. Existence of an Employment Contract

[32]　　In its Motion for Summary Judgment and Brief in Support, TDMN argues that *Byers*'s § 1981 claims should be dismissed because (1) *Byers*'s at-will employment status prevents him from asserting a claim which relies on an underlying employment contract, and (2) *Byers* has failed to plead the existence of such an employment contract.*fn2 To sustain a claim under § 1981 in this case, *Byers* must base his allegations on an underlying, enforceable employment contract. 42 U.S.C. § 1981. In Paniagua v. City of Galveston, Texas, this Court ruled that at-will employees in Texas have an employment contract with their employers, simply one which may be terminated at will. See Paniagua v. City of Galveston, Texas, 995 F2d 1310, 1313 (5th Cir. 1993). This Court finds that *Byers*'s employment-at-will status does not, taken alone, bar his § 1981 claim.

[33]　　Now we address the assertion that *Byers*'s § 1981 claim must fail because of an alleged insufficiency in the pleadings, namely that Plaintiff did not plead a contractual relationship in his initial or amended complaint. First, Motions for Summary Judgment are decided on the pleadings and on the summary judgment evidence, including affidavits, depositions, and admissions. See Celotex, 477 U.S. at 324. Furthermore, courts are to construe summary judgment evidence in the light most favorable to the non-moving party. See Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir. 1988). Second, given the liberal pleading requirements of Federal Rule of Civil Procedure 8(a), *Byers* has pled sufficiently specific facts in his Complaint to establish evidence of an employment contract. See Fed.R.Civ.P. 8(a). (requiring a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). *Byers*'s Original Complaint states that "*Byers* was hired by TDMN as a financial analysis around or about February 13, 1985. Around or about February, 1988, *Byers* was promoted to general

accounting manager." This language is sufficient to establish the existence of an employment contract between *Byers* and TDMN. Accordingly, this Court refuses to dismiss Plaintiff's § 1981 claims based on an alleged failure to sufficiently plead the existence of an employment contract.

[34]    B. Substantive Claims

[35]    1. Race Discrimination Claims

[36]    Under Title VII, "[i]t shall be an unlawful employment practice for an employer (1) . . . to discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. §2000e-2 (a). An employer's decision to terminate an individual's employment violates Title VII when that decision was based on race, whether that race be white or black. See McDonald v. Santa Fe Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed. 2d 493 (19760). This Court will apply, absent direct evidence of discrimination based on race, the basic framework that the Supreme Court articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973). Under that framework, the plaintiff must establish a prima facie case of discrimination. See id. at 802. If the plaintiff succeeds in showing a prima facie case, the defendant must then provide some legitimate, non-discriminatory reason for the employee's rejection. See id. Lastly, if the employer gives a legitimate, non-discriminatory reason for the employment action, the plaintiff must then prove, by a preponderance of the evidence, that the proffered reason was mere pretext for discrimination. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215 (1981).

[37]    *Byers* fails to establish a prima facie case of reverse discrimination based on his race. To establish a prima facie case, *Byers* must establish: (1) that he is a member of a protected group; (2) that he was qualified for the position held; (3) that he was discharged from the position; and (4) that he was replaced by someone outside of the protected group. See Singh v. Shoney's, Inc., 64 F.3d 217, 219 (5th Cir. 1995). *Byers* has indisputably satisfied the second and third prongs of the prima facie case analysis because he was terminated from TDMN and qualified for his position as General Accounting Manager. Whether *Byers* meets the remaining requirements is a matter of dispute between the parties.

[38]    With regard to the first prong, TDMN argues that *Byers* fails to satisfy it because he was not part of a racial minority at his place of work. TDMN observes that throughout *Byers*'s employment, the majority of employees at TDMN, the majority of directors or managers in *Byers*'s level, the majority of employees in *Byers*'s job grade, and the majority of the senior managers in *Byers*'s peer group in the Accounting Depart were white. The parties disagree over the required showing under this first prong. Some Fifth Circuit cases require that a plaintiff be a member of a "racial minority within the company." Switzer v. Texas Commerce Bank, 850 F.Supp. 544, 547 (N.D.Tex. 1994), aff'd without opinion, 42 F.3d 642 (5th Cir. 1994); Flanagan v. Aaron E. Henry Community Health Serv. Ctr., 876 F.2d 1231, 1233 (5th Cir. 1989). Other cases require

only that the plaintiff be a member of "a protected group," meaning a group protected under Title VII. Singh, 64 F.3d at 219; Allison v. Gulf Employees Credit Union, 836 F.Supp. 395, 397 (E.D.Tex. 1993), aff'd mem., 32 F.3d 565 (5th Cir. 1994). This Court finds that Singh marks a retreat from the "racial minority" requirement to the "protected group" requirement for cases of reverse discrimination. Accordingly, we hold that the fact that *Byers* was not a racial minority in his workplace does not prevent him from making a prima facie case of reverse discrimination under Title VII.

[39] As for the fourth prong, TDMN asserts that *Byers* cannot establish a prima facie case of discrimination based on race because he was replaced by someone outside of his protected class. Yvonne Morgan, who is white, assumed *Byers*'s responsibilities upon his termination on February 27, 1996. Gary J. Wierzbicki, who is also white, eventually filled *Byers*'s position of General Accounting Manager. In Singh, the plaintiff, a white woman, "failed to make out a prima facie case of race discrimination on this record, because she was replaced by a white female." Singh, 64 F.3d at 219. TDMN relies on Singh to support its contention that *Byers* cannot establish a prima facie case because he was replaced by other white individuals.

[40] In response, *Byers* directs this Court's attention to a more recent holding in Nieto v. L & H Packing Co., which criticizes the district court for holding that Nieto failed to establish a prima facie case of discrimination because his position was immediately filled by a member of the same protected class. See Nieto v. L & H Packing Co., 108 F.3d 621, 624 n. 7 (5th Cir. 1997). *Byers* also observes that this Court's opinion in Nieto criticizes the Singh opinion for ignoring earlier precedent finding that replacement by someone within one's protected group "does not negate the possibility that the discharge was motivated [by] discriminatory reasons." See id. (citing Hornsby v. Conoco, Inc., 777 F.2d 243, 246-47 (5th Cir. 1985) (quoting Byrd v. Roadway Express, Inc., 687 F.2d 85, 86 (5th Cir. 1982)).

[41] This Court finds *Byers*'s argument unavailing. In Hornsby v. Conoco, Inc., this Court "affirmed the district court's dismissal, however, because Hornsby failed to offer any evidence other than her subjective belief - essentially the same evidence offered with respect to her other charges - that she was terminated because of her sex." Hornsby, 777 F.2d at 247. In Hornsby, this Court disagrees with the district court's decision to automatically dismiss Hornsby's case because she was replaced by another woman, but ultimately affirms the district court's decision based on an absence of additional evidence demonstrating discriminatory intent on the part of the employer. Like Hornsby, *Byers* has failed to produce any direct evidence of discriminatory intent by Brown or TDMN or sufficient evidence indirectly demonstrating discriminatory intent.*fn3 Instead, *Byers* urges this Court to rely on his subjective belief that Brown discriminated against him because he was white. This Court will not do so.

[42]   *Byers*'s argument also fails because he stretches the Nieto holding too far. In footnote 7 of its opinion in Nieto, this Court cautions district courts against applying the four-part, prima facie case test too mechanically: "While the fact that one's replacement is of another national origin 'may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition.' Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)." Nieto, 108 F.3d at 624 n. 7. The Nieto opinion appears to allow courts to find a prima facie case even where an employee has been replaced by someone of the same race. However, *Byers* incorrectly expands this holding into a presumption that replacement by someone within one's protected class is irrelevant. As this court stated in Nieto, "While not outcome determinative, this fact is certainly material to the question of discriminatory intent." Id. at 624. (quotations omitted). In fact, the plaintiff in Nieto did not present, even under an expansive understanding of the fourth prong, sufficient evidence to convince this Court that his national origin was a motivating factor in his employer's decision to terminate him.

[43]   Accordingly, this Court need not proceed to the second and third prongs of analysis under the McDonnell Douglas framework because we find that *Byers* fails to establish a prima facie case of race discrimination under Title VII. We AFFIRM the district court's granting of summary judgment as to *Byers*'s claims under both Title VII and § 1981 of discrimination based on race.

[44]   2. Retaliation Claims

[45]   As this Court has held, the McDonnell Douglas test applied to Title VII disparate treatment cases is also applicable to Title VII unlawful retaliation cases. See Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir. 1996); McMillan v. Rust College, Inc., 710 F.2d 1112, 1116 (5th Cir. 1983). Therefore, *Byers* must first establish a prima facie case of unlawful retaliation. Second, TDMN will have an opportunity to articulate a legitimate, non-discriminatory reason for the adverse employment action. Finally, the burden falls on *Byers* to show that TDMN's explanation is a pretext for unlawful retaliation. See Long, at 304-305.

[46]   *Byers* fails to establish a prima facie case of retaliation under Title VII. To establish a prima facie case, *Byers* must show: (1) that he engaged in activity protected by Title VII; (2) that he suffered an adverse employment action; and (3) that a causal connection exists between the protected activity and the adverse employment action. See Webb v. Cardiothoracic Surgery Assoc., 139 F.3d 532, 540 (5th Cir. 1998). *Byers* cannot sustain this initial, prima facie burden because he has not demonstrated that he engaged in activity protect under Title VII.

[47]   Under Title VII, an employee has engaged in protected activity if he or she has (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). In the instant case, the "participation clause" is irrelevant because *Byers*'s did not file a charge with the EEOC until after the alleged retaliatory discharge took place. To satisfy the "opposition clause," *Byers* need not prove that TDMN's practices were actually unlawful, but only that he had "a reasonably belief that the employer was engaged in unlawful employment practices." Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir. 1981), cert denied 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982) (emphasis added); see also Harvey v. Chevron USA, Inc., 961 F.Supp. 1017, 1032 (S.D. Tex. 1997) (holding that a showing of subjective good faith alone is insufficient).

[48]   This Court finds that *Byers*'s belief that Brown was discriminating against him based on race in violation of Title VII was objectively unreasonable. *Byers* has produced evidence that he alleges demonstrates that on at least four occasions he opposed acts of racial discrimination committed by Brown. First, *Byers* refers to the time when he told Brown, and Mark Rapier, in Human Resources, that he believed TDMN employees Ann Self and Loira Baker were being treated differently because of their race. More specifically, *Byers* complained that Ann Self, who is white, had been discharged and given termination papers, while Brown had sought to promote Loira Baker, who is black. Plaintiff claims that Self and Baker held similar positions in TDMN and had made similar errors in their work. However, the evidence shows that Self was never discharged but was instead rehired into another position in her department and that *Byers* was aware of this detail at the time that he made his complaint. In addition, evidence shows that Brown's reason for refusing to fire Baker was that he believed the Accounts Payable Department had some systemic problems which he wanted to take a look at before blaming individual employees, and this was communicated to *Byers*. A subsequent review of the Department disclosed a confusing set of guidelines preventing employees from correctly processing work. This Court finds that *Byers*'s belief that Brown's decision to retain Loira Baker was evidence of race discrimination was objectively unreasonable.

[49]   Second, *Byers* mentions that he complained to Brown, Rapier and Ellen Wilson after receiving mediocre ratings on his August 1993 performance appraisal. In particular, *Byers* alleges that Brown had given extraordinary weight to subjective criteria, such as *Byers*'s job knowledge, dependability, timeliness, judgment, communication skills and working relationships. While admitting that there is nothing wrong with Brown using these subjective criteria, Byers claims that Brown used a double standard for his white mangers as compared to his black managers. However, *Byers* also admitted that there were no black managers who reported to Brown, and Mr. Coleman, another white employee who reported to Brown, expressly stated that he received good reviews from Brown. In fact, no evidence has been presented indicating why Brown's decision to give consideration to subjective criteria would constitute race discrimination, nor has any evidence been presented showing that other, non-white employees were treated differently. Furthermore, the evidence does show that prior to this August 1993 appraisal, *Byers* had failed to perform a high priority task assigned to him by Brown. It is not

objectively reasonable to leap from an observation that one's communication skills and working relationships are being evaluated to the conclusion that race discrimination is the underlying explanation.

[50] Third, *Byers* complains that he told Brown that he believed he was singled out because of his race with regard to Brown's application of TDMN's sick leave policy. Here, *Byers'* belief that Brown was discriminating based on race is unreasonable for two reasons. First, the evidence shows that the day after Brown recorded "sick leave" on *Byers*'s time card for the half-day of work he had missed, Brown e-mailed *Byers* to say that he had subsequently learned that he had wrongly applied TDMN's sick leave policy. Second, there is no evidence showing that Brown treated similarly situated, non-white employees any differently with regard to application of TDMN's sick leave policy. *Byers* claims that Madeline Norris, who is black, was allowed to work out of her home, and that Elaine Kidd, who is black, took two days off without reporting it. However, the evidence presented shows that Norris had received prior authorization to work from home due to back problems, while *Byers* had never received prior authorization. The evidence further shows that Kidd reported directly to *Byers* and not to Brown and that *Byers* was unaware of how her leave issue was resolved.

[51] Fourth, *Byers* alleges that he told Brown's supervisor, Bill Cox, that he was being discriminated against because of his race when Brown blamed *Byers* for a breakdown in the capital appropriation procedures. On or around February 1995, the auditor of TDMN discovered a breakdown in the process utilized for certain capitalization appropriations: instead of being routed to officers of TDMN and Belo Corporation for review and signature prior to review by Byers, certain appropriations were being forwarded from Brown's secretary directly to *Byers*. When the error was detected, Brown sent Cox a memo explaining what had happened and noting that *Byers* should have caught the missing signatures but thought someone else was checking for such approvals. *Byers* then complained to Brown that he should send out an amended memo because Brown was also at fault and should share the blame. Brown admitted his responsibility and apologized to *Byers*, but refused to send out another memo. On March 17, 1995, *Byers* sent a memo to Cox stating that Brown's earlier memo was "another example of his vicious attack on my professional character due to his personal dislike for my race." After a discussion with Brown, Cox concluded that Byers's allegations of racial animus were baseless. While this last incident provides the clearest example of *Byers* reporting to others that Brown was engaged in race discrimination, there is no evidence showing that *Byers*'s complaints were objectively reasonable.

[52] Even viewing the evidence in the light most favorable to *Byers*, the non-moving party, this Court holds that the district court was correct in finding that *Byers* failed to present sufficient evidence showing that his alleged complaints of Brown's race discrimination were objectively reasonable. The summary judgment evidence instead shows that *Byers*'s complaints were objectively unreasonable.

[53]    Accordingly, this Court finds that the opposition clause requirements have not been satisfied and that *Byers* had failed to establish a prima facie case of unlawful retaliation. Therefore, this Court need not proceed to the second and third prongs of the McDonnell Douglas framework. We AFFIRM the district court's granting of summary judgment as to *Byers*'s retaliation claims under both Title VII and § 1981.

[54]    3. Award of Costs Other than Attorneys' Fees

[55]    On January 7, 1999, the district court issued its Memorandum Opinion and Order granting Defendant's Motion for Summary Judgment in its entirety, finding that *Byers* had not established a prima facie case of either racial discrimination or retaliation, and dismissing each of *Byers*'s claims. As required under Federal Rule of Civil Procedure 58, this Court set forth its judgment on a separate sheet of paper, which was also signed and entered on January 7, 1999. See Fed.R.Civ.P. 58. In that judgment, the district court explained that the case was dismissed with prejudice and that "[e]ach party shall bear its own costs." This "Final Judgment" was incorrectly dated January 7, 1998. On February 19, 1999, Defendant filed its Motion to Modify Final Judgment to Award Costs and Correct Clerical Error, pursuant to Rules 60(a) and (b) of the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 60(a) and (b). *Byers*'s Response was filed on March 10, 1999.

[56]    In its Request for Leave to Consider 60(b) Motion, the district court found that its initial decision to award costs to the party incurring them was made in error and asserted its desire to correct the mistake. However, at the time of this Request for Leave, both parties had already filed their Notices of Appeal with this Court, and the district court no longer had jurisdiction over the case. The district court stated that if it had jurisdiction it would issue an order modifying its previous "Final Judgment" to award costs to the Defendant, pursuant to Federal Rule of Procedure 60(b), which allows courts to modify their judgments, upon motion, because of an earlier mistake.

[57]    On April 8, 1999, this Court remanded the instant case back to the district court, thereby granting its March 19, 1999 request for leave to consider the Rule 60(b) motion. The district court then decided to grant TDMN's motion, awarding TDMN costs other than attorneys' fees. On appeal, *Byers* contends that the district court erred in awarding costs to the prevailing party and requests that this Court order that each party bear its own costs. *Byers* maintains that the district court should not have awarded costs to TDMN absent a finding that his claims were frivolous, unreasonable, without foundation, or filed in bad faith. In support, *Byers* relies primarily on Christianburg Garment Co. v. EEOC, 434 U.S. 412 (1978).

[58] We hold that the district court correctly awarded costs to TDMN. Federal Rule of Civil Procedure 54 governs the award of costs in cases brought in federal court: "[e]xcept when express provision therefore is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed.R.Civ.P. 54. Title VII does not expressly provide otherwise, and the standard procedure is to award costs to the prevailing party in Title VII suits. The "prevailing party" standard for awarding costs under Rule 54(d)(1) is less stringent than the prevailing party test for awarding attorney's fees under Title VII. Furthermore, this Court has held that the Christianburg standard for determining whether a defendant is a prevailing party under Title VII does not apply to an award of costs. Lewis v. NLRB, 750 F.2d 1266, 1279, reh'g denied, 756 F.2d 882 (5th Cir. 1985).

[59] Accordingly, we find that the district court correctly awarded costs other than attorneys' fees to TDMN as the prevailing party.

[60] CONCLUSION

[61] First, we AFFIRM the district court's procedural rulings that *Byers*'s claims are not barred on the grounds of an alleged failure to meet limitations requirements, exhaust administrative remedies, or establish the existence of an employment contract. Second, we AFFIRM the district court's granting of summary judgment, holding that *Byers* has failed to establish a prima facie case of either racial discrimination or retaliation under Title VII and § 1981, and dismissing each of the claims with prejudice. Finally, we AFFIRM the district court's award of costs other than attorneys' fees to TDMN as the prevailing party.

---

Opinion Footnotes

---

[62] *fn1 . Although *Byers* asserts claims under Title VII and 42 U.S.C. §1981, this Court will consider both causes of action under the Title VII rubric of analysis. Claims of intentional discrimination brought under Title VII and Section 1981 require the same proof to establish liability. See Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996); Anderson v. Douglas & Lomason Co., Inc., 26 F.3d 1277, 1284 n. 7 (5th Cir. 1994).

[63]    *fn2 . Under § 1981, "[a]ll persons . . .shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . .[f]or purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981.

[64]    *fn3 . For example, *Byers* cannot provide sufficient evidence of disparate treatment with respect to similarly situated non-white employees.

*20000424*

© 2000 VersusLaw Inc.