UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

MAR 1 9 2001

Michael N. Milby, Clerk

| | | |
|---|---|---|
| JOSEPH K. CONNOR | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. C-00-69 |
| | § | |
| TEXAS A&M UNIVERSITY - KINGSVILLE; | § | **JURY TRIAL REQUESTED** |
| HUMBERTO GARCIA, Individually and in | § | |
| His Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in His Official Capacity | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF JOSEPH CONNOR'S RULE 59(a)-(e) MOTION FOR NEW TRIAL ON DAMAGES AND MOTION TO ALTER AND/OR AMEND JUDGMENT TO INCLUDE EQUITABLE RELIEF IN ACCORDANCE WITH PLEADINGS AND JURY'S VERDICT

Plaintiff, Joseph Connor, asks the Court for relief pursuant to Federal Rule of Procedure 59 (a) and (e) in that he would respectfully show that the Judgment should be amended to allow for equitable and injunctive relief in accordance with the pleadings and jury's verdict and that a Motion for New Trial should be granted on the issue of damages as follows:

1.     Plaintiff Joseph Connor sued defendant, Texas A&M University - Kingsville for violation of Title VII for retaliating against him for opposing discrimination and Mr. Connor sued Humberto Garcia for violating his First Amendment rights to freedom of speech when he retaliated against him for speaking out against discrimination in the workplace.

2.     After a trial on the merits, the Court submitted this cause to the jury.

3.     The jury returned a verdict for the Plaintiff on both the statutory and Constitutional issues, but awarded no damages.

4.     Plaintiff asked for equitable and injunctive relief in his Complaint.

57.

CutePDF - www.fastio.com

5.     Based upon the jury's verdict, Plaintiff, Joseph Connor, asks the Court for the following equitable relief which is appropriate and reasonable based upon the pleadings, the law, the evidence and the jury's verdict:

A.     Reinstatement to his former position with Defendants as a police officer.  See *Mt Healthy v. Doyle*, 429 U.S. 274 (1977), 97 S.Ct. 568 - reinstatement is appropriate remedy for violation of Constitutional rights; *West v. Gibson*, 525 U.S. 212 (1998), 119 S.Ct. 1906 - reinstatement is appropriate remedy for Title VII violation.

B.     Defendants be ordered not to retaliate against Plaintiff Joseph Connor in violation of his Constitutional and statutory rights;

C.     Defendant be ordered to expunge Plaintiff's personnel files of all termination related documents (*42 U.S.C. 2000e - 5(g) (1)* If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, ***and order such affirmative action as may be appropriate***, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), ***or any other equitable relief as the court deems appropriate***.) [emphasis mine].

D.     Defendant be ordered to resubmit form F5 to TCLEOSE to represent that

2

Plaintiff was reinstated and that Plaintiff's termination records were expunged by order of the United States District Court Southern District of Texas Corpus Christi Division.

6.     Plaintiff Joseph Connor files his Motion for New Trial on the issue of damages. The only evidence before the jury was that Plaintiff suffered damages in the form of lost wages as a proximate result of his unlawful termination by Defendants. There was no evidence presented to contradict this. In fact, the only evidence presented at trial supported the fact that Plaintiff Joseph Connor was out of work from the date of his unlawful termination by Defendants on June 4, 1999 until August 7, 2000 when he obtained work as a bailiff. Defendants neither presented any evidence that Plaintiff failed to mitigate his damages nor that Plaintiff's damages were caused by any event other than Plaintiff's termination of employment by Defendants. Also, the only testimony and evidence on the record supported that Plaintiff Joseph Connor suffered damages in the form of mental anguish as a proximate result of his unlawful termination by Defendants. Therefore, a new trial should be granted on the issue of damages.

7.     The equitable relief that Plaintiff Joseph Connor is seeking from the Court is based upon the Jury's finding that Defendant Texas A&M University - Kingsville violated his rights under Title VII and Defendant Humberto Garcia violated his First Amendment rights. This is particularly important because Defendant Humberto Garcia admitted that the form F5 which was submitted to TCLEOSE contained reasons that Plaintiff was terminated which were not true. Further, Defendant Texas A&M University - Kingsville's own "corporate" representative, Jimmy Hartsfield, Director of Human Resources for Texas A&M University - Kingsville, testified that the form F5 in its present state would preclude Plaintiff Joseph Connor from obtaining law enforcement employment within

3

the South Texas area – specifically that Plaintiff would have to move out of state to find similar employment. The Defendants' own testimony supports how serious and appropriate it is for Plaintiff's employment related records to be "cleaned up" and expunged. If this equitable remedy is not afforded, especially after the jury has found that both Defendants have violated the Plaintiff's rights, Mr. Connor will continue to suffer the effects of the Defendant's unlawful actions for years to come.

8.    Plaintiff Joseph Connor prays that the Court grant the requested equitable relief and his request for a new trial on damages be granted so that justice may be done.

Respectfully submitted,

Law Office of Gay E. Gilson
4600 Ocean Drive, Suite 104D
Corpus Christi, Texas 78412
Telephone: (361) 814-0573
Facsimile: (361) 814-0674

By: _____
GAY E. GILSON
SBN 00784131/Fed.I.D. 16385
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded on March 19, 2001 by certified mail, return receipt requested to:

Jose Rangel                                        Via CMRRR # Z 189 456 079
Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

_____
Gay E. Gilson

4

01/11/77 *MT. HEALTHY* CITY SCHOOL DISTRICT BOARD

[1]     SUPREME COURT OF THE UNITED STATES

[2]     No. 75-1278

[3]     1977.SCT.248 <http://www.versuslaw.com>, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471

[4]     January 11, 1977

[5]     *MT. HEALTHY* CITY SCHOOL DISTRICT BOARD OF EDUCATION
        v.
        DOYLE

[6]     CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[7]     Philip S. Olinger argued the cause and filed briefs for petitioner.

[8]     Michael H. Gottesman argued the cause for respondent. With him on the brief were Robert M. Weinberg, David Rubin, Eugene Green, Dennis Haines, Anthony P. Sgambatti II, and Barry R. Laine.

[9]     Burger, Brennan, White, Marshall, Blackmun, Powell, Rehnquist, Stevens

[10]    The opinion of the court was delivered by: Rehnquist

[11]    Respondent, an untenured teacher (who had previously been involved in an altercation with another teacher, an argument with school cafeteria employees, an incident in which he swore at students, and an incident in which he made obscene gestures to girl students), conveyed through a telephone call to a radio station the substance of a memorandum relating to teacher dress and appearance that the school principal had circulated to various teachers. The radio station announced the adoption of the dress code as a news item. Thereafter, petitioner School Board, adopting a recommendation of the superintendent, advised respondent that he would not be rehired and cited his lack of tact in handling professional matters, with specific mention of the radio station and obscene-gesture incidents. Respondent then brought this action against petitioner for reinstatement and damages, claiming that petitioner's refusal to rehire him violated his rights under the First and Fourteenth Amendments. Although respondent asserted jurisdiction under both 28 U.S.C. § 1343 and § 1331, the District Court rested jurisdiction only on § 1331. The District Court, which found that the incidents involving respondent had occurred, concluded that the telephone call was "clearly protected by the First Amendment" and that because it had played a "substantial part" in petitioner's decision not to rehire respondent

CutePDF - www.fastio.com

he was entitled to reinstatement with backpay. The Court of Appeals affirmed. Petitioner, in addition to attacking the District Court's jurisdiction under § 1331 on the ground that the $10,000 jurisdictional requirement of that provision was not satisfied in this case, raised an additional jurisdictional issue after this Court had granted certiorari and after petitioner had filed its reply brief, claiming that respondent's only substantive constitutional claim arises under 42 U.S.C. § 1983 and that because petitioner School Board is not a "person" for purposes of § 1983, liability may no more be imposed on it where federal jurisdiction rests on § 1331 than where jurisdiction is grounded on § 1343. Held:

[12]    1. Respondent's complaint sufficiently pleaded jurisdiction under 28 U.S.C. § 1331. Though the amount in controversy thereunder must exceed $10,000, even if the District Court had chosen to award only compensatory damages, it was far from a "legal certainty" at the time of suit that respondent would not have been entitled to more than that amount. St. Paul Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288-289. Pp. 276-277.

[13]    2. Petitioner in making its belated contention concerning § 1983 failed to preserve the issue whether the complaint stated a claim upon which relief could be granted against it. Because the question involved is not of the jurisdictional sort which the Court raises on its own motion, it is assumed without deciding that respondent could sue under § 1331 without regard to the limitations imposed by § 1983. Pp. 277-279.

[14]    3. Since under Ohio law the "State" does not include "political subdivisions" (a category including school districts), and the record shows that a local school board like petitioner is more like a county or city than it is an arm of the State, petitioner is not immune from suit under the Eleventh Amendment. Pp. 279-281.

[15]    4. Respondent's constitutional claims are not defeated because he did not have tenure. Perry v. Sindermann, 408 U.S. 593. Pp. 283-284.

[16]    5. That conduct protected by the First and Fourteenth Amendments played a substantial part in the decision not to rehire respondent does not necessarily amount to a constitutional violation justifying remedial action. The proper test is one that protects against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights. Since respondent here satisfied the burden of showing that his conduct was constitutionally protected and was a motivating factor in the petitioner's decision not to rehire him, the District Court should have gone on to determine whether petitioner had shown by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. Pp. 284-287.

[17]    529 F.2d 524, vacated and remanded.

[18]    REHNQUIST, J., delivered the opinion for a unanimous Court.

[19]    MR. JUSTICE REHNQUIST delivered the opinion of the Court.

[20]    Respondent Doyle sued petitioner *Mt. Healthy* Board of Education in the United States

District Court for the Southern District of Ohio. Doyle claimed that the Board's refusal to renew his contract in 1971 violated his rights under the First and Fourteenth Amendments to the United States Constitution. After a bench trial the District Court held that Doyle was entitled to reinstatement with backpay. The Court of Appeals for the Sixth Circuit affirmed the judgment, 529 F.2d 524, and we granted the Board's petition for certiorari, 425 U.S. 933, to consider an admixture of jurisdictional and constitutional claims.

[21]     I

[22]     Although the respondent's complaint asserted jurisdiction under both 28 U.S.C. § 1343 and 28 U.S.C. § 1331, the District Court rested its jurisdiction only on § 1331. Petitioner's first jurisdictional contention, which we have little difficulty disposing of, asserts that the $10,000 amount in controversy required by that section is not satisfied in this case.

[23]     The leading case on this point is St. Paul Indemnity Co. v. Red Cab Co., 303 U.S. 283 (1938), which stated this test: S

[24]     "he sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction." Id., at 288-289. (Footnotes omitted.)I

[25]     We have cited this rule with approval as recently as Weinberger v. Wiesenfeld, 420 U.S. 636, 642 n. 10 (1975), and think it requires Disposition of the jurisdictional question tendered by the petition in favor of the respondent. At the time Doyle brought this action for reinstatement and $50,000 damages, he had already accepted a job in a different school system paying approximately $2,000 per year less than he would have earned with the *Mt. Healthy* Board had he been rehired. The District Court in fact awarded Doyle compensatory damages in the amount of $5,158 by reason of income already lost at the time it ordered his reinstatement. Even if the District Court had chosen to award only compensatory damages and not reinstatement, it was far from a "legal certainty" at the time of suit that Doyle would not have been entitled to more than $10,000.

[26]     II

[27]     The Board has filed a document entitled "Supplemental Authorities" in which it raises quite a different "jurisdictional" issue from that presented in its petition for certiorari and disposed of in the preceding section of this opinion. Relying on the District Court opinion in Weathers v. West Yuma County School Dist., 387 F. Supp. 552, 556 (Colo. 1974), the Board contends that even though Doyle may have met the jurisdictional amount requirement of § 1331, it may not be subjected to liability in this case because Doyle's only substantive constitutional claim arises under 42 U.S.C.§ 1983. Because it is not a "person" for purposes of § 1983, the Board reasons, liability may no more be imposed on it where federal jurisdiction is grounded on 28 U.S.C. § 1331 than where such jurisdiction is grounded on 28 U.S.C. § 1343.

[28]     The District Court avoided this issue by reciting that it had not "stated any Conclusion on the possible Monroe-Kenosha problem in this case since it seems that the case is properly here as a § 1331 case, as well as a § 1983 one." App. to Pet. for Cert., 14a-15a. This reference to our decisions in Monroe v. Pape, 365 U.S. 167 (1961), and City of Kenosha v. Bruno, 412 U.S. 507 (1973), where it was held that a municipal corporation is not a suable "person" under § 1983, raises the question whether petitioner Board in this case is sufficiently like the municipal corporations in those cases so that it, too, is excluded from § 1983 liability.

[29]     The quoted statement of the District Court makes clear its view that if the jurisdictional basis for the action is § 1331, the limitations contained in 42 U.S.C. § 1983 do not apply. The Board argues, on the contrary, that since Congress in § 1983 has expressly created a remedy relating to violations of constitutional rights under color of state law, one who seeks to recover for such violations is bound by the limitations contained in § 1983 whatever jurisdictional section he invokes.

[30]     The question of whether the Board's arguments should prevail, or whether as respondent urged in oral argument, we should, by analogy to our decision in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), imply a cause of action directly from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983, is one which has never been decided by this Court. Counsel for respondent at oral argument suggested that it is an extremely important question and one which should not be decided on this record. We agree with respondent.

[31]     The Board has raised this question for the first time in a document filed after its reply brief in this Court. Were it in truth a contention that the District Court lacked jurisdiction, we would be obliged to consider it, even as we are obliged to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction. Liberty Mutual Ins. Co. v. Wetzel, 424 U.S. 737, 740 (1976); Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 152 (1908). And if this were a § 1983 action, brought under the special jurisdictional provision of 28 U.S.C. § 1343 which requires no amount in controversy, it would be appropriate for this Court to inquire, for jurisdictional purposes, whether a statutory action had in fact been alleged. City of Kenosha v. Bruno, (supra) . However, where an action is brought under § 1331, the catchall federal-question provision requiring in excess of $10,000 in controversy, jurisdiction is sufficiently established by allegation of a claim under the Constitution or federal statutes, unless it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction...." Bell v. Hood, 327 U.S. 678, 682 (1946); Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 249 (1951).

[32]     Here respondent alleged that the Board had violated his rights under the First and Fourteenth Amendments and claimed the jurisdictionally necessary amount of damages. The claim that the Board is a "person" under § 1983, even assuming the correctness of the Board's argument that the § 1331 action is limited by the restrictions of § 1983, is not so patently without merit as to fail the test of Bell v. Hood, (supra) . Therefore, the question as to whether the respondent stated a claim for relief under § 1331 is not of the jurisdictional sort which the Court raises on its own motion. The related question of whether a school district is a person for purposes of § 1983 is likewise not before us. We leave those questions for another day, and assume, without deciding, that the respondent could sue under § 1331 without regard to the limitations imposed by 42 U.S.C. § 1983.

[33]     III

[34]     The District Court found it unnecessary to decide whether the Board was entitled to immunity from suit in the federal courts under the Eleventh Amendment, because it decided that any such immunity had been waived by Ohio statute and decisional law. In view of the treatment of waiver by a State of its Eleventh Amendment immunity from suit in Ford Motor Co. v. Dept. of Treasury, 323 U.S. 459, 464-466 (1945), we are less sure than was the District Court that Ohio had consented to suit against entities such as the Board in the federal courts. We prefer to address instead the question of whether such an entity had any Eleventh Amendment immunity in the first place, since if we conclude that it had none it will be unnecessary to reach the question of waiver.

[35]     The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, Edelman v. Jordan, 415 U.S. 651 (1974); Ford Motor Co. v. Dept. of Treasury, (supra) , but does not extend to counties and similar municipal corporations. See Lincoln County v. Luning, 133 U.S. 529, 530 (1890); Moor v. County of Alameda, 411 U.S. 693, 717-721 (1973). The issue here thus turns on whether the *Mt. Healthy* Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, upon the nature of the entity created by state law. Under Ohio law the "State" does not include "political subdivisions," and "political subdivisions" do include local school districts. Ohio Rev. Code Ann. § 2743.01 (Page Supp. 1975). Petitioner is but one of many local school boards within the State of Ohio. It is subject to some guidance from the State Board of Education, Ohio Rev. Code Ann. § 3301.07 (Page 1972 and Supp. 1975), and receives a significant amount of money from the State. Ohio Rev. Code Ann. § 3317 (Page 1972 and Supp. 1975). But local school boards have extensive powers to issue bonds, Ohio Rev. Code Ann. § 133.27 (Page 1969), and to levy taxes within certain restrictions of state law. Ohio Rev. Code Ann. §§ 5705.02, 5705.03, 5705.192, 5705.194 (Page 1973 and Supp. 1975). On balance, the record before us indicates that a local school board such as petitioner is more like a county or city than it is like an arm of the State. We therefore hold that it was not entitled to assert any Eleventh Amendment immunity from suit in the federal courts.

[36]     IV

[37]     Having concluded that respondent's complaint sufficiently pleaded jurisdiction under 28 U.S.C. § 1331, that the Board has failed to preserve the issue whether that complaint stated a claim upon which relief could be granted against the Board, and that the Board is not immune from suit under the Eleventh Amendment, we now proceed to consider the merits of respondent's claim under the First and Fourteenth Amendments.

[38]     Doyle was first employed by the Board in 1966. He worked under one-year contracts for the first three years, and under a two-year contract from 1969 to 1971. In 1969 he was elected president of the Teachers' Association, in which position he worked to expand the subjects of direct negotiation between the Association and the Board of Education. During Doyle's one-year term as president of the Association, and during the succeeding year when he served on its executive committee, there was apparently some tension in relations between the Board and the Association.

[39] Beginning early in 1970, Doyle was involved in several incidents not directly connected with his role in the Teachers' Association. In one instance, he engaged in an argument with another teacher which culminated in the other teacher's slapping him. Doyle subsequently refused to accept an apology and insisted upon some punishment for the other teacher. His persistence in the matter resulted in the suspension of both teachers for one day, which was followed by a walkout by a number of other teachers, which in turn resulted in the lifting of the suspensions.

[40] On other occasions, Doyle got into an argument with employees of the school cafeteria over the amount of spaghetti which had been served him; referred to students, in connection with a disciplinary complaint, as "sons of bitches"; and made an obscene gesture to two girls in connection with their failure to obey commands made in his capacity as cafeteria supervisor. Chronologically the last in the series of incidents which respondent was involved in during his employment by the Board was a telephone call by him to a local radio station. It was the Board's consideration of this incident which the court below found to be a violation of the First and Fourteenth Amendments.

[41] In February 1971, the principal circulated to various teachers a memorandum relating to teacher dress and appearance, which was apparently prompted by the view of some in the administration that there was a relationship between teacher appearance and public support for bond issues. Doyle's response to the receipt of the memorandum -- on a subject which he apparently understood was to be settled by joint teacher-administration action -- was to convey the substance of the memorandum to a disc jockey at WSAI, a Cincinnati radio station, who promptly announced the adoption of the dress code as a news item. Doyle subsequently apologized to the principal, conceding that he should have made some prior communication of his criticism to the school administration.

[42] Approximately one month later the superintendent made his customary annual recommendations to the Board as to the rehiring of non-tenured teachers. He recommended that Doyle not be rehired. The same recommendation was made with respect to nine other teachers in the district, and in all instances, including Doyle's, the recommendation was adopted by the Board. Shortly after being notified of this decision, respondent requested a statement of reasons for the Board's actions. He received a statement citing "a notable lack of tact in handling professional matters which leaves much doubt as to your sincerity in establishing good school relationships." That general statement was followed by references to the radio station incident and to the obscene-gesture incident. *fn1

[43] The District Court found that all of these incidents had in fact occurred. It concluded that respondent Doyle's telephone call to the radio station was "clearly protected by the First Amendment," and that because it had played a "substantial part" in the decision of the Board not to renew Doyle's employment, he was entitled to reinstatement with backpay. App. to Pet. for Cert. 12a-13a. The District Court did not expressly state what test it was applying in determining that the incident in question involved conduct protected by the First Amendment, but simply held that the communication to the radio station was such conduct. The Court of Appeals affirmed in a brief per curiam opinion. 529 F.2d 524.

[44] Doyle's claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, Board of Regents v. Roth, 408 U.S. 564 (1972), he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of

constitutionally protected First Amendment freedoms. Perry v. Sindermann, 408 U.S. 593 (1972).

[45]    That question of whether speech of a government employee is constitutionally protected expression necessarily entails striking "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568 (1968). There is no suggestion by the Board that Doyle violated any established policy, or that its reaction to his communication to the radio station was anything more than an ad hoc response to Doyle's action in making the memorandum public. We therefore accept the District Court's finding that the communication was protected by the First and Fourteenth Amendments. We are not, however, entirely in agreement with that court's manner of reasoning from this finding to the Conclusion that Doyle is entitled to reinstatement with backpay.

[46]    The District Court made the following "Conclusions" on this aspect of the case: S

[47]    "1) If a non-permissible reason, e.g., exercise of First Amendment rights, played a substantial part in the decision not to renew - even in the face of other permissible grounds - the decision may not stand (citations omitted).

[48]    "2) A non-permissible reason did play a substantial part. That is clear from the letter of the Superintendent immediately following the Board's decision, which stated two reasons - the one, the conversation with the radio station clearly protected by the First Amendment. A court may not engage in any limitation of First Amendment rights based on 'tact' - that is not to say that the 'tactfulness' is irrelevant to other issues in this case." App. to Pet. for Cert. 12a-13a.I

[49]    At the same time, though, it stated that S

[50]    "n fact, as this Court sees it and finds, both the Board and the Superintendent were faced with a situation in which there did exist in fact reason... independent of any First Amendment rights or exercise thereof, to not extend tenure." Id., at 12a.I

[51]    Since respondent Doyle had no tenure, and there was therefore not even a state-law requirement of "cause" or "reason" before a decision could be made not to renew his employment, it is not clear what the District Court meant by this latter statement. Clearly the Board legally could have dismissed respondent had the radio station incident never come to its attention. One plausible meaning of the court's statement is that the Board and the Superintendent not only could, but in fact would have reached that decision had not the constitutionally protected incident of the telephone call to the radio station occurred. We are thus brought to the issue whether, even if that were the case, the fact that the protected conduct played a "substantial part" in the actual decision not to renew would necessarily amount to a constitutional violation justifying remedial action. We think that it would not.

[52]    A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better

position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision -- even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

[53]     This is especially true where, as the District Court observed was the case here, the current decision to rehire will accord "tenure." The long-term consequences of an award of tenure are of great moment both to the employee and to the employer. They are too significant for us to hold that the Board in this case would be precluded, because it considered constitutionally protected conduct in deciding not to rehire Doyle, from attempting to prove to a trier of fact that quite apart from such conduct Doyle's record was such that he would not have been rehired in any event.

[54]     In other areas of constitutional law, this Court has found it necessary to formulate a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused. We think those are instructive in formulating the test to be applied here.

[55]     In Lyons v. Oklahoma, 322 U.S. 596 (1944), the Court held that even though the first confession given by a defendant had been involuntary, the Fourteenth Amendment did not prevent the State from using a second confession obtained 12 hours later if the coercion surrounding the first confession had been sufficiently dissipated as to make the second confession voluntary. In Wong Sun v. United States, 371 U.S. 471, 491 (1963), the Court was willing to assume that a defendant's arrest had been unlawful, but held that "the connection between the arrest and the statement [given several days later] had 'become so attenuated as to dissipate the taint.' Nardone v. United States, 308 U.S. 338, 341." Parker v. North Carolina, 397 U.S. 790, 796 (1970), held that even though a confession be assumed to have been involuntary in the constitutional sense of the word, a guilty plea entered over a month later met the test for the voluntariness of such a plea. The Court in Parker relied on the same quoted language from Nardone, (supra) , as did the Court in Wong Sun, (supra) . While the type of causation on which the taint cases turn may differ somewhat from that which we apply here, those cases do suggest that the proper test to apply in the present context is one which likewise protects against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights.

[56]     Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor" - or, to put it in other words, that it was a "motivating factor" *fn2 in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's re-employment even in the absence of the protected conduct.

[57]    We cannot tell from the District Court opinion and Conclusions, nor from the opinion of the Court of Appeals affirming the judgment of the District Court, what Conclusion those courts would have reached had they applied this test. The judgment of the Court of Appeals is therefore vacated, and the case remanded for further proceedings consistent with this opinion.

[58]    So ordered.

Opinion Footnotes

[59]    *fn1 "I. You have shown a notable lack of tact in handling professional matters which leaves much doubt as to your sincerity in establishing good school relationships.

[60]    "A. You assumed the responsibility to notify W.S.A.I. Radio Station in regards to the suggestion of the Board of Education that teachers establish an appropriate dress code for professional people. This raised much concern not only within this community, but also in neighboring communities.

[61]    "B. You used obscene gestures to correct students in a situation in the cafeteria causing considerable concern among those students present.

[62]    "Sincerely yours,

[63]    "Rex Ralph

[64]    "Superintendent"

[65]    *fn2 See Arlington Heights v. Metropolitan Housing Dev. Corp., ante, at 270-271, n. 21.

*19770111*

© 1998 VersusLaw Inc.

*West* v. *Gibson*, 527 U.S. 212, 119 S.Ct. 1906, 144 L.Ed.2d 196 (U.S. 06/14/1999)

[1]     United States Supreme Court

[2]     No. 98-238

[3]     527 U.S. 212, 119 S.Ct. 1906, 144 L.Ed.2d 196, 1999.SCT.42114
        <http://www.versuslaw.com>, 67 USLW 3682, 67 USLW 4462

[4]     June 14, 1999

[5]     **TOGO D. *WEST*, JR., SECRETARY OF VETERANS AFFAIRS, PETITIONER**
        **v.**
        **MICHAEL *GIBSON***

[6]     SYLLABUS BY THE COURT

[7]     Syllabus

[8]     OCTOBER TERM, 1998

[9]     *WEST* v. *GIBSON*

[10]    NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in
        connection with this case, at the time the opinion is issued. The syllabus constitutes no part
        of the opinion of the Court but has been prepared by the Reporter of Decisions for the
        convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U. S.
        321, 337.

[11]    SUPREME COURT OF THE UNITED STATES

[12]    *WEST*, SECRETARY OF VETERANS AFFAIRS v. *GIBSON*

[13]    certiorari to the united states court of appeals for the seventh circuit

[14]    No. 98-238.

[15]    Argued April 26, 1999

[16]     Decided June 14, 1999

[17]     In 1972, Congress extended Title VII of the Civil Rights Act of 1964 to prohibit
employment discrimination in the Federal Government, 42 U. S. C. §2000e-16, to
authorize the Equal Employment Opportunity Commission (EEOC) to enforce that
prohibition through "appropriate remedies, including reinstatement or hiring . . . with or
without back pay," §2000e-16(b), and to empower courts to entertain an action by a
complainant still aggrieved after final agency action, §2000e-16(c). In 1991, Congress
again amended Title VII in the Compensatory Damages Amendment (CDA), which,
among other things, permits victims of intentional discrimination to recover compensatory
damages "[i]n an action . . . under [§2000e-16]," §1981a(a)(1), and adds that any party in
such an action may demand a jury trial, §1981a(c). Thereafter, the EEOC began to grant
compensatory damages awards in Federal Government employment discrimination cases.
Respondent *Gibson* filed a complaint charging that the Department of Veterans Affairs had
discriminated against him by denying him a promotion on the basis of his gender. The
EEOC found in his favor and awarded him the promotion plus backpay. *Gibson* later filed
this suit asking for compensatory damages and other relief, but the District Court dismissed
the complaint. The Seventh Circuit reversed, rejecting the Department's argument that,
because *Gibson* had failed to exhaust his administrative remedies with respect to an award
of compensatory damages, he could not bring that claim in court. In the Seventh Circuit's
view, the EEOC lacked the legal power to award compensatory damages; consequently
there was no administrative remedy to exhaust.

[18]     Held:

[19]     1. The EEOC possesses the legal authority to require federal agencies to pay compensatory
damages when they discriminate in employment in violation of Title VII. Read literally,
the language of the 1972 Title VII extension and the CDA is consistent with a grant of that
authority. Section 2000e-16(b) empowers the EEOC to enforce §2000e-16(a) through a
"remedy" that is "appropriate." Although §2000e-16(b) explicitly mentions only equitable
remedies -- reinstatement, hiring, and backpay -- the preceding word "including" makes
clear that the authorization is not limited to the remedies specified. See Phelps Dodge
Corp. v. NLRB, 313 U. S. 177, 189. The 1972 Title VII extension's choice of examples is
not surprising, for in 1972 (and until the 1991 CDA) Title VII itself authorized only
equitable remedies. Words in statutes can enlarge or contract their scope as required by
other changes in the law or the world. See, e.g., Browder v. United States, 312 U. S. 335,
339-340. The meaning of the word "appropriate" permits its scope to expand to include
Title VII remedies that were not appropriate before 1991, but in light of legal change
wrought by the 1991 CDA are appropriate now. Examining the purposes of the 1972 Title
VII extension shows that this is the correct reading. Section 717's general purpose is to
remedy discrimination in federal employment by creating a system that requires resort to
administrative relief prior to court action to encourage quicker, less formal, and less
expensive resolution of disputes. To deny that an EEOC compensatory damages award is,
statutorily speaking, "appropriate" would undermine this remedial scheme. This point is
reinforced by the CDA's history, which says nothing about limiting the EEOC's ability to
use the new damages remedy or in any way suggests that it would be desirable to
distinguish the new Title VII remedy from the old ones. Respondent's arguments in favor
of depriving the EEOC of the power to award compensatory damages -- that the CDA's
reference to an "action" refers to a judicial case, not to an administrative proceeding; that
an EEOC compensatory damages award would not involve a jury trial, as authorized by the
CDA; and that any waiver of the Government's sovereign immunity to permit the EEOC to
award compensatory damages must be construed narrowly -- are unconvincing. Pp. 4-10.

3/12/01 2:39 PM

[20]     2. Respondent's claims that he can proceed in District Court on alternative grounds include matters that fall outside the scope of the question presented in the Government's petition for certiorari. The case is remanded so that the Court of Appeals can determine whether these questions have been properly raised and, if so, decide them. Pp. 10-11.

[21]     137 F. 3d 992, vacated and remanded.

[22]     Breyer, J., delivered the opinion of the Court, in which Stevens, O'Connor, Souter, and Ginsburg, JJ., joined. Kennedy, J., filed a Dissenting opinion, in which Rehnquist, C. J., and Scalia and Thomas, JJ., joined.

[23]     Court Below: 137 F. 3d 992

[24]     The opinion of the court was delivered by: Justice Breyer

[25]     Opinion of the Court

[26]     *WEST* v. *GIBSON*

[27]     ____ U. S. ____ (1999)

[28]     On Writ Of Certiorari To The United States Court Of Appeals For The Seventh Circuit

[29]     The question in this case is whether the Equal Employment Opportunity Commission (EEOC) possesses the legal authority to require federal agencies to pay compensatory damages when they discriminate in employment in violation of Title VII of the Civil Rights Act of 1964, 84 Stat. 121, 42 U. S. C. §2000e et seq. We conclude that the EEOC does have that authority.

[30]     I.

[31]     A.

[32]     Title VII of the Civil Rights Act of 1964 forbids employment discrimination. In 1972 Congress extended Title VII so that it applies not only to employment in the private sector, but to employment in the Federal Government as well. See Equal Employment Opportunity Act of 1972, 86 Stat. 111, 42 U. S. C. §2000e-16. This 1972 Title VII extension, found in §717 of Title VII, has three relevant subsections.

[33]     The first subsection, §717(a), sets forth the basic Federal Government employment anti-discrimination standard. It says that

[34]     "[a]ll personnel actions affecting employees or applicants for employment [of specified Government agencies and departments] ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U. S. C. §2000e-16(a).

[35]     The second subsection, §717(b), provides the EEOC with the power to enforce the standard. It says (among other things) that

[36]     "the Equal Employment Opportunity Commission shall have authority to enforce the provisions of subsection (a) . . . through appropriate remedies, including reinstatement or hiring of employees with or without back pay, as will effectuate the policies of this section ... ." 42 U. S. C. §2000e-16(b) (emphasis added).

[37]     The third subsection, §717(c), concerns a court's authority to enforce the standard. It says that, after an agency or the EEOC takes final action on a complaint (or fails to take action within a certain time),

[38]     "an employee or applicant ... [who is still] aggrieved ... may file a civil action as provided in section [706, dealing with discrimination by private employers] ... , in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant." 42 U. S. C. §2000e-16(c).

[39]     In 1991 Congress again amended Title VII. The amendment relevant here permits victims of intentional employment discrimination (whether within the private sector or the Federal Government) to recover compensatory damages. See Civil Rights Act of 1991, 105 Stat. 1072, 42 U. S. C. §1981a(a)(1). The relevant portion of that amendment, which we shall call the Compensatory Damages Amendment (CDA), says:

[40]     "In an action brought by a complaining party under section 706 [dealing with discrimination by private employers] or 717 [dealing with discrimination by the Federal Government] against a respondent who engaged in unlawful intentional discrimination ... , the complaining party may recover compensatory ... damages ... ." 42 U. S. C. §1981a(a)(1).

[41]     The CDA also sets forth certain conditions and exceptions. It imposes, for example, a cap on compensatory damages (of up to $300,000 for large employers, §1981a(b)(3)(D)). And it adds: "If a complaining party seeks compensatory ... damages under this section ... any party may demand a trial by jury ... ." §1981a(c). Once the CDA became law, the EEOC began to grant compensatory damages awards in Federal Government employment discrimination cases. Compare 29 CFR pt. 1613, App. A (1990) (no reference to compensatory damages in preamendment list of EEOC remedies), with, e.g., Jackson v. Runyon, EEOC Appeal No. 01923399, p. 3 (Nov. 12, 1992) ("[T]he Civil Rights Act of 1991 ... makes compensatory damages available to federal sector complainants in the administrative process").

[42]     B.

[43]     Respondent, Michael *Gibson*, filed a complaint with the Department of Veterans Affairs
         charging that the Department had discriminated against him by denying him a promotion
         on the basis of his gender. The Department found against *Gibson*. The EEOC, however,
         subsequently found in *Gibson*'s favor and awarded the promotion plus backpay. Three
         months later *Gibson* filed a complaint in Federal District Court, asking the court to order
         the Department to comply immediately with the EEOC's order and also to pay
         compensatory damages. Complaint ¶ ;17 (App. 28). The Department then voluntarily
         complied with the EEOC's order, but it continued to oppose *Gibson*'s claim for
         compensatory damages.

[44]     Eventually, the District Court dismissed *Gibson*'s compensatory damages claim. On
         appeal, the Department supported the District Court's dismissal with the argument that
         *Gibson* had failed to exhaust his administrative remedies in respect to his compensatory
         damages claim; hence, he could not bring that claim in court. *Gibson* v. Brown, 137 F. 3d
         992, 994 (CA7 1998). The Seventh Circuit, however, reversed the District Court's
         dismissal. It rejected the Department's argument because, in its view, the EEOC lacked the
         legal power to award compensatory damages; consequently there was no administrative
         remedy to exhaust. Id., at 995-998.

[45]     Because the circuits have disagreed about whether the EEOC has the power to award
         compensatory damages, compare Fitzgerald v. Secretary, Dept. of Veterans Affairs, 121 F.
         3d 203, 207 (CA5 1997) (EEOC may award compensatory damages), with Crawford v.
         Babbitt, 148 F. 3d 1318, 1326 (CA11 1998) (EEOC cannot award compensatory damages),
         and 137 F. 3d, at 996-998 (same), we granted certiorari in order to decide that question.

[46]     II.

[47]     The language, purposes, and history of the 1972 Title VII extension and the 1991 CDA
         convince us that Congress has authorized the EEOC to award compensatory damages in
         Federal Government employment discrimination cases. Read literally, the language of the
         statutes is consistent with a grant of that authority. The relevant portion of the Title VII
         extension, namely, §717(b), says that the EEOC "shall have authority" to enforce §717(a)
         "through appropriate remedies, including reinstatement or hiring of employees with or
         without back pay." 42 U. S. C. §2000e-16(b). After enactment of the 1991 CDA, an award
         of compensatory damages is a "remedy" that is "appropriate."

[48]     We recognize that subsection 717(b) explicitly mentions certain equitable remedies,
         namely, reinstatement, hiring, and back pay, and it does not explicitly refer to
         compensatory damages. But the preceding word "including" makes clear that the
         authorization is not limited to the specified remedies there mentioned; and the 1972 Title
         VII extension's choice of examples is not surprising, for in 1972 (and until 1991) Title VII
         itself authorized only equitable remedies. See Civil Rights Act of 1964, 78 Stat. 261, 42 U.
         S. C. §2000e-5(g)) (private sector discrimination); Equal Employment Opportunity Act of
         1972, 86 Stat. 111, 42 U. S. C. 2000e-16 (federal sector discrimination).

[49]     Section 717's language, however, does not freeze the scope of the word "appropriate" as of 1972. Words in statutes can enlarge or contract their scope as other changes, in law or in the world, require their application to new instances or make old applications anachronistic. See, e.g., Browder v. United States, 312 U. S. 335, 339-340 (1941) (new, unforeseen "use" of passport); see also United States v. Southwestern Cable Co., 392 U. S. 157, 172-173 (1968) (cable television as "communications"); Fortnightly Corp. v. United Artists Television, Inc., 392 U. S. 390, 395-396 (1968) (old statutory language read to reflect technological change).

[50]     The meaning of the word "appropriate" permits its scope to expand to include Title VII remedies that were not appropriate before 1991, but in light of legal change are appropriate now. The word "including" makes clear that "appropriate remedies" are not limited to the examples that follow that word. See Phelps Dodge Corp. v. NLRB, 313 U. S. 177, 189 (1941). And in context the word "appropriate" most naturally refers to forms of relief that Title VII itself authorizes -- at least where that relief is of a kind that agencies typically can provide. Thus, Congress' decision in the 1991 CDA to permit a "complaining party" to "recover compensatory damages" in "an action brought under section ... 717," by adding compensatory damages to Title VII's arsenal of remedies, could make that form of relief "appropriate" under §717(b) as well.

[51]     An examination of the purposes of the 1972 Title VII extension shows that this permissible reading of the language is also the correct reading. Section 717's general purpose is to remedy discrimination in federal employment. It does so in part by creating a dispute resolution system that requires a complaining party to pursue administrative relief prior to court action, thereby encouraging quicker, less formal, and less expensive resolution of disputes within the Federal Government and outside of court. See 42 U. S. C. §2000e-16(c) (court action permitted only where complainant disagrees with final agency Disposition or, if complainant pursued discretionary appeal to EEOC, with EEOC Disposition; or if either agency or EEOC Disposition is delayed); Brown v. GSA, 425 U. S. 820, 833 (1976) (discussing §717's "rigorous administrative exhaustion requirements"); see also 29 CFR §1614.105(a) (1998) (requiring complainant initially to notify agency and make effort to resolve matter informally); §1614.106(d)(2) (requiring agency investigation prior to EEOC consideration).

[52]     To deny that an EEOC compensatory damages award is, statutorily speaking, "appropriate" would undermine this remedial scheme. It would force into court matters that the EEOC might otherwise have resolved. And by preventing earlier resolution of a dispute, it would increase the burdens of both time and expense that accompany efforts to resolve hundreds, if not thousands, of such disputes each year. See Equal Employment Opportunity Commission, Federal Sector Report on EEO Complaints Processing and Appeals by Federal Agencies for Fiscal Year 1997, pp. 19, 61 (1998) (28,947 Federal Government employment discrimination claims filed in 1997; 7,112 claims appealed to EEOC); Reply Brief for Petitioner 12-13, n. 9 (estimating "hundreds" of cases each year that involve claims for compensatory damages).

[53]     The history of the CDA reinforces this point. The CDA's sponsors and supporters spoke frequently of the need to create a new remedy in order, for example, to "help make victims whole." H. R. Rep. No. 102-40, pt. 1, pp. 64-65 (1991); see also Civil Rights Act of 1991, §2, 105 Stat. 1071, 42 U. S. C. §1981 note (congressional finding that "additional remedies under Federal law are needed to deter ... intentional discrimination in the workplace"); id., §3 (one purpose of Act is "to provide appropriate remedies for intentional discrimination ... in the workplace"); 137 Cong. Rec. 28636-28638, 28663-28667, 28676-28680 (1991)

(introduction and Discussion of Danforth/Kennedy Amendment No. 1274, in relevant part permitting recovery of compensatory damages); id., at 28880-28881 (statements of Sen. Warner and Sen. Kennedy) (clarifying that Danforth/Kennedy amendment covers federal employees and suggesting amendment to this effect). But the CDA's sponsors and supporters said nothing about limiting the EEOC's ability to use the new Title VII remedy or suggesting that it would be desirable to distinguish the new Title VII remedy from old Title VII remedies in that respect. This total silence is not surprising. What reason could there be for Congress, anxious to have the EEOC consider as a preliminary matter every other possible remedy, not to want the EEOC similarly to consider compensatory damages as well?

[54]    Respondent makes three important arguments in favor of a more limited interpretation of the statutes -- an interpretation that would deprive the EEOC of the power to award compensatory damages. First, respondent points out that the CDA says nothing about the EEOC, or EEOC proceedings, but rather states only that a complaining party may recover compensatory damages "in an action brought under section ... 717." 42 U. S. C. §1981a(a)(1) (emphasis added). And the word "action" often refers to judicial cases, not to administrative "proceedings." See New York Gaslight Club, Inc. v. Carey, 447 U. S. 54, 60-62 (1980) (distinguishing civil "actions" from administrative "proceedings").

[55]    Had Congress thought it important so to limit the scope of the CDA, however, it could easily have cross-referenced §717(c), the civil action subsection itself, rather than cross-referencing the whole of §717, which includes authorization for the EEOC to enforce the section through "appropriate remedies." Regardless, as we see it, is whether, by using the word "action," Congress intended to deny that compensatory damages is "appropriate" administrative relief within the terms of §717(b). In light of the previous Discussion, see supra, at 4-7, we do not believe the simple use of the word "action" in the context of a cross-reference to the whole of §717 indicates an intent to deprive the EEOC of that authority.

[56]    Second, in an effort to explain why Congress might have wanted to impose a special EEOC-related limitation in respect to compensatory damages, respondent points to the language in the CDA that says: "If a complaining party seeks compensatory ... damages under this section ... any party may demand a trial by jury." 42 U. S. C. §1981a(c) (emphasis added). Respondent notes that an EEOC compensatory damages award would not involve a jury. And an agency cannot proceed to court under §717(c) because that subsection makes a court action available only to an aggrieved complaining party, not to the agency. §2000e-16(c). Thus, respondent concludes that the CDA must implicitly forbid any such EEOC award, for that award would take place without the jury trial that §1981a(c) guarantees.

[57]    This argument, however, draws too much from too little. One easily can read the jury trial provision in §1981a(c) as simply guaranteeing either party a jury trial in respect to compensatory damages if a complaining party proceeds to court under §717(c). The words "under this section" in §1981a(c) support that interpretation, for "this section," §1981a, refers primarily to court proceedings. And there is no reason to believe Congress intended more. The history of the jury trial provision suggests that Congress saw the provision primarily as a benefit to complaining parties, not to the Government. See, e.g., 137 Cong. Rec., at 29051-29052 (statement of Sen. Leahy) (for "the first time, women and the disabled could recover damages and have jury trials for claims of intentional discrimination"); id., at 30668 (statement of Rep. Ford) (provision will "provid[e] all victims of intentional discrimination a right to trial by jury"); see also, e.g., id., at

29053-29054 (statement of Sen. Wallop) (discussing "economically devastating lawsuits"); id., at 29041 (statement of Sen. Bumpers) (relating fears about "runaway jur[ies]"). The fact that Congress permits an employee to file a complaint in court, but forbids the agency to challenge an adverse EEOC decision in court, also suggests that Congress was not inordinately and unusually concerned with invoking special judicial safeguards to protect the Government.

[58]   Finally, respondent argues that insofar as the law permits the EEOC to award compensatory damages, it waives the Government's sovereign immunity, and we must construe any such waiver narrowly. See Lane v. Peña, 518 U. S. 187, 192 (1996); Lehman v. Nakshian, 453 U. S. 156, 160-161 (1981). There is no dispute, however, that the CDA waives sovereign immunity in respect to an award of compensatory damages. Whether, in light of that waiver, the CDA permits the EEOC to consider the same matter at an earlier phase of the employment discrimination claim is a distinct question concerning how the waived damages remedy is to be administered. Because the relationship of this kind of administrative question to the goals and purposes of the doctrine of sovereign immunity may be unclear, ordinary sovereign immunity presumptions may not apply. In the Government's view here, for example, the EEOC's preliminary consideration, by lowering the costs of resolving disputes, does not threaten, but helps to protect, the public fisc. Regardless, if we must apply a specially strict standard in such a case, which question we need not decide, that standard is met here. We believe that the statutory language, taken together with statutory purposes, history, and the absence of any convincing reason for denying the EEOC the relevant power, produce evidence of a waiver that satisfies the stricter standard.

[59]   For these reasons, we conclude that the EEOC possesses the legal authority to enforce §717 through an award of compensatory damages.

[60]   III.

[61]   Respondent asks us to affirm on alternative grounds the Seventh Circuit's judgment permitting his case to proceed in the District Court. The Seventh Circuit considered whether *Gibson* had "asked the EEOC for compensatory damages." 137 F. 3d, at 994. It added that if "he did, then the government's failure-to-exhaust argument obviously is a non-starter." Ibid. But the Court of Appeals concluded that *Gibson* did not "put the EEOC on notice that he was seeking compensatory damages." Ibid. Respondent claims that he can proceed in District Court because he did satisfy the law's exhaustion requirements, even if the EEOC has the legal power to award compensatory damages and even if he did not give notice to the EEOC that he sought compensatory damages. He argues that is so because (1) the requirement of notice for exhaustion purposes is unusually weak in respect to compensatory damages, (2) he did request a "monetary cash award," and (3) special circumstances estop the Government from asserting a "no exhaustion" claim in this case.

[62]   These matters fall outside the scope of the question presented in the Government's petition for certiorari. See Roberts v. Galen of Va., Inc., 525 U. S. ___, ___ (1999) (per curiam). We remand the case so that the Court of Appeals can determine whether these questions have been properly raised and, if so, decide them.

[63]   The decision of the Court of Appeals is vacated, and the case is remanded for further

proceedings consistent with this opinion.

[64]    It is so ordered.

[65]    Kennedy, J., Dissenting

[66]    ***WEST* v. *GIBSON***

[67]    ____ U. S. ____ (1999)

[68]    SUPREME COURT OF THE UNITED STATES

[69]    No. 98-238

[70]    TOGO D. *WEST*, Jr., SECRETARY OF VETERANS AFFAIRS, PETITIONER v.
MICHAEL *GIBSON*

[71]    on writ of certiorari to the united states court of appeals for the seventh circuit

[72]    [June 14, 1999]

[73]    Justice Kennedy, with whom The Chief Justice, Justice Scalia, and Justice Thomas join,
Dissenting.

[74]    The rules governing this case are clear and well established, or at least had been before the
majority's unsettling opinion today. Relief may not be awarded against the United States
unless it has waived its sovereign immunity. See Department of Army v. Blue Fox, Inc.,
525 U. S. ___ (1999). The waiver must be expressed in unequivocal statutory text and
cannot be implied. Id., at ___ (Slip op., at 4); Lane v. Peña, 518 U. S. 187, 192 (1996).
Even when the United States has waived its immunity, the waiver must be "strictly
construed, in terms of its scope, in favor of the sovereign," Blue Fox, supra, at ___ (Slip
op., at 5); accord, Lane, supra, at 192, for " `this Court has long decided that limitations
and conditions upon which the Government consents to be sued must be strictly observed
and exceptions thereto are not to be implied,' " Lehman v. Nakshian, 453 U. S. 156, 161
(1981), quoting Soriano v. United States, 352 U. S. 270, 276 (1957). Not only do these
rules reserve authority over the public fisc to the branch of Government with which the
Constitution has placed it, they also form an important part of the background of settled
legal principles upon which Congress relied in enacting various statutes authorizing suits
against the United States, such as the Tucker Act, 28 U. S. C. §1491; §10(a) of the
Administrative Procedure Act, 5 U. S. C. §702; and the Federal Tort Claims Act, 28 U. S.
C. §2671 et seq. The rules governing waivers of sovereign immunity make clear that the
Equal Employment Opportunity Commission (EEOC) may not award or authorize
compensatory damages against the United States unless it is permitted to do so by a

statutory provision which waives the United States' immunity to the awards in clear and unambiguous terms.

[75]   Section 717(b) of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e-16(b), which authorizes the EEOC to enforce federal compliance with Title VII "through appropriate remedies, including reinstatement or hiring of employees with or without back pay," effects a waiver of the United States' sovereign immunity for some purposes. Unlike other similar statutes, however, the provision does not mention awards of compensatory damages. Compare §717(b) with 2 U. S. C. §§1311(b)(1)(B), 1405(g) (1994 ed., Supp. III). A waiver of immunity to other types of relief does not provide the unequivocal statement required to establish a waiver of immunity to damages awards. See United States v. Nordic Village, Inc., 503 U. S. 30, 34 (1992) ("Though [11 U. S. C. §106(c)], too, waives sovereign immunity, it fails to establish unambiguously that the waiver extends to monetary claims"); Lane, supra, at 192.

[76]   Nor does the statutory grant of authority to the EEOC to enforce Title VII through appropriate remedies include, in unequivocal terms or even by necessary implication, the power to award or authorize compensatory damages. Even if the phrase "appropriate remedies" had been intended, as the majority maintains, to incorporate relief authorized for violations of Title VII under other statutory provisions, it is not obvious that the phrase's meaning would have been intended also to "expand" to include remedies that were not available at the time §717 was adopted. Ante, at 5.

[77]   It is far from clear, moreover, that the phrase was intended to incorporate other statutory provisions at all. Unlike other subsections of §717, see §717(d) (incorporating various provisions relating to judicial actions), §717(b) does not make an explicit reference to other statutory provisions. In addition, the specific examples given by the statute of appropriate remedies -- reinstatement or hiring of employees with or without backpay --are equitable in nature. See United States v. Burke, 504 U. S. 229, 238 (1992). The interpretive canons of noscitur a sociis and ejusdem generis suggest the appropriate remedies authorized by §717(b) are remedies of the same nature as reinstatement, hiring, and backpay -- i.e., equitable remedies. The phrase "appropriate remedies," furthermore, connotes the remedial discretion which is the hallmark of equity. A plausible, and perhaps even the best, interpretation of §717(b), then, is that it grants administrative authority to determine which of the traditional forms of equitable relief are appropriate in any given case of discrimination. Whether or not this is the better reading, it should suffice to establish beyond dispute that the statute does not authorize awards of compensatory damages in express and unequivocal terms. As a consequence, §717(b) cannot provide the required waiver of the United States' sovereign immunity.

[78]   Unlike §717(b), 42 U. S. C. §1981a does authorize awards of compensatory damages against the United States. Although it is clear the statute authorizes courts to award damages, however, §1981a does not so much as mention the EEOC, much less empower it to award or authorize money damages. It is settled law that a waiver of sovereign immunity in one forum does not effect a waiver in other forums. See, e.g., McElrath v. United States, 102 U. S. 426, 440 (1880) ("[The Government] can declare in what court it may be sued, and prescribe the forms of pleading and the rules of practice to be observed in such suits"); Great Northern Life Ins. Co. v. Read, 322 U. S. 47, 54, n. 6 (1944) ("The Federal Government's consent to suit against itself, without more, in a field of federal power does not authorize a suit in a state court"); Case v. Terrell, 11 Wall. 199, 201 (1871) (The United States' consent to suit in the Court of Claims does not extend to other federal courts).

[79]   The majority's attempt to read 42 U. S. C. §1981a(a)(1) to authorize administrative awards of compensatory damages is not persuasive. Section 1981a(a)(1) provides:

[80]   "In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964 ... ."

[81]   The provision authorizes an award of compensatory damages in an "action" brought under §717; the word "action" is often used to distinguish judicial cases from administrative "proceedings." See New York Gaslight Club, Inc. v. Carey, 447 U. S. 54, 60-62 (1980). Unlike §717(b), which authorizes administrative proceedings, §717(c) authorizes "civil action[s]" in court. It is most natural, therefore, to understand the phrase "an action brought by a complaining party under section ... 717" as a reference to a judicial action under §717(c) but not to an administrative proceeding under §717(b). Compensatory awards are authorized under §1981a(a)(1), moreover, "in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964." Section 706(g) authorizes a "court" to grant equitable relief for violations of Title VII. This provision, as incorporated through §717(d), applies only in "civil actions" brought under §717(c); it does not apply in proceedings before the EEOC or any other agency. Section 1981a(a)(1)'s express reference to §706(g) confirms that compensatory damages are available only in judicial actions.

[82]   Other provisions of §1981a also make clear that the statute authorizes compensatory damages only in judicial actions. Section 1981a(c) provides that "[i]f a complaining party seeks compensatory ... damages under this section -- (1) any party may demand a trial by jury; and (2) the court shall not inform the jury of the limitations [on damages awards] described in subsection (b)(3) of this section." It cannot be disputed that this provision contemplates a jury trial overseen by a court. With due respect to the majority, the provision does not guarantee a jury trial to either party "if a complaining party proceeds to court under §717(c)," ante, at 8-9; it provides that either party may obtain a jury trial "[i]f a complaining party seeks compensatory ... damages," §1981a(c).

[83]   While falling short of embracing the argument as its own, the majority flirts with the contention that allowing agencies rather than juries to award compensatory damages lowers the costs of resolving employment disputes and protects the public fisc. It is not clear to me that juries would be less protective of the fisc than would one group of Government employees who deem themselves empowered by agency interpretation to award Government funds to fellow employees. When a Government employee seeks damages from the Government itself, there may be advantages in insisting upon the expertise of a trial court with experience in awarding damages in all types of cases, with the additional safeguards of trial in a forum of high visibility, trial by jury if either party chooses to ask for it, and appellate review. These factors are disregarded by the majority, which seems instead to suggest that the nature and convenience of administrative proceedings will by necessity provide a financial advantage to the Government.

[84]   In all events, speculation does not suffice to overcome the rule that waivers of sovereign immunity must be clear and express. An unequivocal waiver of the United States' sovereign immunity to administrative awards of compensatory damages cannot be found in

the relevant statutory provisions. To the extent the majority relies on textual analysis, it establishes at most (if at all) that the statutes might be read to authorize such awards, not that that the statutes must be so read. To the extent the majority relies on legislative history and other extratextual sources, it contradicts our precedents and sets us on a new course, for before today it was well settled that "[a] statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text." Lane, 518 U. S., at 192; accord, Nordic Village, 503 U. S., at 37 ("[T]he `unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text. If clarity does not exist there, it cannot be supplied by a committee report"). With respect, I Dissent.

*19990614*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSEPH K. CONNOR | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. C-00-69 |
| | § | |
| TEXAS A&M UNIVERSITY - KINGSVILLE; | § | **JURY TRIAL REQUESTED** |
| HUMBERTO GARCIA, Individually and in | § | |
| His Official Capacity; and ROBERT BAZAN, | § | |
| Individually and in His Official Capacity | § | |
| | § | |
| Defendants. | § | |

## ORDER ON PLAINTIFF'S MOTION EQUITABLE RELIEF AND MOTION FOR NEW TRIAL

On the _____ day of _____, 2001, the Court considered Plaintiff's

Motion for Equitable Relief and Motion for New Trial.  After considering the Motions, the

pleadings, the testimony, the evidence and the argument of the parties, the Court ORDERS_____

_____

_____

_____

_____.

SIGNED this _____ day _____, 2001.

_____

PRESIDING JUDGE

5