1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2    CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

AUG 6 - 2001

Michael N. Milby, Clerk

3    JOSEPH K. CONNOR                    )
                                         )
4         Plaintiff                      )
                                         )
5    v.                                  )    CIVIL ACTION NO. C-00-069
                                         )
6    TEXAS A&M UNIVERSITY-KINGSVILLE,    )
     HUMBERTO GARCIA, INDIVIDUALLY       )
7    AND IN HIS OFFICIAL CAPACITY;       )
     AND ROBERT BAZAN, INDIVIDUALLY      )
8    AND IN HIS OFFICIAL CAPACITY        )
                                         )
9         Defendants                     )    **ORIGINAL**

10

11   ************************************************************

12              EXCERPT OF PROCEEDINGS

13   ************************************************************

14

15

16

17        On the 7th day of March, 2001, the following proceedings

18   came on to be heard in the above-entitled and numbered cause

19   before the Honorable B. JANICE ELLINGTON, Judge presiding, held in

20   Corpus Christi, Nueces County, Texas:

21             Proceedings reported by Computerized Stenotype

22   machine.

23

24

25

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

1                    A P P E A R A N C E S:
                     _____

2    FOR THE PLAINTIFF:
              MS. GAY GILSON
3             Attorney at Law
              4600 Ocean Drive
4             Corpus Christi, Texas 78412

5             MR. JOHN E. SCHULMAN
              Attorney at Law
6             4555 W. Lovers Lane
              Dallas, Texas 75209

7

8    FOR THE DEFENDANTS:
              MR. JOSE M. RANGEL
9             Office of the Attorney General
              Post Office Box 12548
10            Austin, Texas 78711-12548

11            MS. DONA G. HAMILTON
              Office of the Attorney General
12            Post Office Box 12548
              Austin, Texas 78711-2548

13

14

15

16

17

18

19

20

21

22

23

24

25

1  DEPOSITION INDEX

                                                        PAGE
2  Appearances  . . . . . . . . . . . . . . . . . . .  2

3  Stipulations . . . . . . . . . (Attached following Index)

4  ROBERT WESLEY NASH, Jr.
   Direct Examination by Ms. Gilson . . . . . . . . . . . .  4
5  Cross Examination by Mr. Rangel  . . . . . . . . . .  16

6  Redirect Examination by Ms. Gilson . . . . . . . . .  28

7  Further Redirect Examination by Ms. Gilson . . . . . .  32
   Further Recross Examination by Mr. Rangel . . . . . . .  36
8  Further Redirect Examination by Ms. Gilson . . . . . .  42

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ROBERT WESLEY NASH, JR.,

2    having been first duly sworn, testified as follows:

3              D I R E C T   E X A M I N A T I O N

4    BY MS. GILSON:

5          Q     Good morning.

6          A     Good morning.

7          Q     Please state your name.

8          A     Robert Wesley Nash, Jr.

9          Q     And where do you reside?

10         A     I reside in Alice, Texas.

11         Q     And that's in Jim Wells County?

12         A     Yes, ma'am.

13         Q     Mr. Nash, were you employed with the A&M University

14   Police Department?

15         A     Yes, ma'am.

16         Q     And that would be in Kingsville, Texas?

17         A     Yes, ma'am.

18         Q     How long were you employed there?

19         A     Six years.

20         Q     And was your position there with the University Police

21   Department?

22         A     Patrolman.

23         Q     Prior to serving at the Texas A&M University Police

24   Department, did you have any other law enforcement background?

25         A     I served with Jim Wells County Sheriff's Department for

1    a period of about a year and with the Duval County Sheriff's

2    Department prior to that for about a year.

3        Q    While working at the A&M Kingsville Police Department

4    did you have an opportunity to meet a Joseph Connor?

5        A    Yes, ma'am.

6        Q    And how did you come in contact with Mr. Connor?

7        A    When I came to work there, I don't remember if he

8    introduced himself or if I introduced myself, but he was one of

9    the people that I met when I went to work there.

10       Q    Did you work often with Mr. Connor?

11       A    No, I didn't.

12       Q    Go ahead.

13       A    No, because we worked different shifts, but I would see

14   him either coming or going and talk to him just bits and pieces at

15   that time.

16       Q    Did you ever have an opportunity to work on the same

17   shift as Mr. Connor?

18       A    No, ma'am.

19       Q    Based upon your personal observations what kind of

20   employee was Joseph Connor while you were with the A&M University

21   Police Department.

22                 MR. RANGEL:  I'm going to object, Your Honor.  He's

23   just testified that he never worked with him on the same shift and

24   the fact that they worked in different sections.  It's improper

25   testimony for two reasons.  He isn't an expert and secondly, he

1    just isn't --

2              THE COURT:  Objection is sustained.  There is no

3    basis.  You haven't made a foundation to his knowledge.

4         Q    (By Ms. Gilson)  What if anything did Mr. Connor talk to

5    you about while you were employed -- both employed at A&M

6    Kingsville Police Department?

7              MR. RANGEL:  Objection, Your Honor.  Hearsay.

8              THE COURT:  It's not hearsay.  What's your

9    question?

10        Q    (By Ms. Gilson)  What if anything did you and

11   Mr. Connor talk about while you were employed with A&M University?

12             MR. RANGEL:  Objection.  Hearsay.  That's between

13   two patrol officers.  Statements outside of the court.

14             THE COURT:  Well it's a statement of the party and

15   the opponent.

16             MS. GILSON:  I'm trying to -- I can't lead -- I'm

17   trying to get somewhere rather quickly, so we can move this on.

18             MR. SCHULMAN:  Your Honor, it can't be hearsay.

19   The witness is present to be cross-examined.

20             MR. RANGEL:  Your Honor, there's only one attorney

21   that's supposed to be making objections and responding at one

22   time.

23             THE COURT:  Now I'm going to permit her to ask a

24   leading question to get into the subject matter, but if you want

25   to make an objection you can.

1        MR. RANGEL:  That's fine.

2        Q    (By Ms. Gilson)  What if anything did Joseph Connor

3   mention to you regarding his reports?

4        A    Well, he wanted me to take a look at them.  He said

5   because everything that he seemed to do reportwise was being just

6   torn apart.

7        Q    And who was tearing up his reports apart?

8            MR. RANGEL: Objection, Your Honor.  Hearsay.  The

9   only way you can get that information is from Mr. Connor.

10           THE COURT:  Sustained.

11       Q    (By Ms. Gilson)  What else did Mr. Connor say about his

12  reports to you?

13       A    He wanted me to take a look at them, you know, and see

14  if anything was really wrong with them.

15       Q    And did you?

16       A    Yes, ma'am, I did.

17       Q    What did you find?

18       A    I thought they were pretty good.  I mean, they were real

19  descriptive.  I write a pretty decent report, and I've been to

20  report writing school on two occasions, and like I was singled out

21  as having an excellent report, and his work was a lot better than

22  mine.

23       Q    Did Mr. Connor seem concerned about the criticism

24  he was receiving about his reports?

25       A    Yes, he did.

1    Q    How did he display that?

2    A    He was like down in the dumps all the time.  I mean, he

3    had no self-confidence it seemed at all.  Anything that he did was

4    being second guessed at, is the way he explained it to me.

5    Q    Was Mr. Connor liked by the other officers?

6    A    Pretty much.

7    Q    You never personally saw Mr. Connor trying to do

8    something his way verus the policies way?

9    A    Oh, never.

10    Q    What if anything did you hear Humberto Garcia say

11    regarding Joseph Connor's chances in a promotion?

12    A    There wasn't a chance.

13    Q    On what occasions did you hear that comment?

14    A    We were in the outer office where we basically conduct

15    business, in the front office, and the chief had made that

16    comment, because what he did is he came into the room and

17    something Joseph had done, I don't know what it was, he had made a

18    comment about he would never be a sergeant as long as he was

19    there.

20    Q    At the time that Mr. Connor was terminated on June 4th

21    1999, what other Anglo employees were working with the University

22    Police Department, that you recall?

23    A    I don't recall any.

24    Q    And how many total employees were there within the

25    University Police Department on June the 4th, 1999?

1      A      I'm not sure.  I can give you an estimate.

2      Q      What is that estimate.

3      A      Probably 15 or 16 employees.

4      Q      Did you ever feel excluded because you couldn't

5  participate in certain conversations?

6      A      Yes.

7      Q      And why was that?

8              MR. RANGEL:  I'm going to object, Your Honor.  This

9  is totally irrelevant, because he couldn't be involved in

10  conversations?  What does that have to do with the Plaintiff's

11  claim?  It's irrelevant.

12              MS. GILSON:  It has to do with the position for the

13  discrimination and the basis for that, Your Honor.

14              MR. RANGEL:  That's not the right way to ask the

15  question.

16              MS. GILSON:  I've tried before and I was told I

17  couldn't go a certain way, so I'm trying to lay a predicate to

18  claim that he felt excluded and I'd like to follow up on that to

19  show that there was a reasonable basis to make a good faith report

20  or at least investigate whether or not there's discrimination.

21              THE COURT:   That is the same ruling I made

22  yesterday.  I'll sustain the objection.

23      Q      (By Ms. Gilson)  Was participation important for the

24  promotions?

25              MR. RANGEL:  Objection, Your Honor.  That calls for

1   speculation.  There's a board that decides who's promoted.  He's

2   not on the board.

3       Q    (By Ms. Gilson)  Based upon your personal knowledge,

4   what was your opinion of the promotion board?

5               MR. RANGEL:  Same objection, Your Honor, and worse

6   yet, it's asking for opinion testimony.  He's not an expert to

7   testify on this matter.

8               MS. GILSON:  Your Honor, he s an officer.  He went

9   before the promotion board.  The issue is to allow this man to

10  testify as to the perception.  This is an issue where Mr. Connor

11  went and asked to investigate the promotion -- the way that the

12  promotions were done there, and that it was discriminatory in

13  effect.  That is the whole main issue of this question.

14              THE COURT:  Objection is sustained.  It's not

15  relevant.

16      Q    (By Ms. Gilson)  Who took Joseph Connor's place after he

17  was terminated, if you know?

18      A    I don't remember because we have had so many people come

19  and go.

20      Q    What if any training did you receive during your six

21  years of employment with the A&M Kingsville Police Department, did

22  you receive regarding discrimination in the workplace?

23      A    The only training regarding that matter that I can

24  remember receiving was after Mr. Connor had left employment, and

25  it was a mandatory meeting with the university.  That was not a

1  workplace meeting.

2      Q      Do you recall who conducted that training?

3      A      Excuse me, the what?

4      Q      Do you recall who conducted that training?

5      A      The lady that's sitting over there, I'm not sure what

6  her name is.

7      Q      Thank you.  And you're referring to the lady sitting

8  over there in the brown jacket?

9      A      It looks black from here.

10     Q      What if anything can you tell me regarding the

11 University Police Department's policies and procedures?

12     A      Well, for probably five years, we had no policies or

13 procedures in writing.

14     Q      And that would be -- when you say "for five years," that

15 would have been when you started working there?

16     A      When I started working there there was a policy book,

17 but it was written with the old police chief, and it was -- the

18 dates were just outrageous.  I can't remember what the dates were,

19 but they were like years prior till we came to work there.  Then

20 there was an incident, but there was an attorney that came in one

21 day --

22             MR. RANGEL:  Your Honor, this is outside of the

23 scope of the question.  Objection.

24     Q      (By Ms. Gilson)  Were the -- did you ever receive

25 notification regarding the policies and procedures that they were

Case 2:00-cv-00069   Document 72   Filed in TXSD on 08/06/2001   Page 12 of 46

1    no longer in effect?

2         A    Yes.

3         Q    And can you describe what happened, how you were

4    notified of that?

5         A    I was notified by word-of-mouth.  They were just yanked

6    off the shelf in the back.

7         Q    Do you recall when that happened?

8         A    No, I'm not -- it was while Mr. Connor was there, I

9    know.

10        Q    Was it prior to his termination?

11        A    Yes, ma'am.

12        Q    Do you recall how many years it was prior to his

13   termination?

14        A    It had to be at least a year, at least.

15        Q    What about as far as tagging and storing evidence, could

16   you please tell the jury what the procedures were for that?

17        A    Do you want it while Mr. Connor was there or do you want

18   it --

19        Q    Yes.

20        A    Okay.  While Mr. Connor was there, there was no tagging

21   procedures.  We just gave it to the sergeant, they took care of

22   it.

23        Q    And how did you know to do that?

24        A    By word-of-mouth.

25        Q    Was there any written policies that explained what an

```
 1    officer was to do regarding tagging evidence?

 2         A    No, ma'am.

 3         Q    Were there any written procedures regarding storing

 4    evidence?

 5         A    No, ma'am.

 6         Q    Were you ever given any training while you were employed

 7    with the University Police Department as to how evidence was to be

 8    stored?

 9         A    No, ma'am.

10         Q    Were you ever given any training regarding how evidence

11    should have been tagged?

12         A    No, ma'am.

13         Q    Prior to 1998, explain how promotions were made in the

14    University Police Department.

15              MR. RANGEL:  Objection, Your Honor.  Cumulative.

16              THE COURT:  Objection overruled.

17              MS. GILSON:  You may answer.

18         A    It was throughout the whole department, you could name

19    who the sergeant was --

20              MR. RANGEL:  Your Honor, this again is improper,

21    talking about what the thought is or what the rumor was in the

22    office.  If he knows, he can testify.  This is hearsay.

23              THE COURT:  Objection is sustained.

24         Q    (By Ms. Gilson)  Do you know how promotions were made

25    prior to 1998?
```

1    A    This is what I was told by the chief and the lieutenant

2   whenever I showed up there.  Promotions were made by length and

3   time being there, okay.  It had nothing to do with what you did,

4   okay.  If you were the next in line as the senior man, you were up

5   for promotion.  You were going to be promoted.

6    Q    And when you say "Length in time," you mean with the

7   University Police Department?

8    A    Exactly.

9    Q    Did they count time outside the University Police

10  Department?

11   A    Oh, no.

12   Q    Did they count military time?

13   A    Oh, no.

14        MR. RANGEL:  Objection, Your Honor.  Here she's

15  getting him to testify to things -- he has not said that anyone

16  specifically told him.

17        THE COURT:  Objection overruled.  Let's move on.

18   Q    (By Ms. Gilson)  After 1998, do you know how promotions

19  were done within the University Police Department?

20   A    They came up with the board, and the board was comprised

21  of all the sergeants and the lieutenants, and you were asked to go

22  in after there were some preliminary checks done on their

23  qualifications and stuff, and they ask you leading questions,

24  basically.

25   Q    Were Sergeants Bazan and Longoria and Franco friends?

1    A    Oh, yes.

2    Q    Were they good friends?

3    A    Sargent Franco wasn't so much in like Bazan and Longoria

4  were.  They were like tight.

5    Q    And by that you mean that they socialized outside of --

6    A    Well, I don't know if they socialized much outside of

7  work together, but they were inseparable at work.

8    Q    Based upon your personal observances, did you have a

9  concern that Sargent Quinonez had a drinking problem?

10    A    Yes, ma'am.

11    Q    And can you tell the jury about any of your experiences

12  of personal observations of Sargent Qunionez drinking problem?

13    A    Well, we witnessed -- well I had personally witnessed

14  him drinking one night while I was on patrol, and I brought my

15  concerns to the lieutenant, and I heard no more about it.

16    Q    Okay.  When you say that you witnessed him drinking

17  while on patrol, was Sargent Quinonez also on duty?

18    A    Yes, ma'am.

19    Q    And where was he when you saw him?

20    A    It was at Seale Road.  What happened was, I was driving

21  towards Seale Road and there was like a blind spot because of the

22  building, and just as I rounded the building, it was at nighttime,

23  the light shown on his vehicle, and he had a beer bottle up to his

24  mouth.  And for about five seconds I could make it out, and he put

25  it down.  About maybe 20 or 30 minutes later he went home early

1    from his shift.

2         Q    What type of vehicle was he in when you saw him?

3         A    He was in a little, blue truck.

4         Q    And who --

5         A    The University truck.

6         Q    And when you reported that, you said you reported it to

7    the lieutenant?

8         A    Yes, ma'am.

9         Q    And who was that?

10        A    Lieutenant Jefferson.

11        Q    Do you recall what year that occurred?

12        A    No, ma'am, I don't.  It was -- it was prior to

13   Mr. Connor being discharged there, though.

14        Q    What -- during your employment with the university do

15   you recall there being any Anglo superior officers?

16        A    No.

17        Q    And for the record, could you please state your race.

18        A    I'm African-American.

19             MS. GILSON:  Thank you.  I pass the witness.

20             THE COURT:   Mr. Rangel.

21             MR. RANGEL:  Yes, thank you.

22               C R O S S   E X A M I N A T I O N

23   BY MR. RANGEL:

24        Q    Good morning, Mr. Nash.

25        A    Good morning.

1     Q    You stated earlier that you worked at the department for

2  six years?

3     A    Yes, sir.

4     Q    Are you employed there any longer?

5     A    No, I'm not.

6     Q    In fact, you resigned didn't you, just recently?

7     A    Yes, I did.

8     Q    Excuse me?

9     A    Yes, sir, I did.

10    Q    And you were given the option of resigning over

11 quitting, weren't you?

12    A    Yes, sir.

13    Q    And you chose to resign?

14    A    Yes, sir.

15    Q    And you don't have any complaint against the department

16 that they discriminated against you on the basis of race, you

17 never have, obviously?

18    A    Particularly not.

19    Q    With regard to working with Mr. Connor, you indicated

20 you really never had worked with him, you didn't work on the same

21 shift?

22    A    No, sir.

23    Q    You were friends, weren't you?  I mean, ya'll became

24 friends because you visited in-between shifts?

25    A    At work, yes, sir.

1      Q     Did you ever describe Connor as just being the type of

2  person that just tried too hard?

3      A     Yes, I did.

4      Q     And did you ever describe Mr. Connor as being someone

5  who had the nickname "Little Hitler?"

6      A     No, I never described him as that.

7      Q     But you heard that?

8      A     I heard that.

9      Q     Do you remember ever saying to anyone that, in fact,

10  Mr. Connor tried too hard.  In ten minutes he'd get on your

11  nerves, do you remember that?

12     A     Yes, but they weren't put together like that.

13     Q     But you did say that, didn't you?

14     A     Yes, sir.

15     Q     Mr. Nash, you have been criticized through your reports,

16  haven't you, by your supervisors?

17     A     Oh, yes, I have.

18     Q     That's something that happens in the department at the

19  UPD while you were there?  Your reports were criticized?

20     A     Uh-huh.

21     Q     And you corrected them?

22     A     Yes, sir.

23     Q     Did you ever tell your supervisor -- refuse or tell your

24  supervisor, "I'm not going to correct them?"

25     A     No.

1    Q    Now you testified awhile ago that you had heard -- I
2  believe you said you heard Chief Garcia say something to the
3  effect that he would never be a sergeant as long as Chief Garcia
4  was there?
5    A    Yes, sir.
6    Q    Do you remember Chief Garcia saying something to the
7  effect of, "You know he's bad news.  I'm having nothing but
8  problems with him," and then he kind of went off to, "He thinks
9  he's going to be a sergeant," do you remember him making that
10 statement to you, something like that to that effect?
11   A    No, sir.  I don't remember that.
12   Q    Do you remember your deposition being taken in this
13 case?
14   A    Yes, sir.
15   Q    And your deposition was taken August 24th, 2000?
16   A    Yes, sir.
17             MR. RANGEL:  May I approach, Your Honor?  I know
18 I'm not supposed to ask.  I'm sorry.
19             THE COURT:  You are supposed to ask, but only once.
20             MR. RANGEL:  Okay.  I did, thank you, Your Honor.
21   Q    (By Mr. Rangel)  Right there on Page 15.  Sir, if you
22 look at the top of the page there.
23   A    May I tell you something, please?
24   Q    Just -- let's look at this please, sir. You're being
25 asked a question about Chief Garcia and his making any statements

1  with regard to Mr. Connor, correct?  And the question is:  "Was it

2  said and you don't recall the context of any of the other

3  conversation when he made that comment," and what was your answer?

4     A    I can't read this.

5     Q    Oh, do you need glasses?

6     A    Yes, sir.  That's what I was trying to tell you.

7     Q    And you don't have them with you?

8     A    No, sir, I don't.  They're just magnifiers.

9          MR. RANGEL:  Your Honor, that puts me at an extreme

10  disadvantage.

11          MR. SCHULMAN:  Your Honor, I'd be happy to give the

12  witness some magnifying glasses.

13          MR. RANGEL:  Thank you, Mr. Schulman, I appreciate

14  that.  Here you go.  Hopefully you can see.  Can you see now, sir?

15          MR. NASH:  Yes, sir.

16     Q    (By Mr. Rangel)  Okay.  If you look at your answer

17  there, that would be Line 4, Page 15, with regard to what Chief

18  Garcia or what you heard Chief Garcia say?

19     A    Line 4 on Page 15?

20     Q    Yes, sir.

21     A    It was something to the effect of "He's bad news.  I had

22  nothing but problems with him.  And then it kind of went off, he

23  thinks he's going to be a sergeant.  It will never happen as long

24  as I'm here."

25     Q    Something to that effect?

1     A     Okay.  Yes.

2     Q     You remember that now?

3     A     I guess I do.

4     Q     And do you remember Lieutenant Jefferson saying

5  something to the effect of "Poor Joe.  He's never going to get it

6  right and he thinks he's going to be a sergeant," do you remember

7  that?

8     A     I guess, yeah.

9     Q     And Lieutenant Jefferson is African-American as well,

10  just like yourself; is that correct?

11     A     Yes.

12     Q     But you do remember Lieutenant Jefferson saying

13  something to the effect of "Poor Joe, he never gets it right?"

14     A     Yeah.

15     Q     Okay, sir.  You indicated there was a lot of coming and

16  going at the department.  There was a lot of turnover in the

17  department; isn't that correct sir?

18     A     Yes, sir.

19     Q     In fact, I think at the time of your deposition you

20  indicated as far as people who were not sergeants you had probably

21  been there the longest?

22     A     Definitely.

23     Q     Now we heard some questioning about tagging and storing

24  equipment or property that is seized pursuant to a search and

25  seizure, do you remember that line of questioning by Counsel?

1  A  Yes, sir.

2  Q  And you indicated there was no policies, there was no

3 procedures at the department while you were there, at least you

4 didn't know of any?

5  A  No, sir.

6  Q  All right.  You do know though that the normal process

7 of tagging and storing equipment that was seized is that you would

8 get what's there in storage at the police department, the sort of

9 the strips of manila paper, about two inches by four inches, and

10 write down on there what the property was, the particular

11 information, the I.D. number, the property, et cetera?

12  A  Yes, sir.

13  Q  And you're also familiar with the fact that there was a

14 hole punch on the side of that little tag that had a string that

15 went through it, you remember that, sir?

16  A  No, sir.

17  Q  Did you ever I.D. any property that was seized?

18  A  Oh, I've taken property that was seized, and, like I

19 said, I turned it over to the shift sergeant.

20  Q  I see.  So you didn't I.D. it, you didn't tag it,  you

21 never did that yourself?

22  A  Well, it's -- no.

23  Q  You would give it to your sergeant and your sergeant

24 would do it?

25  A  Evidently, because we were instructed to let him have

1    it.

2        Q    Okay.  And if the sergeant wasn't there, well, you just

3    didn't know what to do with it, is that what you're saying, sir?

4        A    You just held it until the sergeant got there.

5        Q    You just held it until the sergeant came back?

6        A    Yes, sir.

7        Q    But you did agree that these tags that you'd write the

8    information on that had hole punches on them that had strings

9    through them?

10       A    Oh, I know what they are.

11       Q    You've seen them?

12       A    I've seen them in other departments.

13       Q    Sure.  And you saw them there at the University Police

14   Department; is that right?

15       A    Very rarely.

16       Q    But you saw them?

17       A    Maybe once.

18       Q    And you knew where you could get those tags, didn't you,

19   sir?

20       A    No.

21       Q    But you never did tag anything, you said earlier?

22       A    No.

23       Q    Do you recall while you were employed at the department

24   hearing Chief Garcia say that he does not hire the people, that he

25   let's -- or he doesn't promote the sergeant, rather, he let's the

1    interviewing board do that, and that he takes the recommendation?

2        A    Yes, sir.

3        Q    You recall that?

4        A    Yes, sir.

5        Q    You do remember him saying that?

6        A    I remember him saying that.

7        Q    Now it's also -- you've made the statement that the

8    opportunities for promotion in the University Police Department

9    were not limited by race or racial discrimination, you've stated

10   that, haven't you, sir?

11       A    To the best of my knowledge.

12       Q    Okay.  Do you remember in your deposition stating that?

13       A    Probably I did.

14       Q    Okay.  Let me direct your attention to Page 55, Line 24.

15   That's Page 55, sir.  Does it refresh your memory?

16       A    Okay.

17       Q    Page 55, Line 24.  I'll read the question and then you

18   read the answer on the next page, sir, okay?  Are you there?

19       A    Yes, sir.  Go ahead.

20       Q    Okay.  "Were the opportunities for promotion in the

21   University Police Department ever limited by race or racial

22   discrimination," what was your answer?

23       A    "Not that I know of."

24       Q    Thank you, sir.  Now with regard to the confiscation of

25   property without a warrant, you're familiar with that, aren't you,

1    sir?

2        A    Yes, sir.

3        Q    The confiscation of property without a warrant is

4    covered by the Penal Code, the Texas Penal Code; isn't that

5    correct, sir?

6        A    Yes, sir.

7        Q    And in fact, when up attend the police academy you're

8    supposed to be familiar with the Texas Penal Code, aren't you?

9        A    Yes, sir.

10       Q    And so if you look at the Texas Penal Code and you've

11   attended classes you're going to know what you need to do in order

12   to confiscate property, you either need to have probable cause,

13   you have to have a warrant, et cetra?

14       A    Yes, sir.

15       Q    You're familiar with that?

16       A    Yes, sir.

17       Q    You've got to know that before you graduate?

18       A    Yes, sir.

19       Q    And you've got to know that before you're certified to

20   be a police officer?

21       A    Yes, sir.

22       Q    And the university cannot make any rules that conflict

23   with that State law, can it?

24       A    They're not supposed to.

25       Q    Right.  So if there are no procedures and policies,

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

1  well, then you look at the Texas Penal Code, correct, sir?

2      A    Yes, sir.

3      Q    And that's something, of course, as a police officer

4  you're supposed to be very familiar with?

5      A    Yes, sir.

6      Q    And that would be the same case with the issue of

7  tagging of property and putting it in a locker, that's covered by

8  the Penal Code as well, sir, isn't it?

9      A    It sure is.

10     Q    Something you studied in school?

11     A    Yes, sir.

12     Q    Something you need to know before you graduate?

13     A    Yes, sir.

14     Q    Something you have to know before you're certified?

15     A    Yes, sir.

16     Q    And that would also relate to the chain of custody of

17 that property, right, sir?

18     A    Yes, sir.  That is exactly right.

19     Q    Now you mentioned this fact about seeing Mr. Quinonez,

20 Sargent Quinonez, Mr. Quinonez now, he's been terminated, correct?

21     A    Yes, sir.

22     Q    Seeing Sargent Quinonez at an intersection, I think you

23 indicated drinking some alcohol?

24     A    Yes, sir.

25     Q    In a University vehicle?

1     **A**    Yes, sir.

2     **Q**    And you said that you informed Lieutenant Jefferson of

3  that; is that correct?

4     **A**    Yes, sir.

5     **Q**    Something you have to remember, right?  I mean, you

6  won't forget that, you know that, don't you?

7     **A**    Yes.

8     **Q**    All right.  Let me direct your attention, if I may, to

9  Page 58, Line 6, of your deposition.  All right.  The question is:

10  "Okay.  The information that you talked about with Sargent

11  Quinonez on Seale Road, was that ever made into a report?  Answer:

12  No, sir," you see that?

13     **A**    Yes, sir.

14     **Q**    So you didn't prepare any kind of report, did you?

15     **A**    No, sir.

16     **Q**    And you didn't present any kind of report to Lieutenant

17  Jefferson, did you?

18     **A**    No, I didn't.

19     **Q**    All right.  And so consequently, did you inform

20  Lieutenant Jefferson or not?

21     **A**    Yes.

22     **Q**    You did, you just told her verbally?

23     **A**    Sure.

24     **Q**    And so if she says you didn't, then she is not telling

25  the truth?

1      A     Pardon me?

2      Q     If she said you didn't do that, then she's not telling

3  the truth?

4      A     Yes, sir.  That is a lie.

5      Q     All right.  With regard to your leaving the department,

6  when did you leave?

7      A     I think 30th of November.

8      Q     And just prior to that time, you had actually been

9  suspended, had you not, sir?

10     A     Yeah.

11     Q     And you had been suspended for a couple of weeks,

12 correct, sir?

13     A     Right.

14     Q     And about two weeks later you resigned, didn't you, sir?

15     A     I sure did.

16     Q     And in fact, weren't you given the option of resigning--

17           THE COURT:  It's been asked and answered.  Move on.

18           MR. RANGEL:  I think that's going to be it, Your

19 Honor.  Thank you very much, Mr. Nash.

20           THE COURT:   Thank you, Mr. Rangel.  Ms. Gilson

21        R E D I R E C T   E X A M I N A T I O N

22 BY MS. GILSON:

23     Q     Mr. Nash, there is nothing improper with taking property

24 from someone with their consent, correct?

25     A     That is right.

1    Q    And that is within your course and scope of your job

2  duties as an officer, if someone gives you consent to take the

3  property and they're the owner of that property, there is nothing

4  wrong with that, correct?

5    A    No, ma'am.

6    Q    And if evidence is -- or contraband is in plain view,

7  there is nothing wrong with taking evidence that is in plain view,

8  correct?

9    A    No, ma'am.

10    Q    In regard to the comment that you heard that

11  Mr. Connor was called "Little Hitler," was that because he liked

12  to follow the policies and the law.

13                MR. RANGEL:  Objection, Your Honor.  That calls for

14  speculation.  That's something for Mr. Connor to testify.

15                MS. GILSON:  I don't think Mr. Connor called

16  himself "Little Hitler."

17                MR. RANGEL:  No, I mean whether he follows the

18  policies and procedures and that's why he's being given that name.

19                THE COURT:  Objection is sustained.

20    Q    (By Ms. Gilson)  Do you know why Mr. Connor was called

21  "Little Hitler?"

22    A    Because of his little mustache and the way he walked.

23    Q    If you were -- there's a difference between correcting a

24  report for say things like typographical errors and spelling,

25  correct?

1        A        Yes, ma'am.

2        Q        And there's a difference being asked to change the
3    content of a report, correct?

4        A        Yes, ma'am.

5        Q        Because as an officer you're held to standards -- that's
6    an official government document, correct?

7                        MR. RANGEL:  Objection.  Leading.

8                        THE COURT:  I'll overrule the objection.  Why don't
9    you finish your question and then we'll let him answer it.

10       Q        (By Ms. Gilson)  Police reports are government
11   documents, correct?

12       A        Yes.

13       Q        And what if any penalties are attached to making an
14   untruthful comment on an official government document?

15       A        You can be prosecuted for making a false statement.

16       Q        As an officer, are you required to follow your orders of
17   your superiors?

18       A        Yes, ma'am.

19       Q        And if a lieutenant gives you an order to do something,
20   you have to follow it, correct?

21       A        Yes, ma'am.

22       Q        If a sergeant gives an order to an officer they have to
23   follow it, correct?

24       A        Yes, ma'am.

25                       MS. GILSON:  Your Honor, may we approach the bench?

1          THE COURT:  Yes.

2          MS. GILSON:  Your Honor, we would like to have

3   evidence admitted to questions regarding the use of Spanish among

4   those people on the promotion board and the exclusion that he felt

5   because they could not speak Spanish.  That is an issue.  They

6   spent all day long talking about the policies and procedures.  The

7   jury should be allowed to weigh all the facts.  There was

8   evidence, also, from Molly Sanchez about the use of Spanish among

9   the supervisors.  The evidence would show that all of the

10  supervisors understood Spanish, that all the supervisors spoke

11  about job duties as supervisors in Spanish.  We think that that

12  would go to show that there was some exclusion of people who do

13  not speak Spanish.

14          MR. RANGEL:  Your Honor, your ruling was correct

15  the first time.

16          THE COURT:  The objection is sustained.

17          MS. GILSON:  Pass the witness.

18          MR. RANGEL:  No further questions, Your Honor.

19          THE COURT:   Mr. Nash, you may step down.

20  Mr. Nash, you are under the rules.  You are not permitted to talk

21  to anyone about the testimony.  Thank you.

22      (At this time, witness was re-examined outside the presence

23                    of the jury)

24          MR. SCHULMAN:  At this time, Your Honor, I would

25  like to offer some evidence outside the presence of the jury, and

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

1   Ms. Gilson will make the examination.

2              THE COURT:  Mr. Nash, come forward, sir, and be

3   seated in the witness box.  You are still under oath, sir.  You

4   may proceed, Ms. Gilson.

5        F U R T H E R   R E D I R E C T   E X A M I N A T I O N

6   BY MS. GILSON:

7        Q    Mr. Nash, while you were employed with the Texas A&M

8   University in Kingsville Police Department as an officer, did you

9   ever feel excluded from the other officers?

10       A    Yes, ma'am.

11       Q    Can you please describe that circumstance.

12       A    Well, there was a lot of Spanish spoken in the

13   workplace.  I don't speak Spanish, okay.  And sometimes it was

14   done very maliciously.  Sometimes it even involved the work, so

15   yeah, I felt excluded.

16       Q    Did Chief Garcia speak Spanish in the workplace?

17       A    Yes, I've heard him speak it in the workplace.

18       Q    Did Sargent Longoria speak Spanish in the workplace?

19       A    Yes.

20       Q    Did Gilbert Gonzalez speak Spanish in the workplace?

21       A    I never -- I heard Gilbert speak Spanish, but it was

22   like he wouldn't talk to me.  It would be like broken Spanish or

23   whatever.

24       Q    What about Hiram Perez, did you hear him speak Spanish?

25       A    I heard him.

1    Q    What about Sargent Bazan?

2    A    Yes.

3    Q    What about Sargent Cavazos?

4    A    Yes.

5    Q    And what about Sargent -- we covered Sargent Longoria.

6  As far as you know, Lieutenant Jefferson understands Spanish,

7  correct?

8    A    She told me that she did, because I went to her with it

9  one time.

10   Q    Based upon your personal knowledge did the persons

11  sitting on the promotion board in 1988 all speak Spanish or

12  understand Spanish?

13   A    Yes.

14   Q    And did the persons sitting on the promotion board in

15  1999 all speak Spanish or understand Spanish?

16   A    Yes.

17   Q    Did you feel like Spanish was necessary in order to

18  participate in certain things within the University Police

19  Department?

20   A    At times I did.

21   Q    And what were those?

22   A    When like all the camaraderie and stuff was going

23  around, you know, some things were said, like I say, that you have

24  no understanding of and they didn't want you to understand it

25  either.

1          MR. RANGEL:  Objection, Your Honor.  How can he

2    know what they wanted to do.  That calls for speculation.

3          THE COURT:  The objection will be sustained.

4     Q    (By Ms. Gilson)  Was there any incident in particular

5    that you base the statement on that they did not want you to know

6    what was being said?

7     A    Well, I can think of one.  Just outright --

8          MR. RANGEL:  Your Honor, he's testifying as to his

9    opinion and once again, what someone else is doing.

10         THE COURT:  Let him testify.  I'll note your

11   objection for the record.

12         MR. RANGEL:  I know, Your Honor.  I need to at

13   least make a record.  I'm sorry, I need to make a record.

14    Q    (By Ms. Gilson)  Go ahead, please.

15    A    There was one incident where Sargent Franco was talking

16   to the other officer that worked on a shift, I can't recall his

17   name right know, but when I walked in they were speaking Spanish,

18   and some of it was an English word here and there.  And I asked, I

19   was like, "Well, what is going on," and Sargent Franco told me,

20   "Oh, don't worry about it."  So I was like, "Okay.  No problem."

21   So all that night I was like, well where is everybody at because I

22   couldn't find anybody.  Okay.  Well, what they had been discussing

23   I found out later was they were going to hold some kind of

24   surveillance in a building, and that's what they were discussing.

25   So I felt really excluded then.  I mean, a patrolman, Chapa, was

1   the other guy he was talking to.  That was the incident right

2   there that really stood out amongst everything because at the same

3   time they practice, "We're a team," you know.  Well, they were a

4   team and I was out on my own, basically.

5        Q    Participation based upon your personal experience was

6   important in regarding the promotions?

7        A    Participation as per what?

8        Q    Participation as within the department of talking about

9   issues and so forth?  I'm sorry, strike that.  Do you believe that

10  the ability to speak Spanish or communicate in Spanish had any

11  effect on a person's ability to promote?

12               MR. RANGEL:  Calls for speculation and it calls for

13  opinion testimony, and it's totally irrelevant to any issue in

14  this lawsuit, Your Honor.

15               THE COURT: You can answer.

16       A    I felt that.

17       Q    (By Ms. Gilson)  Why?

18       A    Because you could be excluded.  A lot of times you

19  didn't really understand what was going on because, like I say,

20  you know, if you don't speak that language and everybody's talking

21  around you, okay.  There were times when people would speak

22  English and I would walk up and all of a sudden it would turn to

23  Spanish, and I'm not used to that.  I'm used to the Spanish

24  language even though I don't speak it.  I'm married to a Hispanic.

25               MS. GILSON:  We have no further questions.

```
 1              MR. RANGEL:  Just a few, Your Honor.
 2          F U R T H E R   R E C R O S S   E X A M I N A T I O N
 3  BY MR. RANGEL:
 4       Q    Hello again, Mr. Nash.
 5       A    Hello.
 6       Q    Now this speaking of Spanish, did it make you feel like
 7  -- that it hindered your opportunities for promotion?
 8       A    It made me fell that way sometimes, yes.
 9              MR. RANGEL:  Okay.  Let me go ahead and I may need
10  to borrow your glasses again.
11              MR. SCHULMAN:  Sure, no problem.
12       Q    (By Mr. Rangel)  Here you go, Mr. Nash.  I'll tell you
13  what page and line.
14       A    Sure.
15       Q    Let me direct your attention to Page 19, Line 20.  And
16  in fact let's start a little bit above that, on Line 13.
17  "Question.  Did you feel excluded when the officers would speak
18  Spanish," and your answer was?
19       A    "I didn't feel excluded until it came to the work part
20  of it."
21       Q    Go ahead, sir.
22       A    "I felt excluded because sometimes the job was being
23  discussed and I had no idea what was going on."
24       Q    And then the question was, "Did that make you feel like
25  that that hindered your opportunities for promotion," answer?
```

1      A      "Well, not as much hindered my opportunities for

2  promotion, but I didn't feel like a part of the team when it was

3  going on."

4      Q      All right, sir.  And you also didn't feel that or don't

5  feel -- didn't feel then and don't feel now that speaking Spanish

6  helped some of the persons with promotions, correct?

7      A      My personal feeling?

8      Q      Yes, sir.

9      A      I felt like you had like a better opportunity.  I didn't

10  know whether it helped or hindered, but --

11      Q      Well, if you've got --

12      A      There was a camaraderie that went along with that.

13      Q      You said it gave you a better opportunity, so are you

14  saying it helped you?

15      A      No, I didn't feel that it helped me because when people

16  are talking around you, okay, and you don't understand what's

17  going on, and they know that you don't know what's going on, you

18  don't feel like part of the team.

19      Q      But I'm not asking you that question.  I asked you, do

20  you think now and did you think when you were at the department

21  that speaking Spanish helped some of the persons with promotions,

22  you didn't, did you?

23      A      I really don't know.  I can't say yes.

24      Q      Well, let me go ahead and direct your attention, if I

25  may, just to refresh your recollection.  Page 20, Line 19.  Let me

1    make sure --

2                    THE COURT:  Do we need to do this?  Is this proper?

3                    MR. RANGEL:  This is the end of it, Your Honor.

4        Q    (By Mr. Rangel)  Line 25.  Hold on just a second.  I'm

5    sorry, it's Page 19, Line 25.  "Question.  Okay.  Based on your

6    observations do think that it helped some of the persons with

7    promotion," your answer?

8        A    Where am I at now, I'm sorry.

9        Q    I'm sorry.  Bottom of Page 19, Line 25?

10       A    19.

11       Q    "Question.  Okay.  Based on your observations do you

12   think that it helped some of the persons with promotions," answer?

13       A    Speaking Spanish?

14       Q    Or if it's --  what was your answer?

15       A    Oh, no.  That was my answer.

16       Q    So your answer was what?

17       A    No.

18                   MS. GILSON:  Your Honor, under the rule of optional

19   completeness, I ask that he go ahead and read the next question

20   and answer.

21                   THE COURT:  You can do that on redirect

22   examination.

23       Q    (By Mr. Rangel)  Now at one time you were married to a

24   Hispanic; is that correct, sir?

25       A    I have been.  I still am.

1        Q    And she speaks Spanish, correct, sir?

2              THE COURT:  Why do we have to go through this.

3   You'll have a chance to cross-examine him if his testimony goes in

4   front of the jury.  I'm just trying to decide whether or not the

5   proper testimony goes to the jury.

6              MR. RANGEL:  I understand, Your Honor.  I just want

7   to make a complete picture.  At what point am I going to be able

8   to offer the other evidence, once this part of it is done, Your

9   Honor?

10             THE COURT:  What other evidence?

11             MR. RANGEL:  With regard to his reasons of -- with

12  regard to the arrest and the reasons why he left.

13             THE COURT:  You want to offer that?

14             MR. RANGEL:  Yes, I do.

15             THE COURT:  Well, why don't you do that now.  This

16  is now evidence that you are objecting to by refusing to admit.

17             MR. SCHULMAN:  Was Your Honor asking if we object

18  to the evidence of his arrest?  We do.

19             THE COURT:  I know that you do.  We're making an

20  offer of it for the record.

21       Q    (By Mr. Rangel)  Mr. Nash, you resigned from the

22  University Police Department effective November 30th, 2000; is

23  that correct, the year 2000?

24       A    Yes.

25       Q    And at that time, prior to that time you actually had

1  been a arrested on campus for having allegedly traded a computer

2  for a half a pound or so of marijuana and $300 cash, those are the

3  allegations?

4      A    Those were the allegations.

5      Q    And you were actually arrested and handcuffed and taken

6  off of the university property?

7      A    Put on TP.

8      Q    And you were placed on suspension because of that

9  arrest, were you not, sir?

10     A    Yes.

11     Q    By Lieutenant Jefferson?

12     A    Well, I don't know if it was Lieutenant Jefferson.

13     Q    And subsequently you were given the option of either

14 resigning or quitting because of that arrest, as well as in

15 related matters, correct, sir?

16     A    Correct.

17     Q    And you opted to go ahead and resign; is that correct,

18 sir?

19     A    Correct.

20          MR. RANGEL:  Your Honor, at this time I would offer

21 just a formal offer, of Defendant's Exhibit 67, 68 -- I'm sorry.

22 66, 67, and 68, which are records relevant to this particular line

23 of testimony.

24          THE COURT:  It will be admitted for the purposes of

25 the offer only.

1       MR. RANGEL:  That's fine, Your Honor.

2       THE COURT:  Now tell me, what is your basis for

3  wanting this evidence admitted?

4       MR. RANGEL:  It essentially goes to his credibility

5  and --

6       THE COURT:  What rule says that an arrest goes to

7  your credibility or what case?

8       MR. RANGEL:  Well, dealing drugs and doing it on

9  campus, and I didn't want to get into the details of it because

10  I'm sure he probably would claim the 5th, and I don't want to go

11  there, but the allegations are that he was on duty, he was on his

12  bicycle, he traded essentially half a pound or so of marijuana and

13  $300 for a computer with a student who was essentially an

14  informant or someone who was assisting the law enforcement

15  authorities, did this on campus during his working hours, and he

16  was arrested.

17       THE COURT:  Explain to me how that relates to his

18  credibility.

19       MR. RANGEL:  Well, Your Honor, that speaks for

20  itself, and that's essentially my argument.

21       THE COURT:  All right.  Now Ms. Gilson, did you

22  have something else?

23       MS. GILSON:  Your Honor, just for the record, I

24  object to the exhibits that defense counsel --

25       THE COURT:  I know you do.

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

1        MS. GILSON:  Not only on the basis that they're not

2    relevant, but because they were not produced through disclosures.

3    In addition I'd asked for all evidence of convictions regarding

4    persons, and nothing was mentioned regarding Robert Nash through

5    discovery.  In regard to follow-up --

6        THE COURT:  It's not a conviction.

7    F U R T H E R   R E D I R E C T   E X A M I N A T I O N

8    BY MS. GILSON:

9    Q    Mr. Nash, do you still have the glasses?  I'm going to

10   go ahead and direct your attention to Page 20, Line 7, and I'm

11   going to ask -- excuse me, Line 6.  In follow-up to the testimony

12   that the defense attorney had you read.  The question was "Or

13   participating in those conversations, what was your answer at Line

14   7?

15   A    "I think participation helped a lot, I do."

16   Q    And in order to participate you need to speak Spanish,

17   correct?

18   A    Sure.

19        Ms. Gilson:  Thank you.  No further questions.  Oh,

20   wait, I have one more question.

21        THE COURT:  All right.  Go ahead.

22   Q    (By Ms. Gilson)  Mr. Nash, after you testified on behalf

23   of Joseph Connor on August 24th, 2000, did your working conditions

24   change after that with the University?

25   A    Yes, ma'am.

1      MR. RANGEL:  Your Honor, this is outside the scope
2  of the formal offer.
3      THE COURT:  Well, it is outside the scope.  Where
4  is this coming from?
5      MS. GILSON:  To show it became hostile once he
6  testified.
7      THE COURT:  He never even tried to offer it during
8  his testimony.
9      MS. GILSON:  If the testimony were to come in
10 regarding the arrest then we would also like to bring that in at
11 that time.
12     THE COURT:  Well, the testimony is not coming in
13 about the arrest.
14     MS. GILSON:  Thank you, Your Honor.
15     THE COURT:  Thank You, Mr. Nash.  You may step
16 down.  Now what is the basis for the objection of Mr. Nash's
17 testimony about Spanish being spoken in the workplace?
18     MR. RANGEL:  Well, to begin with, we discussed
19 this earlier.  The fact that someone is speaking Spanish in the
20 workplace, what does that -- if anything, and this sounds funny
21 being that I'm a Spanish-speaking individual.  Hostile work
22 environment, is that it?  We've got lawsuits in our office where
23 people are trying to say they can't speak Spanish in the
24 workplace, and they get sued for it.  It just make no sense to me
25 getting into these kinds of issues.  What this has to do with is

 1   talking about someone's right to speak Spanish in the workplace.

 2   I mean, we're opening up a can of worms here.  I speak Spanish

 3   sometimes in the workplace with someone who is there, and it

 4   doesn't mean anything.  Someone's going to feel insecure about it,

 5   well, I'm sorry about that, but it's something that just

 6   potentially opens up a can of worms.  It has no relevance to any

 7   of the issues here.

 8              THE COURT:  Ms. Gilson, what is -- what is the

 9   basis?  Why is this relevant and admissable?

10              MS. GILSON:  Your Honor, it goes to show the

11   culture within the police department.

12              THE COURT:  Why is it relevant and admissible that

13   the jury has to decide?

14              MS. GILSON:  Regarding Mr. Connor's position to

15   discrimination.  It is believed that there was discrimination

16   within the promotion of officers.  In that regard, even Sargent

17   Bazan testified that the officers, the supervisors spoke Spanish

18   while in the workplace.  And a lot of times that it was easier for

19   them to understand each other when they spoke Spanish.

20              THE COURT:  Again, it's not an issue that needs to

21   be proved before the jury.  Mr. Connor is using that as a

22   predicate for why he made his complaint to the EEOC.  I'm still

23   having a hard time with it.

24              MR. RANGEL:  It goes back to something that you

25   stated earlier when you made your initial ruling.  And again just

1  awhile ago before you said that it would be okay to have a formal

2  offer, and that is what we're talking about a retaliation claim,

3  and we're not talking about a  --

4             THE COURT:  I know Mr. Rangel, I don't need you to

5  repeat what I said.

6             MR. RANGEL:  That's what it is, Your Honor.  It's

7  totally irrelevant.

8             THE COURT:  Well, the only thing that I can see has

9  happened, and I might change my mind about the admissibility of

10  this kind of testimony -- well, never mind.  I might change my

11  mind later on, but right now I'm going to rule that it's not

12  relevant.

13  (CONCLUSION OF REQUESTED EXCERPT OF PROCEEDINGS, TESTIMONY OF

14                 ROBERT WESLEY NASH, JR.)

15

16

17

18

19

20

21

22

23

24

25

**46**

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
2                        CORPUS CHRISTI DIVISION

3   JOSEPH K. CONNOR                    )
                                        )
4              Plaintiff                )
                                        )
5   v.                                  )    CIVIL ACTION NO. C-00-069
                                        )
6   TEXAS A&M UNIVERSITY-KINGSVILLE,    )
    HUMBERTO GARCIA, INDIVIDUALLY       )
7   AND IN HIS OFFICIAL CAPACITY;       )
    AND ROBERT BAZAN, INDIVIDUALLY      )
8   AND IN HIS OFFICIAL CAPACITY        )
                                        )
9              Defendants               )

10

            I, VERONICA VILLARREAL, Court Reporter in and for
11   the State of Texas, do hereby certify that the above and foregoing
    contains a true and correct transcription of all portions of
12   evidence and other proceedings requested in writing by counsel for
    the parties to be included in this volume of the Reporter's
13   Record, in the above styled and numbered cause, all of which
    occurred in open court or in chambers and were reported by me.
14            I further certify that this Reporter's Record of the
    proceedings truly and correctly reflects the exhibits, if any,
15   admitted by the respective parties.
            I further certify that the total cost for the
16   preparation of this Reporter's Record is $_____ and was paid
    _____ will be paid _____by_____.
17

18            WITNESS MY OFFICIAL HAND this the 6th day of August,
    2001.
19
            _____
20            VERONICA VILLARREAL
            Certified Shorthand Reporter
21            Certification No. 7030
            Expiration Date:  12-31-2002
22
            CERTIFIED REPORTING & VIDEO
23            500 Frost Bank Plaza
            Corpus Christi, Texas 78470
24            Phone:  (361) 883-3400

25